No. 16-15

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DUSTIN JOHN HIGGS,
*Petitioner-Appellant,*
v.

UNITED STATES OF AMERICA,
*Respondent-Appellee*.

_____

On Appeal from the United States District Court
for the District of Maryland
Criminal No. PJM-98-0520, Hon. Peter J. Messitte, U.S.D.J.

_____

**INITIAL BRIEF OF APPELLANT**

Leigh Skipper, Esq.
Chief Federal Defender
Matthew Lawry
Aren Adjoian
Cristi Charpentier
Elizabeth Hadayia
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
5 Roland Mews
Baltimore, MD 21210
410-532-8405

Dated: January 17, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………….iii

PRELIMINARY STATEMENT REGARDING BRIEFING, CITATIONS AND APPENDIX ............................................................................................... ix

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF ISSUES ………………………………………………...2

INTRODUCTION…………………………………………….………......2

STATEMENT OF THE CASE ………………………………………….....5

    Procedural History ……………………………………………...5

    Relevant Facts …………………………………………………..7

    1.     The trial and Victor Gloria's testimony ………………………….7

    2.     Victor Gloria and the Murder of Martrelle Creighton ………….9

    3.     Federal Authorities and the Creighton Murder Investigation……....13

    4.     The Resolution of the Creighton Murder Case ……………….…..18

    5.     The first §2255 proceedings………………………………......19

    6.     Mr. Higgs's Attempts to Obtain the Baltimore Police and Park Police Files …………………………………………………..22

    7.     Mr. Higgs's Motion to Set Aside the District Courts Final Judgment………………………………………………..23

SUMMARY OF ARGUMENT …………………………………….………24

STANDARD OF REVIEW ……………………………………..………….26

ARGUMENT ………………………..…………………………………26

I.   THE DISTRICT COURT ERRED IN SUMMARILY DENYING MR. HIGGS'S CLAIM THAT THE GOVERNMENT COMMITTED FRAUD ON THE COURT…...……………………………………..……….26

   A. Legal Standard Governing Fraud on the Court Claims.................................26

   B. Mr. Higgs Made a Prima Facie Showing of a Fraud on the Court.................29

      1. Mr. Higgs's allegations satisfy the fraud on the court standard..................29

      2. The evidence Mr. Higgs has thus far been able to unearth supports his allegations..................................................................................................37

   C. The District Court Erred in Denying the Rule 60(d) Motion Without Granting Discovery or a Hearing...................................................................39

II.  THE GOVERNMENT DEPRIVED MR. HIGGS OF DUE PROCESS BY WITHHOLDING FAVORABLE, MATERIAL EVIDENCE. ........................45

   A. Legal Standard Governing *Brady* Claims. ......................................................45

   B. The Government Suppressed Favorable Impeachment Evidence.................47

   C. Mr. Higgs Made a Substantial Showing of Materiality. ...............................48

STATEMENT REGARDING ORAL ARGUMENT ……………..……………...48

CONCLUSION………………..…………………………………………..…49

CERTIFICATE OF COMPLIANCE…………………………………………50

# TABLE OF AUTHORITIES

**Federal Cases**

*Banks v. Dretke*, 540 U.S. 668 (2004) ................................................................ 32

*Berger v. United States*, 295 U.S. 78 (1935) ...................................................... 37

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................... 5, 19

*Browder v. Dir., Dep't of Corr.*, 434 U.S. 257 (1978) ...................................... 25

*Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993) ...................................... 27

*Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131 (4th Cir. 2014) ........ 25, passim

*Geo. P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44 (1st Cir. 1995) ................. 27

*Giglio v. United States*, 405 U.S. 150 (1972) ................................................ 19, 46

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ...................................................... 23, 24

*Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, etc.,* 675 F.2d 1349 (4th Cir. 1982) ...................................................................................................... 31

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ...... 6, passim

*Herring v. United States*, 424 F.3d 384 (3d Cir. 2005) ...................................... 27

*Higgs v. United States*, 543 U.S. 999 (2004) ....................................................... 5

*Higgs v. United States*, 543 U.S. 1004 (2004) ..................................................... 5

*Higgs v. United States*, 133 S. Ct. 787 (2012) ..................................................... 6

*Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) .................... 5, passim

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) .................................................. 45, 46

*Kerwit Med. Prods. v. N. & H. Instruments, Inc.*, 616 F.2d 833 (11th Cir. 1980) ...................................................................................................... 27

*Kyles v. Whitley*, 514 U.S. 419 (1995) .................................................... 33, passim

*MacDonald v. MacDonald*, No. 97-7297, 1998 WL 637184 (4th Cir. Sept. 8, 1998) ................................................................................... 40

*Machibroda v. United States*, 368 U.S. 487 (1962) ............................................ 40

*Madonna v. United States*, 878 F.2d 62 (2d Cir. 1989) ...................................... 28

*Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995) ................. 27

*Smith v. Cain*, 132 S. Ct. 627 (2012) ................................................................ 33

*Smith v. Sec'y, Dep't of Corr.,* 572 F.3d 1327 (11th Cir. 2009) ............................ 45

*Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547 (4th Cir. 1999) ................................ 34

*Square Constr. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68 (4th Cir. 1981) ................................................................................................................ 27

*Strickler v. Greene*, 527 U.S. 263 (1999) ........................................................... 45

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................................ 45

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................... 47

*United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013) ....................................... 33

*United States v. Haynes*, 26 F. App'x 123 (4th Cir. 2001) ................................ 7, 8

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) .............................. 5, passim

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) .............................. 6, passim

*United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004) ....................................... 5

*United States v. Higgs*, 2016 WL 3541387 (D. Md. June 29, 2016) ......... 6, passim

*United States v. MacDonald*, No. 97-7297, 1998 WL 637184 (4th Cir. Sept. 8, 1998) ................................................................................. 27

*United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) ....................................... 40

*United States v. Parker*, 790 F.3d 550 (4th Cir. 2015) ........................................ 32

*United States v. Poindexter*, 492 F.3d 263 (4th Cir. 2007) ................................. 25

*Weese v. Schukman*, 98 F.3d 542 (10th Cir. 1996) ............................................. 27

*Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012) ................................................... 33

**Federal Statutes**

28 U.S.C. § 1291 (2012) ........................................................................................ 1

28 U.S.C. § 2241 (2012) ........................................................................................ 1

28 U.S.C. § 2255 (2012) .............................................................................. 3, passim

28 U.S.C. § 2253(c)(1) (2012) ............................................................................... 1

**Other**

Fed. R. App. P. 22(b)(2) ............................................................ 1

Fed. R. App. P. 32(a)(5) ............................................................ 51

Fed. R. App. P. 32(a)(6) ............................................................ 51

Fed. R. App. P. 32(a)(7)(B) ....................................................... 51

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................. 51

Fed. R. Civ. P. 60(d) ...................................................... 1, passim

Fed. R. Civ. P. 60(b)(3) ............................................................ 28

Fed. R. Civ. P. 60(c)(1) ............................................................ 28

Fed. R. Civ. P. 60(d)(3) ............................................................ 27

**PRELIMINARY STATEMENT REGARDING
BRIEFING, CITATIONS, AND APPENDIX**

All emphasis in this brief is supplied unless otherwise indicated. Parallel citations are usually omitted.

Appellant Dustin John Higgs is referred to herein by name or as Appellant. Respondents below, Appellees here, are referred to as "the government."

Appellant is filing an appendix together with this brief. Entries in the appendix are cited as "A," followed by the volume and page number.

The district court's opinion is cited herein as "DCO" followed by its appendix cite.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from a district court order denying a motion for relief from final judgment. Pursuant to Federal Rule of Civil Procedure 60(d), Mr. Higgs sought relief from the district court's order denying his Petition for a Writ of Habeas Corpus. The district court denied relief on June 29, 2016. A-441 (Memorandum Opinion); A-474 (Order). Mr. Higgs timely filed his notice of appeal on August 26, 2016. A-475. Because this is a case in which 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability ("COA") to take an appeal and the district court order denying relief neither granted nor denied a COA, this Court remanded for a COA determination on August 30, 2016. The district court denied a COA on November 11, 2016. A-476 (Memorandum Opinion); A-480 (Order).

Pursuant to Federal Rule of Appellate Procedure 22(b)(2) and Fourth Circuit Local Rule 22(a)(1)(B), Mr. Higgs is filing this brief on the merits and is contemporaneously filing a separate request for a COA. Should the Court grant a COA, it will have jurisdiction under 28 U.S.C. §§ 1291 and 2253. The district court had jurisdiction under 28 U.S.C. §§ 2241 and 2255.

# STATEMENT OF ISSUES

I.      Whether the district court erred in summarily denying Mr. Higgs's claim that the government committed a fraud on the court.

II.     Whether the government deprived Mr. Higgs of due process by withholding favorable, material evidence.

# INTRODUCTION

Victor Gloria was at the scene of two homicides, about two and a half years apart – the shooting deaths of three young women in January 1996 on Route 197 in the Patuxent National Wildlife Refuge, and the stabbing of Martrelle Creighton in July 1998 in the Inner Harbor area of Baltimore, Maryland.  Mr. Gloria was arrested in connection with the Route 197 homicides in October 1998.  After initially denying any detailed knowledge about the Route 197 homicides, he cooperated and gave the federal authorities a statement implicating both Dustin Higgs and Willis Haynes in those murders.  Before he cooperated, the federal authorities had only a tenuous case, and no real evidence as to which of the three defendants had done what on the night of the offense.  After he cooperated, the federal authorities had a strong case of first degree murder against both Mr. Haynes and Mr. Higgs – a case that ultimately resulted in first degree murder convictions for both, and the death sentence of Mr. Higgs.

But there was a fly in the ointment, both for Mr. Gloria and for the government.  After he cooperated, the federal authorities learned that Mr. Gloria

was present at the Creighton homicide, and three of the men who were present implicated Mr. Gloria as the stabber. Mr. Gloria was now a suspect in the Creighton homicide and if he were to be charged in that case, it would surely hurt his status as the key witness in the Route 197 homicides. To be sure, there was evidence pointing both towards and away from Mr. Gloria in the Creighton homicide, but the same could be said with respect to the other suspects. Unlike the other suspects, Mr. Gloria had an ace in the hole – his status as the key witness in the Route 197 homicides.

Once the Baltimore authorities learned of Mr. Gloria's status, there were numerous contacts between the Baltimore authorities and the federal agents and prosecutors in the Route 197 case. And the evidence gives rise to a clear inference that the federal authorities talked to Mr. Gloria, and then passed his version on to the Baltimore authorities – that the other suspects had only implicated Mr. Gloria because they were friends with Mr. Haynes and Mr. Higgs. The Baltimore authorities decided that was good enough for them, and neither interviewed nor charged Mr. Gloria in the Creighton homicide.

None of this was disclosed to the defense at Mr. Higgs's trial. His counsel in post-conviction proceedings under 28 U.S.C. § 2255 got wind of it and filed a *Brady* claim and request for discovery. But the government adamantly denied

there was any truth to it and the district court – relying on the government's representations – denied both the discovery request and the claim.

Years later, Mr. Higgs's counsel finally obtained the Baltimore police files that for the first time provided hard evidence to support the *Brady* claim. Mr. Higgs filed a motion for relief under Fed. R. Civ. P. 60(d), alleging that the government's failure to disclose its role in shielding Gloria from prosecution for murder in Baltimore constituted a fraud on the court. Without further evidentiary development, the district court again denied relief, emphasizing that Mr. Higgs had not *proved* that the federal government's intervention was what led to the Baltimore authorities' decision not to charge Mr. Gloria.

This Court should remand this matter for discovery and an evidentiary hearing. Mr. Higgs has not had the *opportunity* to prove either the full extent of the federal authorities' intervention on behalf of Mr. Gloria, or the full effect that intervention had on the decisions made by the Baltimore authorities. The federal government should not execute Mr. Higgs without giving him the opportunity to do so.

**STATEMENT OF THE CASE**

**Procedural History**

Mr. Higgs was charged with the January 27, 1996 deaths of three women occurring on federal land. On October 11, 2000, Mr. Higgs was convicted by a jury of three counts of first-degree premeditated murder, three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping, three counts of kidnapping resulting in death, and firearms charges. Following a sentencing hearing, the jury recommended that Mr. Higgs be sentenced to death on each of nine death-eligible counts. This Court upheld the judgment on direct appeal, and affirmed the district court's denial of a new trial motion. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ("*Higgs-1*") and *United States v. Higgs*, 95 F. App'x 37 (4th Cir. 2004) ("*Higgs-2*"). The United States Supreme Court denied Mr. Higgs's petitions for writ of certiorari on November 29, 2004. *Higgs v. United States*, 543 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs filed a motion for relief pursuant to 28 U.S.C. § 2255 on November 28, 2005. A-035 (hereafter "2255 Motion"). He also moved for discovery and a hearing with respect to several of the claims alleged in the petition, including a claim under *Brady v. Maryland*, 373 U.S. 83 (1963). On April 7, 2010,

the district court summarily denied the motion, *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) ("*Higgs-3*").  The district court subsequently denied Mr. Higgs's motion for a COA.  ECF No. 561.

Mr. Higgs then sought a COA from this Court on several issues, including his *Brady* claim.  This Court denied a COA on all but one issue, and subsequently denied relief.  *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) ("*Higgs-4*").  The United States Supreme Court denied certiorari on December 10, 2012.  *Higgs v. United States*, 133 S.Ct. 787 (2012).

On December 4, 2014, after receiving previously undisclosed documents from the Baltimore Police Department, Mr. Higgs filed his motion for relief from the district court's judgment, pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d).  A-085 (hereafter "Rule 60(d) Motion").  On June 29, 2016, the district court denied relief without granting discovery or a hearing.  *United States v. Higgs*, 2016 WL 3541387 (D. Md. June 29, 2016) ("*Higgs-5*"); *see* A-441.

Mr. Higgs filed a timely notice of appeal.  A-475.  This Court remanded for the district court to decide whether to issue a COA.  Order of August 30, 2016, Doc. 3.  On November 22, 2016, the district court issued an opinion and order denying Mr. Higgs's request for a COA.  A-477.

**Relevant Facts**

**1.      The trial and Victor Gloria's testimony.**

During the early morning hours of January 27, 1996, Tanji Jackson, Tamika Black, and Mishann Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince George's County, Maryland.  The overview of the government's case is that Willis Haynes, Victor Gloria, and Mr. Higgs spent the evening socializing with the three women but eventually took them to an isolated area of the wildlife refuge where Mr. Haynes shot and killed each woman.[1] *Higgs-1*, 353 F.3d at 289-91.

Victor Gloria was the most significant witness at Mr. Higgs's trial. Although Mr. Haynes was the undisputed killer of all three women, Mr. Gloria testified to a number of damaging facts relating to Mr. Higgs's involvement in the killings.[2]  Mr. Gloria testified, for example, that the three victims were socializing at Mr. Higgs's apartment on the night of the killings with Mr. Haynes, Mr. Gloria, and Mr. Higgs, when Mr. Higgs got into an argument with Ms. Jackson.  *Id.* at

---

[1] The facts set forth in this brief are those that are most relevant to this appeal.  A fuller recitation of the evidence supporting the government's case is set forth in *Higgs-1*, 353 F.3d at 289-95.

[2] Mr. Haynes's and Mr. Higgs's cases were severed for trial.  Mr. Haynes was tried first and although the government sought the death penalty against him, received a life sentence.  *See United States v. Haynes*, 26 F. App'x 123 (4th Cir. 2001), *cert denied*, 535 U.S. 979 (2002).

289-90.  According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed.  *Id.*  Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle.  *Id.* at 290.  Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings.  *Id.*  While other evidence supported Mr. Higgs's presence at the scene, the allegation that Mr. Higgs aided, abetted, or caused Mr. Haynes to commit the killings was unsupported by any evidence other than Mr. Gloria's testimony.[3]

According to one of the trial prosecutors, the government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony.  A-120 (Transcript of Gloria sentencing hearing).  The district court concurred in that assessment.  A-132 (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important

---

[3] Mr. Gloria testified pursuant to a plea agreement, under which he was sentenced to 84 months imprisonment and three years' supervised release for his role in the homicides.  He was impeached on various grounds, including his prior inconsistent statements concerning the homicides and heavy alcohol and drug use on the night of the murders.

thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-1*, 353 F.3d at 289 (noting that "[m]ost of the facts surrounding the murders of the three women were obtained from [Gloria's] eyewitness testimony"); *Higgs-4*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders . . . ."); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in them.").

### 2. Victor Gloria and the murder of Martrelle Creighton.

Following the Route 197 murders but prior to Mr. Higgs's trial, Mr. Gloria was present at the scene of and a suspect in an unrelated homicide in Baltimore.[4] On July 18, 1998, approximately two and a half months prior to Mr. Gloria's arrest in this case, a man named Martrelle Creighton was murdered in the Inner Harbor area of Baltimore.[5] A-136-40. At approximately 2:00 a.m. on July 18, Mr.

---

[4] As is discussed in greater detail below, most of the information recited herein regarding the Baltimore homicide and all of the information regarding federal authorities' involvement in the Baltimore homicide investigation became known to Appellant when he obtained a copy of the Baltimore Police file in 2012 (several years after the district court's final judgment denying habeas relief) through his continuing investigative efforts.

[5] Although law enforcement suspected the involvement of Mr. Gloria in the Route 197 murders early on in their investigation, Mr. Gloria was not arrested until almost three years after the killings, on October 5, 1998. Thus, on the date of Mr. Creighton's murder, Mr. Gloria was not yet in custody.

Creighton was found by police lying on the sidewalk near 301 Light Street, suffering from a single stab wound to the neck. *Id.* Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m. *Id.*

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women. *Id.* One of the groups of men was comprised of Mr. Creighton and his friends. *Id.* The other group of men was comprised of Kevin Miller, twin brothers Keith and Kevin Scott, and Victor Gloria. A-142-44.

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women. A-138. The young women, who did not previously know anyone in Mr. Creighton's group, were not interested. *Id.* Shortly thereafter, the young women began talking with Mr. Gloria's group, whom they also had not known previously. *Id.*

Mr. Creighton apparently became angry that the young women were talking to members of Mr. Gloria's group given that they had been uninterested in talking with Mr. Creighton's group. *Id.* As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group. *Id.* With minor variations, every witness interviewed by Baltimore Police, which included members of Mr.

Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins, gave essentially the same account of the lead up to the stabbing.

At that point, however, the accounts began to differ, with some tending to inculpate Mr. Gloria as the killer and others tending to inculpate Mr. Miller. Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing. A-146. Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad." A-148-49. Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing. *Id.* Mr. White was reinterviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the stabber was "brown skinned," a description more consistent with Mr. Miller. A-153. Mr. White also stated in the second interview that he definitely saw three people involved in the altercation with Mr. Creighton. A-152-53. Mr. White identified the three individuals involved as the Scott twins and Mr. Miller. A-154-55.

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the stabbing and said that he saw both a man matching the description

of Mr. Miller and a "light skin dude" punch Mr. Creighton.  A-160.  Mr. Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop assumed – once he realized that Mr. Creighton had been stabbed – that it was the man matching Mr. Miller's description who did the stabbing.  A-161-62.

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively.  A-164-82.  Both women said that around the time the confrontation between the two groups of men started, they started to walk away and had their backs turned when it began.  *Id.*  Both women also stated that at the beginning of the altercation they turned around to see Mr. Gloria run away and Mr. Creighton and Mr. Miller engage in a brief fistfight in which Mr. Miller punched Mr. Creighton.  *Id.*  Like Mr. White and Mr. Bishop, neither Bailey sister realized that Mr. Creighton had been stabbed.  *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were arrested in connection with the stabbing.  The Scott twins each said that it was Mr. Gloria who stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been stabbed.  A-184-212.  The Scott twins both said that Mr. Gloria punched Mr. Creighton and then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all.  *Id.*

Mr. Miller was arrested and interviewed by police on April 7, 1999. Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away. A-214-32. Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton. *Id.* Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed. *Id.*

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some tended to suggest it was Mr. Miller. All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

**3.     Federal authorities and the Creighton murder investigation.**

The government became aware of Mr. Gloria's involvement in the Creighton murder on February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer. A-237. A handwritten note with that date in the Baltimore Police file lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. *Id.* It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers is the following notation: "JAN '96 –

3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information. *Id.* In other words, the very day that Mr. Gloria was first named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's capital prosecution.

Detective Green had further contact with Baltimore Police the following day, February 3, 1999. On that date, Detective Green retrieved a photographic lineup previously created by the Park Police, which included Mr. Gloria, and provided it to the Baltimore Police. A-239-43.

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office." A-245. Under this notation are two different telephone numbers. *Id.* Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197. A-247-51.

At some point, a member of the Baltimore Police Department traveled, or at least planned to travel, to the office of the United States Park Police, presumably in

14

order to meet with a Park Police officer regarding Mr. Gloria.  *See* A-252 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that, not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with Assistant United States Attorney Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the government during Mr. Higgs's § 2255 proceedings.  A-255.  The note recounting the Johnston-Cohen conversation, authored by Mr. Cohen on April 12, 1999, indicates that Ms. Johnston suggested to Mr. Cohen that Mr. Miller and the Scott twins might be falsely implicating Mr. Gloria.[6]  *Id.*  The note also shows that Mr. Cohen, the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was inclined to charge Mr. Gloria, but deferred his decision until after he received "background" information from federal agents regarding the unrelated investigation into the Route 197 homicides.  *Id.*  Mr. Cohen's note states in full:

---

[6] The note is addressed to "Bobby," presumably Baltimore Homicide Detective Robert Patton, who authored a number of reports relating to the investigation.

Bobby

    Re Victor Gloria

1  I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99.  She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed.  The two Co-Δ's Willis Haynes + Dustin Higgs have trial date of 2-7-2000.  Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-Δ.

2  AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are blaming Gloria because they are friends of Δ's in her case especially Haynes.  She suggested we talk to

    ①   Joe Green Park Police

        B - [phone number]

    ②   Brad Sheafe - FBI

        B - [phone number]

    -they could give us background on case

3  After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.

4  Please call me

Mark Cohen

*Id.*

While Mr. Cohen reported that the United States Attorney's Office could not disclose whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because Mr. Gloria's plea agreement was sealed, the reluctance to share this information was apparently short-lived.  In a report dated April 21, 1999,

Baltimore Police Detective Robert Patton noted that "[p]er the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller." A-257 (text reproduced as it appears in original). Detective Patton's report continues by noting that the United States Attorney's Office conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely implicating him as a form of retaliation due to their friendship with Mr. Haynes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

A-258 (text reproduced as it appears in original).[7]

---

[7] Kevin Miller and the Scott brothers were not implicated in the Route 197 murders. As the district court found, "It seems highly doubtful that AUSA Johnston would have known through the course of the *Higgs/Haynes* investigation that Haynes and Higgs knew the Scott twins and Miller and therefore was able to deduce the Scotts and Miller were conspiring against Gloria on behalf of Haynes/Higgs. . . . As Higgs suggest, then, it seems plausible that the AUSA's

The report then notes that:

Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

*Id.* (text reproduced as it appears in original).

### 4. The resolution of the Creighton murder case.

The Baltimore authorities charged Mr. Miller and each of the Scott twins with first degree murder. A-260-62. Mr. Gloria was the only member of the group not charged with first degree murder; he received no charges at all arising from this incident.

The Scott twins both entered pleas to second degree assault and were sentenced to time served. A-264-68. They were released from custody on August 30, 1999, having served approximately seven months in jail. *Id.* Mr. Miller pled

knowledge of the friendship and theory of the conspiracy came from her questioning Gloria himself about the Creighton murder." DCO, A-466 n.12.

guilty to second degree murder, but pursuant to a negotiated plea agreement he received an extraordinarily low sentence, given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended. A-271. This five-year sentence was made concurrent to any other sentence, with credit for time already served. A-273-75. Mr. Miller also received three years of probation upon release. *Id.* The sentencing judge (Quarles, J.) justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved." A-273.

Mr. Miller did not serve his full five-year term; he was released from prison in July 2002, three years and three months after he was first arrested. A-277.

### 5. The first § 2255 proceedings.

During the course of their investigation for the § 2255 proceedings, Mr. Higgs's counsel learned that Mr. Gloria had been a suspect in a Baltimore murder, and that he likely was not prosecuted in that case because he was to be the star witness in federal capital cases against Mr. Higgs and Mr. Haynes. In light of that information and because Mr. Gloria's involvement in the Baltimore homicide was not disclosed to trial counsel, Mr. Higgs alleged that the government had not turned over all of the material relating to Mr. Gloria that it was required to under

19

*Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore. 2255 Motion, A-050. Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government, "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case," and that the government's failure to disclose this consideration violated Mr. Higgs's due process rights. *Id.*[8]

In the § 2255 proceedings, Mr. Higgs moved for discovery, including *Brady* material. A-053. In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement in the Baltimore homicide. A057-58. Mr. Higgs requested any information in the possession of the Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or non-prosecution for the above described homicide." A-058. Mr. Higgs also made a more general request for "all relevant and exculpatory witness and law enforcement statements" not previously provided. A-060.

---

[8] Pretrial, the defense and the government had entered into a discovery agreement, under which the government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial, and other *Brady* material "if and when discovered." A-279-80.

The government did not disclose the facts that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton; that federal authorities had been in contact with state authorities responsible for the Baltimore murder investigation; or that Mr. Gloria was not charged in the Baltimore homicide, following the federal authorities' intervention.

In its response to Mr. Higgs's § 2255 motion, the government made several materially false and/or misleading representations. The government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials." A-082. The government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions." *Id.* The government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial." A-080. The government also resisted Mr. Higgs's discovery and *Brady*/*Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." A-066.

AUSA Johnston, who, as noted, was in direct contact with the Baltimore authorities prior to Mr. Higgs's trial, signed the government's opposition to the § 2255 motion, as well as the government's opposition to the discovery motion. A-069, 071.

Relying in part on the government's representations, the district court denied the *Brady* claim relating to Victor Gloria, as well as Mr. Higgs's request for discovery. *Higgs-3*, 711 F. Supp. 2d at 507-09, 557.

**6. Mr. Higgs's attempts to obtain the Baltimore Police and Park Police files.**

During the original § 2255 proceedings, Mr. Higgs sought, through investigative efforts and discovery requests, to obtain documentary evidence about Mr. Gloria's involvement in the Creighton homicide and the federal government's intervention in that case. Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation. A-052. Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-page summary report and the government opposed Mr. Higgs's § 2255 discovery requests, which the district court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request. Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report,

they responded to his second written request by turning over their investigative file, with some information redacted.[9] Mr. Higgs came into possession of the file in September 2012.

Since 2012, Mr. Higgs has also been trying to obtain a copy of the United States Park Police file relating to the murders on Route 197, via the Freedom of Information Act ("FOIA") and discovery. After lengthy delays and administrative appeals relating to his FOIA request, Mr. Higgs filed a FOIA lawsuit, which is pending in the Southern District of Indiana. *Higgs v. United States Park Police*, No. 2:16-cv-00096-JMS (S.D. Ind.). Mr. Higgs has recently received some, but not all, of the Park Police file during the course of the FOIA litigation.

### 7. Mr. Higgs's motion to set aside the district court's final judgment.

On December 4, 2014, Mr. Higgs filed his Rule 60(d) Motion and a renewed motion for production of exculpatory evidence and for discovery. A-085 (Rule 60(d) Motion); A-285 (Renewed Discovery Motion). The Rule 60(d) Motion argued that, in light of the information that has thus far come to light regarding the Creighton murder investigation and federal authorities' involvement therein, the government's representations made during the original § 2255 litigation in

---

[9] There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

response to Mr. Higgs's *Brady* claim were materially false. A-085-112. The

motion further argued that because all aspects of the district court's original ruling

on the *Brady* claim were affected by the government's misrepresentations, the

original judgment denying habeas relief should be set aside under Rule 60(d)

pursuant to the fraud on the court doctrine.[10] *Id.* The motion argued that while the

district court should grant relief on the existing record, at a minimum it should hold

a hearing on the motion, given that as-yet undisclosed evidence and testimony will

likely provide further support for Mr. Higgs's allegation that Baltimore authorities

were influenced in their charging decision by the intervention of federal

authorities. *Id.*

The district court denied the Rule 60(d) Motion without granting an

evidentiary hearing and denied the renewed discovery request. DCO, A-459-72.

## SUMMARY OF ARGUMENT

Victor Gloria was the key witness at Mr. Higgs's trial. What the

government knew, but neither the defense nor the jury knew, was that Mr. Gloria

---

[10] As the district court found, the Rule 60(d) Motion is not barred by the prohibition on "second or successive" § 2255 petitions absent appellate court permission. *See* 28 U.S.C. 2255(h); DCO, A-457 n.5 (ruling that "if a Rule 60(b) motion 'attacks . . . the integrity of the federal habeas proceedings,' rather than the outcome of those proceedings, it is not a habeas corpus application and does not require pre-filing authorization.") (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005)). The government did not dispute this point below.

had also been a suspect in a separate murder case until the government – acting as a conduit for information likely provided by Mr. Gloria himself – intervened and convinced the local authorities in that case not to charge Mr. Gloria.

In the original proceedings under 28 U.S.C. § 2255, Mr. Higgs's counsel alleged what they knew about these events, and sought discovery of additional information. The government adamantly denied that there was any truth to the allegations, persuading the district court to deny discovery and relief.

Mr. Higgs presented a prima facie case that officers of the court representing the government made material misrepresentations of the facts to the district court in the original proceedings under 28 U.S.C. § 2255, constituting a fraud on the court. Mr. Higgs also presented a prima facie case that the original failure to disclose these facts violated due process under *Brady v. Maryland*. Nevertheless, the district court again summarily denied relief, without allowing any evidentiary development. This Court should reverse and remand for discovery and a hearing, to give Mr. Higgs the opportunity to prove that the government's actions resulted in a fraud on the court, and that he is entitled to relief from his convictions and death sentences.

A district court's ruling on a Rule 60 motion is reviewed for an abuse of discretion, *Browder v. Director, Dep't of Corr.*, 434 U.S. 257, 263 n.7 (1978), but legal errors in the application of the fraud on the court doctrine are reviewed *de novo*. *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014). Because the district court denied relief without a hearing, the facts are reviewed "in the light most favorable to the movant." *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN SUMMARILY DENYING MR. HIGGS'S CLAIM THAT THE GOVERNMENT COMMITTED FRAUD ON THE COURT.**

### A. Legal Standard Governing Fraud on the Court Claims.

Federal Rule of Civil Procedure 60(d)(3) vests in courts the power to "set aside a judgment for fraud on the court." The fraud on the court doctrine derives from the United States Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In *Hazel-Atlas*, the Court set aside a fraudulently obtained ruling after finding one of the parties both procured and presented false evidence and made misrepresentations to the district court. *Id.* at 239-43. As the Court described it, the fraud was the product of a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of

the judicial process." *Id.* at 245-46. The Court set aside the ruling where the fraud perpetrated "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.* at 246.

This Circuit has discussed the fraud on the court doctrine in additional depth. It recently made clear that fraud on the court within the meaning of *Hazel-Atlas* "is not your 'garden-variety fraud.'" *Fox*, 739 F.3d at 135 (quoting *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)). Instead, the rule applies to situations "in which the integrity of the court and its ability to function impartially is directly impinged." *Id.* at 136 (quoting *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)). A party that alleges "ordinary" fraud as a basis for setting aside a final judgment typically must move for relief under Fed. R. Civ. P. 60(b)(3), which requires that a motion be filed within one year of the entry of the final judgment. *Id.*; *see also* Fed. R. Civ. P. 60(c)(1). But, "as often happens with a rule, there is an exception." *Fox*, 739 F.3d at 135. The "savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for

27

'fraud on the court.'" *Id.* at 135-36. Rule 60(d)(3) fraud is the type of fraud with which *Hazel-Atlas* is concerned.[11]

A party alleging fraud on the court must establish his claim by clear and convincing evidence. *Square Const. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981). However, when as here the issue is whether the party alleging fraud is entitled to an evidentiary hearing, he should be granted one if the facts he alleges, assumed to be true, would entitle him to relief. *United States v. MacDonald*, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8, 1998) (unpublished) (district court could only deny evidentiary hearing on Rule 60(d) motion "if, assuming the new facts MacDonald asserts to be true, such facts could

---

[11] While some circuits have adopted multi-factor tests for establishing fraud on the court, *see, e.g.*, *Herring v. United States*, 424 F.3d 384, 386 (3d Cir. 2005) (four factor test); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (five factor test), those courts and all others agree that the critical feature of fraud on the court is the commission of misdeeds by an officer of the court. *See, e.g.*, *Reintjes*, 71 F.3d at 47-48; *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) ("One species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court of jury to impartially judge a case."); *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("[F]raud on the court should 'embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication.'") (quoting 7 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 60.33, at 60-360 (2d ed. 1987)); *Kerwit Med. Prods., Inc., v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

not establish fraud by clear and convincing evidence") (citing *Madonna v. United States*, 878 F.2d 62, 64-65 (2d Cir. 1989)); *see also Madonna*, 878 F.2d at 64-65 ("[F]or the purpose of refuting a motion for judgment on the pleadings . . ., the nonmoving party need not meet [the clear and convincing evidence] burden of proof at the threshold; it is enough to allege facts which, when assumed to be true, would amount to fraud on the court.").

## B. Mr. Higgs Made a Prima Facie Showing of a Fraud on the Court.

Mr. Higgs's allegations regarding the government's conduct during Mr. Higgs's § 2255 proceedings satisfy the standard for fraud on the court set forth in *Hazel-Atlas* and *Fox*. Mr. Higgs's allegations, in tandem with the evidentiary support he has thus far been able to unearth, entitle him to an evidentiary hearing to prove the alleged fraud by clear and convincing evidence.

### 1. Mr. Higgs's allegations satisfy the fraud on the court standard.

As Mr. Higgs alleged below in support of the Rule 60(d) Motion, in response to Mr. Higgs's very specific *Brady* claim made during § 2255 proceedings, the government offered misrepresentations intended to cover up its own past misconduct and persuade the district court to uphold a death sentence. The government was not faced with a vague allegation that it failed to turn over all available *Brady* evidence; it was faced with a precise claim that Victor Gloria was

a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government. It is now virtually certain that these allegations are accurate. But the government flatly denied them during Mr. Higgs's § 2255 proceedings.

If, as Mr. Higgs has alleged, Baltimore authorities decided not to charge Mr. Gloria with murder due to the intervention of federal authorities, the government's representations during § 2255 proceedings that no such benefit was conferred were fraudulent. By the time the government filed its opposition to Mr. Higgs's habeas petition, it had been aware for years that its star witness, Victor Gloria, received a tremendous benefit as a result of the interactions between the state authorities and the federal authorities regarding the Creighton homicide, but nonetheless denied the existence of this benefit in multiple pleadings. Such a course of action represents a "deliberately planned and carefully executed scheme" to defraud the district court that undermined the "integrity of the judicial process." *Hazel-Atlas*, 322 U.S. at 245-46. Because the conduct involved the suppression of evidence both at trial and again during habeas proceedings, it caused a "subversion of the legal process . . . that we cannot necessarily expect to be exposed by the normal adversary process." *Great Coastal*, 675 F.2d at 1357.

The government's gambit during the § 2255 proceedings was successful. The government's misrepresentations induced the district court to rule that Mr. Higgs's constitutional claim failed because "pure speculation about supposed benefits cannot substitute for hard facts," and because "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *Higgs-3*, 711 F. Supp. 2d at 508. The district court would not have made such a ruling had it been aware that a direct causal connection in fact existed. In other words, the "[p]roof of the scheme, and of its complete success up to this date, is conclusive." *Hazel-Atlas*, 322 U.S. at 246.

In addition to holding that Mr. Higgs could not establish a causal connection between federal authorities and the decision not to prosecute Mr. Gloria for the murder in denying the *Brady* claim, the district court also held that Mr. Higgs could not demonstrate prejudice. *Higgs-3*, 711 F. Supp. 2d at 508-09. Here, too, the district court's ruling was impacted by the government's fraud.

The lynchpin of the district court's materiality analysis was that Mr. Gloria was so thoroughly impeached that no further impeachment of him could have made any difference. *Id.* That conclusion would have been undermined by the Creighton murder evidence for several reasons.

31

First, it is impossible to overstate the importance of Mr. Gloria to the government's case.  As this Court noted on direct appeal, "Most of the facts surrounding the murders of the three women were obtained from [Mr. Gloria's] eyewitness testimony." *Higgs-1*, 353 F.3d at 289 n.1; *see also id.* at 313-14 (evidence of kidnapping, felony murder, and premeditated murder is all derived from Mr. Gloria's testimony).  While this Court noted that Mr. Gloria's testimony was "partially corroborated," *id.* at 289 n.1, by evidence associating the decedents with a car of the type driven by Mr. Higgs, that evidence by itself would have been insufficient to charge Mr. Higgs with any crime, let alone prove his guilt of kidnapping and murder, as the government has admitted.  A-120 (argument of AUSA Johnston at Mr. Gloria's sentencing hearing that "the government could not have proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria").  *See also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (where eyewitness's "testimony was the *only* evidence linking [the defendant] to the crime," impeaching statements "were plainly material"); *Kyles v. Whitley*, 514 U.S. 419, 444 (1995) ("The likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses."); *Wolfe v. Clarke*, 691 F.3d 410,

424 (4th Cir. 2012) (materiality of impeachment evidence is "manifest" where jury had to believe witness to support petitioner's conviction).

Second, given the importance of Mr. Gloria's testimony, the jury must have credited that testimony, regardless of trial counsel's attempts to impeach his credibility.

Third, the assertion that additional impeachment of Mr. Gloria would not have made any difference is both legally and factually erroneous. As a legal matter, courts have frequently rejected such arguments when reviewing *Brady* claims. *See, e.g.*, *Banks v. Dretke*, 540 U.S. 668, 702 (2004) (rejecting argument that because witness "was heavily impeached" at trial, his status as an informant would have been "merely cumulative"); *United States v. Parker*, 790 F.3d 550, 562 (4th Cir. 2015) (impeachment value of information known to defendants was far less than fact that witness "may have been testifying in an effort to receive favorable treatment from the government"); *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 561 (4th Cir. 1999) (rejecting argument that additional impeachment evidence was not material because witness "had already been impeached with evidence of his prior convictions, as well as the extremely favorable terms of his plea agreement").

And as a factual matter, the district court's materiality ruling understates the value of the undisclosed impeachment material and overstates the degree to which Mr. Gloria was actually impeached at trial. While there are cases in which additional impeachment, even of a crucial witness, is so cumulative of evidence already presented that it is immaterial because it "would have provided only marginal additional support for [the] defense," *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013) (citations and quotation marks omitted), this is not such a case. Here, the suppressed impeachment evidence was different in force and in kind from the impeachment developed at trial.

While the district court pointed out that at trial, Mr. Gloria was revealed to have an "extensive criminal history" and to be thoroughly self-serving, *Higgs-3*, 711 F. Supp. 2d at 508-09, the suppressed evidence gave him an additional motivation – of which the jury was not aware – to curry favor with the government. That motivation was to escape being charged with first degree murder, the most serious charge one can face. That additional, powerful motivation was not merely cumulative of the impeachment conducted at trial.

And this information would have had broader implications. A jury informed that Mr. Gloria may have committed a separate homicide would have had stronger grounds to question Mr. Gloria's true role in the instant case. The evidence that

Mr. Higgs had a motive to kill the decedents came solely from Mr. Gloria, as did the account of the actions of Mr. Higgs and Mr. Haynes. Aside from what it heard from Mr. Gloria on the witness stand, the jury had no way of knowing who did what on the night in question. A jury that knew of the benefit conferred on Mr. Gloria with respect to the Creighton homicide could reasonably have questioned whether Mr. Gloria himself had a greater role in the Route 197 homicides than he claimed, and thus that Mr. Higgs had a lesser role.

The jurors could also have reasonably questioned whether the government was truly seeking justice or was following a win-at-all-costs approach. It is well recognized that evidence that could cause the jury to question the "thoroughness and even the good faith of the investigation," *Kyles*, 514 U.S. at 445, is especially powerful and material. No such evidence was developed at trial, because it was suppressed by the government.

Finally, the district court overstated the degree to which Mr. Gloria's testimony was impeached at trial. Although the district court stated that "any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility," DCO, A-470, that view was not shared by this Court. This Court's assessment of Mr. Gloria was that his "eyewitness testimony provided

compelling and convincing details of the events of that evening and of Higgs's involvement in them." *Higgs-4*, 663 F.3d at 741. The fraud at issue here thus meets both this Court's more general formulation and its sister circuits' more specific tests. During Mr. Higgs's § 2255 proceedings, (1) an Assistant United States Attorney; (2) made intentional misstatements; (3) directed to the court itself; (4) that in fact deceived the court in its adjudication of Mr. Higgs's claim.

Moreover, as in *Hazel-Atlas*, the government's misdeeds here "involve[d] far more than an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246. The federal government's intrusion into the business of the Baltimore City State's Attorney's Office has affected numerous individuals involved with Mr. Creighton's murder. The Baltimore Police, without the outside pressure applied to it by federal authorities, likely would have come to the conclusion that Mr. Gloria was culpable in Mr. Creighton's killing. As such, not only did Mr. Miller and the Scott twins unfairly take the blame for the killing, but Mr. Creighton's friends and family members were deprived of justice for their loved one.

More globally, the fraud here constitutes "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246. The "United States Attorney is the representative not of an

ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The United States Attorney "is in a peculiar and very definite sense the servant of the law." *Id.* While "[s]he may strike hard blows, [s]he is not at liberty to strike foul ones." *Id.*

The attempt by an officer of the United States government to secure a citizen's execution by deception certainly "touch[es] on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136. As such, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," and this Court should remedy the injustice. *Hazel-Atlas*, 322 U.S. at 246.

### 2. The evidence Mr. Higgs has thus far been able to unearth supports his allegations.

Additional evidence remains to be developed at an evidentiary hearing, particularly given that (1) Mr. Higgs has obtained access to files maintained by the Baltimore authorities, but only a portion of those maintained by the federal authorities, and (2) evidence that would support his motion (e.g., any in-person discussions that the Baltimore authorities had with the Park Police, *see* A-253) was

likely not reduced to writing and placed in a file. Still, Mr. Higgs succeeded in supporting his allegations with substantial evidence.

As noted in the Statement of the Case, multiple federal officials were in direct contact with state officials during the pendency of the Creighton murder investigation. This included the chief homicide prosecutor for the Baltimore City State's Attorney's Office, ASA Cohen, who was in direct contact with AUSA Johnston, the federal trial prosecutor. AUSA Johnston offered ASA Cohen her opinion that the witnesses who identified Mr. Gloria as the stabber were lying in order to frame him. A-258. Further, as noted in the Statement of the Case, there is a clear inference that AUSA Johnston's opinion was based at least in part on information provided by Mr. Gloria himself. While we do not know the content of any conversations between the federal authorities and Mr. Gloria, that is all the more reason why discovery and an evidentiary hearing were necessary.

ASA Cohen made clear immediately following this conversation that his charging decision would be deferred pending the receipt of "background" information on Mr. Gloria from federal officials. A-255. It is difficult to conceive of any "background" the government possibly could have provided to state authorities that would have legitimately aided them in their deliberative process; the government has not provided any insight throughout the course of this

litigation.  In the absence of any meaningful response or attempt to explain, the only logical conclusion is that this "background" consisted of the government informing state authorities that Mr. Gloria was a vital witness in Mr. Higgs's prosecution and that this information influenced state authorities.

Mr. Higgs has also pointed to irregularities in the Baltimore investigation, including the fact that Baltimore Police did not interview Mr. Gloria, despite the fact that he was identified as the stabber by multiple eyewitnesses.  The evidence that Mr. Higgs has been able to unearth without the benefit of discovery or an evidentiary hearing supports his allegations and demonstrates that this claim deserves encouragement to proceed further.

### C. The District Court Erred in Denying the Rule 60(d) Motion Without Granting Discovery or a Hearing.

In summarily denying Mr. Higgs's Rule 60(d) Motion, the district court did precisely the opposite of what is required by this Court's law: it resolved disputed, material facts in favor of the party moving for summary judgment without granting discovery or holding a hearing.  Indeed, the district court repeatedly made clear that it denied relief because it believed the government's position to be more probably true.  And it did so while considering the evidence and all reasonable inferences in the light most favorable to the government.  Under the governing law regarding summary dismissal, the district court was required to assume that Mr.

Higgs's allegations *are all true*, while considering the evidence in the light most favorable to him. *MacDonald*, 1998 WL 637184 at \*2; *see also Machibroda v. United States*, 368 U.S. 487, 495-96 (1962) (district court was required to hold hearing where, if the movant's allegations were true, he was entitled to relief); *accord United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992). At no point did the district court acknowledge these requirements, let alone suggest that it was following them. This Court should remand the case and instruct the district court to hold a hearing to resolve the disputed material facts at the center of this claim.

The essence of Mr. Higgs's claim is that in light of the evidence pointing to Mr. Gloria, the repeated contacts between state and federal officials during the course of the Creighton murder investigation, the peculiarities surrounding that investigation (e.g., the fact that Baltimore Police did not interview Mr. Gloria as a witness), and the fact that ASA Cohen made clear that he would take federal input into account before deciding whether to charge Mr. Gloria, Mr. Gloria received a benefit by not facing a murder charge he otherwise would have faced. As a result, the government's claims made during § 2255 proceedings denying that any such benefit was conferred constituted a fraud on the court.

In light of these circumstances, Mr. Higgs alleged that the investigative reports found in the Baltimore Police file cannot simply be taken at face value in

order to defeat the claim, as the investigation and conclusions of Baltimore authorities would have looked very different had federal authorities not intervened. Because further fact development – particularly witness testimony, given that the only information thus far available is that which was reduced to writing – is required in order to adjudicate the claim, Mr. Higgs requested that a hearing be granted.

Instead of treating Mr. Higgs's allegations as true for the purposes of determining whether summary dismissal was appropriate, the district court simply adopted the government's interpretation of the existing record in all respects:

> The reasonable inference from all the foregoing is that AUSA Johnston's suggestion of collusion among the Scott twins and Miller with regard to their statements merely helped solidify the BPD in their own theory of the case, rather than amounting to federal pressure that changed the course of the Creighton murder probe. Patton's own words in his April 1999 Report say it all: professing his belief that Johnston was "on track with [her] assumption" about the Creighton suspects, Patton told his superiors that his conclusion was supported by "information that Victor Gloria ran from the scene prior to the stabbing" and eyewitnesses who "identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation."

DCO, A-466.

Moreover, instead of viewing the facts and making all inferences in the light most favorable to Mr. Higgs, the district court did the opposite. In particular, the district court made this error regarding ASA Cohen's note detailing his thought

41

process. As Mr. Higgs argued below, the most reasonable inference to be drawn from ASA Cohen's statement that "[a]fter we talk to these [federal] officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case," is that the Baltimore State's Attorney's decision was relying on information received from federal authorities to make a final decision regarding whether or not to charge Mr. Gloria. There is no obvious reason for Baltimore authorities to have spoken to federal authorities otherwise.

Instead of making this straightforward inference in favor of Mr. Higgs, the district court made the much more strained inference in favor of the government that the note demonstrates that "ASA Cohen was still contemplating charging Gloria" even after discussing the case with AUSA Johnston and learning that Gloria was a witness in the federal trial. DCO, A-467.[12] This inference was particularly problematic in light of the fact that we still do not know what additional contacts took place that may have affected ASA Cohen's thinking.[13]

---

[12] It is equally apparent from ASA Cohen's note that Baltimore authorities were "still contemplating" charging Mr. Gloria with murder even after the Bailey sisters told Baltimore Police that Mr. Gloria ran away at the beginning of the fight. The district court did not acknowledge this fact.

[13] Curiously, the district court held this gap in the record against Mr. Higgs. *See* DCO, A-469 n.13 (noting that "[t]here is no direct evidence in the record" that anyone followed up on ASA Cohen's direction to contact federal authorities). Mr. Higgs sought discovery and a hearing precisely in order to place such direct

And as a general matter, the district court repeatedly discounted the evidence pointing to Mr. Gloria as the killer while ignoring weaknesses or ambiguity in the evidence pointing to Mr. Miller as the killer. For example, it provided a laundry list of reasons as to why Baltimore Police may have disbelieved Mr. Miller's and the Scotts' eyewitness accounts inculpating Mr. Gloria. DCO, A-465-66. But it dismissed as "beside the point" the fact that both of the Bailey sisters had their backs turned to the fight as it began, because the district court stated that its inquiry was "not to determine Gloria's actual guilt or innocence, but instead whether the evidence tends to show that the BPD came to their own independent conclusion not to charge Gloria at the time." DCO, A-465 n.8.

What is more, even while ignoring the thrust of Mr. Higgs's claim and improperly viewing the evidence in the light most favorable to the government, the district court found only that the government's interpretation of the documents was probably true, rather than that it was conclusively established. The district court ruled, for example, that:

---

evidence in the record. Given the current state of the record, which includes numerous handwritten notes in the Baltimore Police file with various federal authorities' phone numbers and handwritten driving directions from Baltimore to the United States Park Police Office, it is highly likely that direct evidence of further contacts will be developed at a hearing.

As noted, to prevail on his 60(d) Motion, Higgs must prove by clear and convincing evidence that the Government's § 2255 response to this Court fraudulently denied the fact that Baltimore authorities decided not to charge Gloria at the behest of the federal prosecutors. He has not done so.  On the contrary, *it is far more likely, as the Government has it*, that throughout its investigation the BPD suspected Miller, not Gloria, was Creighton's killer, and that the Baltimore City State's Attorney's Office ultimately chose not to prosecute Gloria because of the lack of evidence that he was involved, especially in the fact of strong evidence pointing to Miller.

DCO, A-464; *see also id.* at 464 n.7 ("Later testimony indicating Gloria fled before the fight is consistent with this initial report; *quite possibly, then,* this would have made the BPD more inclined to believe the fight involved Miller, the Scott twins, and Creighton . . . ."); *id.* at 465-66 ("[T]he BPD had independent reason to doubt the accuracy and reliability of these statements [implicating Gloria] in comparison to the independent statements implicating Miller, again making it *more likely* that the decision not to charge Gloria was based not on federal intervention, but on the Baltimore authorities' own assessment of [the] strength of the evidence in their case.") (footnote omitted).

The district court's denial of the Rule 60(d) Motion cannot be sustained in the absence of further fact development.  This Court should reverse and remand for discovery and a hearing on the motion.

## II. THE GOVERNMENT DEPRIVED MR. HIGGS OF DUE PROCESS BY WITHHOLDING FAVORABLE, MATERIAL EVIDENCE.

The district court did not meaningfully address the merits of the *Brady* claim. For the reasons set forth in the separately filed Request for Certificate of Appealability, this Court should grant a COA on the *Brady* claim. Having done so, this Court should remand for a hearing at which the district court can assess, on a developed record, both the fraud on the court allegations and the *Brady* claim. Here, we briefly set forth the merits of the *Brady* claim based on the existing record.

### A. Legal Standard Governing *Brady* Claims.

The three essential elements of a *Brady* claim are as follows: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422 (citation omitted).

Evidence that a critical witness received consideration for his testimony in the form of a lack of prosecution for criminal charges is prototypical *Brady* material. *Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended

almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Undisclosed evidence that would have raised opportunities to attack "the thoroughness and even the good faith of the investigation" likewise constitutes *Brady* material. *Kyles*, 514 U.S. at 445.

Regarding materiality, a court must assess not whether the defendant "would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. A prosecutor's failure to disclose *Brady* material requires a new trial where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009). In other words, materiality is established where there is a reasonable probability that the nature and quality of the suppressed evidence would have raised a reasonable doubt about the defendant's guilt. *See United States v.*

*Agurs*, 427 U.S. 97, 112 (1976) ("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."); *Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014) (prejudice exists where there is a reasonable probability that new evidence would lead the jury to have a reasonable doubt about defendant's guilt).

**B.     The Government Suppressed Favorable Impeachment Evidence.**

As set forth in the Rule 60(d) Motion, we now know that the federal investigative and prosecutorial authorities had numerous contacts with the Baltimore authorities concerning the Creighton homicide investigation, that the federal authorities informed the Baltimore authorities that Mr. Gloria was a critical witness in the instant case, and that the federal authorities suggested to the Baltimore authorities that Mr. Gloria was being framed. *See* A-087, 095-99. We likewise know that, in addition to Mr. Miller and the Scott twins, two eyewitnesses who were friends of Mr. Creighton and who would not have shared the purported motive to frame Mr. Gloria also initially described a man matching Mr. Gloria's description as being culpable, yet Baltimore Police still did not charge him or even interview him. *Id.* And we know that Baltimore authorities conditioned their charging decision for Mr. Gloria on the receipt of further (as yet undisclosed) information from federal authorities. A-086, 095-99. Obviously, none of these

facts were disclosed at the time of trial or in response to Mr. Higgs's original § 2255 motion and request for discovery.

There can be no question that evidence that Mr. Gloria received a free pass on a murder charge that he otherwise would have received in exchange for his testimony against Mr. Higgs constitutes exculpatory impeachment material. Nor can there be any question that the government suppressed this information, as the government plainly knew about it, yet failed to disclose it to the defense.

### C. Mr. Higgs Made a Substantial Showing of Materiality.

As set forth in detail in Section I, above, and in the Request for Certificate of Appealability, the government's withholding of this impeachment evidence was material. Mr. Higgs does not repeat those arguments here, but instead merely notes that if evidence demonstrating that the key government witness literally got away with murder due to the intervention of the government is not material under *Brady*, then *Giglio* is a dead letter.

### STATEMENT REGARDING ORAL ARGUMENT

Given the important issues presented in this case regarding the availability of relief under Rule 60(d) and *Hazel-Atlas*, and the fact that this is a capital case, this Court should hear oral argument before rendering a decision.

# CONCLUSION

For all of the reasons set forth herein and in the Request for Certificate of Appealability, this Court should grant a COA, issue a final briefing order, and remand this matter for discovery and an evidentiary hearing.

Respectfully Submitted,


/s/ Matthew C. Lawry
Matthew C. Lawry
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520
Matthew_Lawry@fd.org

/s/ Stephen H. Sachs
Stephen H. Sachs
WilmerHale LLP
Five Roland Mews
Baltimore, MD 21210
(410) 532-8405
Steve.Sachs@wilmerhale.com

Dated:      January 17, 2017

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,271 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ Matthew C. Lawry
Matthew C. Lawry

# CERTIFICATE OF SERVICE

I, Matthew Lawry, hereby certify that on this 17th day of January, 2017, I electronically filed the foregoing brief using the Court's CM/ECF system.

Electronic notice will be provided to the following individuals:

James A. Crowell IV
Assistant United States Attorney
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

Debra Lynn Dwyer
Assistant United States Attorney
Office of the United States Attorney
36 South Charles Street, 4th Floor
Baltimore, MD  21201-0000

Deborah A. Johnston
Assistant United States Attorney
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

/s/ Matthew C. Lawry
Matthew C. Lawry