No. 16-15

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DUSTIN JOHN HIGGS,
*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

_____

On Appeal from the United States District Court
for the District of Maryland
Criminal No. PJM-98-0520, Hon. Peter J. Messitte, U.S.D.J.

_____

**APPENDIX**

Leigh Skipper, Esq.
Chief Federal Defender
Matthew Lawry
Aren Adjoian
Cristi Charpentier
Elizabeth Hadayia
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
5 Roland Mews
Baltimore, MD 21210
410-532-8405

Dated: January 17, 2017

TABLE OF CONTENTS

District Court Docket ...................................................................................................................A001

Excerpts of Motion for Relief Pursuant to 28 U.S.C. § 2255, November 28, 2005 .........................A035

Excerpts of Motion for Discovery and Consolidated Memorandum of Law, June 29, 2006 ............A052

Government's Response to Higgs' Motion for Discovery, July 31, 2006........................................A061

Excerpts of Government's Response to Motion for Relief Pursuant to 28 U.S.C. § 2255, November 8, 2006.........................................................................................................................A071

Motion for Relief from Final Judgment, December 4, 2014 ...........................................................A085

Renewed Motion for . . . Discovery, December 4, 2014 .................................................................A285

Government's Response to Motion for Relief from Final Judgment, February 19, 2015 ................A291

Order & Opinion denying Rule 60(d) motion, June 29, 2016 .........................................................A441

Notice of appeal, August 26, 2016.................................................................................................A475

Order & opinion denying COA, November 22, 2016.......................................................................A477

# U.S. District Court
## District of Maryland (Greenbelt)
## CRIMINAL DOCKET FOR CASE #: 8:98-cr-00520-PJM-2

Case title: USA v. Haynes, et al

Date Filed: 12/21/1998
Date Terminated: 01/03/2001

Assigned to: Judge Peter J. Messitte

Appeals court case numbers: 01-03, 16-15
USCA

### Defendant (2)

**Dustin John Higgs**
*TERMINATED: 03/22/2001*

represented by **Angela S Elleman**
Community Defender Organization
Eastern District of Pennsylvania
601 Walnut St Ste 545W
Philadelphia, PA 19106
12159280520
Email: angela_elleman@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Barbara Hartung**
700 Main St Ste 1600
Richmond, VA 23219
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Wiseman**
Federal Defender of Philadelphia
Capital Habeas Corpus Unit
Federal Court Division
The Curtis Center Independent Sq West Ste
545 W
Philadelphia, PA 19106
12159280520
Fax: 12159280826
Email: michael_wiseman@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Stephen H Sachs**
WilmerHale LLP

**A-001**

1875 Pennsylvania Ave
Washington, DC 20006
2026636000
Fax: 2026636363
Email: Steve.Sachs@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Timothy Joseph Sullivan**
United States District Court for the District
of Maryland
101 W Lombard Street
Baltimore, MD 21201
14109622600
Email: tsullivan@bsm-legal.com
*TERMINATED: 03/22/2001*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Matthew C Lawry**
Federal Community Defender Office
Eastern District of Pennsylvania
601 Walnut St Ste 545 W
Philadelphia, PA 19106
12159280520
Fax: 12159280826
Email: matthew_lawry@fd.org
*ATTORNEY TO BE NOTICED*

## Pending Counts

18:1111; 18:7 & 18:2 Murder; Aiding and
Abetting
(1ss)

18:1111; 18:7 & 18:2 Murder; Aiding and
Abetting
(2ss)

18:1201(a)(2); 18:7 & 18:2 Kidnapping;
Aiding and Abetting
(4ss)

18:924(c) & 18:2 Use of a Handgun During
Crime of Violence; Aiding and Abetting
(5ss)

## Disposition

Consecutive Sentences of Death as to each
of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

Consecutive Sentences of Death as to each
of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

Consecutive Sentences of Death as to each
of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

5 years Imprisonment consecutive to all
Sentences currently being served and
consecutive to the Death Sentences imposed
in Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14 as to
Count 5 of the Second Superseding
Indictment; 20 years Imprisonment
consecutive to C ount 5 as to Count 10 of
the Second Superseding Indictment; 20
years Imprisonment consecutive to Count
10 as to Count 15 of the Second
Superseding Indictment; 5 years Supervised

**A-002**

Release with Conditions as to each of Counts 5, 10 & 15 of the Second Su perseding Indictment, to run concurrent to each other; ,687.22 Restitution; .00 Special Assessment

18:1111; 18:7 & 18:2 Murder; Aiding and Abetting
(6ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:1111; 18:7 & 18:2 Murder; Aiding and Abetting
(7ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:1201(a)(2); 18:7 & 18:2 Kidnapping; Aiding and Abetting
(9ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding and Abetting
(10ss)

5 years Imprisonment consecutive to all Sentences currently being served and consecutive to the Death Sentences imposed in Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14 as to Count 5 of the Second Superseding Indictment; 20 years Imprisonment consecutive to C ount 5 as to Count 10 of the Second Superseding Indictment; 20 years Imprisonment consecutive to Count 10 as to Count 15 of the Second Superseding Indictment; 5 years Supervised Release with Conditions as to each of Counts 5, 10 & 15 of the Second Su perseding Indictment, to run concurrent to each other; ,687.22 Restitution; .00 Special Assessment

18:1111; 18:7 & 18:2 Murder; Aiding and Abetting
(11ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:1111; 18:7 & 18:2 Murder; Aiding and Abetting
(12ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:1201(a)(2); 18:7 & 18:2 Kidnapping; Aiding and Abetting
(14ss)

Consecutive Sentences of Death as to each of Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14

18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding and Abetting
(15ss)

5 years Imprisonment consecutive to all Sentences currently being served and consecutive to the Death Sentences imposed in Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14 as to Count 5 of the Second Superseding Indictment; 20 years Imprisonment consecutive to C ount 5 as to Count 10 of the Second Superseding Indictment; 20 years Imprisonment consecutive to Count 10 as to Count 15 of the Second Superseding Indictment; 5 years Supervised Release with Conditions as to each of

A-003

Counts 5, 10 & 15 of the Second Su
perseding Indictment, to run concurrent to
each other; ,687.22 Restitution; .00 Special
Assessment

## Highest Offense Level (Opening)

Felony

| Terminated Counts | Disposition |
|---|---|
| 18:1111; 18:7 & 18:2 Murder within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting<br>(1) | Dismissed |
| 18:1111, 18:7 & 18:2 Murder; Aiding & Abetting<br>(1s) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting<br>(2) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping; Aiding & Abetting<br>(2s) | Dismissed |
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting<br>(3) | Dismissed |
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting<br>(3s) | Dismissed |
| 18:1111; 18:7 & 18:2 Murder; Aiding and Abetting<br>(3ss) | Dismissed |
| 18:1111; 18:7 & 18:2 Murder within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting<br>(4) | Dismissed |
| 18:1111, 18:7 & 18:2 Murder; Aiding & Abetting<br>(4s) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting<br>(5) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping; Aiding & Abetting<br>(5s) | Dismissed |

**A-004**

| | |
|---|---|
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting (6) | Dismissed |
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting (6s) | Dismissed |
| 18:1111; 18:7 & 18:2 Murder within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting (7) | Dismissed |
| 18:1111, 18:7 & 18:2 Murder; Aiding & Abetting (7s) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping within Special Maritime and Territorial Jurisdiction of the United States; Aiding & Abetting (8) | Dismissed |
| 18:1201(a)(2); 18:7 & 18:2 Kidnapping; Aiding & Abetting (8s) | Dismissed |
| 18:1111; 18:7 & 18:2 Murder; Aiding and Abetting (8ss) | Dismissed |
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting (9) | Dismissed |
| 18:924(c) & 18:2 Use of a Handgun During Crime of Violence; Aiding & Abetting (9s) | Dismissed |
| 18:1111; 18:7 & 18:2 Murder; Aiding and Abetting (13ss) | Dismissed |

## Highest Offense Level (Terminated)

Felony

## Complaints

None

**Disposition**

---

## Movant

**Victor Gloria**

represented by **Paul Francis Kemp**
Ethridge Quinn Kemp McAuliffe Rowan and Hartinger
33 Wood Ln
Rockville, MD 20850
13017621696

**A-005**

Fax: 13017627691
Email: pfk@eqkmrh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Movant**

**Eke Ndibire**                                   represented by **Paul B. DeWolfe**
Law Office
20 Courthouse Square
Suite 214
Rockville, MD 20850
301/309-6678
Fax: 13013402843
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA**                                           represented by **Deborah A Johnston**
Office of the US Attorney
6500 Cherrywood Lane Suite 200
6406 Ivy Lane 8th floor
Greenbelt, MD 20770
13013444433
Fax: 13013444516
Email: deborah.johnston@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Debra Lynn Dwyer**
Office of the United States Attorney
36 S Charles St Fourth Fl
Baltimore, MD 21201
14102094813
Fax: 14109623124
Email: Debbie.Dwyer@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James A Crowell , IV**
United States Attorneys Office
Southern Division
6500 Cherrywood Ln Ste 200
Greenbelt, MD 20770
13013444235
Fax: 13013444516
Email: james.a.crowell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A-006**

**Sandra Wilkinson**
Office of the US Attorney
36 S Charles St Fourth Fl
Baltimore, MD 21201
4102094921
Fax: 4109633091
Email: sandra.wilkinson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sujit Raman**
Office of the US Attorney
6500 Cherrywood Lane Ste 400
Greenbelt, MD 20770
13013444433
Fax: 13013444516
Email: sujit.raman@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/21/1998 | 1 | INDICTMENT for Willis Mark Haynes (1) and Dustin John Higgs (2) as to count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9 (lad, Deputy Clerk) (Entered: 12/22/1998) |
| 01/15/1999 | 4 | WRIT of Habeas Corpus ad Prosequendum issued as to Dustin John Higgs for January 22, 1999 (td, Deputy Clerk) (Entered: 01/21/1999) |
| 01/22/1999 | | Initial appearance as to Dustin John Higgs held before Magistrate Judge Jillyn K. Schulze (ER: Sutton) (Defendant informed of rights.) (td, Deputy Clerk) Modified on 01/27/1999 (Entered: 01/27/1999) |
| 01/22/1999 | | Arraignment as to Dustin John Higgs, Not Guilty: as to count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9 held before Magistrate Judge Jillyn K. Schulze (ER: Sutton) (td, Deputy Clerk) (Entered: 01/27/1999) |
| 01/26/1999 | 5 | NOTICE of Appearance for Dustin John Higgs by Attorney Timothy Joseph Sullivan (td, Deputy Clerk) (Entered: 01/27/1999) |
| 01/26/1999 | 6 | ORDER OF DETENTION by Agreement as to Dustin John Higgs ( Signed by Magistrate Judge Jillyn K. Schulze 1/22/99 ) (td, Deputy Clerk) (Entered: 01/27/1999) |
| 02/17/1999 | 9 | MOTION by Dustin John Higgs to Adopt Motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 proceedings in Criminal Case No. PJM-98-0482 of Defendant Willis Mark Haynes (c/s) (lad, Deputy Clerk) (Entered: 02/18/1999) |
| 02/19/1999 | 10 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 02/23/1999) |
| 02/22/1999 | 11 | MOTION by USA as to Willis Mark Haynes, Dustin John Higgs for One Day Enlargement of Time to file its response to the defendant's Motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 Proceedings (lad, Deputy Clerk) (Entered: 02/23/1999) |
| 02/22/1999 | 12 | ORDER "GRANTING" [11-1] motion for One Day Enlargement of Time to file its response to the defendant's Motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 Proceedings as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 2/23/99lad) (lad, Deputy Clerk) (Entered: 02/23/1999) |

A-007

| | | |
|---|---|---|
| 02/25/1999 | 16 | Memorandum "SUSPENDING" the Current Schedule as to Willis Mark Haynes, Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m 2/25/99esp) (lad, Deputy Clerk) (Entered: 02/26/1999) |
| 02/26/1999 | 17 | MOTION by USA as to Willis Mark Haynes, Dustin John Higgs to Exclude Time under the Speedy Trial Act , and for Continuance in Interests of Justice (c/s) (lad, Deputy Clerk) (Entered: 02/26/1999) |
| 03/04/1999 | | Status conference as to Willis Mark Haynes, Dustin John Higgs held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 03/05/1999) |
| 03/04/1999 | | Scheduling conference as to Willis Mark Haynes, Dustin John Higgs held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 03/05/1999) |
| 03/05/1999 | 18 | MEMORANDUM/ORDER "CONFIRMING" the Determinations made at the Status Conference held on 3/4/99; and "SCHEDULING" Trial as to Willis Mark Haynes and Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m ras) (td, Deputy Clerk) (Entered: 03/09/1999) |
| 03/05/1999 | 19 | ORDER "GRANTING" [9-1] motion to Adopt Motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 proceedings in Criminal Case No. PJM-98-0482 of Defendant Willis Mark Haynes as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte 3/4/99 ) (c/m 3/9/99 td) (td, Deputy Clerk) (Entered: 03/09/1999) |
| 03/05/1999 | | Motion(s) adopted by Dustin John Higgs : adoption of [7-1] motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 Proceedings in Criminal Case No. PJM-98-0482 (td, Deputy Clerk) (Entered: 03/09/1999) |
| 03/29/1999 | | Status conference held before Judge Peter J. Messitte (lad, Deputy Clerk) (Entered: 03/30/1999) |
| 04/09/1999 | | Sealed hearing held before Messitte, J. (td, Deputy Clerk) (Entered: 05/04/1999) |
| 04/19/1999 | 26 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 04/21/1999) |
| 04/22/1999 | 27 | ORDER dated 4/15/99 "AUTHORIZING" Interim payments for Services other than Counsel as to Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m by D. Shearer) (lad, Deputy Clerk) (Entered: 04/28/1999) |
| 04/26/1999 | | Tele-conference as to Willis Mark Haynes, Dustin John Higgs held before Judge Peter J. Messitte (lad, Deputy Clerk) (Entered: 04/28/1999) |
| 04/28/1999 | | Tele-conference held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 05/04/1999) |
| 05/04/1999 | | Status conference held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 05/06/1999) |
| 05/06/1999 | 28 | ORDER for Interim Payments to Appointed Counsel ( Signed by Judge Peter J. Messitte 4/22/99 ) (c/m ds) (td, Deputy Clerk) (Entered: 05/07/1999) |
| 05/07/1999 | 29 | ORDER dated 5/7/99 "GRANTING" [17-1] motion to Exclude Time under the Speedy Trial Act as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed Judge Peter J. Messitte ) (c/m 5/11/99lad) (lad, Deputy Clerk) (Entered: 05/11/1999) |
| 05/20/1999 | 32 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 05/26/1999) |
| 06/14/1999 | 36 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 06/15/1999) |
| 07/08/1999 | 38 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 07/13/1999) |

**A-008**

| 07/16/1999 | | Tele-conference held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 07/19/1999) |
| 07/29/1999 | | Defendant sworn and examined on voir dire re: L. Barrett Boss' continued Representation of Defendant (td, Deputy Clerk) (Entered: 07/30/1999) |
| 08/02/1999 | 48 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 08/03/1999) |
| 08/12/1999 | 51 | WRIT of Habeas Corpus ad Prosequendum issued as to Gerald Vaughn for 9/1/99 (5 cc's to USMS 8/13/99 td) (td, Deputy Clerk) (Entered: 08/17/1999) |
| 08/17/1999 | 52 | MEMORANDUM re: Scheduling a Meeting to Discuss Logistical and Security Issues as to the trials of Willis Mark Haynes and Dustin John Higgs ( Signed by Judge Peter J. Messitte 8/13/99 ) (c/m 8/16/99 esp) (td, Deputy Clerk) (Entered: 08/18/1999) |
| 09/01/1999 | | Argument of counsel (rank, Deputy Clerk) (Entered: 09/03/1999) |
| 09/01/1999 | 53 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/03/1999) |
| 09/01/1999 | 55 | ORDER for Interim Payments for Services other than Counsel as to Dustin John Higgs ( Signed by Judge Peter J. Messitte 4/26/99 and Approved by Chief Judge J. Harvie Wilkinson of the Court of Appeals for the 4th Circuit on 8/10/99) (td, Deputy Clerk) (Entered: 09/03/1999) |
| 09/01/1999 | 56 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 57 | MOTION with Memorandum in Support by Willis Mark Haynes and Dustin John Higgs to Dismiss the Kidnapping Counts (Counts Two, Five and Eight) of the Indictment (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 58 | MOTION with Memorandum in Support by Willis Mark Haynes and Dustin John Higgs to Unseal Plea Agreement and Transcript of the Plea Hearing in Victor Gloria's Case, Criminal No. PJM 98-0482 (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 60 | MOTION with Memorandum in Support by Dustin John Higgs to Suppress Physical Evidence (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 61 | MOTION with Memorandum in Support by Dustin John Higgs for Leave to File Additional Pretrial Motions and Notices (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 62 | MOTION by Dustin John Higgs to Adopt Pretrial Motions Filed by Co-Defendant (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 63 | MOTION with Memorandum in Support by Dustin John Higgs and Willis Mark Haynes for Change of Venue or, alternatively, Other Appropriate Relief due to Prejudicial Pretrial Publicity (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 64 | MOTION by Dustin John Higgs and Willis Mark Haynes for Individual Sequestered Voir Dire with Participation by Counsel (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/03/1999 | 65 | MEMORANDUM of LAW by Dustin John Higgs and Willis Mark Haynes regarding the Scope of Appropriate Voir Dire in a Captial Case (c/s) (td, Deputy Clerk) (Entered: 09/07/1999) |
| 09/07/1999 | 68 | MOTION by Willis Mark Haynes, Dustin John Higgs to Compel elections within Counts One, Four & Seven (c/s) (lad, Deputy Clerk) (Entered: 09/09/1999) |
| 09/23/1999 | | Status conference as to Willis Mark Haynes and Dustin John Higgs held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 09/29/1999) |
| 09/30/1999 | 70 | ORDER dated 9/27/99 "SUMMARIZING" the Schedule in this case as to Willis Mark |

**A-009**

| | | |
|---|---|---|
| | | Haynes, Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m 9/30/99esp) (lad, Deputy Clerk) (Entered: 10/04/1999) |
| 10/04/1999 | 71 | Consolidated RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs to [68-1] motion to Compel elections within Counts One, Four & Seven, [57-1] motion to Dismiss the Kidnapping Counts (Counts Two, Five and Eight) of the Indictment, [69-1] motion to Reorder Trials, [69-2] motion for Continuance of his Trial until a date fixed by the Court subsequent to the conclusion of the trial of Dustin Higgs, [63-1] motion for Change of Venue, [63-2] motion Other Appropriate Relief due to Prejudicial Pretrial Publicity, [7-1] motion to Order Disclosure of Vincent Gloria's Court File and Rule 11 Proceedings in Criminal Case No. PJM-98-0482, [64-1] motion for Individual Sequestered Voir Dire with Participation by Counsel, [66-1] motion to Suppress Tangible Evidence and other Fruits of the Illegal Search, [14-1] motion to Suppress Statements, Admissions and Confessions, [60-1] motion to Suppress Physical Evidence and Exhibits A thru F (c/s) (lad, Deputy Clerk) (Entered: 10/05/1999) |
| 10/20/1999 | 73 | MOTION by USA as to Willis Mark Haynes, Dustin John Higgs to Extend Time to File Notice of Intention to Seek Death Penalty (c/s) (lad, Deputy Clerk) (Entered: 10/21/1999) |
| 10/22/1999 | 74 | MOTION by USA as to Willis Mark Haynes, Dustin John Higgs to Withdraw [73-1] motion to Extend Time to File Notice of Intention to Seek Death Penalty by USA (lad, Deputy Clerk) (Entered: 10/22/1999) |
| 10/22/1999 | 75 | ORDER granting [74-1] motion to Withdraw [73-1] motion to Extend Time to File Notice of Intention to Seek Death Penalty by USA as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 10/22/99lg) (lad, Deputy Clerk) (Entered: 10/22/1999) |
| 10/22/1999 | 76 | NOTICE of Intention to Seek the Death by USA as to Dustin John Higgs (c/s) (lad, Deputy Clerk) Modified on 10/25/1999 (Entered: 10/25/1999) |
| 11/01/1999 | 78 | SUPERSEDING INDICTMENT as to Willis Mark Haynes (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s; and Dustin John Higgs (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, 9s (lad, Deputy Clerk) (Entered: 11/01/1999) |
| 11/02/1999 | 81 | MOTION by USA as to Dustin John Higgs for Notice and Discovery of Mental Health Evidence or Defenses to be Raised at the Penalty Phase of Trial (c/s) (lad, Deputy Clerk) (Entered: 11/03/1999) |
| 11/04/1999 | 82 | REPLY by Defendants to Government's Opposition to [57-1] motion to Dismiss the Kidnapping Counts (Counts Two, Five and Eight) of the Indictment (c/s) (td, Deputy Clerk) (Entered: 11/04/1999) |
| 11/04/1999 | 83 | REPLY by Defendants to Government's Opposition to their [58-1] motion to Unseal Plea Agreement and Transcript of the Plea Hearing in Victor Gloria's Case, Criminal No. PJM 98-0482 (c/s) (td, Deputy Clerk) (Entered: 11/04/1999) |
| 11/04/1999 | 84 | REPLY by Defendants to Government's Opposition to [66-1] motion to Suppress Tangible Evidence and other Fruits of the Illegal Search (c/s) (td, Deputy Clerk) (Entered: 11/04/1999) |
| 11/05/1999 | 86 | RESPONSE by Dustin John Higgs to [69-1] motion to Reorder Trials, [69-2] motion for Continuance of his Trial until a date fixed by the Court subsequent to the conclusion of the trial of Dustin Higgs filed by Willis Mark Haynes (c/s) (lad, Deputy Clerk) (Entered: 11/05/1999) |
| 11/08/1999 | 87 | REPLY by Willis Mark Haynes and Dustin John Higgs to Government's Opposition to their [68-1] motion to Compel Elections within Counts One, Four & Seven (c/s) (td, Deputy Clerk) (Entered: 11/09/1999) |

A-010

| 11/09/1999 | 88 | CONSENT MOTION with Memorandum in Support by Dustin John Higgs to Continue Evidentiary Pretrial Non-Death Penalty Motions (c/s) (td, Deputy Clerk) (Entered: 11/10/1999) |
| --- | --- | --- |
| 11/10/1999 | 89 | LETTER/REQUEST of the Government to Modify the Schedule/Format for the Motions Hearing as to Willis Mark Haynes and Dustin John Higgs, and "APPROVAL" ( Signed by Judge Peter J. Messitte ) (c/m 11/10/99 esp) (td, Deputy Clerk) (Entered: 11/10/1999) |
| 11/15/1999 | 91 | ORDER dated 11/12/99 granting [62-1] motion to Adopt Pretrial Motions Filed by Co-Defendant as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 11/15/99esp) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 |  | Motion hearing held before Messitte, J. as to Willis Mark Haynes and Dustin John Higgs re: [79-1] motion to Continue Trial Date for Five Months, [69-1] motion to Reorder Trials, [69-2] motion for Continuance of his Trial until a date fixed by the Court subsequent to the conclusion of the trial of Dustin Higgs, [68-1] motion to Compel elections within Counts One, Four & Seven, [64-1] motion for Individual Sequestered Voir Dire with Participation by Counsel, [63-1] motion for Change of Venue, [63-2] motion Other Appropriate Relief due to Prejudicial Pretrial Publicity, [58-1] motion to Unseal Agreement and Transcript of the Plea Hearing in Victor Gloria's Case, Criminal No. PJM 98-0482, [57-1] motion to Dismiss the Kidnapping Counts (Counts Two, Five and Eight) of the Indictment (Reporter: Simpkins) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 92 | Declaration of Catherine S. Paukert (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 93 | ORDER as to Willis Mark Haynes, Dustin John Higgs denying [57-1] motion to Dismiss the Kidnapping Counts (Counts Two, Five and Eight) of the Indictment ( Signed by Judge Peter J. Messitte ) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 94 | Marginal ORDER denying [63-1] motion for Change of Venue as to Willis Mark Haynes (1), Dustin John Higgs (2), denying [63-2] motion Other Appropriate Relief due to Prejudicial Pretrial Publicity as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (For paper #94, See paper #63) (c/m 11/15/99esp) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 95 | Marginal ORDER "DEFERRING" [64-1] motion for Individual Sequestered Voir Dire with Participation by Counsel under advisement as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed by Judge Peter Messitte ) (for paper no. 95 see paper no. 64) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 96 | Marginal ORDER as to Willis Mark Haynes, Dustin John Higgs denying [68-1] motion to Compel elections within Counts One, Four & Seven as to Willis Mark Haynes (1), Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (for paper 96 see paper 68) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/15/1999 | 98 | ORDER as to Dustin John Higgs granting [88-1] motion to Continue Evidentiary Pretrial Non-Death Penalty Motions ( Signed by Judge Peter J. Messitte ) (c/m 11/15/99esp) (lad, Deputy Clerk) (Entered: 11/15/1999) |
| 11/17/1999 | 103 | Exhibit list by USA as to Willis Mark Haynes, Dustin John Higgs (lad, Deputy Clerk) (Entered: 11/19/1999) |
| 11/17/1999 | 104 | Exhibit list by Dustin John Higgs (lad, Deputy Clerk) (Entered: 11/19/1999) |
| 11/17/1999 | 105 | Exhibit #1 presented by Dustin John Higgs at 11/15/99 Motions Hearing (Filed Separately) (lad, Deputy Clerk) (Entered: 11/22/1999) |

**A-011**

| 11/18/1999 | 106 | ORDER "POSTPONING" a Ruling on the Defendants' Motion to Order Disclosure of Victor Gloria's Court File and Rule 11 Proceedings and the Government's Motion to Maintain Sealing Order Temporarily with Respect to Plea Agreement and Rule 11 Proceedings as therein set forth; "MAINTAINING" the Sealing Order of this Court as therein set forth; "UNSEALING" the Transcript of the Plea Proceedings in U.S. v. Gloria as therein set forth as to Willis Mark Haynes and Dustin John Higgs ( Signed by Judge Peter J. Messitte 11/18/99 ) (c/m to counsel and court reporter 11/18/99 esp) (td, Deputy Clerk) (Entered: 11/23/1999) |
|---|---|---|
| 11/18/1999 | 107 | ORDER "RETURNING" Exhibits to Counsel Pending Appeal ( Signed by Judge Peter J. Messitte ) (td, Deputy Clerk) (Entered: 11/23/1999) |
| 11/30/1999 | 108 | ORDER dated 11/23/99 denying [61-1] motion for Leave to File Additional Pretrial Motions and Notices as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m by cham) (lad, Deputy Clerk) (Entered: 12/02/1999) |
| 12/13/1999 | 109 | ORDER as to Willis Mark Haynes, Dustin John Higgs, to Extend Time within which to file the defendants death penalty motions to 12/20/99 ( Signed by Judge Peter J. Messitte ) (c/m 12/13/99kc) (lad, Deputy Clerk) (Entered: 12/15/1999) |
| 12/20/1999 | 111 | REQUEST with Memorandum in Support by Defendants for Penalty Phase Allocution (c/s) (td, Deputy Clerk) (Entered: 12/21/1999) |
| 12/20/1999 | 112 | MOTION with Memorandum in Support by Defendants for Disclosure , Judicial Screening and Appropriate Limitation of Victim Impact Information (c/s) (td, Deputy Clerk) (Entered: 12/21/1999) |
| 12/20/1999 | 113 | MOTION with Memorandum in Support by Defendants to Preclude the Death Penalty (c/s) (td, Deputy Clerk) (Entered: 12/21/1999) |
| 12/20/1999 | 114 | MOTION with Memorandum in Support by Defendants to Exclude Tainted Evidence and Exhibit 1 (c/s) (td, Deputy Clerk) (Entered: 12/21/1999) |
| 12/20/1999 | 115 | MOTION with Memorandum in Support by Defendants to Strike the Government's [76-1] and [77-1] Notices of Intention to Seek the Death Penalty (c/s) (td, Deputy Clerk) (Entered: 12/21/1999) |
| 12/20/1999 | 116 | SUPERSEDING INDICTMENT as to Willis Mark Haynes (1) - count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss and 15ss; Dustin John Higgs (2) - count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss and 15ss (lad, Deputy Clerk) (Entered: 12/22/1999) |
| 12/27/1999 | 117 | MEMORANDUM Stating that the Hearing on Defendant Higgs's Motion to Suppress Physical Evidence will be held on 2/8/2000 at 10:00 a.m. before the Death Penalty-related Motions (c/m 12/27/99 esp) (td, Deputy Clerk) (Entered: 12/28/1999) |
| 12/28/1999 | 118 | INCORPORATION of OBJECTIONS Previously Lodged by Willis Mark Haynes and Dustin John Higgs to the Continued Sealing of the Portions of Mr. Gloria's Plea Colloquy and Plea Agreement (c/s) (td, Deputy Clerk) (Entered: 12/29/1999) |
| 01/05/2000 | 119 | TRANSCRIPT of Proceedings Held before Messitte, J. as to Willis Mark Haynes and Dustin John Higgs for date of 11/15/99 (Filed Separately) (td, Deputy Clerk) (Entered: 01/06/2000) |
| 01/14/2000 | 123 | Request by USA for Production of Federal Prisoner Dustin John Higgs (c/s to USMS) (rank, Deputy Clerk) (Entered: 01/20/2000) |
| 01/18/2000 | 122 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 01/19/2000) |
| 01/31/2000 | | Tele-conference as to Willis Mark Haynes, Dustin John Higgs held before Judge Peter J. |

A-012

| | | Messitte (lad, Deputy Clerk) (Entered: 02/01/2000) |
|---|---|---|
| 01/31/2000 | 124 | RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs re [114-1] motion to Exclude Tainted Evidence (c/s) (lad, Deputy Clerk) (Entered: 02/01/2000) |
| 01/31/2000 | 125 | RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs re [113-1] motion to Preclude the Death Penalty and attachment (c/s) (lad, Deputy Clerk) (Entered: 02/01/2000) |
| 01/31/2000 | 126 | RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs in opposition to [111-1] motion for Penalty Phase Allocution (c/s) (lad, Deputy Clerk) (Entered: 02/02/2000) |
| 01/31/2000 | 127 | RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs re [115-1] motion to Strike the Government's [76-1] and [77-1] Notices of Intention to Seek the Death Penalty and attachment (c/s) (lad, Deputy Clerk) (Entered: 02/02/2000) |
| 01/31/2000 | 128 | RESPONSE by USA as to Willis Mark Haynes, Dustin John Higgs in opposition to [112-1] motion for Disclosure, [112-2] motion Judicial Screening, [112-3] motion Appropriate Limitation of Victim Impact Information (c/s) (lad, Deputy Clerk) (Entered: 02/02/2000) |
| 02/01/2000 | 129 | LETTER/REQUEST of USA that the Government's Response to Death Penalty Motions be Filed on 1/31/2000, the Defense Response be Filed on 2/8/2000 and the Hearings on those Motions be held on 2/10 & 2/11/2000, if necessary as to Willis Mark Haynes and Dustin John Higgs and "APPROVAL" ( Signed by Judge Peter J. Messitte 1/28/2000 ) (c/m 1/31/2000 esp) (td, Deputy Clerk) (Entered: 02/03/2000) |
| 02/02/2000 | 130 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 02/04/2000) |
| 02/02/2000 | 131 | Revised Juror Questionnaire (lad, Deputy Clerk) (Entered: 02/04/2000) |
| 02/07/2000 | 132 | CONSENT ORDER Regarding Mental Health Evidence as to Willis Mark Haynes, Dustin John Higgs (Signed by Judge Peter J. Messitte 2/4/00)(c/m 2/8/00 lad) (mdd, Deputy Clerk) (Entered: 02/08/2000) |
| 02/08/2000 | 133 | REPLY by Willis Mark Haynes, Dustin John Higgs to response to [115-1] motion to Strike the Government's [76-1] and [77-1] Notices of Intention to Seek the Death Penalty (c/s) (mdd, Deputy Clerk) (Entered: 02/08/2000) |
| 02/08/2000 | 136 | MOTION by USA as to Willis Mark Haynes and Dustin John Higgs for Leave of Court to File Amended Notice of Intent to Seek Death Penalty and Proposed Amended Notices of Intent to Seek Death Penalty (c/s) (td, Deputy Clerk) (Entered: 02/09/2000) |
| 02/10/2000 | | Arraignment as to Dustin John Higgs, Not Guilty: as to count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss, 15ss held before Magistrate Judge Jillyn K. Schulze (ER: Fosbrook) (lad, Deputy Clerk) (Entered: 02/14/2000) |
| 02/10/2000 | | Motion hearing held before Messitte, J. as to Willis Mark Haynes and Dustin John Higgs re: [115-1] motion of Defendants to Strike the Government's [76-1] and [77-1] Notice of Intention to Seek the Death Penalty - Argued - "GRANTED" in part, "DENIED" in part, "DEFERRED" in part; and [112-1] motion by Defendants for Disclosure, [112-2] motion for Judicial Screening and [112-3] motion for Appropriate Limitation of Victim Impact Information - Argued - "GRANTED" in part, "DENIED" in part for reasons stated by the Court (Reporter: Simpkins) (td, Deputy Clerk) (Entered: 02/15/2000) |
| 02/11/2000 | | Motion hearing held before Messitte, J. as to Willis Mark Haynes and Dustin John Higgs re: [60-1] motion of Dustin Higgs to Suppress Physical Evidence - Argued - "DENIED"; [113-1] motion of Defendants to Preclude the Death Penalty - Argued - "DENIED" without prejudice; [111-1] Request of Defendants for Penalty Phase Allocution - Argued - "GRANTED"; [114-1] motion of Defendants to Exclude Tainted Evidence - Argued - |

A-013

| | | |
|---|---|---|
| | | "DENIED"; and [121-1] motion of Willis Haynes to Extend Date in which to File Notice of Alibi and Incorporated Memorandum in Support until 3/1/2000 - Argued - "GRANTED" for reasons stated by the Court (Reporter: Simpkins) (td, Deputy Clerk) (Entered: 02/15/2000) |
| 02/25/2000 | | Chambers conference as to Willis Mark Haynes, Dustin John Higgs held before Judge Peter J. Messitte (lad, Deputy Clerk) (Entered: 02/29/2000) |
| 02/25/2000 | 144 | ORDER as to Willis Mark Haynes, Dustin John Higgs denying [60-1] motion to Suppress Physical Evidence; ), granting in part, deferring in part [115-1] motion to Strike the Government's [76-1] and [77-1] Notices of Intention to Seek the Death Penalty; denying [113-1] motion to Preclude the Death Penalty; granting in part, denying in part [112-1] motion for Disclosure; granting in part, denying in part [112-2] motion Judicial Screening; granting in part, denying in part [112-3] motion Appropriate Limitation of Victim Impact Information; denying [114-1] motion to Exclude Grand Jury Evidence; granting [111-1] motion for Penalty Phase Allocution; and "GRANTING" Motion to extend time to file an Alibi ( Signed by Judge Peter J. Messitte ) (c/m 2/29/00 lad) (lad, Deputy Clerk) (Entered: 02/29/2000) |
| 02/29/2000 | 145 | ORDER "DENYING" [135-1] motion for A.J. Kramer and the Office of the Public Defender to Withdraw as Counsel for Wills Mark Haynes (1) ( Signed by Judge Peter J. Messitte 2/25/2000 ) (c/m 2/29/2000 esp) (td, Deputy Clerk) (Entered: 03/01/2000) |
| 02/29/2000 | 148 | SEALED DOCUMENT (mdd, Deputy Clerk) (Entered: 03/06/2000) |
| 02/29/2000 | 149 | SEALED DOCUMENT (mdd, Deputy Clerk) (Entered: 03/06/2000) |
| 03/20/2000 | | Tele-conference held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 03/21/2000) |
| 03/23/2000 | 161 | MEMORANDUM from Judge Peter J. Messitte requesting Counsel to submit Written Comments to a Proposed Memorandum Order resolving Defendant's Motion for Clarification of Terms of the Order regarding Mental Health Examinations to chambers no later than 3/29/2000, and Proposed Memorandum Order and Transcript Excerpt (c/m 3/23/2000 esp) (td, Deputy Clerk) (Entered: 03/27/2000) |
| 03/27/2000 | | Tele-conference held before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 03/28/2000) |
| 04/03/2000 | 169 | TRANSCRIPT of Proceedings Held before Messitte, J. as to Willis Mark Haynes and Dustin John Higgs for dates of February 10 and 11, 2000 (Filed Separately) (td, Deputy Clerk) (Entered: 04/04/2000) |
| 04/10/2000 | 173 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 04/11/2000) |
| 04/10/2000 | 178 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 04/11/2000) |
| 04/17/2000 | 187 | MARGINAL ORDER "GRANTING" [136-1] motion of the United States for Leave of Court to File Amended Notice of Intent to Seek Death Penalty as to Willis Mark Haynes (1) and Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 4/17/2000 esp & kc) (td, Deputy Clerk) (Entered: 04/17/2000) |
| 05/01/2000 | 196 | MOTION by Victor Gloria to Quash Criminal Subpoena (1 c/s) (td, Deputy Clerk) (Entered: 05/02/2000) |
| 05/02/2000 | 199 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 05/02/2000) |
| 05/03/2000 | 203 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 05/04/2000) |
| 05/04/2000 | 208 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 05/05/2000) |

A-014

| 05/06/2000 | 209 | MEMORANDUM/ORDER "REMINDING" Counsel of the Schedule governing the Trial as to Dustin John Higgs as therein more particularly set forth; and "STATING" that Counsel are to Advise the Law Clerk, by 5/15/2000, all Dates and Times they are available to Meet ( Signed by Judge Peter J. Messitte 5/4/2000 ) (c/m 5/5/2000 esp) (td, Deputy Clerk) (Entered: 05/08/2000) |
|---|---|---|
| 05/12/2000 | 219 | CORRESPONDENCE by USA to Defense Counsel as to Willis Mark Haynes (received in chambers on 5/11/2000) (copy) (td, Deputy Clerk) (Entered: 05/12/2000) |
| 05/15/2000 | 222 | MEMORANDUM from the Court re: thoughts and concerns about the Trial as to Dustin John Higgs ( signed by Judge Peter J. Messitte 5/9/2000 ) (c/m 5/15/2000 rs/kc) (td, Deputy Clerk) (Entered: 05/16/2000) |
| 05/16/2000 | | Jury was not present (td, Deputy Clerk) (Entered: 05/18/2000) |
| 05/17/2000 | | Jury retired to the Deliberations Room to begin their Deliberations (td, Deputy Clerk) (Entered: 05/19/2000) |
| 05/18/2000 | | Jury continued their Deliberations (td, Deputy Clerk) (Entered: 05/19/2000) |
| 05/19/2000 | | Jury Polled at the Direction of the Court (td, Deputy Clerk) (Entered: 05/23/2000) |
| 05/19/2000 | | Jurors Excused until 5/26/2000 at 10:00 a.m. (td, Deputy Clerk) (Entered: 05/23/2000) |
| 05/23/2000 | 236 | WRIT of Habeas Corpus ad Prosequendum issued as to John Peter Sinelli for 5/26/2000 (td, Deputy Clerk) (Entered: 05/24/2000) |
| 05/25/2000 | 251 | MEMORANDUM from Nina Wang, Law Clerk to Judge Messitte, stating that the Judge would like to Postpone the start of the Higgs Trial until 9/19/2000; requesting that Counsel advise her no later than 6/2/2000 as to what issues, if any, the change of trial schedule raises; and requesting that Counsel advise her of as many of the dates listed that they are available for a meeting prior to the deadline for the Jury Questionnaires (c/m 5/26/2000 esp) (td, Deputy Clerk) (Entered: 05/26/2000) |
| 06/02/2000 | 258 | Authorization for Juror Meal directing the U.S. Marshal to Provide Lunch to the Jury (signed by Felicia C. Cannon, Clerk 5/30/2000) (c/m to Finance 6/1/2000 esp) (td, Deputy Clerk) (Entered: 06/05/2000) |
| 06/19/2000 | 279 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 06/20/2000) |
| 06/20/2000 | 281 | WRIT of Habeas Corpus ad Prosequendum issued as to Dustin John Higgs for 9/5/2000 (c/s USMS 6/20/2000) (td, Deputy Clerk) (Entered: 06/21/2000) |
| 06/21/2000 | 282 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 06/21/2000) |
| 06/21/2000 | 283 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 06/21/2000) |
| 06/21/2000 | | Charging Conference held in Open Court on the Record (td, Deputy Clerk) (Entered: 06/22/2000) |
| 06/22/2000 | | Alternate Jurors not formally excused from Jury Service at this time; They are to remain on call until regular jury is dismissed (td, Deputy Clerk) (Entered: 06/23/2000) |
| 06/23/2000 | | Logistics Meeting held before Messitte, J. (td, Deputy Clerk) (Entered: 06/23/2000) |
| 06/28/2000 | 296 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 06/28/2000) |
| 07/07/2000 | 306 | MEMORANDUM/ORDER "SUMMARIZING" the Decisions made during the Logistical Meeting as therein more particularly set forth as to Dustin John Higgs ( Signed by Judge Peter J. Messitte 7/6/2000 ) (c/m 7/10/2000 esp) (td, Deputy Clerk) (Entered: 07/11/2000) |

A-015

| | | |
|---|---|---|
| 07/14/2000 | 307 | Writ of Habeas Corpus Ad Testificandum Executed as to Willie Mark Woods (td, Deputy Clerk) (Entered: 07/18/2000) |
| 07/18/2000 | 308 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 07/19/2000) |
| 07/28/2000 | 309 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 07/28/2000) |
| 08/18/2000 | 312 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 08/21/2000) |
| 08/21/2000 | 315 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 08/22/2000) |
| 08/25/2000 | 316 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 08/25/2000) |
| 08/28/2000 | 318 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 08/30/2000) |
| 08/30/2000 | 319 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 08/30/2000) |
| 08/30/2000 | 321 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/01/2000) |
| 08/31/2000 | 322 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/01/2000) |
| 09/05/2000 | 325 | MOTION with Memorandum in Support by Dustin John Higgs in Limine to Exclude Evidence of November 19, 1995 District of Columbia Assaults During Trial and Exhibits A & B (1 c/s) (td, Deputy Clerk) (Entered: 09/05/2000) |
| 09/05/2000 | 326 | MOTION with Memorandum in Support by Dustin John Higgs to Exclude Certain Testimony of Steve Zabrenski (c/s) (td, Deputy Clerk) (Entered: 09/05/2000) |
| 09/05/2000 | 327 | MOTION with Memorandum in Support by Dustin John Higgs in Limine to Exclude Evidence of Bank Fraud and Theft During Trial and Exhibit A (c/s) (td, Deputy Clerk) (Entered: 09/05/2000) |
| 09/05/2000 | 328 | MOTION with Memorandum in Support by Dustin John Higgs in Limine to Exclude Government's Proposed Fed. R. Evid. 807 Evidence During Trial and Exhibits A & B (c/s) (td, Deputy Clerk) (Entered: 09/05/2000) |
| 09/05/2000 | | Jurors Sworn and Examined on Voir Dire as to Dustin John Higgs (2) as to Counts 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss, and 15ss before Judge Peter J. Messitte (td, Deputy Clerk) (Entered: 09/06/2000) |
| 09/05/2000 | | Jury trial - Day 1 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/06/2000) |
| 09/05/2000 | | ORAL MOTION by Dustin John Higgs for Change of Venue - Argued - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 09/06/2000) |
| 09/05/2000 | | Jury impaneled and sworn as to Dustin John Higgs (td, Deputy Clerk) (Entered: 09/06/2000) |
| 09/05/2000 | 331 | Exhibit list by Dustin John Higgs as to Motions Hearing re: Motion for Change of Venue (td, Deputy Clerk) (Entered: 09/06/2000) |
| 09/06/2000 | | Jury trial - Day 2 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Bankins) (td, Deputy Clerk) (Entered: 09/08/2000) |
| 09/06/2000 | | Individual Voir Dire Continued (td, Deputy Clerk) (Entered: 09/08/2000) |
| 09/07/2000 | | Jury trial - Day 3 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/08/2000) |
| 09/07/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/08/2000) |
| 09/08/2000 | | Jury trial - Day 4 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court |

A-016

| | | Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/11/2000) |
|---|---|---|
| 09/08/2000 | | Individual voir dire continued (td, Deputy Clerk) (Entered: 09/11/2000) |
| 09/18/2000 | | Jury trial - Day 5 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/18/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/18/2000 | 333 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/19/2000 | 334 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/19/2000 | | Jury trial - Day 6 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/19/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/19/2000 | 335 | RESPONSE by USA as to Dustin John Higgs re [327-1] motion in Limine to Exclude Evidence of Bank Fraud and Theft Trial (c/s) (td, Deputy Clerk) (Entered: 09/19/2000) |
| 09/20/2000 | | Jury trial - Day 7 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/21/2000) |
| 09/20/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/21/2000) |
| 09/20/2000 | 336 | MEMORANDUM to Introduce 404(b) Evidence by USA as to Dustin John Higgs (1 c/s) (td, Deputy Clerk) (Entered: 09/21/2000) |
| 09/21/2000 | 337 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/21/2000) |
| 09/21/2000 | 338 | REPLY by Dustin John Higgs to response to Defendant's [327-1] motion in Limine to Exclude Evidence of Bank Fraud and Theft During Trial, and Memorandum (c/s) (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/21/2000 | | Jury trial - Day 8 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/21/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/21/2000 | 339 | RESPONSE by USA as to Dustin John Higgs re [326-1] motion in Limine to Exclude Certain Testimony of Steve Zabrenski (1 c/s) (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/21/2000 | 340 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/21/2000 | 341 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/22/2000) |
| 09/22/2000 | | Jury trial - Day 9 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/25/2000) |
| 09/22/2000 | | Individual Voir Dire continued (td, Deputy Clerk) (Entered: 09/25/2000) |
| 09/22/2000 | | Motion hearing held before Messitte, J. as to Dustin John Higgs re: [328-1] motion of Defendant in Limine to Exclude Government's Proposed Fed. R. Evid. 807 Evidence During Trial - "RENDERED" MOOT; [326-1] motion of Defendant to Exclude Certain Testimony of Steve Zabrenski - Argued - "DENIED" for reasons stated by the Court; [327-1] motion of Defendant in Limine to Exclude Evidence of Bank Fraud and Theft During Trial - Argued - "DENIED" for reasons stated by the Court; [325-1] motion of Defendant in Limine to Exclude Evidence of November 19, 1995 District of Columbia Assaults During Trial - Argued - "DENIED" for reasons stated by the Court (Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/25/2000) |

A-017

| | | |
|---|---|---|
| 09/25/2000 | 342 | ORDER "DENYING" [325-1] motion of Defendant in Limine to Exclude Evidence of November 19, 1995 District of Columbia Assaults During Trial as to Dustin John Higgs (2) Signed by Judge Peter J. Messitte 9/22/2000 ) (c/m 9/25/2000 kc) (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/25/2000 | 343 | ORDER "DENYING" [326-1] motion of Defendant to Exclude Certain Testimony of Steve Zabrenski as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte 9/22/2000 ) (c/m 9/25/2000 kc) (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/25/2000 | 344 | ORDER "DENYING" [327-1] motion of Defendant in Limine to Exclude Evidence of Bank Fraud and Theft During Trial as to Dustin John Higgs (2) ( Signed by Judge Peter Messitte 9/22/2000 ) (c/m 9/25/2000 kc) (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/25/2000 | 345 | ORDER "DEEMING" MOOT [328-1] motion of Defendant in Limine to Exclude Government's Proposed Fed. R. Evid. 807 Evidence During Trial as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte 9/22/2000 ) (c/m 9/25/2000 kc) (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/25/2000 | 346 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/25/2000 | 347 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/26/2000 | 348 | MOTION with Memorandum in Support by Dustin John Higgs in Limine to Exclude Certain Crime Scene and Autopsy Photographs during Trial (c/s) (td, Deputy Clerk) (Entered: 09/26/2000) |
| 09/26/2000 | | Jury trial - Day 10 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/27/2000) |
| 09/26/2000 | | Opening Statements made by USA (td, Deputy Clerk) (Entered: 09/27/2000) |
| 09/26/2000 | | Opening Statements made by Dustin John Higgs (td, Deputy Clerk) (Entered: 09/27/2000) |
| 09/26/2000 | 351 | Trial Phase Witness List by Dustin John Higgs (filed in Court on 9/5/2000) (1 c/s) (td, Deputy Clerk) (Entered: 09/28/2000) |
| 09/27/2000 | 350 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 09/27/2000) |
| 09/27/2000 | | Jury trial - Day 11 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/28/2000) |
| 09/27/2000 | 352 | ORDER "DENYING" [348-1] motion of Defendant in Limine to Exclude Certain Crime Scene and Autopsy Photographs during Trial as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte 9/26/2000 ) (c/m 9/26/2000 esp) (td, Deputy Clerk) (Entered: 09/28/2000) |
| 09/28/2000 | | Jury trial - Day 12 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 09/29/2000) |
| 09/29/2000 | | Jury trial - Day 13 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/02/2000) |
| 10/03/2000 | | Jury trial - Day 14 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/03/2000) |
| 10/04/2000 | 353 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 10/04/2000) |
| 10/04/2000 | | Jury trial - Day 15 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/04/2000) |

**A-018**

| 10/05/2000 | | Jury trial - Day 16 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (mdd, Deputy Clerk) (Entered: 10/06/2000) |
|---|---|---|
| 10/05/2000 | 354 | SEALED DOCUMENT (mdd, Deputy Clerk) (Entered: 10/06/2000) |
| 10/06/2000 | 355 | TRANSCRIPT of Proceedings Held as to Dustin John Higgs for dates of 9/29/00 (Filed Separately) (mdd, Deputy Clerk) (Entered: 10/06/2000) |
| 10/06/2000 | | Jury trial - Day 17 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/06/2000 | | ORAL MOTION by Dustin John Higgs for Judgment of Acquittal - Argued - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/10/2000 | | Jury trial - Day 18 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/10/2000 | | Court's Charge to the Jury as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/10/2000 | | Closing Statements by USA and Dustin John Higgs (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/10/2000 | | Bailiff David Williams Sworn as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/10/2000 | | Special Verdict Form submitted to the Jury as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/11/2000) |
| 10/11/2000 | | Jury trial - Day 19 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | | Jury Deliberations began as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | | VERDICT of Guilty: as to Dustin John Higgs (2) as to Counts 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss & 15ss (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | | Jury Polled at the Direction of the Court (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | | Jurors Excused until 10/18/2000 (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 356 | Requested Jury instructions as to Dustin John Higgs (filed in Court on 10/10/2000) (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 357 | Requested Jury instructions by Defendant as to Dustin John Higgs (filed in Court on 10/10/2000) (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 357 | OBJECTIONS by Dustin John Higgs to Government's [356-1] Jury Instructions (filed in Court on 10/10/2000) (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 358 | Certification of Counsel re: Exhibits to be Submitted to Jury (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 359 | Exhibit list by USA as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 360 | Exhibit list by Dustin John Higgs (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 361 | VERDICT SHEET as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/11/2000 | 362 | STIPULATION regarding Return of Exhibits to Counsel, Pending Appeal (td, Deputy |

**A-019**

| | | |
|---|---|---|
| | | Clerk) (Entered: 10/12/2000) |
| 10/12/2000 | 363 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 10/12/2000) |
| 10/13/2000 | 364 | MEMORANDUM (MOTION) by USA as to Dustin John Higgs to Preclude Expert Testimony relating to Maryland State Law on Eligibility for Capital Punishment (c/s) (td, Deputy Clerk) (Entered: 10/16/2000) |
| 10/13/2000 | 365 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 10/16/2000) |
| 10/16/2000 | 366 | Proposed Penalty-Phase Jury instructions by USA as to Dustin John Higgs (c/s) (td, Deputy Clerk) (Entered: 10/16/2000) |
| 10/16/2000 | 367 | MOTION by Dustin John Higgs to Limit Argument by the Government during the Penalty Phase and for Other Appropriate Relief (c/s) (td, Deputy Clerk) (Entered: 10/16/2000) |
| 10/16/2000 | 368 | RESPONSE by Dustin John Higgs to Government's [366-1] Proposed Penalty Phase Jury Instructions (c/s) (td, Deputy Clerk) (Entered: 10/16/2000) |
| 10/17/2000 | 369 | RESPONSE by Dustin John Higgs in opposition to [364-1] motion to Preclude Expert Testimony relating to Maryland State Law on Eligibility for Capital Punishment (c/s) (rank, Deputy Clerk) (Entered: 10/17/2000) |
| 10/17/2000 | 370 | RESPONSE by USA as to Dustin John Higgs re [367-1] motion to Limit Argument by the Government during the Penalty Phase, [367-2] motion for Other Appropriate Relief and exhibits A & B (c/s) (lad, Deputy Clerk) (Entered: 10/17/2000) |
| 10/17/2000 | 371 | MOTION by USA as to Dustin John Higgs to Strike Defendant's Mitigating Factors Numbers Three, Four, Five, Six, Eight and Ten (c/s) (lad, Deputy Clerk) (Entered: 10/17/2000) |
| 10/17/2000 | 372 | MOTION with Memorandum in Support by USA as to Dustin John Higgs in Limine to Preclude References in Social History Report to Statements made by the Defendant , and for Disclosure of Mr. Sickler's Notes (c/s) (lad, Deputy Clerk) (Entered: 10/17/2000) |
| 10/18/2000 | 373 | TRANSCRIPT(S) of Proceedings Held before the Court Messitte, J. as to Dustin John Higgs for dates of 9/27 & 28/00 (filed separately) (lad, Deputy Clerk) (Entered: 10/18/2000) |
| 10/18/2000 | | Jury trial - Day 20 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Mech-O'Neill) (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | | Court's Opening Charge to the Jury as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | | Opening Statements made by USA and Dustin John Higgs (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | 374 | Preliminary Penalty-Phase Jury instructions by Dustin John Higgs (filed in Court) (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | 375 | NOTICE of Filing and copy of Correspondence from Defense Counsel to the Government re: their Motion to Preclude References in Social History to Statements made by the Defendant and for Disclosure of Mr. Sickler's Notes by Dustin John Higgs (filed in Court) (1 c/s) (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | 376 | ORDER "GRANTING" in part, "DENYING" in part [367-1] motion of Defendant to Limit Argument by the Government during the Penalty Phase and [367-2] motion for |

A-020

| | | |
|---|---|---|
| | | Other Appropriate Relief as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 10/20/2000 td) (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/18/2000 | 377 | ORDER "GRANTING" [371-1] motion to Strike Defendant's Mitigating Factors as to Numbers Three, Four, Five and Six; "DEEMING" MOOT as to Number Eight; and "DENYING" as to Number Ten as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 10/20/2000 td) (td, Deputy Clerk) (Entered: 10/20/2000) |
| 10/19/2000 | | Jury trial - Day 21 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/19/2000 | | ORAL MOTION by Dustin John Higgs for Judgment of Acquittal made at the conclusion of the Government's Case-in-Chief - Argued - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/20/2000 | | Jury trial - Day 22 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/20/2000 | 378 | CORRESPONDENCE by Counsel for Dustin John Higgs re: New York's youthful offender procedure (filed in Court) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/20/2000 | 379 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/20/2000 | 380 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/20/2000 | 381 | Government's Amended Proposed Final Penalty-Phase Jury Instructions as to Dustin John Higgs (c/s) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/23/2000 | 382 | RESPONSE by USA as to Dustin John Higgs to Government's [381-1] Final Penalty-Phase Jury Instructions (c/s) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/23/2000 | 383 | MOTION with Memorandum in Support by Dustin John Higgs to Preclude the Government from Arguing to the Jury that Defendant is more Culpable than Co-Defendant during Closing Arguments and Rebuttal in Penalty Phase or, alternatively, to Permit Defendant to Introduce Certain Government Admissions during Penalty Phase Case-in-Chief (c/s) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/23/2000 | 384 | MOTION by USA as to Dustin John Higgs to Admit Summary Chart relating to "Background, Record [and] Character" of Defendant in Government's Rebuttal Case and Attachment (c/s) (td, Deputy Clerk) (Entered: 10/23/2000) |
| 10/24/2000 | 385 | RESPONSE by Dustin John Higgs in opposition to [384-1] motion to Admit Summary Chart relating to "Background, Record [and] Character" of Defendant in Government's Rebuttal Case (c/s) (mib, Deputy Clerk) (Entered: 10/24/2000) |
| 10/24/2000 | 386 | RESPONSE by USA as to Dustin John Higgs in opposition to Defendant's [383-1] motion to Preclude the Government from Arguing to the Jury that Defendant is more Culpable and in the alternative [383-2] motion to Permit Defendant to Introduce Certain Government Admissions during Penalty Phase (c/s) (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | Jury trial - Day 23 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | Oral Arguments of Counsel as to Dustin John Higgs re: [371-1] motion of Defendant to Strike Defendant's Mitigating Factors Numbers Three, Four, Five, Six, Eight and Ten - "DENIED"; [372-1] motion of the Government in Limine to Preclude References in Social History Report to Statements made by the Defendant - "DENIED"; and [384-1] motion of the Government to Admit Summary Chart relating to "Background, Record [and] Character" of Defendant in Government's Rebuttal Case - "GRANTED" in part, |

| | | |
|---|---|---|
| | | "DENIED" in part all for reasons stated by the Court (Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | Oral Arguments of Counsel re: Instructions and Verdict Sheet (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | Defendant sworn and responded to Voir Dire on his Right to Testify or not to Testify on his behalf (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | ORAL MOTION by Dustin John Higgs to Dismiss Statement of Government "Intention to Kill" - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | ORAL MOTION by Dustin John Higgs to Renew his Motion to Strike the Rebuttal Evidence of the Government - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | | Court's Charge to the Jury as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/24/2000 | 387 | ORDER "GRANTING" in part, "DENYING" in part [384-1] motion of USA to Admit Summary Chart relating to "Background, Record [and] Character" of Defendant in Government's Rebuttal Case as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte ) (c/m 10/25/2000 td) (td, Deputy Clerk) (Entered: 10/25/2000) |
| 10/25/2000 | | Jury trial - Day 24 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | | Final Closing Arguments of Counsel (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | | ORAL MOTION by Dustin John Higgs for Mistrial as to all Counts - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | | RENEWED ORAL MOTION by Dustin John Higgs for Mistrial as to all Counts - "DENIED" for reasons stated by the Court (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | | Bailiff Robert Panko Sworn as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | | Verdict Form and Instructions submitted to the Jury as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/25/2000 | 388 | Certification of Counsel re: Exhibits to be Submitted to the Jury (td, Deputy Clerk) (Entered: 10/26/2000) |
| 10/26/2000 | | Jury trial - Day 25 - held before Judge Peter J. Messitte as to Dustin John Higgs (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | | VERDICT of Guilty: as to Dustin John Higgs (2) as to Counts 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss, 13ss, 14ss and 15ss (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | | Jurors excused from further jury service (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | | Special Verdict Forms returned by the Jury with answers as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | 390 | Special Verdict Form for Offenses against Tamika Black (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | 391 | Special Verdict Form for Offenses against Mishann Chinn (td, Deputy Clerk) (Entered: |

A-022

| | | |
|---|---|---|
| | | 10/30/2000) |
| 10/26/2000 | 392 | Special Verdict Form for Offenses against Tanji Jackson (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | 393 | Exhibit list by USA as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | 394 | Exhibit list by Dustin John Higgs (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/26/2000 | 395 | Final Penalty-Phase Jury instructions as to Dustin John Higgs (td, Deputy Clerk) (Entered: 10/30/2000) |
| 10/31/2000 | 396 | ORDER for Expedited Sentencing on Uncontested Presentence Report Determinations as to Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m 10/31/2000 esp) (td, Deputy Clerk) (Entered: 11/01/2000) |
| 11/08/2000 | 397 | MOTION with Memorandum in Support by Dustin John Higgs to Vacate [396-1] Order for Expedited Sentencing on Uncontested Presentence Report Determinations and to Waive Presentence Investigation and Report (c/s) (td, Deputy Clerk) (Entered: 11/08/2000) |
| 11/08/2000 | 398 | STIPULATION of Counsel regarding Return of Exhibits, Pending Appeal (td, Deputy Clerk) (Entered: 11/09/2000) |
| 11/13/2000 | 399 | RESPONSE by USA as to Dustin John Higgs re [397-1] motion to Vacate [396-1] Order for Expedited Sentencing on Uncontested Presentence Report Determinations (c/s) (td, Deputy Clerk) (Entered: 11/14/2000) |
| 11/16/2000 | 400 | ORDER "DENYING" [397-1] motion of Defendant to Vacate [396-1] Order for Expedited Sentencing on Presentence Report Determinations and [397-2] motion to Waive Presentence Investigation and Report as to Dustin John Higgs (2) ( Signed by Judge Peter J. Messitte 11/14/2000 ) (c/m 11/16/2000 esp) (td, Deputy Clerk) (Entered: 11/16/2000) |
| 11/30/2000 | 402 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 12/06/2000) |
| 12/01/2000 | 403 | ORDER "DIRECTING" the U.S. Marshal to Provide the Jury with Lunch as to Dustin John Higgs (signed by Valerie Sutton for Felicia C. Cannon) (c/s 12/1/2000 pf) (td, Deputy Clerk) Modified on 12/06/2000 (Entered: 12/01/2000) |
| 12/01/2000 | 404 | ORDER "DIRECTING" the U.S. Marshal to Provide Lunch for the Jury as to Dustin John Higgs (signed by Valerie Sutton for Felica C. Cannon 11/30/2000) (c/s to finance 12/1/2000 bbe) (td, Deputy Clerk) Modified on 12/06/2000 (Entered: 12/04/2000) |
| 12/01/2000 | 405 | NOTICE of Filing by Dustin John Higgs and Copy of Correspondence of Defense Counsel to the USA re: Defendant's Sentence (c/s) (td, Deputy Clerk) (Entered: 12/06/2000) |
| 12/05/2000 | 406 | MEMORANDUM resetting the Sentencing as therein set forth as to Dustin John Higgs (c/m 12/4/2000 esp) (td, Deputy Clerk) (Entered: 12/06/2000) |
| 12/08/2000 | 407 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 12/11/2000) |
| 12/12/2000 | 408 | SEALED DOCUMENT (lad, Deputy Clerk) (Entered: 12/12/2000) |
| 12/14/2000 | 409 | SEALED DOCUMENT (td, Deputy Clerk) (Entered: 12/15/2000) |
| 01/03/2001 | | Sentencing as to Dustin John Higgs (2) as to Counts 1ss, 2ss, 4ss, 5ss, 6ss, 7ss, 9ss, 10ss, 11ss, 12ss, 14ss & 15ss held Judge Peter J. Messitte (Court Reporter: Simpkins) (td, Deputy Clerk) (Entered: 01/10/2001) |

A-023

| 01/09/2001 | 413 | JUDGMENT as to Dustin John Higgs (2) as to Counts 1ss, 2ss , 4ss , 6ss , 7ss , 9ss , 11ss , 12ss and 14ss - Consecutive Sentences of Death; as to Counts 5ss, 10ss and 15ss - 5 years Imprisonment consecutive to all Sentences currently being served and consecutive to the Death Sentences imposed in Counts 1, 2, 4, 6, 7, 9, 11, 12 & 14 as to Count 5 of the Second Superseding Indictment; 20 years Imprisonment consecutive to Count 5 as to Count 10 of the Second Superseding Indictment; 20 years Imprisonment consecutive Count 10 as to Count 15 of the Second Superseding Indictment; 5 years Supervised Release with Conditions as each of Counts 5, 10 & 15 of the Second Superseding Indictment, to run concurrent to each other; $13,687.22 Restitution; $600.00 Special Assessment ( Signed by Judge Peter J. Messitte 1/5/2001 ) (c/m & microfilmed 1/8/2001 bbe) (td, Deputy Clerk) (Entered: 01/11/2001) |
|---|---|---|
| 01/09/2001 | 414 | JUDGMENT AND ORDER "STATING" that the Defendant shall pay to the United States a Special Assessment of $50.00 for Counts 1, 2, 4, 6, 7, 9, 11, 12 and 14 as therein set forth; "STATING" that the Court imposes upon the Defendant a Sentence of Death as to Counts 1, 2, 5, 6, 7, 9, 11, 12 and 14; and "STATING" that the Sentence shall be Executed as therein more particularly set forth as to Dustin John Higgs ( Signed by Judge Peter J. Messitte ) (c/m & microfilmed 1/8/2001 bbe) (td, Deputy Clerk) (Entered: 01/11/2001) |
| 01/11/2001 | 415 | NOTICE OF APPEAL by Dustin John Higgs (2) count(s) 1ss, 2ss, 4ss, 5ss, 6ss, 7ss, 9ss, 10ss, 11ss, 12ss FILING FEE $ IFP Status Granted (mlb, Deputy Clerk) (Entered: 01/16/2001) |
| 01/16/2001 | | Notice of appeal and certified copy of docket as to Dustin John Higgs to USCA: [415-1] appeal (mlb, Deputy Clerk) (Entered: 01/16/2001) |
| 01/17/2001 | 416 | ORDER "PLACING UNDER SEAL" the Presentence Investigation Report as to Dustin John Higgs ( Signed by Judge Peter J. Messitte 1/16/2001 ) (td, Deputy Clerk) (Entered: 01/17/2001) |
| 01/17/2001 | 417 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Dustin John Higgs (td, Deputy Clerk) (Entered: 01/17/2001) |
| 01/29/2001 | | USCA Case Number as to Dustin John Higgs Re: [415-1] appeal USCA Number: 01-03 (Case Manager Beth Walton) (mlb, Deputy Clerk) (Entered: 01/29/2001) |
| 02/08/2001 | 418 | ORDER as to Dustin John Higgs "DISMISSING" the Indictment and the Superseding Indictment pending against the Defendant ( Signed by Judge Peter J. Messitte 2/7/2001 ) (cc/m & microfilmed 2/8/2001 esp) (td, Deputy Clerk) (Entered: 02/08/2001) |
| 02/08/2001 | | DISMISSAL of Count(s) as to Dustin John Higgs; Counts Dismissed: Dustin John Higgs (2) as to Counts 1s, 1, 2s, 2, 3s, 3, 4s, 4, 5s, 5, 6s, 6, 7s, 7, 8s, 8, 9s and 9 (td, Deputy Clerk) (Entered: 02/12/2001) |
| 02/27/2001 | 419 | TRANSCRIPT filed as to Dustin John Higgs for dates of September 5, 7-8, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 03/01/2001) |
| 02/28/2001 | 420 | Transcript requested in appeal as to Dustin John Higgs [415-1] appeal (Sept. 6, 2000) (mlb, Deputy Clerk) (Entered: 03/01/2001) |
| 03/06/2001 | 421 | TRANSCRIPT filed as to Dustin John Higgs for dates of October 18, 2000 Re: [415-1] appeal (FILED SEPERATELY) (mlb, Deputy Clerk) (Entered: 03/12/2001) |
| 03/22/2001 | 422 | ORDER for Dismissal of Alternative Counts 3,8 & 13 of the Second Superseding Indictment as to Dustin John Higgs ( Signed by Judge Peter J. Messitte 3/20/01) (c/m 3/23/01lad) (lad, Deputy Clerk) (Entered: 03/23/2001) |
| 03/22/2001 | | DISMISSAL of Count(s) as to Dustin John Higgs Counts Dismissed: Dustin John Higgs |

A-024

| | | |
|---|---|---|
| | | (2) count(s) 3ss, 8ss, 13ss (lad, Deputy Clerk) (Entered: 03/23/2001) |
| 03/23/2001 | 423 | TRANSCRIPT filed as to Dustin John Higgs for dates of 9/18/00 thru 9/22/00 and 9/26/00 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 03/23/2001) |
| 03/29/2001 | 424 | TRANSCRIPT filed as to Dustin John Higgs for date of 9/6/2000 Re: [415-1] Appeal (Filed Separately) (Court Reporter: Bankins) (td, Deputy Clerk) (Entered: 03/30/2001) |
| 04/09/2001 | 425 | ORDER "EXTENDING" time for filing transcript to 4/30/01 as to Dustin John Higgs (mlb, Deputy Clerk) (Entered: 04/10/2001) |
| 04/25/2001 | 426 | TRANSCRIPT filed as to Dustin John Higgs for dates of 9/27/00 - 9/29/00 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 04/25/2001) |
| 04/25/2001 | 427 | TRANSCRIPT filed as to Dustin John Higgs for dates of October 3-6, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 04/25/2001) |
| 04/30/2001 | 428 | TRANSCRIPT filed as to Dustin John Higgs for dates of October 10-11, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 05/01/2001) |
| 04/30/2001 | 429 | TRANSCRIPT filed as to Dustin John Higgs for dates of October 19-20, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 05/01/2001) |
| 04/30/2001 | 430 | TRANSCRIPT filed as to Dustin John Higgs for dates of October 24-26, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 05/01/2001) |
| 04/30/2001 | 431 | TRANSCRIPT filed as to Dustin John Higgs for dates of January 3, 2001 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 05/01/2001) |
| 05/01/2001 | | TRANSCRIPT filed as to Dustin John Higgs for dates of October 19-20, 2000 Re: [415-1] appeal (mlb, Deputy Clerk) (Entered: 05/01/2001) |
| 05/15/2001 | 432 | CERTIFICATE OF CLERK certifying record is complete for appeal purposes for [415-1] appeal as to Dustin John Higgs (mlb, Deputy Clerk) (Entered: 05/15/2001) |
| 09/06/2001 | 433 | CORRESPONDENCE from Messitte, J., to Counsel regarding juror questionnaires (c/m 9/7/01 ib) (mib, Deputy Clerk) (Entered: 09/07/2001) |
| 10/01/2001 | 434 | ORDER (copy) From United States Court of Appeals for the Fourth Circuit "STRIKING" the appearance of Harry Trainor and "SUBSTITUTING" Barbara L. Hartung as co-counsel for the appellant, Dustin Higgs, the Court "GRANTS" appellant's request for authorization for interim payments under the Criminal Justice Act. (c/s 10/01/01 pf) (pkf, Deputy Clerk) Modified on 10/12/2001 (Entered: 10/01/2001) |
| 10/12/2001 | | Certified and transmitted record on appeal to U.S. Court of Appeals as to Willis Mark Haynes, Dustin John Higgs : [415-1] appeal (Voulmes 1 thourgh 173) (pkf, Deputy Clerk) (Entered: 10/12/2001) |
| 12/12/2001 | | Appeal Record Returned as to Willis Mark Haynes, Dustin John Higgs: 473 Notice of Appeal - Final Judgment, 415 Notice of Appeal - Final Judgment, 332 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 10/25/2005) |
| 03/20/2002 | | Certified and transmitted record on appeal to U.S. Court of Appeals as to Dustin John Higgs (Per request of USCA, Beth Walton) (mlb, Deputy Clerk) (Entered: 03/20/2002) |
| 07/30/2002 | 436 | Motion of defendant Dustin John Higgs for a New Trial and/or New Sentencing Hearing. (Exhibits A-R) (Filed separately) (unsealed in open court on the record 8/4/2003) (ajh, Deputy Clerk) Modified on 8/5/2003 (esp, Deputy Clerk). Modified on 8/5/2003 (esp, Deputy Clerk). (Entered: 07/30/2002) |
| 08/05/2002 | 437 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 08/06/2002) |

A-025

| 08/06/2002 | 438 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 08/06/2002) |
|---|---|---|
| 08/06/2002 | 439 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 08/07/2002) |
| 08/07/2002 | 440 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 08/08/2002) |
| 09/16/2002 | 441 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 09/17/2002) |
| 09/23/2002 | 442 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 09/24/2002) |
| 09/25/2002 | 443 | SEALED DOCUMENT (mib, Deputy Clerk) (Entered: 09/26/2002) |
| 10/02/2002 | 444 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 10/02/2002) |
| 10/03/2002 | 445 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 10/04/2002) |
| 01/14/2003 | 450 | NOTICE of Waiver of Right to be Physically Present for Motions Hearing and Request/Consent to Participate by Video Teleconferencing by Dustin John Higgs (c/s) (ajh, Deputy Clerk) (Entered: 01/15/2003) |
| 01/21/2003 | 451 | ORDER granting defendant's waiver of Right to be Physically Present and Request/Consent to Participate by Video Conferencing ( Signed by Judge Peter J. Messitte 1/17/03) (c/m 1/17/03esp) (lad, Deputy Clerk) (Entered: 01/21/2003) |
| 02/10/2003 | 453 | SEALED DOCUMENT (ajh, Deputy Clerk) (Entered: 02/11/2003) |
| 05/09/2003 | 459 | Letter from Robin Shea Assistant to Judge Messitte setting hearing on Defendant's Motion for New Trial (c/m 5/6/03esp) (lad, Deputy Clerk) (Entered: 05/09/2003) |
| 06/10/2003 | 465 | MOTION to Unseal Motion for New Trial and/or New Sentencing Hearing, Exhibits, Response, and Reply by Dustin John Higgs. Responses due by 6/27/2003 (lad, Deputy Clerk) (Entered: 06/12/2003) |
| 07/16/2003 | 466 | Sealed Document. (rank, Deputy Clerk) Modified on 8/5/2003 (esp, Deputy Clerk). (Entered: 07/18/2003) |
| 07/30/2003 | 467 | AFFIDAVIT of Willis Mark Haynes filed by Dustin John Higgs (c/s) (lad, Deputy Clerk) (Entered: 08/01/2003) |
| 07/30/2003 | 468 | Sealed Document (lad, Deputy Clerk) (Entered: 08/01/2003) |
| 08/01/2003 | 469 | Request and ORDER Appointing Additional Co-Counsel Barbara Hartung as to Dustin John Higgs. Signed by Judge Peter J. Messitte on July 30, 2003. (c/m 8/4/03lad) (lad, Deputy Clerk) (Entered: 08/04/2003) |
| 08/01/2003 | | Attorney update in case as to Dustin John Higgs. Attorney Barbara Hartung for Dustin John Higgs added. (lad, Deputy Clerk) (Entered: 08/06/2003) |
| 08/04/2003 | | Oral Motion of Timothy Sullivan to admit Barbara Hartun Pro Hac Vice as co-counsel on behalf of defendant Dustin Higgs - "granted" as stated on the record in open court. (esp, Deputy Clerk) (Entered: 08/05/2003) |
| 08/04/2003 | | Motion Hearing as to Dustin John Higgs re 465 MOTION to Unseal Document filed by Dustin John Higgs - "granted" for reasons stated on the record before Judge Peter J. Messitte. (Court Reporter Simpkins) (esp, Deputy Clerk) (Entered: 08/05/2003) |
| 08/04/2003 | | Motion Hearing held before Judge Messitte on Motion by defendant Dustin John Higgs for a New Trial and/or New Sentencing Hearing. (Exhibits A-R) (Paper No. 436) (Court Reporter Simpkins.) (esp, Deputy Clerk) (Entered: 08/05/2003) |
| 08/04/2003 | | Argument of counsel. (esp, Deputy Clerk) (Entered: 08/05/2003) |

**A-026**

| 08/04/2003 | | Oral ruling of the Court. (esp, Deputy Clerk) (Entered: 08/05/2003) |
|---|---|---|
| 08/04/2003 | | Oral order (Messitte, J.) "denying" Motion by defendant Dustin John Higgs for a New Trial and/or New Sentencing Hearing. (Paper No 436) for reasons stated on the record in open court. (Court to prepare order) (esp, Deputy Clerk) (Entered: 08/05/2003) |
| 08/04/2003 | 470 | EXHIBIT LIST by Dustin John Higgs re: Motions hearing held on 8/4/2003. (esp, Deputy Clerk) (Entered: 08/05/2003) |
| 08/04/2003 | 473 | NOTICE OF APPEAL re Order (472) by Dustin John Higgs (mlb, Deputy Clerk) (Entered: 08/06/2003) |
| 08/05/2003 | 471 | ORDER granting 465 Motion to Unseal Motion for New trial and/or New Sentencing Hearing as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on August 4, 2003. (c/m 8/5/03esp) (lad, Deputy Clerk) (Entered: 08/06/2003) |
| 08/05/2003 | 472 | ORDER denying 436 motion for New Trial and/or New Sentencing Hearing as to Dustin John Higgs. Signed by Judge Peter J. Messitte on August 4, 2003. (c/m 8/5/03esp) (lad, Deputy Clerk) (Entered: 08/06/2003) |
| 08/06/2003 | | Transmission of Notice of Appeal and Docket Sheet as to Willis Mark Haynes, Dustin John Higgs to US Court of Appeals re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 08/06/2003) |
| 08/22/2003 | 475 | CJA 30: Appointment of Attorney Barbara Hartung as co-counsel for Dustin John Higgs in Death Penalty Proceedings as to Dustin John Higgs., CJA 30: Authorization to Pay in Death Penalty Proceedings as to Dustin John Higgs. Signed by Donna Shearer on 07/31/2003. (elt, Deputy Clerk) (Entered: 08/25/2003) |
| 09/22/2003 | 476 | ORDER of USCA (certified copy) "APPOINTING" Timothy J. Sullivan as lead counsel and Barbara L. Hartung as co-counsel for the appeal; as to Dustin John Higgs re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 09/22/2003) |
| 09/26/2003 | 478 | ORDER of USCA (certified copy) "EXTENDING" time for court reporter Gail Simpkins, to file transcript, without sanctions, to 9/30/03; as to Dustin John Higgs re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 09/26/2003) |
| 10/14/2003 | 480 | TRANSCRIPT filed as to Dustin John Higgs for dates of 8/4/03 before Judge Peter J. Messitte, re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 10/14/2003) |
| 02/03/2004 | 481 | JUDGMENT of USCA (certified copy) "AFFIRMING" the judgment of the USDC as to Dustin John Higgs re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 02/03/2004) |
| 05/06/2004 | 482 | JUDGMENT of USCA (certified copy) "AFFIRMING" the judgment of the USDC; Rec'd from USCA on 4/21/04 as to Dustin John Higgs re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 05/06/2004) |
| 05/13/2004 | 483 | MANDATE of USCA (certified copy) as to Dustin John Higgs re 473 Notice of Appeal - Final Judgment (mlb, Deputy Clerk) (Entered: 05/17/2004) |
| 01/27/2005 | 484 | ORDER Appointing Counsel Under The Criminal Justice Act as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 1/27/05 (c/m 1/27/05 CJA Attorney -Baltimore esp) (zf, Deputy Clerk) (Entered: 01/28/2005) |
| 02/24/2005 | 486 | NOTICE OF ATTORNEY APPEARANCE: Michael Wiseman appearing for Dustin John Higgs (c/s) (zf, Deputy Clerk) (Entered: 03/01/2005) |
| 02/28/2005 | 485 | NOTICE OF ATTORNEY APPEARANCE: Stephen H Sachs appearing for Dustin John |

A-027

| | | Higgs (c/s) (zf, Deputy Clerk) (Entered: 02/28/2005) |
|---|---|---|
| 05/19/2005 | 487 | Sealed Document (rank, Deputy Clerk) (Entered: 05/19/2005) |
| 05/19/2005 | 488 | Sealed Document (rank, Deputy Clerk) (Entered: 05/19/2005) |
| 05/19/2005 | 489 | ORDER For Interim Payments to Appointed Counsel as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 5/16/05 (c/m 5/18/05 dps) (zf, Deputy Clerk) (Entered: 05/20/2005) |
| 05/19/2005 | 490 | CJA 30: Appointment of Attorney Stephen H Sachs for in Death Penalty Proceedings as to Dustin John Higgs. Signed by Clerk on 2/28/05 (c/m 5/17/05 dps) (zf, Deputy Clerk) (Entered: 05/20/2005) |
| 11/28/2005 | 492 | MOTION to Vacate under 28 U.S.C. 2255 or in the Alternative Pursuant to 28 U.S.C. 2241 ( Civil Action 05-3180 ) and Exhibits by Dustin John Higgs; Responses due by 12/15/2005 (Exhibits Filed Separately)(ajh, Deputy Clerk)(c/s) (Entered: 11/28/2005) |
| 11/30/2005 | 493 | NOTICE of Filing of Original Verification by Dustin John Higgs (c/s) (zf, Deputy Clerk) (Entered: 12/01/2005) |
| 12/14/2005 | 494 | Response with no objection to petitioner's request to the court to grant him 90 days to file a brief in support of the petition by USA (elt, Deputy Clerk) (Entered: 12/14/2005) |
| 12/22/2005 | 495 | ORDER "Directing" that the Petitioner's Request to be Permitted to File a Brief in Support of his Petition within ninety (90) days, contained in his Motion for Relief Pursuant to 28 U.S.C. 2255, or, in the alternative, Pursuant to 28 U.S.C. 2241 [Paper No. 492] is GRANTED; and it is further ORDERED that the Government's Request that the Court defer setting a date for filing of the Government's response until Petitioner's Brief is filed [Paper No. 494] is GRANTED as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 12/22/05 (c/m 12/23/05 zf) (zf, Deputy Clerk) (Entered: 12/23/2005) |
| 02/14/2006 | 496 | MOTION to Continue *Unopposed Motion for 60 Day Continuance for Filing of Memorandum* by Dustin John Higgs. Responses due by 3/3/2006 (Wiseman, Michael) (Entered: 02/14/2006) |
| 02/24/2006 | 497 | ORDER granting 496 MOTION to Continue Unopposed Motion for 60 Day Continuance for Filing of Memorandum by Dustin John Higgs (2) Signed by Judge Roger W Titus on 2/24/06 (c/m 2/27/06 zf) (zfs, Deputy Clerk) (Entered: 02/27/2006) |
| 04/06/2006 | 498 | MOTION to Preclude Contact With Jurors by USA as to Dustin John Higgs. Responses due by 4/24/2006 (c/s)(zf, Deputy Clerk) (Entered: 04/07/2006) |
| 04/27/2006 | 499 | RESPONSE to Motion by Dustin John Higgs re 498 MOTION to Preclude Contact With Jurors. Replies due by 5/11/2006 (c/s)(zf, Deputy Clerk) (Entered: 04/27/2006) |
| 04/27/2006 | 500 | Cross MOTION to allow Standard Post-Conviction Interviews with Petitioner's Jury by Dustin John Higgs. Responses due by 5/15/2006 (c/s)(zf, Deputy Clerk) (Entered: 04/27/2006) |
| 05/01/2006 | 501 | Petitioner's Uncontested MOTION For A Four Day Extension of Time For Filing Memorandum of Law In Support of Petition For Writ of Habeas Corpus (Section 2255 Petition) by Dustin John Higgs. Responses due by 5/18/2006 (c/s)(zf, Deputy Clerk) (Entered: 05/01/2006) |
| 05/02/2006 | 502 | ORDER granting 501 Petitioner's Uncontested MOTION For A Four Day Extension of Time For Filing Memorandum of Law In Support of Petition For Writ of Habeas Corpus (Section 2255 Petition)by Dustin John Higgs (2) Signed by Judge Peter J. Messitte on 5/1/06 (c/m 5/2/06 zf) (zf, Deputy Clerk) (Entered: 05/02/2006) |

A-028

| 05/04/2006 | 503 | NOTICE OF ATTORNEY APPEARANCE: Angela S Elleman appearing for Dustin John Higgs (c/s) (zf, Deputy Clerk) (Entered: 05/04/2006) |
| 05/04/2006 | 504 | Petitioner's BRIEF in Support and Supplemental Appendix by Dustin John Higgs re 492 MOTION to Vacate under 28 U.S.C. 2255 ( Civil Action 05-3180) (FILED SEPARATELY)(corrected conclusion to petitioner's brief in support recvd on 5/5/06)(c/s) (zf, Deputy Clerk) Modified on 5/8/2006 (zf, Deputy Clerk) (Entered: 05/04/2006) |
| 05/08/2006 | 505 | ORDER "Directing" that a telephonic conference call to set filing deadlines shall be held with counsel of record on Wednesday, May 17, 2006 at 10:00 a.m.; and it is further ORDERED that if the parties have a conflict with this date, counsel should contact chambers in a telephonic conference call (with all counsel on the telephone) by the close of business on Monday, May 15, 2006 to reschedule the date as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 5/8/06 (c/m 5/9/06 zf) (zf, Deputy Clerk) (Entered: 05/09/2006) |
| 05/10/2006 | 506 | REPLY TO RESPONSE to Motion by USA as to Dustin John Higgs re 498 MOTION to Preclude Contact With Jurors, RESPONSE to Motion re 500 Cross MOTION to allow Standard Post-Conviction Interviews with Petitioner's Jury (c/s) (zf, Deputy Clerk) Modified on 5/17/2006 (zf, Deputy Clerk) (Entered: 05/11/2006) |
| 05/10/2006 | | Set/Reset Deadlines re Motion in case as to Dustin John Higgs 500 MOTION to allow Standard Post-Conviction Interviews with Petitioner's Jury. Replies due by 5/24/2006. (cag, Deputy Clerk) (Entered: 05/17/2006) |
| 05/17/2006 | | Telephone Conference as to Dustin John Higgs held on 5/17/2006 before Judge Peter J. Messitte. (esp, Deputy Clerk) (Entered: 05/18/2006) |
| 05/18/2006 | 507 | ORDER "Confirming" the matters discussed and schedule set during today's status conference as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 5/17/06 (c/m 5/18/06 zf) (zf, Deputy Clerk) (Entered: 05/18/2006) |
| 05/31/2006 | | Motion Hearing as to Dustin John Higgs held on 5/31/2006 re 498 MOTION to Preclude Contact With Jurors filed by USA,, 500 MOTION to allow Standard Post-Conviction Interviews with Petitioner's Jury filed by Dustin John Higgs, before Judge Peter J. Messitte. (Court Reporter Marshall) (esp, Deputy Clerk) (Entered: 06/01/2006) |
| 05/31/2006 | | Argument of counsel. (esp, Deputy Clerk) (Entered: 06/01/2006) |
| 05/31/2006 | | Oral ruling of the Court. (esp, Deputy Clerk) (Entered: 06/01/2006) |
| 05/31/2006 | | Oral order (Messitte, J.) "granting" Motion to Preclude Contact with Jurors by USA as to Dustin John Higgs. (Paper No. 498) and "denying" Cross Motion to Allow Standard Post-Conviction Interviews with Petitioner's Jury by Dustin John Higgs. (Paper No. 500) for reasons stated on the record in open court. (esp, Deputy Clerk) (Entered: 06/01/2006) |
| 06/02/2006 | 508 | ORDER granting 498 Motion to Preclude Contact with Jurors as to Dustin John Higgs (2); denying 500 Motion to Allow Standard Post-Conviction Interviews with Petitioner's Jury as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 05/31/2006. (c/m 6/2/06) (elt, Deputy Clerk) (Entered: 06/02/2006) |
| 06/27/2006 | 510 | TRANSCRIPT of Proceedings as to Dustin John Higgs held on May 31, 2006 before Judge Peter J. Messitte. Court Reporter: Linda C. Marshall (filed separately) (zf, Deputy Clerk) (Entered: 07/05/2006) |
| 07/05/2006 | 509 | MOTION for Discovery, and Memorandum by Dustin John Higgs. Responses due by 7/24/2006 (c/s)(aap, Deputy Clerk) (Entered: 07/05/2006) |
| 07/31/2006 | 513 | RESPONSE to Motion by USA as to Dustin John Higgs re 509 MOTION for Discovery |

**A-029**

| | | |
|---|---|---|
| | | Replies due by 8/14/2006. (c/s)(aap, Deputy Clerk) (Entered: 07/31/2006) |
| 08/14/2006 | 514 | ORDER Extending time an additional 7 days to file Petitioner's Reply as to Dustin John Higgs. Signed by Judge Deborah K. Chasanow on 08/14/06.(c/m 08/14/06rs) (jc, Deputy Clerk) (Entered: 08/15/2006) |
| 08/22/2006 | 515 | Memorandum in Reply to Government's Response to Motion by Dustin John Higgs re 509 MOTION for Discovery (c/s) (aap, Deputy Clerk) (Entered: 08/22/2006) |
| 09/29/2006 | 516 | Government's Request for 30-day extension and ORDER "Approved" as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 09/29/2006. (elt, Deputy Clerk) (Entered: 10/02/2006) |
| 11/01/2006 | 518 | Government's Request for extension of time to respond to Defendant's Petition as to Dustin John Higgs, and Order Approving extension until 11/8/2006. Signed by Judge Peter J. Messitte on 11/1/2006. (c/m 11/3/06 esp) (aap, Deputy Clerk) (Entered: 11/06/2006) |
| 11/08/2006 | 519 | MOTION to Strike Procedurally Defective Claims and exhibits 1-12 by USA as to Dustin John Higgs (filed separately) Responses due by 11/27/2006 (lad3, Deputy Clerk) (Entered: 11/09/2006) |
| 11/08/2006 | 520 | RESPONSE to Motion by USA as to Dustin John Higgs re 492 MOTION to Vacate under 28 U.S.C. 2255 or in the Alternative pursuant to 28:2241 ( Civil Action 05-3180.) and exhibits 1-12 (filed separately) Replies due by 11/22/2006. (lad3, Deputy Clerk) (Entered: 11/09/2006) |
| 11/27/2006 | 521 | MOTION for Extension of Time to File Reply Memorandum by Dustin John Higgs. Responses due by 12/14/2006 (c/s) (rank, Deputy Clerk) (Entered: 11/27/2006) |
| 11/27/2006 | 522 | ORDER granting 521 Motion for Extension of Time to File Reply Memorandum as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 11/27/2006. (c/m 11/27/06 rs) (aap, Deputy Clerk) (Entered: 11/30/2006) |
| 01/22/2007 | 523 | Memorandum/Order Defering the ruling on the Motion for Discovery 509 until such a time as the Motion to Vacate 492 has been fully briefed as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 1/19/07. (c/s) (aap, Deputy Clerk) Modified on 1/23/2007 (aap, Deputy Clerk). (Entered: 01/23/2007) |
| 01/24/2007 | 524 | Uncontested MOTION for A Fourteen Day Enlargement of Time in Which to file Reply Memorandum by Dustin John Higgs. Responses due by 2/12/2007 (c/s) (jc, Deputy Clerk) (Entered: 01/24/2007) |
| 01/30/2007 | 525 | ORDER granting 524 Uncontested MOTION for A Fourteen Day Enlargement of Time in Which to file Reply Memorandum; further directing that Petitioner may file his reply Memorandum of Law on or before February 12, 2007 as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 1/29/07. (c/m 1/30/07 aap) (aap, Deputy Clerk) (Entered: 01/30/2007) |
| 02/13/2007 | 526 | MEMORANDUM in Reply to the Government's Motion, by Dustin John Higgs re 519 MOTION to Strike Procedurally Defective Claims. (c/m 2/13/07 aap) (aap, Deputy Clerk) (Filed Separately) (Entered: 02/16/2007) |
| 02/13/2007 | 527 | Second Supplemental Appendix 1-7 to petitioner's 2255 Motion for Relief, by Michael Wiseman, as to Dustin John Higgs. (Filed Separately)(c/s) (aap, Deputy Clerk) (Entered: 02/16/2007) |
| 04/07/2010 | 547 | OPINION as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 4/6/10. (Attachments: # 1 Part II of Opinion (pgs. 54-119)) (cm, Deputy Clerk) (Entered: |

**A-030**

| | | |
|---|---|---|
| | | 04/07/2010) |
| 04/07/2010 | 548 | FINAL ORDER OF JUDGMENTdenying 492 Motion to Vacate (2255) as to Dustin John Higgs (2); denying 509 Motion for Discovery as to Dustin John Higgs (2); denying 519 Motion to Strike as to Dustin John Higgs (2); Final Judgment is ENTERED in favor of the Government and against Petitioner Higgs; AND directing the Clerk to CLOSE this case. Signed by Judge Peter J. Messitte on 4/6/10. (cm, Deputy Clerk) (Entered: 04/07/2010) |
| 05/04/2010 | 550 | MOTION for Certificate of Appealability *APPLICATION FOR CERTIFICATE OF APPEALABILITY* by Dustin John Higgs. Responses due by 5/21/2010 (Attachments: # 1 Text of Proposed Order)(Elleman, Angela) (Entered: 05/04/2010) |
| 05/04/2010 | 551 | MOTION for Reconsideration *MOTION TO ALTER OR AMEND THE JUDGMENT* by Dustin John Higgs. Responses due by 5/21/2010 (Elleman, Angela) (Entered: 05/04/2010) |
| 05/21/2010 | 552 | RESPONSE in Opposition by USA as to Dustin John Higgs re 551 MOTION for Reconsideration *MOTION TO ALTER OR AMEND THE JUDGMENT* (Johnston, Deborah) (Entered: 05/21/2010) |
| 05/21/2010 | 553 | RESPONSE in Opposition by USA as to Dustin John Higgs re 550 MOTION for Certificate of Appealability *APPLICATION FOR CERTIFICATE OF APPEALABILITY* (Johnston, Deborah) (Entered: 05/21/2010) |
| 06/11/2010 | 554 | NOTICE OF ATTORNEY APPEARANCE Deborah A Johnston appearing for USA. (Johnston, Deborah) (Entered: 06/11/2010) |
| 07/20/2010 | 559 | MEMORANDUM OPINION as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 7/19/10. (cm, Deputy Clerk) (Entered: 07/20/2010) |
| 07/20/2010 | 560 | ORDER DENYING 550 Motion for Certificate of Appealability as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 7/19/10. (cm, Deputy Clerk) (Entered: 07/20/2010) |
| 07/20/2010 | 561 | Marginal/ORDER DENYING 551 Motion for Reconsideration as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 7/19/10. (cm, Deputy Clerk) Modified on 7/20/2010 (cm, Deputy Clerk). (Entered: 07/20/2010) |
| 09/16/2010 | 564 | NOTICE OF APPEAL as to 548 FINAL ORDER OF JUDGMENT denying 492 Motion to Vacate (2255); denying 509 Motion for Discovery and denying 519 Motion to Strike AND as to 561 Marginal/ORDER DENYING 551 Motion for Reconsideration by Dustin John Higgs (Elleman, Angela) Modified to create linkage on 9/17/2010 (kn, Deputy Clerk). (Entered: 09/16/2010) |
| 09/17/2010 | 565 | Transmission of Notice of Appeal and Docket Sheet as to Dustin John Higgs to US Court of Appeals re 564 Notice of Appeal - Final Judgment(kn, Deputy Clerk) (Entered: 09/17/2010) |
| 10/22/2010 | 567 | ORDER of USCA "APPOINTING" Stephen Howard Sachs as lead counsel and Federal Community Defenders of Philadelphia as co-counsel for Appellant effective 9/16/10 as to Dustin John Higgs re 564 Notice of Appeal - Final Judgment, (krc, Deputy Clerk) (Entered: 10/25/2010) |
| 03/03/2011 | 569 | ORDER of USCA "GRANTING" appellant a certificate of appealability as to Issue II and "DENYING" a certificate of appealability as to the remaining issues as to Dustin John Higgs re 564 Notice of Appeal - Final Judgment (krc, Deputy Clerk) (Entered: 03/03/2011) |

A-031

| 07/15/2011 | 570 | Certified and Transmitted Supplemental Record on Appeal - Request for Docket No. 492 and exhibits only) as to Dustin John Higgs to US Court of Appeals re 564 Notice of Appeal - Final Judgment, (Attachment: # 1 Transmittal Sheet)(krc, Deputy Clerk) (Entered: 07/15/2011) |
|---|---|---|
| 08/09/2011 | 571 | Transmitted Second Supplemental Record on Appeal as to Dustin John Higgs re 564 Notice of Appeal - Final Judgment (Docket Entry #504 only) (Attachment: # 1 Transmittal Sheet)(krc, Deputy Clerk) (Entered: 08/09/2011) |
| 11/23/2011 | 572 | JUDGMENT of USCA AFFIRMING the Judgment of the USDC as to Dustin John Higgs re 564 Notice of Appeal - Final Judgment. (Attachments: # 1 Notice of Judgment, # 2 Published Authored Opinion)(rss, Deputy Clerk) (Entered: 11/23/2011) |
| 01/09/2012 | 573 | MANDATE of USCA "STAYED" pending of disposition or motion as to Dustin John Higgs (krc, Deputy Clerk) (Entered: 01/10/2012) |
| 01/20/2012 | 574 | ORDER of USCA "DENYING" the petition for rehearing and rehearing en banc as to Dustin John Higgs re 564 Notice of Appeal - Final Judgment, (krc, Deputy Clerk) (Entered: 01/20/2012) |
| 01/30/2012 | 575 | MANDATE of USCA takes effect today as to Dustin John Higgs re, 473 Notice of Appeal - Final Judgment. (krc, Deputy Clerk) (Entered: 01/30/2012) |
| 02/15/2012 | | Appeal Record Returned (Volumes 2) as to Dustin John Higgs (krc, Deputy Clerk) (Entered: 02/15/2012) |
| 07/08/2013 | 576 | NOTICE OF ATTORNEY APPEARANCE: Matthrew C Lawry as Public Defender appearing for Dustin John Higgs (Lawry, Matthrew) (Entered: 07/08/2013) |
| 07/08/2013 | 577 | MOTION Petitioner's Motion for Order Authorizing Expert Access to Evaluate Client for Clemency Proceedings by Dustin John Higgs. Responses due by 7/25/2013 (Attachments: # 1 Text of Proposed Order)(Lawry, Matthrew) (Entered: 07/08/2013) |
| 07/26/2013 | 578 | PAPERLESS ORDER GRANTING 577 Petitioner's Motion for Order Authorizing Expert Access to Evaluate Client for Clemency Proceedings as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 7/25/13. (rass, Chambers) (Entered: 07/26/2013) |
| 12/04/2014 | 579 | MOTION *for relief from final judgment* by Dustin John Higgs. Responses due by 12/22/2014 (Attachments: # 1 Appendix)(Sachs, Stephen) (Entered: 12/04/2014) |
| 12/04/2014 | 580 | MOTION for Release of Brady Materials , MOTION for Discovery by Dustin John Higgs. Responses due by 12/22/2014 (Sachs, Stephen) (Entered: 12/04/2014) |
| 12/22/2014 | 581 | NOTICE OF ATTORNEY APPEARANCE Sujit Raman appearing for USA. (Raman, Sujit) (Entered: 12/22/2014) |
| 12/23/2014 | 582 | Consent MOTION for Extension of Time to File Response/Reply by USA as to Dustin John Higgs. Responses due by 1/9/2015 (Raman, Sujit) (Entered: 12/23/2014) |
| 12/23/2014 | 583 | PAPERLESS ORDER GRANTING 582 Unopposed Motion for Extension of Time to File Responses to 579 Defendant's Motion for Relief from Final Judgment and 580 Defendant's Motion for Discovery (until February 20, 2015) as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 12/23/2014. (rass, Chambers) (Entered: 12/23/2014) |
| 02/13/2015 | 584 | NOTICE OF ATTORNEY APPEARANCE James A Crowell, IV appearing for USA. (Crowell, James) (Entered: 02/13/2015) |
| 02/19/2015 | 585 | RESPONSE to Motion by USA as to Dustin John Higgs re 580 MOTION for Release of Brady Materials MOTION for Discovery , 579 MOTION *for relief from final judgment* Replies due by 3/9/2015. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, |

A-032

| | | |
|---|---|---|
| | | # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit)(Crowell, James) (Entered: 02/19/2015) |
| 03/04/2015 | 586 | MOTION for Extension of Time to File Response/Reply by Dustin John Higgs as to Willis Mark Haynes, Dustin John Higgs. Responses due by 3/23/2015 (Attachments: # 1 Text of Proposed Order)(Sachs, Stephen) (Entered: 03/04/2015) |
| 03/04/2015 | 587 | PAPERLESS ORDER GRANTING 586 Petitioner's Unopposed Motion for Extension of Time to File Reply to 579 Motion for Relief From Final Judgment and 580 Motion for Production of Exculpatory Evidence and Discovery (until April 8, 2015) as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 3/4/2015. (rass, Chambers) (Entered: 03/04/2015) |
| 04/07/2015 | 588 | REPLY TO RESPONSE to Motion by Dustin John Higgs as to Willis Mark Haynes, Dustin John Higgs re 579 MOTION *for relief from final judgment* (Sachs, Stephen) (Entered: 04/07/2015) |
| 04/07/2015 | 589 | REPLY TO RESPONSE to Motion by Dustin John Higgs as to Willis Mark Haynes, Dustin John Higgs re 580 MOTION for Release of Brady Materials MOTION for Discovery (Sachs, Stephen) (Entered: 04/07/2015) |
| 05/20/2015 | 591 | RESPONSE re 588 Reply to Response filed by USA. Replies due by 6/8/2015. (Crowell, James) (Entered: 05/20/2015) |
| 06/29/2016 | 600 | MEMORANDUM OPINION as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 6/29/2016. (c/m 6/29/2016 aos, Deputy Clerk) (Entered: 06/29/2016) |
| 06/29/2016 | 601 | ORDER denying 579 Relief from Final Judgment Pursuant to Hazel-Atlas Glass Co. and Federal Rule of Civil Procedure 60(d) ; denying 580 Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 6/29/2016. (c/m 6/29/2016 aos, Deputy Clerk) (Entered: 06/29/2016) |
| 07/25/2016 | 602 | MOTION for Certificate of Appealability *and Consolidated Memorandum of Law* by Dustin John Higgs. Responses due by 8/11/2016 (Sachs, Stephen) (Entered: 07/25/2016) |
| 08/26/2016 | 605 | NOTICE OF APPEAL by Dustin John Higgs re 601 Order on Motion for Miscellaneous Relief,, Order on Motion for Release of Brady Materials,, Order on Motion for Discovery, Fee Status: Federal Public Defender. (Sachs, Stephen) (Entered: 08/26/2016) |
| 08/29/2016 | 606 | Transmission of Notice of Appeal and Docket Sheet as to Dustin John Higgs to US Court of Appeals re 605 Notice of Appeal - Final Judgment (krcs, Deputy Clerk) (Entered: 08/29/2016) |
| 08/30/2016 | 607 | USCA Case Number 16-15 as to Dustin John Higgs for 605 Notice of Appeal - Final Judgment filed by Dustin John Higgs. Case Manager - RJ Warren. (krcs, Deputy Clerk) (Entered: 08/31/2016) |
| 08/30/2016 | 608 | ORDER of USCA "APPOINTING" the Federal Community Defender Office for the Eastern District of Pennsylvania as lead counsel and Stephen H. Sachs as co-counsel for the appellant pursuant to the provisions of 18 U.S.C. § 3599(c) and the Criminal Justice Act effective 08/26/2016, as to Dustin John Higgs re 605 Notice of Appeal - Final Judgment (krcs, Deputy Clerk) (Entered: 08/31/2016) |
| 08/30/2016 | 609 | ORDER of USCA "REMANDING" to the USDC for the limited purpose to supplement the record with an order granting or denying a certificate of appealability as to Dustin |

A-033

| | | |
|---|---|---|
| | | John Higgs re <u>605</u> Notice of Appeal - Final Judgment (krcs, Deputy Clerk) (Entered: 08/31/2016) |
| 09/07/2016 | <u>610</u> | ORDER directing the United States Attorney to respond to the Motion for Certificate of Appealability within 30 days of the date of this order. Signed by Judge Peter J. Messitte on 9/7/2016. (c/m/s 9/8/2016 aos, Deputy Clerk) (Entered: 09/08/2016) |
| 10/07/2016 | <u>613</u> | RESPONSE in Opposition by USA as to Dustin John Higgs re <u>602</u> MOTION for Certificate of Appealability *and Consolidated Memorandum of Law* (Wilkinson, Sandra) (Entered: 10/07/2016) |
| 10/27/2016 | <u>614</u> | RESPONSE in Support by Dustin John Higgs re <u>602</u> MOTION for Certificate of Appealability *and Consolidated Memorandum of Law* (Sachs, Stephen) (Entered: 10/27/2016) |
| 11/22/2016 | <u>616</u> | MEMORANDUM OPINION as to Dustin John Higgs. Signed by Judge Peter J. Messitte on 11/22/2016. (c/m 11/22/2016 aos, Deputy Clerk) (Entered: 11/22/2016) |
| 11/22/2016 | <u>617</u> | ORDER denying <u>602</u> MOTION for Certificate of Appealability and Consolidated Memorandum of Law as to Dustin John Higgs (2). Signed by Judge Peter J. Messitte on 11/22/2016. (c/m 11/22/2016 aos, Deputy Clerk) (Entered: 11/22/2016) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/23/2016 09:43:20 | | | |
| **PACER Login:** | fd0347:2548085:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 8:98-cr-00520-PJM |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

A-034

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : |  |
|  | : |  |
| Respondent, | : | Criminal No. PJM-98-0520 |
|  | : |  |
| v. | : | Peter J. Messitte, U.S.D.J. |
|  | : |  |
| DUSTIN JOHN HIGGS, | : | Greenbelt Division |
|  | : |  |
| Petitioner. | : |  |

## PETITIONER'S MOTION FOR RELIEF PURSUANT TO
## 28 U.S.C. SECTION 2255
## OR IN THE ALTERNATIVE
## PURSUANT TO 28 U.S.C. 2241

MAUREEN KEARNY ROWLEY, ESQ.
Chief Federal Defender
By: MICHAEL WISEMAN, ESQ.
Supervisory Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org

STEPHEN H. SACHS, ESQ.
Wilmer Cutler Pickering Hale &
Dorr, LLP
c/o Sachs
5 Roland Mews
Baltimore, MD 21210
410-532-8405
Stephen.Sachs@wilmerhale.com

COUNSEL FOR PETITIONER
DUSTIN JOHN HIGGS

Dated: November 28, 2005
        Greenbelt, Maryland

RECEIVED

2005 NOV 28 P 1: 04

UNITED STATES ATTORNEY
GREENBELT. MD

A-036

Petitioner was charged with the January 27, 1996 deaths of three women occurring on federal land. On October 11, 2000 Petitioner was convicted by a jury of three counts of first-degree premeditated murder (18 U.S.C.A. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping (id.), three counts of kidnapping resulting in death, (18 U.S.C.A. § 1201(a)(2)), and three counts of use of a firearm (18 U.S.C. § 924(c)). Following a sentencing hearing, the jury recommended that Petitioner be sentenced to death on each of the nine death-eligible counts. On January 3, 2001 he was formally sentenced by this Court to nine death sentences and 45 years for the firearm convictions, consecutive to the death sentences.

In this Petition, Mr. Higgs demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

References to transcripts of the trial proceedings before this Court are cited as "TT" (Trial Transcript) followed by the date of the proceedings, and a page citation. Pre-trial proceedings are identified by "PTT" (Pre-Trial Transcripts), again followed by the relevant date and page citation. The two opinions of the United States Courts of Appeals rendered on direct appeal US v. Higgs, 353 F.3d 281 (4th Cir. Dec. 22, 2003) and U.S. v. Higgs, 95 Fed.Appx. 37, 2004 WL 835795 (4th Cir.(Md.) April 20, 2004)) are cited as Higgs 1 and Higgs 2, respectively. All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

i

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claim I. Petitioner's Convictions and Sentences Were Obtained Through the Government's Use of Scientifically Unsound Comparative Bullet Lead Analysis. The Reliance on This Unsound Science Violated Petitioner's Rights to Due Process of Law and Effective Assistance of Counsel. Alternatively, the Lack of Scientific Foundation is Newly Discovered and Petitioner is Entitled to Relief Because of Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . 3

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. How CBLA was Used at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. CBLA is not Valid Science – Lundy's Opinions were Not Supportable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

 i. The Lead Smelting and Bullet Manufacturing Process . . . . . . . . . 9

 ii. The Definition of "Source." . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

 iii. The Definition of "Analytically Indistinguishable" and the Use of Chaining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

 iv. The Assumptions of Uniqueness of the Source, Homogeneity of the Source and that there Exists a Pattern to the Geographic Distribution for Retail Sale . . . . . . . . 12

  a. The Assumption that Each Source is Unique . . . . . . . . . 12

  b. The Assumption That Each Source Is Homogeneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ii

c.   The Failure to Consider the Problem of
     Geographical Bullet Distribution .................16

v.    Ms. Lundy's Theories Have Been Tested and Proven
      Invalid .........................................17

vi.   Ms. Lundy's and the FBI's Theory Has Not Been
      Subjected to Peer Review and Publication .................18

vii.  Ms. Lundy's Opinions Do Not Have an Acceptable
      Rate of Error ......................................18

viii. Ms. Lundy's Theory Is Not Generally Accepted Within
      the Relevant Scientific Community .....................19

ix.   Use of Standard Deviations ...........................19

D.    Conclusion ...........................................20

Claim II.   Petitioner's Trial Prosecutors Exercised Their Peremptory
            Challenges in a Discriminatory Manner, on the Basis of
            Gender in Violation of Petitioner's Rights under the Fifth
            and Sixth Amendments to the United States Constitution ...........21

A.    The Prosecutor's Strikes in Petitioner's Case ....................22

B.    The Trial Prosecutors' Strikes in Other Capital Murder Cases ........28

C.    Conclusion .........................................29

Claim III.  As a Result of Ineffective Assistance of Counsel, Court Error,
            the Government's Suppression of Exculpatory Evidence and
            Newly Discovered Evidence (Not Available at the Time of
            Petitioner's Trial), Petitioner Was Wrongly Convicted of
            Capital Murder; Petitioner Is Innocent of Capital Murder and
            Should Be Granted a New Trial .............................29

A.    Trial Counsel Failed to Investigate or Present Evidence of
      Victor Gloria's Prior Inconsistent Statements ...................29

B.    Newly Discovered Evidence Exists Which Corroborates Gloria's
      Prior Statements That He Was Sleeping During the Murders and
      Testified Falsely at Petitioner's Trial ..........................31

C.    The Government Suppressed Information Related to

iii

Consideration Given to Gloria in Exchange for His
Testimony .............................................. 31

D.     Trial Counsel Was Ineffective for Failing to Elicit from Victor
Gloria His Possession and Use of Weapons, Including .38
Caliber Guns ........................................... 33

E.     Trial Counsel Ineffectively Failed to Present the Jury with
Evidence of Haynes Motive to Kill, Which was at Significant
Odds with the Government's Theory of Motive ................. 35

F.     Trial Counsel Failed to Investigate an Alleged, but Untrue,
Incident in Which Ms. Darby Testified That Petitioner
Threatened Her with a Gun; Proper Investigation Would Have
Revealed this Testimony to Be Unreliable. The Government
Suppressed Evidence That Ms. Darby Was Untruthful ............ 39

G.     The Government Suppressed Evidence of Consideration Given
to Richard Diolamou and Wondwossen Kabtamu, Both
Witnesses for the Prosecution Given Favorable Treatment in
Immigration Proceedings ................................. 43

H.     Trial Counsel Failed to Obtain Records Proving That Domenick
Williams Testified Falsely, since He Was Not on the Cell Block
with Petitioner at All the Relevant Times .................... 43

Claim IV.     Trial Counsel Ineffectively Failed to Challenge the Admissibility
of Ballistics Testimony That Was of No Probative Value and
Which Failed to Prove Any Connection Between Petitioner and
the Crimes Charged ..................................... 43

Claim V.     Trial Counsel Ineffectively Failed to Object to the Admission
of Evidence Concerning Co-defendant Willis Haynes'
Confessions During the Guilt Phase of Trial .................. 47

Claim VI.     Petitioner was Denied Effective Counsel During Capital
Sentencing in Violation of the Sixth and Eighth Amendments
to the United States Constitution ........................... 50

A.     Introduction and Statement of the Claim ..................... 51

B.     Counsel's Deficient Performance ........................... 52

i.     The Investigation Stage ............................. 52

iv

|  |  | a. | The School Records ............................. 52 |
|  |  | b. | Counsel and Mr. Sickler's Abrogation of their Investigative Responsibility to Lay People ........... 55 |
|  |  | c. | The Failure to Interview Others Who Interacted Daily with Petitioner or Otherwise Knew of Alphonso Higgs' Life of Crime ........................... 60 |
|  |  | d. | Failure to Provide Any Accurate Evidence About the Emotional and Mental Health Impact Upon Petitioner of the Tragic Loss of his Mother .......... 63 |
|  |  | e. | The Failure to Provide Mental Health Experts with the Actual Mitigating Evidence ................... 67 |
|  | ii. | | The Gutting of Petitioner's Penalty Phase, and Counsels' Lack of a Response ........................... 73 |
|  | C. | | Counsels' Deficient Performance Caused Petitioner Prejudice ........ 80 |

Claim VII.      The Federal Death Penalty, as Administered, Violates the Fifth and Eighth Amendments, and Trial Counsel Was Ineffective for Failing to Challenge the Death Penalty on this Ground ....................................................... 80

Claim VIII.     Trial Counsel Ineffectively Failed to Object to the Admission of Co-defendant Willis Haynes' Confession During the Penalty Phase of Petitioner's Trial on Fifth and Sixth Amendment Grounds ..................................................... 83

Claim IX.      The Victim Impact Evidence, Argument and Instruction Allowed the Sentencing Jury to Consider Victim Family Members' Views as to the Appropriate Sentence, and Were Excessively Emotional and Duplicative, in Violation of the Eighth Amendment ........... 85

|  A. | The Victim Impact Evidence .............................. 85 |
|  B. | The Victim Impact Argument ............................. 89 |
|  C. | The Victim Impact Instructions .......................... 90 |
|  D. | The Constitutional Violations ........................... 91 |

Claim X.      The Submission of Mr. Higgs' Prior Conviction for Assault and Reckless Endangerment as a Statutory Aggravating Factor under 18 U.S.C. § 3592(c)(2) (Previous Conviction for Felony

A-041

Involving Firearm) Violated the Eighth Amendment and Due Process Clause of the Fifth Amendment, because (1) These Offenses Did Not Necessarily Involve Use of a Firearm, and (2) the Conviction for These Offenses Did Not Take Place Previous to the Instant Offense. Defense Counsel Was Ineffective at Trial and on Appeal for Not Making the Proper Objections and Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Claim XI. The submission of Mr. Higgs' conviction for violation of the federal drug statute in 1997 as an aggravating factor under 18 U.S.C. § 3592(c)(12) violated the Eight Amendment because this subsection only applies to federal drug convictions for which Mr. Higgs "had previously been convicted," and this language means the conviction had to have taken place prior to the instant offense, which occurred in 1996 . . . . . . . . . . . . . . . . . . . . . . 95

Claim XII. The Fourth Circuit Improperly Assumed That Presentation of the Invalid "Multiple Killings" Aggravating Factor to the Jury Did Not Infect the Jury's Weighing Process, in Violation of the Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim XIII. Defense Counsel were Ineffective for Failing to Interview and Call as Witnesses Gerald Vaughn and Kevin Darnell Anderson . . . . . . . 99

Claim XIV. Petitioner's Death Sentences Violated the Fifth and Eighth Amendments Because the Government Failed to Indict Mr. Higgs for the Aggravating Factors Required for a Capital Offense, or for the Additional Non-Statutory Factors Relied Upon by the Government During the Penalty Phase . . . . . . . . . . . . . . . 100

Claim XV. Petitioner's Death Sentences Were Obtained in Violation of the Fifth, Sixth and Eighth Amendments Because the Court Failed to Instruct the Jury That in Reaching its Penalty Verdict, it must Determine Beyond a Reasonable Doubt Whether the Aggravating Factors Outweighed Mitigating Factors, and Because Counsel Ineffectively Failed to Object to the Improper Instruction or to Propose a Constitutional Instruction . . . . . . . . . . . . . . 101

Claim XVI. The Trial Court Excluded from the Jury's Consideration as a Mitigating Factor the Fact That a Life Sentence Would Mean That Mr. Higgs Would Be Imprisoned till He Dies, in Violation of the Eighth Amendment; Appellate Counsel's Failure to Raise this Claim Deprived Petitioner of the Effective Assistance of Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

vi

Claim XVII.    The Fourth Circuit Erred in the Materiality Analysis of Petitioner's Claim under <u>Brady V. Maryland</u> . . . . . . . . . . . . . . . . . . . 104

Claim XVIII.   Testimony Regarding Petitioner's Post-Arrest Silence Violated Petitioner's Rights Under the Fifth and Sixth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Claim XIX.    Petitioner's Rights Under the Fifth Amendment Were Violated During the Penalty Phase When the Court Neglected to Instruct the Jury to Draw No Adverse Inference from the Fact that Petitioner Did not Testify . . . . . . . . . . . . . 106

Claim XX.    Petitioner's Convictions Were Obtained in Violation of the Fifth and Sixth Amendments Because the Government Failed to Prove by Sufficient and Competent Evidence That the Offenses Occurred Within the Special Maritime and Territorial Jurisdiction of the United States. Counsel Ineffectively Failed to Challenge the Government's Insufficient Proof And/or to Object to the "Expert" Opinion Testimony of a Witness Who Was Neither Tendered Nor Accepted as an Expert Witness . . . . . . . . . 107

Claim XXI.    The Trial Prosecutors Violated the Due Process Clause When they Failed to Provide Trial Counsel with All Witness Statements and Reports Generated by the Park Police and the FBI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Claim XXII.    Petitioner is Entitled to Relief Based Upon the Cumulative Errors Identified Above . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Claim XXIII.   Petitioner is Entitled to and Request that the Court Provide an Evidentiary Hearing on All Disputed Issues of Material Fact . . . . . . . . 111

Claim XXIV.   Jurors in Petitioner's Trial Engaged in Misconduct in Violation of Petitioner's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution . . . . . . . . . . 111

Claim XXV.    The Execution of Petitioner Though Lethal Injection Pursuant to the Federal Government's Execution Protocol, Maryland's Execution Protocol, or Any Similar Protocol, Would Violate the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Request for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

A-043

## JURISDICTION

1.      This Court has jurisdiction to provide the relief requested herein pursuant to 28 U.S.C. § 2255.

## PROCEDURAL HISTORY

2.      On the morning of January 27, 1996 the bodies of three women (Mishann Chinn, Tanji Jackson and Tamika Black) were found on Route 197 as it passes through the Patuxent National Wildlife Refuge in Prince George's County, Maryland.  Following years of investigation, Petitioner along with Willis Haynes was charged in connection with these deaths.

3.      Pre-trial hearings pertaining to Petitioner and Haynes were conducted on November 15, 1999 and February 10 & 11, 2000.

4.      Petitioner and Haynes were tried separately.  Haynes was convicted of murder and related counts.  The jury did not sentence him to death, and accordingly, on August 24, 2000 this Court sentenced him to life imprisonment and 45 years consecutive.  Mr. Haynes' conviction was affirmed by the Court of Appeals.  U.S. v. Willis Mark Haynes, 26 Fed.Appx. 123,  2001 WL 1459702 (4th Cir. Nov. 19, 2001 (Md.)), cert denied, Haynes v. U.S., 535 U.S. 979 (April 1, 2002).

5.      Jury selection commenced in Petitioner's case on September 5, 2000 and concluded on September 26, 2000.  The empaneled jury was all male.

6.      Opening statements and the taking of evidence occurred on September 26, 2000.

7.      The jury returned its guilt phase verdict on October 11, 2000.

8.      Petitioner's penalty hearing commenced on October 18, 2000.  Evidence was taken on that date, and on October 19, 20 and 24, 2000.  Counsel closed to the jury on October 25, and penalty deliberations commenced that day.

1

9. On October 26, 2000, the jury returned its verdict recommending death on nine counts.

10. This Court formally sentenced Mr. Higgs on January 3, 2001 to nine death sentences and 45 years imprisonment consecutive to the capital sentences.

11. Petitioner took a direct appeal of the judgments of this Court to the United States Court of Appeals for the Fourth Circuit. While prosecuting Petitioner's direct appeal, his counsel discovered what it considered to be exculpatory evidence and filed a motion in this Court seeking a new trial. This Court denied that motion, which Petitioner also appealed to the Fourth Circuit.

12. Petitioner's direct appeals of his judgments of conviction and of the denial of his motion for a new trial, were affirmed in Higgs 1 and Higgs 2, respectively on December 22, 2003 and April 20, 2004.

13. Timely petitions for writ of certiorari were filed in the United States Supreme Court.

14. The petitions for certiorari were denied as to each case on the same day. See Higgs v. United States, 125 S.Ct. 627 (Nov. 29, 2004) (docket #03-10498); Higgs v. United States, 125 S.Ct. 608 (Nov. 29, 2004) (docket # 04-5226).

15. Petitioner was represented at trial by Harry J. Trainor, Esq. and Timothy J. Sullivan, Esq. The Government was represented by Deborah A. Johnston, Esq., Sandra Wilkinson, Esq. and Joseph Uberman, Esq.

16. Petitioner was represented on appeal, in his motion for a new trial and in his certiorari proceedings by Mr. Sullivan and Barbara Hartung. The Government was again represented by Ms. Wilkinson and Ms. Johnston.

2

17. Petitioner is currently incarcerated at the United States Penitentiary in Terre Haute, Indiana (Register #31133-037).

18. Petitioner is also serving a previously imposed sentence of 212 months imposed by this Court on December 12, 1997 for violations of federal drug laws. See United States v. Higgs, 8:96-cr-00153-PJM. That judgment is not the subject of this Petition.

### GROUNDS FOR RELIEF

19. Petitioner herein alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his right to due process of law. Additionally, his judgments and convictions must be vacated in view of the newly discovered evidence discussed herein.

20. Petitioner moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Petitioner's claims are not cognizable under section 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241 as to any claim for which section 2255 proves to be ineffective or inadequate to test the legality of his detention and sentences.

### CLAIMS FOR RELIEF

CLAIM I. PETITIONER'S CONVICTIONS AND SENTENCES WERE OBTAINED THROUGH THE GOVERNMENT'S USE OF SCIENTIFICALLY UNSOUND COMPARATIVE BULLET LEAD ANALYSIS. THE RELIANCE ON THIS UNSOUND SCIENCE VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL. ALTERNATIVELY, THE LACK OF SCIENTIFIC FOUNDATION IS NEWLY DISCOVERED AND PETITIONER IS ENTITLED TO RELIEF BECAUSE OF NEWLY DISCOVERED EVIDENCE.

**A. Introduction.**

21. Petitioner's convictions and sentences were based in large measure upon junk science. The government relied on evidence of the now-discredited Comparative Bullet Lead

3

interviewed him, because he was a witness (noted in police paperwork) to the alleged incident in which Petitioner held a gun to the head of Ednisia Darby. Had trial counsel interviewed Mr. Dacosta, they would have learned that Gloria also gave this prior inconsistent statement to Mr. Dacosta, indicating that he was asleep during the car ride and the homicides. Trial counsel was ineffective for failing to interview Mr. Dacosta and elicit this information.

**B.    Newly Discovered Evidence Exists Which Corroborates Gloria's Prior Statements That He Was Sleeping During the Murders and Testified Falsely at Petitioner's Trial.**

108.    Newly discovered evidence exists that corroborates Victor Gloria's statements to Havenner and Dacosta that he was sleeping in the van. Gloria's own statements to Robert Durand, an investigator working for undersigned counsel, confirm that Gloria was asleep and **did not see** Petitioner hand any gun to Haynes prior to the murders.

109.    This evidence is newly discovered evidence that was not available at the time of Petitioner's trial, but seriously undermines any confidence in the verdict against Petitioner.

**C.    The Government Suppressed Information Related to Consideration Given to Gloria in Exchange for His Testimony.**

110.    Victor Gloria has a significant criminal history. His criminal history, including a number of pending charges, was properly revealed to the jury. Also revealed was the fact that Gloria was facing a maximum of 15 years for accessory after the fact in this case, and that he had pled guilty. The jury was also advised that he faced up to 30 years incarceration on other federal drug charges before this Court; and up to 10 years on State drug charges. See, U.S. v. Gloria, PJM-98-482 (Md.D.) 98-CR; U.S. v. Gloria, PJM-98-0435 (Md. D.); and Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD).

111.    The only agreement with any prosecutor that was revealed to the jury in this case,

31

was that the Government agreed with Gloria that it would seek a lighter sentence for his involvement as an accessory after the fact in exchange for his satisfactory cooperation. In fact, only weeks after Petitioner's trial was completed Gloria was sentenced to only 7 years of time for accessory after the fact, with a recommendation that he be place in a bootcamp facility. This favorable treatment was primarily due to the Government's oral motion at sentencing that he receive a downward departure of two offense levels. Sentencing transcript in U.S. v. Gloria, PJM-98-482 (Md.D.), dated 11/22/00, 3.

112. However, the charges against Gloria in both other pending drug cases were also resolved in a highly favorably manner – a manner which was not disclosed to the jury. Though Gloria was facing up to 30 years in prison on these charges, Prosecutor Johnston dismissed the federal drug charges against Gloria on December 7, 2000. U.S. V. Gloria, PJM-98-0435 (Md.D.) Due to the extraordinarily favorable outcome of this case, it is apparent that this was additional consideration given to Mr. Gloria, that was not revealed at the time of Petitioner's trial.

113. In addition, Gloria received another extraordinarily favorable outcome in the state drug charges pending. In that case, Gloria was facing up to ten years in prison, due to a prior drug conviction. However, Gloria - unrepresented by counsel - was allowed to enter an Alford plea and given one year to serve on conspiracy to distribute cocaine, concurrent with the time he was already serving in federal prison. Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD). The remaining charges were nolle prossed. Id.

114. The favorable disposition of the two other charges strongly suggests that there was undisclosed consideration offered to Gloria in exchange for his testimony, in violation of the due process clause.

32

115. Through a combination of prosecutorial misconduct and/or ineffective assistance of trial counsel, the jury also did not learn that Gloria also had open charges, and an open bench warrant, in Virginia. GC93-001182-01 (Smyth County General District Court, Virginia). Gloria was, and is to this day, a "fugitive" from Smyth County, Virginia. Id. It is particularly revealing that, although Gloria had numerous arrests and was facing numerous charges, and was in significant ongoing contact with law enforcement officers, a detainer was never placed on him and Virginia authorities were never notified that Mr. Gloria was in their custody. This is additional undisclosed consideration that was not revealed by the Government and which trial counsel failed to discover or elicit.

116. Finally, Gloria was a suspect, but never charged, in an unrelated homicide in Baltimore, Maryland. He was never charged with this homicide in an effort to preserve his status as a testifying witness in this federal capital triple homicide case. Thus, he received further consideration in the form of charges that were never brought against him. The Government's failure to disclose this consideration also violated due process, and counsels' failure to discover it on their own was ineffective.

### D. Trial Counsel Was Ineffective for Failing to Elicit from Victor Gloria His Possession and Use of Weapons, Including .38 Caliber Guns.

115. Trial counsel ineffectively failed to cross examine Victor Gloria with his own possession and use of firearms. Gloria was familiar with .38 caliber weapons, and used and fired them in the past. As a participant in the murders, who certainly distanced himself from the use or possession of the murder weapon, this would have been impeaching evidence that Gloria himself may have had a bigger role in the murders than the one he admitted. Trial counsel had access to this information, and was ineffective in failing to present it to the jury.

33

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 28th day of November, 2005 I served two copies of the foregoing upon the following person by hand delivery:

Deborah A. Johnston
Assistant United States Attorneys
Office of the United States Attorney
6500 Cherrywood Lane, Suite 400
Greenbelt, MD 20770-1249

Michael Wiseman

123

## VERIFICATION

I verify and declare under penalty of perjury that the facts, allegations and statements contained in the foregoing Motion Under 28 U.S.C. § 2255 are true and correct.

/s/
Dustin John Higgs

Dated: 4/28/05

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Respondent, | : | Criminal No. PJM-98-0520 |
| v. | : | Peter J. Messitte, U.S.D.J. |
| DUSTIN JOHN HIGGS, | : | Greenbelt Division |
| Petitioner. | : | **THIS IS A CAPITAL CASE** |

### PETITIONER'S MOTION FOR DISCOVERY
### AND
### CONSOLIDATED MEMORANDUM OF LAW

Petitioner, Dustin John Higgs, hereby moves for the following discovery pursuant to Rule

6 of the *Rules on Motion Attacking Sentence Under Section 2255*, the *Federal Rules of Civil*

*Procedure*, the *Federal Rules of Criminal Procedure*, the due process clause of the Fifth

Amendment and the Eighth Amendment.

### Relevant Procedural History

1.      On October 11, 2000, Petitioner was convicted in this Court of nine counts of first

degree murder, and related charges following a jury trial.

2.      October 26, 2000, following a penalty hearing, the jury returned a sentencing verdict

of death on each of the nine murder counts.

3.      On January 3, 2001 this Court formally sentenced Mr. Higgs to nine death sentences

and 45 years imprisonment consecutive to the capital sentences.

4.      Petitioner took a direct appeal of the judgments of this Court to the United States

1

Court of Appeals for the Fourth Circuit. While prosecuting Petitioner's direct appeal, his counsel discovered what it considered to be exculpatory evidence and filed a motion in this Court seeking a new trial. This Court denied that motion, which Petitioner also appealed to the Fourth Circuit.

5. Petitioner's direct appeals of his judgments of conviction and of the denial of his motion for a new trial, were affirmed on December 22, 2003 and April 20, 2004, United States v. Higgs, 353 F.3d 281 (4th Cir. Dec. 22, 2003) and U.S. v. Higgs, 95 Fed.Appx. 37, 2004 WL 835795 (4th Cir.(Md.) April 20, 2004)).

6. Timely petitions for writ of certiorari were filed in the United States Supreme Court.

7. The petitions for certiorari were denied as to each case on the same day. See Higgs v. United States, 125 S.Ct. 627 (Nov. 29, 2004) (docket #03-10498); Higgs v. United States, 125 S.Ct. 608 (Nov. 29, 2004) (docket # 04-5226).

8. On November 28, 2005 Petitioner filed a *Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241*. On May 3, 2006 Petitioner filed his *Brief in Support*.

9. This Court has set a deadline of June 30, 2006 for Petitioner to file the instant discovery motion.

### Standards Governing Discovery

10. Petitioner's discovery requests are governed by Rule 6 of the *Rules on Motion Attacking Sentence Under Section 2255*. Rule 6 states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy

2

v. Gramley, 520 U.S. 899, 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 299 (1969));

Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir. 1998) ("Good cause is shown if the petitioner

makes a specific allegation that shows reason to believe that the petitioner may be able to

demonstrate that he is entitled to relief.").

11.     When a petitioner establishes good cause, discovery must be allowed. The United

States Supreme Court has explained that "[t]he very nature of the writ [of habeas corpus] demands

that [habeas proceedings] be administered with the initiative and flexibility essential to insure that

miscarriages of justice within its reach are surfaced and corrected." Harris, 394 U.S. at 291.

Johnston v. Love, 165 F.R.D. 444, 445 (E.D. Pa. 1996) ("it is the duty of the courts to provide the

necessary facilities and procedures for an adequate inquiry.").[1] Since the purpose of post-conviction

discovery "is to ensure that the facts underlying a [habeas] claim are adequately developed," a court

must allow discovery whenever "a petitioner has provided a sufficient basis for believing that

discovery may be necessary to adequately explore a petitioner's claim for relief." Id. Accordingly,

a court may not deny a petitioner's discovery motion "if there is a sound basis for concluding that

the requested discovery might allow him to demonstrate" his entitlement to relief. Id. This is never

more so than in the context of a capital case, where the unique finality and irreversibility of the

---

[1]Accord McDaniel v. United States District Court, 127 F.3d 886, 888 (9th Cir. 1997) (where
Petitioner "presented specific allegations . . .[he] is entitled to discovery"); Johnston v. Love, 165
at 445 (Rule 6's "history makes clear that its purpose is to ensure that the facts underlying a habeas
corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases
in which a petitioner has provided a sufficient basis for believing that discovery may be necessary
to adequately explore a petitioner's claim for relief." Accordingly, "a court may not deny a habeas
corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that
the requested discovery might allow him to demonstrate that he has been confined illegally.");
Gaitan-Campanioni v. Thornburgh, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery
is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will
help illuminate the issues underlying the applicant's claim.").

3

sentence require heightened procedural safeguards. See e.g. Kyles v. Whitley, 514 U.S. 419, 422 (1995) (Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").

12. Petitioner will next demonstrate that he has good cause for each item of requested discovery.

## SPECIFIC DISCOVERY REQUESTS[2]

**Claim I.** **Discovery Related to Comparative Bullet Lead Analysis.**

13. Petitioner has pled that his convictions are based in large measure upon the faulty, false and erroneous Comparative Bullet Lead Analysis (CBLA), the introduction of which violated Petitioner's right to due process of law. He also has pled that the Government was aware of the flaws in CBLA, yet did not reveal them to the defense. Petitioner asserts that his counsel were ineffective for not challenging this flawed science, and that more recent science in this area – showing the utter scientific unreliability of CBLA – constitutes newly discovery evidence. *Petition* at ¶¶ 21-74. In order to prove his entitlement to relief on this claim, Petitioner requests that the Court order the Government to provide the following:

_____

[2]Should the Government assert that any of the following items are subject to a privilege and are therefore protected from disclosure in full or in part, Petitioner requests that the Government comply with Fed.R.Civ.P. 26(b)(5). Thus, should the Government assert a privilege in response to any of the following requests, it should: "describe the nature of the documents, communications or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."

Should the Government assert a privilege as to portions of a document, communication or thing that is requested, Petitioner requests that the Government describe the ostensibly protected portion as required under Rule 26(b)(5), and disclose those portions not covered by the privilege being asserted.

4

**B.      Discovery Regarding Victor Gloria.**

25.      Petitioner has pled that Victor Gloria lied about his observations on the night of killings; that he did not see or hear Petitioner pass the gun to Mr. Haynes, and did not hear Petitioner direct Mr. Haynes to kill the three women.  Moreover, Petitioner has pled that Mr. Gloria received undisclosed consideration in exchange for his false testimony.   See *Petition* at ¶¶ 104-115. Petitioner has two discovery requests with regard to Mr. Gloria.

**First Request.**

26.      Petitioner has specifically pled that Mr. Gloria was a suspect in another homicide in Baltimore County and that he escaped prosecution due to his status as a Government witness against Petitioner.  *Petition* at ¶ 116.[9]  If Petitioner is able to prove this allegation, he would be entitled to relief.

27.      With regard to the Baltimore homicide case, Petitioner has learned that one Kevin Anthony Miller was prosecuted in Baltimore County, Maryland for a homicide.  (District Court Case # 000B00359961; CC # 98-1G13258).  Mr. Miller did not commit the homicide as reflected by the disposition of his case — he received time-served and probation.  He advised undersigned counsel that, in fact, Victor Gloria committed the murder, and that he (Miller) witnessed it.  Miller also told counsel that he entered into a plea bargain after his attorney told him that it would be futile to assert

---

[9]Petitioner allegation is:

> Finally, Gloria was a suspect, but never charged, in an unrelated homicide in Baltimore, Maryland.  He was never charged with this homicide in an effort to preserve his status as a testifying witness in this federal capital triple homicide case.  Thus, he received further consideration in the form of charges that were never brought against him.  The Government's failure to disclose this consideration also violated due process, and counsels' failure to discover it on their own was ineffective.

*Petition* at ¶ 116.

11

that Mr. Gloria was the actual killer, "because he is a protected federal witness."

28.　Although Mr. Miller has spoken with counsel, he has not signed a release authorizing disclosure of his defense counsel's file. Accordingly, Petitioner requests an order requiring Miller's counsel, the Baltimore County Public Defender, to provide counsel with access to their file in order to substantiate what Miller told counsel, and/or to determine if there is any other evidence therein regarding this undisclosed consideration given to Mr. Gloria.[10]

29.　Petitioner also requests an order directed to the Baltimore County prosecutor requiring that it disclose to Petitioner any evidence in its file regarding Mr. Gloria's participation in and/or non-prosecution for the above described homicide.[11]

**Second Request.**

30.　Petitioner has alleged that part of the consideration received by Mr. Gloria was the favorable disposition of state and federal drug charges. Some of the consideration was disclosed to the jury and some was not. *Petition* at ¶¶ 110-114. In particular, Petitioner believes that the drug charges in USA v. Gloria, PJM-98-0435 (Md.D.) (*Petition* ¶ 112) and in Maryland v. Gloria, CT981978X (Prince George's County Circuit Court, MD) (*Petition* at ¶ 113) were favorably resolved in consideration of Mr. Gloria's testimony against Mr. Higgs, but that consideration was not disclosed.

31.　Petitioner therefore requests that the Government provide him with any writing, document or communication between it and any other law enforcement agency (e.g. Prince George's County prosecutor) regarding or evidencing that the favorable consideration on the two drug charges

---

[10]Petitioner is serving a copy of this *Motion* on the Baltimore County Public Defender.

[11]Petitioner is serving a copy of this *Motion* on the Baltimore County prosecutor.

12

were in consideration of Mr. Gloria's cooperation.

32. Petitioner also requests an order directing the Prince George's County prosecutor to provide to Petitioner's counsel any writing, communication or memoranda in its file in the above-cited case, reflecting that the disposition of the state drug charge was done in consideration of Mr. Gloria's testimony.[12]

### C. Discovery Regarding the Identity of Confidential Informants Who Provided Law Enforcement Agents with Evidence of Haynes' Motive to Kill.

33. Petitioner has alleged that Willis Haynes had a motive to kill at least some of the victims unrelated to the Government's trial theory. *Petition* at ¶¶ 123-136. Some of the motive evidence has been garnered from reports that were provided to trial counsel, but which referenced information provided by three confidential informants. *Petition* at ¶¶ 127-129.

34. Petitioner requests that the Government disclose the identity of these informants, or alternatively, provide precise written explanations as to why their identities must remain secret years after the fact.

35. Evidence showing that Haynes had a motive different from Petitioner's alleged motive (i.e. the alleged argument with the victims that preceded the killings) would squarely contradict the Government's trial theory that Petitioner directed the killings. Faced with the prospect of Petitioner's execution, when this alternative motive theory has not been fully explored, the Government must disclose the identity of these witnesses or provide a compelling reason not to.

### D. Discovery Regarding Favorable Consideration Provided to Richard Diolamou and/or Wondwossen Kabtamu.

36. Petitioner has alleged that the Government provided assistance to Richard Diolamou

---

[12]Petitioner is serving this *Motion* on the Prince George's County prosecutor.

13

or communications between the local prosecutors and the DOJ regarding the question of whether to pursue the death penalty in his case, both before and after Mr. Haynes' trial.

**Claim XXI.   Discovery of Previously Undisclosed Witness and Law Enforcement Statements.**

45.   Petitioner has alleged that the Government violated due process when it failed to provide all relevant and exculpatory witness and law enforcement statements to trial defense counsel. Petitioner requests that the Government do so now.

46.   Moreover, since the prosecutor's due process obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, continue in post-conviction, (Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976)), Petitioner requests that the Government review all such statements for their exculpatory value in view of Petitioner's allegations and claims contained herein, in the *Petition* and *Brief in Support*.

17

**Request for Relief**

WHEREFORE, for all of the above reasons, those contained in the *Petition* and Petitioner's *Brief in Support*, and the entire record of these proceedings, Petitioner respectfully requests the following relief:

A. That the Government provide a written *Answer* to any item of requested discovery to which it objects;

B. That any such written objections include precise descriptions of the documents or things about which the Government objects, along with a description of any withheld item or document, in conformity with Fed.R.Civ.P. 26(b)(5);

C. That the Court permit Petitioner to file a reply memorandum following receipt of the Government's *Answer;*

D. That the Court conduct argument on Petitioner's *Motion;*

E. That the Court conduct evidentiary hearings on any material fact in controversy that is relevant to the disposition of the *Motion;* and

E. That the Court grant Petitioner's *Motion* in all respects.

Respectfully Submitted,

Michael Wiseman
Angela Elleman
Assistant Federal Defenders
Federal Community Defender for the
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West, The Curtis Center
Philadelphia, PA 19106
215-928-0520
Michael_Wiseman@fd.org
Angela_Elleman@fd.org

Stephen H. Sachs
Wilmer Cutler Pickering Hale
& Dorr, LLP
c/o Sachs
5 Roland Mews
Baltimore, MD 21210
410-532-8405
Stephen.Sachs@wilmerhale.com

Co-Counsel for Petitioner
Dustin J. Higgs

Dated: Philadelphia, PA
June 29, 2006

18

**A-060**

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 29th day of June, 2006 I served the foregoing upon the following in the manner indicated:

Deborah A. Johnston<br>
Sandra Wilkinson<br>
Assistant United States Attorneys<br>
Office of the United States Attorney<br>
6500 Cherrywood Lane, Suite 400<br>
Greenbelt, MD 20770-1249<br>
By electronic mail and United States Mail, First Class

Brenda Baldwin-White, Esq.<br>
Deputy General Counsel<br>
District of Columbia Department of Corrections<br>
1923 Vermont Avenue, NW, Suite N102<br>
Washington, DC 20001<br>
By United States Mail, First Class<br>
(Served as to paragraphs 22-24)

Office of the Baltimore County Public Defender<br>
Virginia Towers<br>
500 Virginia Avenue<br>
Towson, MD 21204<br>
(Served as to paragraphs 26-29)

Baltimore County State's Attorney's Office<br>
Suite 410 Hampton Plaza<br>
401 Bosley Avenue, Room 511<br>
Towson, MD 21204<br>
(Served as to paragraphs 26-29)

Office of the State's Attorney for Prince George's County<br>
Courthouse<br>
14735 Main Street<br>
Upper Marlboro, MD 20772-3050<br>
(Served as to paragraphs 30-32)

_____
Michael Wiseman

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      :

                **CIVIL ACTION NO. PJM 05-3180**

       v.               :    **CRIMINAL NO. PJM 98-0520**

DUSTIN JOHN HIGGS          :

                 ...oOo...

## RESPONSE TO HIGGS' MOTION FOR DISCOVERY

COMES NOW the United States of America, by and through undersigned counsel, and in response to defendant, Dustin John Higgs' Motion for Discovery, requests this court to dismiss the motion for discovery without prejudice as it is premature. Specifically, the government requests that the Court defer consideration of Higgs' discovery request until the Government has had the opportunity to file its Opposition to Higgs' underlying Motion for Relief Pursuant to 28 U.S.C. § 2255 which will include a request to dismiss some claims as procedurally barred.

## PROCEDURAL HISTORY

A jury for the District of Maryland convicted Higgs of three counts of first-degree premeditated murder (18 U.S.C. § 1111(a)); three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnaping (*see id.*); three counts of kidnaping resulting in death (18 U.S.C. § 1201(a)(2)); and three counts of using a firearm "during and in relation to [a] crime of violence" (18 U.S.C. § 924(c)). Following the penalty phase hearing, the jury recommended, and the Court imposed, nine death sentences on Higgs. The judgment was affirmed by the Fourth Circuit, which rejected Higgs' 20 claims of error. *United States v. Higgs'*, 353 F.3d 281 (4th Cir. 2003). On November 29, 2004, the Supreme Court of the United States denied Higgs' petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 1004, (2004).

A-062

While still on appeal, Higgs filed an unsuccessful new trial motion in this Court. The Fourth Circuit upheld the denial of the motion, and the Supreme Court refused a subsequent request for certiorari. *United States v. Higgs*, 95 Fed. Appx. 37, (4th Cir.2004), *cert. denied*, 543 U.S. 1004, (2004).

On November 28, 2005, (364 days after the Supreme Court denied the second petition for writ of certiorari), Higgs filed a 122-page Motion for Relief (referred to as a "§ 2255 Motion"), asserting 24 claims of error. On May 4, 2006, Higgs filed a Brief in Support of the § 2255 Motion. On May 17, 2006, this Court ordered the Government to respond to the Motion for Relief by October 31, 2006. On June 30, 2006, Higgs filed the instant Motion for Discovery, with the government's response due on July 31, 2006.

## ARGUMENT

In his present Motion, Higgs requests discovery in support of a variety of claims in his § 2255 Motion. The Government opposes these discovery requests, as Higgs has not demonstrated the legal viability of his underlying claims, and the Government has not yet had an opportunity to respond to those contentions. This Court should deny, without prejudice, as premature the defendant's request for discovery because the government has not had an opportunity to respond to Higgs' underlying § 2255 motion. The Government asks this Court to exercise its discretion in regulating discovery to ensure a rational and reasonable sequence for this litigation.

Specifically, the Government seeks the opportunity to file its opposition to the § 2255 Motion, presently due October 31, 2006, before confronting requests for discovery. The Government asserts that its opposition to the § 2255 Motion will demonstrate that this Court

2

cannot grant relief, as a matter of law, on the claims underlying these discovery requests. The Government's response will obviate the need to dispute, much less conduct, discovery. Because Higgs' has not given the Government a chance to fully explicate the flaws in his § 2255 claims, the Court should view this request for discovery as premature.

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, (1997). Discovery in this setting can occur only with leave of the court, upon a showing of good cause. *See* Rule 6(a) of the Rules Governing § 2255 Cases. In other words, a defendant "may invoke the processes of discovery... if, and to the extent that, the judge in the exercise of discretion and for good cause shown, grants leave to do so, but not otherwise." *Hall v. United States*, 30 F. Supp. 2d 883, 899 (E.D. Va. 1998). Good cause, under Supreme Court and Fourth Circuit authority, exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *See Bracy*, 520 U.S. at 908-09 (citing *Harris v. Nelson*, 394 U.S. 286, 295, (1969)); *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004)( affirming denial of multiple discovery requests). In *Roane*, the appellate court rejected defendants' argument that the trial judge committed error by granting summary judgement on some claims without first permitting discovery. *Roane*, 378 F.3d at 403-04.

Thus good cause does not exist, if a defendant premises a discovery request on a claim that fails as a matter of law. *See Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999). Furthermore, a request for discovery must rely on specific factual allegations. Discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999); *accord United States v. Wilson*, 901 F.2d 378,

3

381 (4th Cir. 1990); *Hall*, 30 F. Supp.2d at 899 ("'Petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence.'").

"District Courts enjoy nearly unfettered discretion to control the timing and scope of discovery ." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 426 (4th Cir. 1996); *see United States v. Roane*, 378 F.3d at 403 (reviewing, for abuse of discretion, the denial of discovery in a § 2255 case). This Court should not exercise its broad discretion to permit discovery before the Government files its opposition to the § 2255 Motion.

Given the procedural posture of this case, any grant of discovery would be premature, as the Government believes that Higgs' claims will fail, either procedurally, on their legal merits, or for want of demonstrable prejudice. For instance, Higgs initially requests information concerning comparative bullet lead analysis ("CBLA"), in support of his first § 2255 claim. (*See* Mot. at 4-6.) The Government, however, intends to show that the introduction of CBLA evidence in this trial had no demonstrable effect on the verdicts. *See generally Brecht v. Abrahamson*, 507 U.S. 619, 623, (1993). The Government should have full opportunity to show the harmlessness of the evidence before this Court obligates it to disclose a trove of irrelevant information about CBLA.

In his second request for discovery, Higgs seeks information to support his claim that the prosecution discriminated against women during jury selection, thereby violating constitutional principles articulated in *Batson v. Kentucky*, 476 U.S. 79, (1986). (*See* Mot. at 6-10.) The Government, however, intends to show that this claim is procedurally defaulted because Higgs failed to raise it at trial or on appeal. *See generally Massaro v. United States*, 538 U.S. 500, 504, (2003). Higgs may argue that the Court should still find viable his pendant claim – that trial

4

and appellate attorney failed him when they omitted to press the *Batson* issue. But that claim would not require any discovery from the government; rather it would require Higgs to show that his former attorneys possessed, or should reasonably have possessed, the information upon which he would have had them make the *Batson* claim in the first instance.

In his third request for discovery, Higgs seeks Dominick Williams' custodial records. (*See* Mot. at 10.) According to Higgs, this information will support his § 2255 claim that the Government previously suppressed those records. Rather, as the Government intends to show in its opposition to the § 2255 Motion, Higgs' trial attorneys had access to, and relied upon, the very records at the base of the underlying claim and the request for discovery.

In his fourth and fifth discovery requests, Higgs seeks information concerning Victor Gloria's treatment by the federal Government, and by third party law enforcement agencies. (*See* Mot. at 11-13.) According to Higgs, the information will demonstrate that Gloria had undisclosed motives to lie – motives that would have fatally undermined his credibility. The Government, however, intends to show that Higgs' claim fails as a matter of law because – even assuming Gloria received the alleged benefits – there is no evidence that he was promised anything other than that which he admitted at trial. Moreover, the Government intends to show that the outcome of the trial would have been the same even if the defense had confronted Gloria with the alleged additional benefits.

In his sixth discovery request, Higgs seeks information about confidential government informants, which he contends will support a claim that trial counsel failed to adequately investigate a third-party culpability defense. (*See* Mot. at 13.) The Government intends to show that the claim of ineffective assistance is premised on speculation and inadmissible hearsay. It

5

cannot, as a result, satisfy the operative legal standard for relief. Likewise, the Government intends to show that the § 2255 claim underlying Higgs' seventh discovery request, for immigration documents concerning Richard Diolamou and Wondwossen Kabtamu, is based on another fundamentally flawed, ineffective assistance claim. (*See* Mot. at 13-14.) Higgs arguments in support of that claim are rooted in rank speculation about Diolamou and Kabtamu, and fundamentally fail to establish that trial counsel breached any applicable duty.

In his eighth discovery request, Higgs seeks the Department of Justice's privileged work product to support his § 2255 claim that the Government administers the death penalty in a racially biased manner. (*See* Mot. at 14-17.) The Government intends to show that Higgs has procedurally defaulted his claim by failing to raise it on appeal. *See Massaro*, 538 U.S. at 504. Further, it intends to demonstrate, as Higgs essentially concedes, that the claim in facially meritless.

Lastly, the Government will show that Higgs' final discovery request, for exculpatory documents the prosecution allegedly suppressed, has its basis in another facially meritless, and wholly speculative claim regarding the Government's alleged suppression of exculpatory evidence. (*See* Mot. at 17.)

Presently, Higgs cannot show good cause for discovery, because he cannot demonstrate that his claims will survive the Government's forthcoming legal challenges. *See Taylor*, 170 F.3d at 474. The Government should have a full opportunity to demonstrate the legal failings of Higgs' claims outside the limited arena of discovery litigation. To show good cause at this juncture, the Court should require Higgs to show not only that he has an actual need for information in service of a viable claim — something he cannot do — but that he will lose the

6

opportunity to obtain the requested evidence, if the Court first permits the Government the opportunity to respond to his claims of error. In evaluating that showing, this Court should proceed with skepticism. First, Higgs has made no attempt to show a pressing need for information. Second, Higgs not only filed his underlying § 2255 Motion at the last possible instant, but subsequently sought and received additional time in which to submit supporting points and authorities. Only after filing his supplementary briefing did he seek discovery. If outside forces threaten the vitality of the evidence Higgs now wishes to obtain, his deliberate approach to this litigation certainly betrays any prior lack of concern about them.

The Government should have the opportunity, unmolested by requests for irrelevant discovery, to press its defenses against Higgs' § 2255 Motion. Permitting the Government to fully develop its opposition to the § 2255 Motion will save inestimable time and effort for the Government, the Court, and innocent third parties, all presently confronted with requests for discovery in support of claims upon which relief cannot be granted.

Higgs may respond that he requires the requested discovery to forestall the Government's opposition to his claims. Such an argument should not long detain this Court, as discovery on collateral review is not permitted so that a petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d at 1067. Assuming, arguendo, that the Government later fails to show that one or more of Higgs' claims do not fail as a matter of law, the Court can then address the propriety of discovery in that context.[1] Until that time, however, this Court

---

[1]The Government does not intend by this response to waive any specific argument or defense to Higgs' discovery requests, now or in the future. The Government merely seeks to press for a fair and orderly opportunity to show that the Motion for Relief has no merit before it is required to address specific requests for discovery.

7

should hold that Higgs has necessarily failed to show good cause for discovery, as he has not

shown that any of his underlying claims will survive the Government's defenses.

## CONCLUSION

Based on the foregoing arguments and authorities, the Government respectfully urges this

Court to deny, as premature, Higgs' requests for discovery.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____

Deborah A. Johnston
Sandra Wilkinson
Assistant United States Attorneys
6500 Cherrywood Lane
Greenbelt, Maryland 20770-1249

Jeffrey Kahan
Trial Attorney, Capitol Case Unit
1331 F. Street, NW, 3d Floor
Washington, DC 20530

8

## CERTIFICATE OF SERVICE

This is to certify that on this 31st day of July, 2006, a copy of the foregoing Reply to Petitioner's Answer to Motion to Preclude Contact with Jurors and Petitioner's Cross-motion to Allow Standard Post-conviction Interviews with Petite Jury was sent by first-class mail, postage prepaid, to the following:

> Michael Wiseman
> Federal Defender of Philadelphia
> Capital Habeas Corpus Unit
> Federal Court Division
> The Curtis Center Independent Square, West, Suite 545 W
> Philadelphia, PA 19106

> Stephen H Sachs
> Wilmer Cutler Pickering Hale and Dorr, L.L.P
> Five Roland Mews
> Baltimore, MD 21210

Deborah A. Johnston
Assistant United States Attorney

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA       :

                                 CIVIL ACTION NO. PJM 05-3180

v.                      :       CRIMINAL NO. PJM 98-0520

DUSTIN JOHN HIGGS         :

                       ...oOo...

## MOTION TO STRIKE PROCEDURALLY DEFECTIVE CLAIMS AND RESPONSE TO PETITIONER'S MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. § 2241

COMES NOW the United States of America, by and through its undersigned counsel in

Opposition to Higgs's Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative

Pursuant to 28 U.S.C. § 2241, moves this court to strike the procedurally defaulted portions of

claims II, VII, IX, XV, XVI, XIX, XX, XXI, and XXIV; claims X, XI, XII, XIV, and XVII as

improper attempts to re-litigate previously considered issues; and, claims XXI and XXIV as

inadequately pled and defaulted and to the extent the Court denies any portion of request to strike

Higgs's defective claims, the Government respectfully requests that this Court deny any and all of

Petitioner's claims for lack of merit.

                               Respectfully submitted,

                               Rod J. Rosenstein
                               United States Attorney

                By:

                               Deborah A. Johnston
                               Sandra Wilkinson
                               Assistant United States Attorneys
                               6500 Cherrywood Lane
                               Greenbelt, Maryland 20770-1249

                               Jeffrey Kahan
                               Trial Attorney, Capitol Case Unit
                               1331 F. Street, NW, 3d Floor
                               Washington, DC 20530

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

HIGGS'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

PART ONE: MOTION TO STRIKE PROCEDURALLY DEFECTIVE CLAIMS . . . . . . . . . . . . . . . . . . . . . . . 13

   I. HIGGS HAS PROCEDURALLY DEFAULTED A VARIETY OF CLAIMS BY
      FAILING TO RAISE THEM ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A. Procedural Default Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B. Higgs has Procedurally Defaulted Claims II, VII, IX, XV, XVI, XIX, XX,
         XXI, and XXIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         1. Claim II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         2. Claim VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         3. Claim IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         4. Claim X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         5. Claim XV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         6. Claim XVI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         7. Claim XVIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         8. Claim XIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         9. Claim XX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

         10. Claim XXI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         11. Claim XXIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         12. The Actual Innocence Exception Will not Lie . . . . . . . . . . . . . . . . 26

  II. HIGGS HAS PREVIOUSLY LITIGATED SEVERAL OF HIS PRESENT
      CLAIMS AND MAY NOT LITIGATE THEM ANEW ON COLLATERAL
      REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      A. The Relitigation Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. Higgs has Previously Litigated Claims VIII, X, XI, XII, XIV, and XVII ... 29

1. Claim VIII ............................................... 29

2. Claim X ................................................. 31

3. Claim XI ................................................ 34

4. Claim XII ............................................... 35

5. Claim XIII .............................................. 37

6. Claim XIV .............................................. 38

7. Claim XVII ............................................. 39

III. HIGGS HAS INADEQUATELY PLED TWO CLAIMS AND MAY NOT CONTINUE TO PRESS THEM AS A BASIS FOR RELIEF ............ 41

A. Claim XXI .............................................. 42

B. Claim XXIV ............................................. 43

PART TWO: RESPONSE TO PETITIONER'S MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255 OR IN THE ALTERNATIVE PURSUANT TO 28 U.S.C. § 2241 ........................... 45

ESSENTIAL LAW REGARDING MOTIONS UNDER 18 U.S.C. § 2255 ....... 45

A. Limits on Retroactive Application of Law .......................... 45

B. Harmless Error .......................................... 46

I. HIGGS HAS FAILED TO STATE A COGNIZABLE OR MERITORIOUS CLAIM REGARDING THE INTRODUCTION OF COMPARATIVE BULLET LEAD ANALYSIS ..................................... 47

A. The Factual Background for the CBLA Testimony ................. 48

B. The Comparative Bullet Lead Analysis Testimony ................. 49

C. Legal Argument ........................................ 52

1. Newly Discovered Evidence does not Provide a Basis for Relief ... 52

2. The Government did not Violate Higgs's Due Process Rights ...... 55

3. Defense Counsel Was Not Ineffective ...................... 59

II. THE TRIAL PROSECUTORS PROPERLY EXERCISED THEIR PEREMPTORY JURY CHALLENGES IN A NON-DISCRIMINATORY FASHION .............................................. 62

A. Higgs's Claim of Discriminatory Use of Peremptory Challenges Is Without Merit ............................................... 62

1. Higgs Has Failed to Establish a Prima Facie Case of Gender Discrimination ...................................... 63

2. The Government Had Legitimate, Non-discriminatory Bases for its Peremptory Strikes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

3. Higgs Has Not Carried His Burden of Proving Purposeful Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

B. Higgs Cannot Establish Ineffective Assistance of Counsel nor Should he Receive Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

III. TRIAL COUNSEL PRESENTED A CONSTITUTIONALLY ADEQUATE DEFENSE, AND THE PROSECUTION HONORED ITS DUTY TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE . . . . . . . . . . . . . . 74

A. Counsel Effectively Responded to Victor Gloria's Testimony . . . . . . . . . . 74

B. The Supposed Recantation of Victor Gloria . . . . . . . . . . . . . . . . . . . . 83

C. The Alleged Failure to Disclose or Discover Impeachment Evidence . . . . . . 85

1. The Supposed Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . 86

2. The Supposed Ineffective Assistance . . . . . . . . . . . . . . . . . . . . . . 89

D. Defense Counsel Had No Duty to Examine Victor Gloria About His Prior Possession of Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

E. Defense Counsel Did Not Forgo any Reasonable Investigation as to Third Party Culpability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

F. Defense Counsel did not Forgo Any Fruitful Investigation with Regard to Enidsia Darby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

G. The Government did not Suppress Any Evidence Regarding Richard Diolamou or Wondwossen Kabtamu . . . . . . . . . . . . . . . . . . . . . . . . . . 99

H. The Government did not Suppress Information Regarding the Custodial Status of Domenick Williams, nor Did Trial Counsel Fail to Investigate Such Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

I. Higgs has Belatedly Added a Meritless Claim Regarding Domenick Williams's Criminal Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

IV. TRIAL COUNSEL PROPERLY PREPARED TO CONFRONT EVIDENCE REGARDING THE UBIQUITY OF .38 CALIBER FIREARMS . . . . . . . 105

V. COUNSEL PROPERLY DECLINED TO CHALLENGE HIGGS'S ADOPTIVE ADMISSION UNDER THE CONFRONTATION CLAUSE . . . . . . . . . . 109

VI. HIGGS RECEIVED EFFECTIVE REPRESENTATION IN ALL ASPECTS OF HIS MITIGATION CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

A. Trial Counsel had no Reason to Believe they Could Obtain Higgs's Public School Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

B. Trial Counsel Adequately Investigated Alphonso Higgs, the Defendant's Father . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

C. Trial Counsel Adequately Investigated Alphonso Higgs, Despite the
Observations of Third Party Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . 121

D. Trial Counsel Adequately Investigated the Defendant's Response to his
Mother's Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

E. Trial Counsel Performed a Constitutionally Adequate Investigation on Behalf
of the Defense's Mental Health Experts . . . . . . . . . . . . . . . . . . . . . . . 126

VII. THE GOVERNMENT SOUGHT THE DEATH PENALTY IN THIS CASE
ON RACE-NEUTRAL GROUNDS, AND TRIAL COUNSEL PROVIDED
CONSTITUTIONALLY ADEQUATE REPRESENTATION DESPITE
DEFENDING THE CASE WITHOUT RELYING ON CLAIMS OF
PROSECUTORIAL RACISM . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

A. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

B. Statistical Data Does not Support a Claim of Racially Biased Charging . . . 127

C. Ineffective Assitance of Counsel Claims Premised on Higgs's Statistical Data
Fail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

VIII. THE FOURTH CIRCUIT FOUND THE ADMISSION OF CODEFENDANT
HAYNES'S INCULPATORY STATEMENT WAS, AT MOST,
HARMLESS ERROR; THEREFORE, THIS COURT CANNOT FIND
THAT TRIAL COUNSEL PREJUDICIALLY ERRED IN FAILING TO
OBJECT TO THE EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

A. The Prior Appellate Decision in this Case Disposes of the Question of
Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

B. Counsel Provided Constitutionally Adequate Representation . . . . . . . . . . 132

IX. THE TRIAL COURT PROPERLY ADMITTED VICTIM-IMPACT
EVIDENCE, AND THE PROSECUTION PROPERLY ARGUED ITS
EFFECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

A. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

B. The Prosecution Properly Adduced Victim-Impact Evidence and Argued its
Significance in Light of Appropriate Jury Instructions . . . . . . . . . . . . . 137

1. The Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

2. The Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

3. The Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

C. Retroactive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

D. Any Error Regarding Victim Impact was Harmless . . . . . . . . . . . . . . . . 149

E. Defense Counsel Appropriately Chose not to Object to the Government's
Wholly Proper Evidence and Argument Regarding Victim Impact . . . . 151

X. THE FOURTH CIRCUIT HAS ALREADY FOUND THAT THIS COURT PROPERLY ADMITTED EVIDENCE OF HIGGS'S CONVICTION FOR ASSAULT AND RECKLESS ENDANGERMENT, AND THIS COURT SHOULD NOT REVISIT THAT DETERMINATION .............. 151

    A. This Court Cannot Reconsider the Decision of the Court of Appeals Rejecting the Argument in Favor of a Categorical Analysis of Higgs's Prior Conviction ............................................. 152

    B. Higgs has not Properly Raised his Meritless Argument that Statutory Language Precluded a Statutory Aggravator Based on a Conviction that Post-Dated the Capital Offense ............................. 153

    C. Defense Counsel Appropriately Chose to Omit Meritless Arguments Regarding the Applicability of the Aggravator for Prior Violent Firearm Felony Convictions ........................................ 157

XI. THE FOURTH CIRCUIT HAS ALREADY UPHELD THE APPLICATION OF THE PRIOR-DRUG-CONVICTION AGGRAVATOR IN THIS CASE, AND THIS COURT SHOULD NOT REVISIT THAT DETERMINATION ...................................................... 157

XII. THE FOURTH CIRCUIT HAS UPHELD THE APPLICATION OF A MULTIPLE-MURDER AGGRAVATOR IN THIS CASE, ALBEIT AS A NON-STATUTORY FACTOR, AND THIS COURT SHOULD NOT REVISIT THAT DETERMINATION .............................. 159

XIII. THE FOURTH CIRCUIT HELD THAT KEVIN ANDERSON COULD OFFER NO MATERIAL EVIDENCE; THIS COURT SHOULD NOT REVISIT THAT DETERMINATION UNDER THE GUISE OF A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL .................. 161

XIV. THE FOURTH CIRCUIT HAS ALREADY UPHELD THE SUFFICIENCY OF THE INDICTMENT, AND THIS COURT SHOULD NOT REVISIT THAT DETERMINATION ...................................... 163

XV. THIS COURT PROPERLY INSTRUCTED THE JURY AS TO THE PROCESS FOR WEIGHING AGGRAVATING AND MITIGATING FACTORS ................................................... 164

    A. Procedural Default ....................................... 165

    B. The Jury Charge and Federal Statute Properly Permit the Weighing of Factors in the Absence of the Reasonable Doubt Standard ............... 165

    C. Defense Counsel Appropriately Chose not to Object to the Government's Wholly Proper Evidence and Argument Regarding Victim Impact .... 168

XVI. THIS COURT PROPERLY DECLINED AN INSTRUCTION ALLOWING THE JURY TO CONSIDER IN MITIGATION THAT THE DEFENDANT COULD RECEIVE A SENTENCE OF LIFE WITHOUT PAROLE .... 169

    A. The Pertinent Proceedings ................................ 169

B. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

C. The Jury Received an Appropriate Instruction Regarding Parole Eligibility and Used that Information to Higgs's Benefit
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

D. Appellate Counsel Appropriately Omitted Any Claim Regarding a Parole Ineligibility Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

XVII. THE FOURTH CIRCUIT HAS ALREADY REJECTED HIGGS'S CLAIM THAT THE GOVERNMENT SUPPRESSED MATERIAL EVIDENCE, AND THIS COURT SHOULD NOT REVISIT THAT DETERMINATION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

XVIII. THIS COURT PROPERLY ADMITTED HIGGS'S STATEMENTS ABOUT HIS REFUSAL TO MEET WITH INVESTIGATORS . . . . . . . 176

A. Pertinent Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

B. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

C. Evidence of Higgs's Comments Regarding his Refusal to Assist Investigators did not Violate his Fifth Amendment Right to Silence or Prejudice the Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

D. Evidence of Higgs's Post-Indictment Actions did not Violate the Sixth Amendment Right to Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

E. Defense Counsel Appropriately Omitted Any Objection to Evidence Regarding Higgs's Refusal to Meet with the Police . . . . . . . . . . . . . . 184

XIX. DEFENSE COUNSEL PROPERLY DECLINED TO OBJECT TO THE OMISSION OF A PENALTY PHASE JURY INSTRUCTION REGARDING HIGGS'S SILENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

A. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

B. This Court had no Sua Sponte Duty to Instruct the Jury not to Draw an Adverse Inference from Higgs's Decision not to Testify . . . . . . . . . . . 186

C. The Record Betrays the Basis of Higgs's Claim . . . . . . . . . . . . . . . . . . . 187

D. Defense Counsel did not Prejudicially Err . . . . . . . . . . . . . . . . . . . . . . . 190

XX. SUFFICIENT EVIDENCE SUPPORTS FEDERAL JURISDICTION OVER THESE MURDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

A. Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

B. Sufficient Evidence of Jurisdiction Supports Higgs's Conviction . . . . . . . 192

C. The Court Properly Instructed the Jury . . . . . . . . . . . . . . . . . . . . . . . . . 197

D. Defense Counsel Appropriately Chose not to Challenge the Evidence or Instructions Regarding Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

**XXI. PETITIONER HAS FAILED TO STATE A CLAIM OF SUPPRESSED EVIDENCE UPON WHICH THIS COURT CAN GRANT RELIEF** .... 199

**XXII. THERE ARE NO ERRORS TO ACCUMULATE** .................... 200

**XXIII. HIGGS HAS FAILED TO STATE A CLAIM UPON WHICH THIS COURT SHOULD GRANT DISCOVERY OR AN EVIDENTIARY HEARING** ............................................. 201

**XXIV. HIGGS HAS FAILED TO STATE A CLAIM OF JUROR MISCONDUCT UPON WHICH THIS COURT CAN GRANT RELIEF** ............... 202

**XXV. THIS COURT LACKS JURISDICTION TO DETERMINE WHETHER HIGGS'S EXECUTION WILL CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT** ......................................... 203

   A. Justiciability ......................................... 203

   B. Improper Venue and Procedural Vehicle ..................... 205

   C. Higgs's Eighth Amendment Claim Fails ..................... 207

**CONCLUSION** ............................................. 209

existence of hearsay. In short, Higgs has not even attempted to meet his burden of proof on collateral review. *Cf. Miller v. United States*, 261 F.2d at 547.

As previously discussed, Higgs's own actions betrayed his guilt, regardless of Gloria's testimony about the transfer of the murder weapon. (*See supra* Part Two, Arg. I.A.) Higgs sanitized his apartment after the killing, lied to police, attempted to create a false alibi, sought to silence Gloria, and expressed a desire to avoid connection with the murder weapon. He cannot overcome this overwhelming manifestation of guilt simply by asserting that his agent heard Victor Gloria contradict some prior testimony. Higgs's actions corroborated Gloria's accusations. Indeed, Higgs's trial attorneys expended substantial energy unsuccessfully advocating that the jury should mistrust Gloria, and extracting a concession from the witness that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." (TT 9/28/00 at 101.) Ironically, Higgs now asks this Court to put its trust not in Gloria, not in a defense investigator, but in a description of a conversation between the two. Higgs's claim is wholly wanting in an evidentiary or legal basis and, therefore, entirely unpersuasive. Certainly, he cannot hope to meet an extraordinarily high standard of proof on the basis of the information he has presented to this Court. *House v. Bell*, 126 S. Ct. at 2086.

C. The Alleged Failure to Disclose or Discover Impeachment Evidence

At trial, Victor Gloria testified that, under the agreement he had struck with prosecutors, he could receive a sentence as low as seven years imprisonment in connection with his plea to accessory after the fact to these murders. In fact, Gloria received just such a sentence, but Higgs theorizes that he received more – a dismissal of outstanding federal drug charges and a one-year sentence on Maryland state drug charges. Higgs claims that as additional benefits to Gloria, the

85

federal government did not report his whereabouts to the Commonwealth of Virginia, which had a warrant for his arrest. Higgs even attributes the fact that Gloria did not face prosecution in a Baltimore homicide case, in which he "was a suspect," to the federal government. Higgs argues that the trial prosecutors failed to disclose supposed consideration provided to Victor Gloria in exchange for his testimony. He also claims that his attorney provided ineffective assistance when they failed to discover certain charges against Gloria. (Mot. at 31-33; BSM at 42-46.) The Government disagrees and submits that Higgs has failed to demonstrate that the prosecutors violated his constitutional rights. Certainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial.

1. The Supposed Prosecutorial Misconduct

Higgs claims that the prosecutors in his trial failed to inform him of a series of benefits that flowed to Victor Gloria after the trial.

The prosecution violates a defendant's due process rights when it suppresses material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Exculpatory evidence includes evidence regarding the reliability of a witness. *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. at 433; *Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence is material only if its admission would have resulted in a reasonable probability of a different result. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *United States v. Bagley*, 473 U.S. 667, 681-82 (1985).

Promises made as consideration for testimony reflect upon a witness's credibility. *Giglio*,

86

405 U.S. at 155. Such evidence is material where a reasonable probability exists that it would

result in a more favorable verdict. *See Bagley*, 473 U.S. at 678. Thus, prosecutors must disclose

consideration to witness's whose credibility is an important issue in the case. *Giglio*, at 154-55.

"The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might

motivate a witness in giving testimony." *McCleskey v. Kemp*, 753 F.2d 877, 884 (11th Cir.1985)

(en banc), *aff'd on other grounds*, 481 U.S. 279 (1987).

At an irreducible minimum, the prosecution's duty to disclose depends upon the existence

of an agreement or understanding involving tangible benefits. *See Alderman v. Zant*, 22 F.3d

1541, 1549 n.6 (11th Cir. 1994). Thus, an attorney's belief "that his client may be in a better

position to negotiate a reduced penalty should he testify . . . is not an agreement within the

purview of *Giglio*. *Id.* at 1555. Simply put, *Giglio* requires the disclosure of promised benefits,

not the prognostication of subsequent leniency, even if it rewards prior cooperation:

> Petitioner argues that Ulrich consented to the lenient sentence in light of Boone's
> cooperation. This may be true. However, the issue is not whether Boone
> eventually received favorable treatment because she testified at petitioner's trial.
> The relevant inquiry is whether the District Attorney's Office made an
> undisclosed promise of additional leniency in exchange for Boone's cooperation.
> Contrary to petitioner's argument, the mere fact that Ulrich acceded to the
> sentencing court's request does not provide sufficient evidence of any such
> promise.

*Shabazz v. Artuz*, 336 F.3d 154, 162 (2d Cir. 2003); *see also Williams v. Coyle*, 260 F.3d 684,

707 (7th Cir. 2001) (holding that later benefit did not necessarily reflect the existence of a prior

agreement).

In this case, Higgs claims that Gloria received lenient treatment after the conclusion of

this trial. Higgs, however does not allege, much less show, that the Government had promised

these benefits to Gloria before he testified. In the absence of such evidence, Higgs's fails to state

87

a constitutionally cognizable claim. *See Shabazz v. Artuz*, 336 F.3d at 162.

Significantly, Higgs's vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials. Higgs observes that Smyth County, Virginia has failed to execute an arrest warrant against Gloria and that Gloria received a one-year prison sentence in a Prince George's County drug case that carried a 10-year exposure. Higgs, however, does not allege or demonstrate a causal link between Gloria's cooperation in this case and the actions of local officials in others. Indeed, Higgs essentially concedes that he has based his claim on speculation, asserting only that the treatment of Gloria "strongly suggests" the existence of undisclosed benefits. Elsewhere, Higgs states in conclusory fashion that Baltimore City officials did not arrest Gloria in connection with a murder to preserve the witness's "status" in this case. But, as the Fourth Circuit has recognized, speculation about the Government's knowledge or actions does not suffice to discharge a defendant's burden on collateral review, and will not merit relief. *See Roane*, 378 F.3d at 401. Higgs apparently has no alternative but speculation, as he has not offered a declaration from the only person who could speak to Victor Gloria's expectations at the time of trial – Victor Gloria.

Even if Higgs could demonstrate that the prosecutors failed to provide him with some information about Gloria's outstanding cases, he cannot establish the materiality of that evidence. As previously mentioned, defense counsel thoroughly explored Gloria's sullied character and history, and unambiguously demonstrated that the witness would receive substantial consideration in exchange for his cooperation. Furthermore, the prosecutor began her direct examination of Gloria by adducing his admissions that he was a criminal, having been convicted of distribution of cocaine and two instances of assault and battery. (TT 9/27/00 at 140-41.)

88

Regardless of this impeachment, Gloria's testimony about Higgs was corroborated with evidence that Higgs attempted to avoid detection and prosecution for the crime. Higgs's actions after the crime demonstrated the truthfulness of Gloria's accusations at trial. (*See, supra* Part Two, III, B.) Higgs sanitized his apartment (*see* TT 9/28/00 at 39; TT 10/11/00 at 147, 149), lied to police (*see* TT 9/28/00-afternoon at 6-8), attempted to present a false alibi (*see* TT 9/28/00-afternoon at 15-25), announced his desire to silence a witness (*see* TT 10/4/00 at 40-42), and said that he wished to avoid connection to the apparent murder weapon (*see* TT 10/4/00 at 34). Having so completely revealed his consciousness of guilt, Higgs failed to persuade the jury to disbelieve Gloria, regardless of any demonstrable defects in the witness's character or motives for testifying. Indeed, Gloria had incriminated Higgs before he received any promise of leniency in any case. (See TT 9/28/00 at 209-14.) As such, there exists no reasonable probability that Higgs would have received a more favorable verdict had he adduced evidence of the attenuated motives to fabricate that he now attributes to Gloria. In short, Higgs has not identified any foregone evidence that would have created a reasonable probability of a different result. *Kyles v. Whitley*, 514 U.S. at 436.

## 2. The Supposed Ineffective Assistance

Higgs argues that his trial attorneys provided ineffective assistance when they failed to investigate and discover the fact that Victor Gloria supposedly received further benefits from the Government stemming from charges in the Commonwealth of Virginia and suspicions of his involvement in a Baltimore murder. Given that Higgs cannot show that the absence of this evidence from his trial had a prejudicial effect under the *Kyles* standard, as shown above, he cannot make out a showing of prejudice under the identical *Strickland* standard, either. *See*

89

*supra* Part Two, Arg. I, C, 1; *see also Strickland,* 466 U.S. at 694.

Claims of attorney ineffectiveness premised on a failure to investigate must show the error resulted in the failure to present admissible, exculpatory evidence. *See Spencer v. Murray,* 18 F.3d at 233. Higgs has not shown that his attorneys failed to find admissible, exculpatory evidence concerning benefits conferred by the Government; rather, he claims that they failed to find Gloria's fugitive warrant or his status in a Baltimore homicide investigation. Absent some showing that Gloria had received forbearance in Virginia or Baltimore in exchange for his testimony, his status in those jurisdictions was and is wholly irrelevant.

The relevant inquiry is whether the prosecution made an undisclosed promise of additional benefits in exchange for Gloria's cooperation, and the mere fact that the Commonwealth of Virginia has not pursued a case against the witness does not provide sufficient evidence of such a promise. *See Shabazz v. Artuz,* 336 F.3d at162. Higgs cannot show that his attorneys' decision not to investigate or present irrelevant evidence, concerning criminal matters wholly outside the control of the United States Attorney's Office fell below an objective standard of reasonableness or resulted in a reasonable probability of prejudice. *See Strickland v. Washington,* 466 U.S. at 687-88 & 694. As with Higgs's related claim of prosecutorial misconduct, his attempt to show that his attorneys prejudicially failed to impeach Victor Gloria must founder in view of the fact that the defendant's own actions substantiated the witness's accusations. (*See, supra,* Part Two, III, C, 1.)

D. Defense Counsel Had No Duty to Examine Victor Gloria About His Prior Possession of Firearms

Higgs claims that his attorneys ineffectively failed to present evidence that Victor Gloria was familiar with .38 caliber weapons. According to Higgs, such information "would have been

90

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

_____

UNITED STATES OF AMERICA,      :

          :

             Respondent,      :      Criminal No. PJM-98-0520

          :

                v.      :      Peter J. Messitte, U.S.D.J.

          :

DUSTIN JOHN HIGGS,      :      Greenbelt Division

          :

              Petitioner.      :

_____ :

**PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT**
**PURSUANT TO _HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO._ AND**
**FEDERAL RULE OF CIVIL PROCEDURE 60(d)**

Petitioner, Dustin John Higgs, hereby moves for relief from this Court's final judgments

denying him relief pursuant to 28 U.S.C. § 2255 or in the alternative pursuant to 28 U.S.C. §

2241 (Doc. 548); denying discovery (_id._); denying a certificate of appealability (Doc. 560); and

denying his motion to alter or amend the judgment pursuant to Federal Rule of Civil Procedure

59(e) (Doc. 561). Mr. Higgs makes this motion pursuant to _Hazel-Atlas Glass Co. v. Hartford-_

_Empire Co._, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d). In support of this

motion, Mr. Higgs states the following:

**INTRODUCTION**

Dustin Higgs is currently on death row, having been convicted and sentenced to death for

murder and related charges in this Court. Victor Gloria was the most important witness at Mr.

Higgs's trial. Indeed, in the opinion of the trial prosecutor, "the government could not have

proceeded and obtain[ed] a conviction against Mr. Higgs certainly without the assistance of Mr.

1

Gloria." Exhibit 1 at 4 (argument of AUSA Deborah Johnston during Mr. Gloria's sentencing hearing in support of a motion for downward departure due to Mr. Gloria's "substantial assistance to the government").

As part of the § 2255 proceedings in this Court challenging Mr. Higgs's convictions and sentences, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore that was committed prior to the time of Mr. Higgs's trial. Doc. 492 at 33. Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case." *Id.* Mr. Higgs alleged that the government's failure to disclose this favorable treatment of Mr. Gloria violated Mr. Higgs's due process rights. *Id.*

The government responded to Mr. Higgs's § 2255 allegation regarding Mr. Gloria by denying that federal officials had any knowledge of or ability to influence any benefits conferred on Mr. Gloria by local authorities in Baltimore, dismissing the allegation as speculative, and urging the denial of relief. Doc. 520 at 85-88. This Court denied Mr. Higgs's claim, adopting the government's line of argument. The Court ruled that "pure speculation about supposed benefits cannot substitute for hard facts," and that "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *United States v. Higgs*, 711 F. Supp. 2d 479, 508 (D. Md. 2010).

Mr. Higgs has now obtained the Baltimore City Police file for the homicide in which he alleged Mr. Gloria was an uncharged suspect. The contents of the file reveal that: 1) Mr. Gloria was indeed a suspect in the Baltimore murder, having been identified as the killer by multiple eyewitnesses; 2) at least as early as February 2, 1999, Detective Joseph Green of the United States Park Police was aware that Mr. Gloria was a suspect in the murder; 3) on April 12, 1999, Assistant United States Attorney Deborah Johnston spoke with Mark Cohen, then the chief of the homicide division of the Baltimore City State's Attorney's Office, about the fact that Mr. Gloria was a suspect in the Baltimore homicide; 4) during this conversation, AUSA Johnston suggested to Mr. Cohen that it was possible Mr. Gloria did not commit the killing because, in her estimation, the eyewitnesses who identified him had a motive to lie; 5) the Baltimore City Police embraced AUSA Johnston's proffered theory of Mr. Gloria's innocence of the murder and declined to charge Mr. Gloria with any crime; and 6) the Baltimore City State's Attorney's Office would have charged Mr. Gloria with the murder absent the intervention of federal officials, including AUSA Johnston, Detective Green, Detective Rydi Abt of the Park Police, and Agent Bradlee Sheafe of the FBI. In sum, the government knew that Mr. Higgs's allegation was supported by "hard facts," but made false representations to this Court during the § 2255 litigation in order to prevail.

The government's representations during the course of the § 2255 proceedings therefore constitute fraud on the Court, and merit relief from the Court's final judgment denying discovery and post-conviction relief under *Hazel-Atlas* and Federal Rule of Civil Procedure 60(d)(3). Not only has the government now been engaged in a years-long *Brady* violation, but officers of this Court representing the government have made materially false statements in their continuing

3

attempt to cover up the violation.  AUSA Johnston signed the government's pleading that faulted

Mr. Higgs for failing to demonstrate any connection to federal officials regarding the "supposed"

benefits obtained by Mr. Gloria.  It is now clear that multiple federal officials, including AUSA

Johnston, had intimate involvement in the conferring of these benefits, which were directly

related to Mr. Gloria's testimony in this case.  The government's misrepresentations to this Court

in a death penalty case, which formed the basis for the Court's denial of relief, merit relief from

the final judgments.

Mr. Higgs submits that this motion, and the exhibits thereto, demonstrate his entitlement

to relief under Fourth Circuit and United States Supreme Court precedent.  At a minimum, Mr.

Higgs requests that he be granted an evidentiary hearing at which he will prove these serious

allegations.  Further, a probing inquiry is necessary into what additional undisclosed *Brady*

and/or *Giglio* material remains in the hands of the government.  Mr. Higgs therefore also requests

to be heard on the renewed *Brady*/*Giglio* discovery request that he has filed contemporaneously

with this motion.

## PROCEDURAL HISTORY

On December 21, 1998, Mr. Higgs, along with co-defendant Willis Haynes, was indicted

on charges connected with the January 27, 1996, shooting deaths of Tanji Jackson, Tamika

Black, and Mishann Chinn.  On October 22, 1999, the government filed a notice of its intent to

seek the death penalty against Mr. Higgs.  On December 20, 1999, the grand jury returned a

second superseding indictment, and the government thereafter filed an amended death notice.

The cases against Mr. Haynes and Mr. Higgs were severed for trial.  Mr. Haynes – by all

4

**A-088**

accounts the person who actually killed Ms. Jackson, Ms. Black, and Ms. Chinn[1] – was tried first and sentenced to life in prison without release.  Mr. Higgs was tried next, and on October 11, 2000, was found guilty of firearms charges and three counts each of first-degree premeditated murder, first-degree murder committed during a kidnapping, and kidnapping resulting in death. Following a sentencing hearing, the jury recommended death sentences on the nine death-eligible counts.

The Fourth Circuit upheld the convictions and sentences on direct appeal.  *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (*Higgs-1*).  While the direct appeal was pending, Mr. Higgs filed a motion for a new trial, alleging that the government had withheld *Brady* material relating to two witnesses.  This Court denied the motion for new trial, and the Fourth Circuit again affirmed.  *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (*Higgs-2*).  Certiorari was denied with respect to each appeal.  *Higgs v. United States*, 542 U.S. 999 (2004); *Higgs v. United States*, 543 U.S. 1004 (2004).

Mr. Higgs then filed his *Motion for Relief Pursuant to 28 U.S.C. Section 2255 or in the Alternative Pursuant to 28 U.S.C. 2241* on November 28, 2005.  Doc. 492.  He also moved for discovery and a hearing on several of his claims.  *Id.*; *see also* Doc. 509.  On April 7, 2010, this Court denied the § 2255 motion without argument, discovery, or a hearing.  *United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010) (*Higgs-3*); *see also* Doc. 548 (Final Judgment Order). The Court denied Mr. Higgs's motions for reconsideration and for a certificate of appealability (COA) on July 20, 2010.  Docs. 560, 561.

---

[1] *See, e.g.*, *United States v. Haynes*, 26 Fed. Appx. 123, 127 (4th Cir. 2001) (unpub.) (describing how "Haynes exited the vehicle and fired five shots, killing all three women").

Mr. Higgs then sought a COA from the Fourth Circuit on numerous issues, including that the government improperly suppressed the benefit Mr. Gloria received in avoiding a first degree murder charge in Baltimore.  The Fourth Circuit denied a COA on all but one issue, regarding the government's withholding of exculpatory material relating to comparative bullet lead analysis and counsel's ineffectiveness in handling the issue, and subsequently denied relief.  *United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) (*Higgs-4*).  The United States Supreme Court denied certiorari on December 10, 2012.  *Higgs v. United States*, 133 S.Ct. 787 (2012).

## STATEMENT OF FACTS

**A.      Victor Gloria's Trial Testimony**

During the early morning hours of January 27, 1996, Ms. Jackson, Ms. Black, and Ms. Chinn were found murdered along Route 197 in the Patuxent National Wildlife Refuge in Prince George's County, Maryland.  Victor Gloria was the most significant witness at Mr. Higgs's trial on the charges arising from these murders.  According to AUSA Johnston, the government "could not have proceeded and obtain[ed] a conviction against Mr. Higgs" without Mr. Gloria's testimony.  Exhibit 1 at 4 (Gloria sentencing hearing).  This Court concurred in that assessment.  *Id.* at 16 (describing Mr. Gloria as "the critical link in the conviction of these two men," and finding that "[t]hat is the most important thing about [Gloria] at this point in the sentencing, and it overrides everything else"); *see also Higgs-1*, 353 F.3d at 289 (noting that "[m]ost of the facts surrounding the murders of the three women were obtained from [Gloria's] eyewitness testimony"); *Higgs-4*, 663 F.3d at 730 ("At trial, [Gloria] provided a detailed, eyewitness account of the kidnappings and murders"); *id.* at 741 ("Gloria's eyewitness testimony provided compelling and convincing details of the events of that evening and of Higgs's involvement in

them").

Mr. Gloria testified to a number of highly damaging facts relating to Mr. Higgs's involvement in the killings. Mr. Gloria testified, for example, that the three victims were socializing at Mr. Higgs's apartment on the night of the killings with Mr. Haynes, Mr. Gloria, and Mr. Higgs, when Mr. Higgs got into an argument with Ms. Jackson. *Higgs-1*, 353 F.3d at 289-90. According to Mr. Gloria, this argument led Mr. Higgs to want to have the victims killed. *Id.* Mr. Gloria testified that after the three women left the apartment following the fight, Mr. Higgs got a gun and told Mr. Haynes to get the three women into Mr. Higgs's vehicle. *Id.* at 290. Finally, Mr. Gloria testified that he then got in the back seat of Mr. Higgs's vehicle and observed Mr. Higgs drive the three women to a secluded location along Route 197 while having whispered conversations with Mr. Haynes, pull over, and hand Mr. Haynes the gun with which to carry out the killings. *Id.* Mr. Gloria was the only source of this direct, highly damaging testimony.

**B.      The Murder of Martrelle Creighton**

On July 18, 1998, approximately two and a half months prior to Mr. Gloria's arrest in this federal case, a man named Martrelle Creighton was murdered in the Inner Harbor area of Baltimore.[2] Exhibit 2 (Report of Baltimore Police Detective Robert L. Patton, 7/18/98). At approximately 2:00 a.m. on July 18, Mr. Creighton was found by police lying on the sidewalk near 301 Light Street, suffering from a single stab wound to the neck. *Id.*

As discussed below, the fatal wound was consistent with having been inflicted by a single

---

[2]Although law enforcement suspected the involvement of Mr. Gloria in the federal case early on in their investigation, Mr. Gloria was not arrested until almost three years after the Route 197 murders, on October 5, 1998. Thus, on the date of Mr. Creighton's murder, Mr. Gloria was not yet in custody.

7

**A-091**

blow, which could have appeared to onlookers to be a punch.  Witnesses told police that both Victor Gloria and Kevin Miller swung at the decedent during an altercation, and several said that Mr. Gloria was the first to run away.  Thus, either Mr. Gloria or Mr. Miller could have been the person who stabbed Mr. Creighton.

Mr. Creighton was immediately transported to the University of Maryland Shock Trauma Center for treatment, but was pronounced dead at approximately 2:30 a.m.  Exhibit 2.

Baltimore Police soon learned that Mr. Creighton's murder was precipitated by two groups of young men arguing over a group of young women.  *Id.*  One of the groups of men was comprised of Mr. Creighton and his friends.  *Id.*  The other group of men was comprised of Kevin Miller, twin brothers Keith and Kevin Scott, and Victor Gloria.  Exhibit 3 (Report of Report of Baltimore Police Detective Robert L. Patton, 2/2/99).

The trouble in the Inner Harbor began when Mr. Creighton's group attempted to strike up a conversation with the group of young women.  Exhibit 2.  The young women, who did not previously know anyone in Mr. Creighton's group, were not interested.  *Id.*  Shortly thereafter, the young women began talking with Mr. Gloria's group, who they also had not known previously.  *Id.*  Mr. Creighton apparently then became angry that the young women were talking to members of Mr. Gloria's group given that they had been uninterested in talking with Mr. Creighton's group.  *Id.*  As a result, Mr. Creighton began yelling at the young women as well as at Mr. Gloria's group.  *Id.*  With minor variations, every witness interviewed by Baltimore Police, which included members of Mr. Creighton's group, members of the group of young women, and Mr. Miller and the Scott twins, gave essentially the same account of the lead up to the stabbing.

8

**A-092**

At that point, however, the accounts began to differ somewhat.  Clarence White, a friend of Mr. Creighton's, was interviewed by Baltimore Police on the night of the stabbing.  Exhibit 4 (information sheet regarding interview of Clarence White, 7/18/98).  Handwritten police notes from this unrecorded interview indicate that Mr. White described how once the altercation began, a man with "light skin" – a description consistent with Mr. Gloria – swung at Mr. Creighton, at which point Mr. Creighton "grabbed his neck and was bleeding bad."  Exhibit 5 (handwritten notes from interview of Clarence White).[3]  Mr. White also stated that there were three or four members of the stabber's group, who all ran away together after the stabbing.  *Id.*  Mr. White was reinterviewed nearly a year later, on June 11, 1999, at which point he changed his account to indicate that the stabber was "brown skinned," a description more consistent with Mr. Miller.  Exhibit 6 (transcript of interview with Clarence White, 6/11/99).  Mr. White also stated in the second interview that he definitely saw three people involved in the altercation with Mr. Creighton.  *Id.*  Mr. White identified the three individuals involved as the Scott twins and Mr. Miller at that time.  *Id.*

David Bishop, another friend of Mr. Creighton's, was also interviewed on the night of the stabbing and said that he saw both a man matching the description of Mr. Miller and a man matching the description of Mr. Gloria punch Mr. Creighton.  Exhibit 7 (transcript of interview with David Bishop, 7/18/98).  Mr. Bishop did not initially realize that Mr. Creighton had been stabbed, although Mr. Bishop assumed once he realized that Mr. Creighton had been stabbed that it was Mr. Miller who did the stabbing.  *Id.*

---

[3] Mr. White's description must refer to Mr. Gloria.  While the Scott twins are also light skinned, none of the witnesses asserted that either of them punched Mr. Creighton.

9

Sisters Barbara and Charnetta Bailey, who were in the group of young women, were initially interviewed by police on July 29th, 1998, and August 12th, 1998, respectively. Exhibit 8 (transcript of interview with Barbara Bailey, 7/29/98); Exhibit 9 (transcript of interview with Charnetta Bailey, 8/12/98). Both women said that around the time the confrontation between the two groups of men started, they started to walk away. *Id.* Both women also stated that at the beginning of the altercation they saw Mr. Gloria run away and Mr. Creighton and Mr. Miller then engaged in a brief fistfight in which Mr. Miller punched Mr. Creighton. *Id.* Neither Bailey sister realized that Mr. Creighton had been stabbed. *Id.*

The Scott twins were first interviewed by police on February 2, 1999, when they were arrested in connection with the stabbing. The Scott twins each said that it was Mr. Gloria who stabbed Mr. Creighton, although they, too, did not initially realize that Mr. Creighton had been stabbed. Exhibit 10 (transcript of interview with Keith Scott, 2/2/99); Exhibit 11 (transcript of interview with Kevin Scott, 2/2/99). The Scott twins both said that Mr. Gloria punched Mr. Creighton and then ran away, and that they did not see Mr. Miller fighting with Mr. Creighton at all. *Id.*

Mr. Miller was arrested and interviewed by police on April 7, 1999. Mr. Miller also said that Mr. Gloria punched Mr. Creighton and then ran away. Exhibit 12 (transcript of interview with Kevin Miller, 4/7/99). Mr. Miller said that he himself then threw a punch at one of Mr. Creighton's friends, but never hit Mr. Creighton. *Id.* Mr. Miller denied stabbing Mr. Creighton and stated that he did not realize when he began fighting that Mr. Creighton had been stabbed. *Id.*

There is no indication that Baltimore Police ever interviewed or attempted to interview

10

Mr. Gloria, despite the fact that he had previously pled guilty to threatening a different individual with a knife during a fight.  Exhibit 13 (Application for Statement of Charges, 9/28/96).

Baltimore Police were thus left with conflicting accounts of who stabbed Mr. Creighton. Some of the accounts tended to suggest that it was Mr. Gloria, and some of the accounts tended to suggest it was Mr. Miller.  All of the accounts described a chaotic atmosphere, with almost no one initially having realized that Mr. Creighton had been stabbed.

**C.      The Involvement of Federal Authorities in the Investigation into Mr. Creighton's Murder**

The first indication in the Baltimore Police file of federal authorities' knowledge of and involvement in the investigation into the Creighton murder is a handwritten note dated February 2, 1999 – the same day the Scott twins identified Mr. Gloria as the killer.  Exhibit 14 (handwritten note, 2/2/99).  That note lists the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers.  *Id.*  It also lists the number for the Park Police Criminal Investigations Bureau.  *Id.*  Immediately under the names and telephone numbers is the following notation: "JAN '96 – 3/B/F victims shot to death on BW Pkwy."  *Id.*  Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Mr. Haynes, Mr. Higgs, and Mr. Gloria, along with certain other identifying information.  *Id.*  In other words, the very day that Mr. Gloria was named as the killer of Mr. Creighton, Baltimore authorities were in contact with the federal authorities responsible for Mr. Higgs's prosecution.

Detective Green had further contact with Baltimore Police the following day, February 3, 1999.  On that date, Detective Green retrieved a photographic lineup previously created by the

11

**A-095**

Park Police, which included Mr. Gloria, and provided it to the Baltimore Police. Exhibit 15 (envelope, request form, and photo lineup provided by Detective Green, 2/3/99).

The Baltimore Police file also contains a handwritten note dated one week later, February 10, 1999, which includes the notation: "Case Agent for Victor Gloria S/A Brad Sheafe FBI Calverton Office." Exhibit 16 (collection of handwritten notes). Under this notation are two different telephone numbers. *Id.* Several additional, undated, handwritten notes also contain the names of Detective Green and Detective Abt, along with telephone numbers and information relating to the murders on Route 197. Exhibit 17 (undated handwritten note); Exhibit 18 (undated handwritten note); Exhibit 19 (undated handwritten to-do list).

At some point, a member of the Baltimore Police Department traveled, or at least planned to travel, to the physical office of the United States Park Police, presumably in order to meet with a Park Police officer regarding Mr. Gloria. Exhibit 20 (undated handwritten note with the words "Directions to U.S. Park Police" written across the top, underneath which are directions from Baltimore to the Park Police office).

The Creighton file further reveals that, not only were members of the Baltimore Police Department in contact with federal law enforcement agents, but the chief homicide prosecutor in the Baltimore City State's Attorney's Office, Mark Cohen, was in direct communication with AUSA Deborah Johnston, who prosecuted Mr. Higgs at trial and represented the government during Mr. Higgs's § 2255 proceedings. Exhibit 21 (handwritten note from Mark Cohen, 4/12/99). The note recounting the Johnson-Cohen conversation, authored by Mr. Cohen on April 12, 1999, reveals that Ms. Johnston on that date suggested to Mr. Cohen that Mr. Miller and the Scott twins might be falsely implicating Mr. Gloria. *Id.* The note also reveals that Mr. Cohen,

the person with the authority to bring charges against Mr. Gloria for the Baltimore homicide, was

inclined to charge Mr. Gloria, but deferred his decision until after he received "background"

information from federal agents regarding the unrelated investigation into the Route 197

homicides.  *Id.*  Mr. Cohen's note is reproduced here in full:

Bobby

> Re Victor Gloria

1   I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99.  She
told me that Gloria pled guilty to AAF in triple murder case + that his plea
agreement is sealed.  The two Co-Δ's Willis Haynes + Dustin Higgs have trial
date of 2-7-2000.  Because plea agreement is sealed, she could not tell me if
Gloria is going to testify agt. Co-Δ.

2   AUSA Johnston stated that it is possible that Co-Δ's - Scott, Scott + Miller are
blaming Gloria because they are friends of Δ's in her case especially Haynes.  She
suggested we talk to

> ①   Joe Green Park Police
>         B - [phone number]
>
> ②   Brad Sheafe - FBI
>         B - [phone number]
>
> -they could give us background on case

3   After we talk to these officers, we will decide on next course of action, that is,
either writ Gloria + charge him or talk to his lawyer about the case.

4   Please call me

Mark Cohen

*Id.*

While Mr. Cohen reported in his memo that the United States Attorney's Office could not

share whether Mr. Gloria was going to testify against Mr. Higgs and Mr. Haynes because his plea

13

agreement was sealed, the reluctance to share this information was apparently short-lived.  In a report dated April 21, 1999, Baltimore Police Detective Robert Patton noted that "[p]er the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller."  Exhibit 22 (Report of Detective Patton, 4/21/99) (text reproduced as it appears in original).  Detective Patton's report continues by noting that the United States Attorney's Office conveyed to Baltimore authorities its belief, ostensibly based on the unrelated federal investigation, that all three eyewitnesses who identified Mr. Gloria as the murderer were falsely implicating him as a form of retaliation due to their friendship with Mr. Haynes and Mr. Higgs:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide.  The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs.  The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

*Id.* (text reproduced as it appears in original).

The report then notes that:

> Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption.  Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing.  The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

> In an effort to finally discern who of the four listed suspects actually stabbed the victim.  Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth.  This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

*Id.* (text reproduced as it appears in original).

In sum, the intervention of federal officials had a direct impact on Mr. Gloria not being charged with first degree murder in the death of Mr. Creighton.  Federal officials' only interest in intervening in the investigation of this quintessentially local crime was Mr. Gloria's status as a witness in a federal capital case.[4]

**D.     The Resolution of the Case Arising from Mr. Creighton's Murder**

As a result of the Baltimore Police Department's investigation of Mr. Creighton's murder, Mr. Miller and each of the Scott twins were charged with first degree murder.  Exhibit 23 (Scott indictment); Exhibit 24 (Miller indictment).  Mr. Gloria was the only member of this group not charged with first degree murder; he received no charges at all arising from this incident.

Each of the Scott twins entered pleas to second degree assault and were sentenced to time served.  Exhibit 25 (Keith Scott docket); Exhibit 26 (Kevin Scott docket).  They were released from custody on August 30, 1999, having served approximately seven months in jail.  *Id.*  Mr.

---

[4]Further, it is not clear what aspect of the federal investigation would have shed any light on the supposed friendships between Mr. Miller, the Scott twins, and either Mr. Haynes or Mr. Higgs.  Neither the Scott twins nor Mr. Miller had any involvement in the Route 197 homicides.  Mr. Higgs proffers, and will prove at a hearing if necessary, that Mr. Gloria was the source of this self-serving information, as federal officials specifically questioned Mr. Gloria about his involvement in the Baltimore homicide during the course of his cooperation with them.

Moreover, Mr. Higgs submits that the representations that AUSA Johnston made to Mr. Cohen about the supposed friendships were largely inaccurate.  Mr. Higgs hereby represents to the Court that he was not, in fact, friends with either the Scott twins or Mr. Miller.  And while it does appear that Mr. Miller was friends with Willis Haynes, the same cannot be said for the Scott twins.  As such, AUSA Johnston's representations to Mr. Cohen do not provide a reasonable basis on which to conclude that the Scott twins and Mr. Miller went out of their way to falsely implicate Mr. Gloria as a form of retaliation.

15

Miller pled guilty to second degree murder, however pursuant to a negotiated plea agreement he received an extraordinarily low sentence given that he supposedly killed a man in the middle of downtown by stabbing him in the neck: twenty years, with all but five years suspended.  Exhibit 27 (Kevin Miller docket).  This five-year sentence was made concurrent to any other sentence, with credit for time already served.  *Id.*; Exhibit 28 (Kevin Miller sentencing worksheet); Exhibit 29 (Kevin Miller commitment record).  Mr. Miller also received three years of probation upon release.  *Id.*  The judge who sentenced Mr. Miller, Judge Quarles (then a judge for the Circuit Court for Baltimore City), justified his extreme downward departure from the guidelines range as follows: "muddled factual statement leaves few things clear: someone died and the Def. was involved."  Exhibit 28.

Mr. Miller did not serve his full five-year term; he was released from prison in July, 2002, three years and three months after he was first arrested.  Exhibit 30 (Memorandum from Maryland Department of Public Safety and Correctional Services).

**E.**      **Mr. Higgs's Discovery and *Brady* Requests at Trial and During § 2255 Proceedings**

Mr. Higgs made his first *Brady* request at the time of trial, by entering into a joint written agreement with the government.  In that agreement, which is signed by both of Mr. Higgs's defense attorneys and by AUSAs Deborah Johnston and Sandra Wilkinson, the government agreed to provide *Jencks* and *Giglio* material no later than one week prior to trial.  The government further agreed to provide *Brady* material not otherwise covered by Fed. R. Crim. P. 16, *Jencks*, or *Giglio*, "if and when discovered."  Exhibit 31 (Discovery agreement, 1/21/99).[5]

---

[5]Immediately prior to trial, AUSA Johnston acknowledged the importance of each party making timely and full disclosures in discovery:

During § 2255 proceedings, Mr. Higgs made another request for discovery and for *Brady*

material. Doc. 509. In that motion, Mr. Higgs specifically referenced Mr. Gloria's involvement

in the Baltimore homicide. *Id.* at 11-12. Mr. Higgs requested any information in the possession

of the Baltimore City State's Attorney's Office "regarding Mr. Gloria's participation in and/or

non-prosecution for the above described homicide." *Id.* at 12. Mr. Higgs also made a more

general request for "all relevant and exculpatory witness and law enforcement statements" not

previously provided. *Id.* at 17.

At no point, either at trial or during § 2255 proceedings, did the government disclose the

fact that Mr. Gloria had been identified by multiple eyewitnesses as the killer of Mr. Creighton,

that federal authorities had been in contact with state authorities responsible for the Baltimore

murder investigation, or that Mr. Gloria was not charged in the Baltimore homicide, almost

certainly as a result of federal authorities' intervention.

**F.      Mr. Higgs's Allegations During § 2255 Proceedings**

During the course of Mr. Higgs's initial investigation during § 2255 proceedings, Mr.

Higgs's counsel learned that Mr. Gloria had been a suspect in a Baltimore murder, but was not

---

The other issue is in regard to discovery, and there are two issues. Yesterday Mr. Sullivan delivered to us after the close of court a letter saying that they were compiling their evidence, the documents and tangible objects that they are required to provide to the government under the reciprocal rule, 16(b)(1)(A).

We have not gotten anything. The whole purpose of these rules and reciprocal discovery is so that no one should go into trial without having that discovery provided to them. Here we are Friday and the trial is scheduled to begin on Tuesday and we have not received any of those materials.

I mentioned this to Mr. Sullivan this morning while the Court was conducting its sentencing hearing. So Mr. Sullivan is aware of our concerns. Like a defendant should not be tried by ambush, neither should the government.

Tr. 9/22/00 at 136-37.

prosecuted because he was to be the star witness in two federal capital cases.  In light of this information, Mr. Higgs alleged that the government did not turn over all of the material relating to Mr. Gloria that it was required to under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny.  Specifically, Mr. Higgs alleged that Mr. Gloria was a suspect, but was never charged, in an unrelated homicide in Baltimore.  Doc. 492 at 33.  Mr. Higgs further alleged that Mr. Gloria was not charged with this homicide at the behest of the government, "in an effort to preserve his status as a testifying witness in this federal capital triple homicide case," and that the government's failure to disclose this consideration violated Mr. Higgs's due process rights.  *Id.*

**G.     The Government's Representations to This Court in Response to Mr. Higgs's Claim**

In its response to Mr. Higgs's § 2255 motion, the government made several materially false and/or misleading representations.  The government argued that Mr. Higgs's "vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials."  Doc. 520 at 88.  The government described Mr. Higgs's allegations regarding the undisclosed leniency afforded to Mr. Gloria as mere "speculation about the Government's knowledge or actions."  *Id.*  The government further argued that "[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to Gloria in exchange for his testimony; the prosecutors, however, had no duty or ability to predict, much less inform Higgs of benefits, or acts of grace, that coincidentally flowed to the witness after this trial."  *Id.* at 86.  The government also resisted Mr. Higgs's discovery and *Brady*/*Giglio* requests pertaining to Mr. Gloria, arguing that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial."  Doc. 513 at 5.

18

**A-102**

Each of the above statements in the government's pleadings faulted Mr. Higgs for his failure to prove his *Brady* claim, when the government all the while was in possession of the evidence that, in all likelihood, would have proved it.  Given that the government has a constitutional and ethical duty to disclose *Brady* and *Giglio* material, the government's representations created the false impression that federal authorities had no knowledge of or involvement in Baltimore authorities' investigation into or treatment of Mr. Gloria for an unrelated crime.  AUSA Johnston, who, as noted, was in direct contact with the Baltimore authorities prior to Mr. Higgs's trial, signed her name to the government's opposition to the § 2255 motion, as well as to the government's opposition to the discovery motion.  Doc. 520 at 1; Doc. 513 at 8.

**H.     Mr. Higgs's Attempts to Obtain and Ultimate Acquisition of the Baltimore Police File**

Mr. Higgs's post-conviction counsel first learned of Mr. Gloria's involvement in the Baltimore homicide during their investigation in advance of filing Mr. Higgs's § 2255 motion. While Mr. Higgs possessed some information about Mr. Gloria's involvement and the federal government's intervention, he did not at the time of the § 2255 proceedings have documentary evidence to confirm the federal government's direct involvement in the investigation into Mr. Creighton's murder.  As such, Mr. Higgs sought to obtain documentary evidence to confirm the information he had.  Mr. Higgs sought to do so both through his own investigative efforts and via specific discovery requests in this post-conviction litigation.  Mr. Higgs sent a written request for the complete investigation file to the Baltimore Police and filed a discovery motion in the § 2255 litigation.  Mr. Higgs was unsuccessful, however, as the Baltimore Police only turned over a one-

19

**A-103**

page summary report and the government opposed Mr. Higgs's § 2255 discovery requests, which this Court denied.

In the spring of 2012, Mr. Higgs attempted, a second time, to obtain the Baltimore Police file via written request. Whereas the Baltimore Police responded to Mr. Higgs's first written request by turning over a one-page summary report, they responded to his second written request by turning over their entire investigative file, with some information redacted.[6] Mr. Higgs came into possession of the file in September, 2012.

Mr. Higgs has simultaneously been attempting to obtain – also since 2012 – a copy of the United States Park Police file relating to the murders on Route 197 via the Freedom of Information Act (FOIA). Given the seriousness of the accusations Mr. Higgs is now leveling against the government, and the lack of a time restriction for filing motions under Rule 60(d)(3), Mr. Higgs has endeavored to exhaust his attempts to obtain the Park Police file (and thereby confirm the full extent of the government's knowledge and actions) prior to filing this motion. Mr. Higgs submits that, given the contents of the Baltimore Police file, the Park Police file will almost certainly contain confirmation of the connection between federal and local officials in the investigation into Mr. Creighton's murder and will likely provide additional evidence of government misconduct.

The Park Police have been extraordinarily dilatory in their response to the FOIA request. It has now been almost 3 years since Mr. Higgs made his request. The Park Police initially responded by seeking to charge over $11,000 to copy and produce the investigative file. When

---

[6]There is no apparent reason why the two requests were handled so differently by the Baltimore Police.

counsel for Mr. Higgs protested that such fees were excessive and clearly precluded by the FOIA statute, the Park Police refused to reconsider and directed Mr. Higgs to file an administrative appeal if he was unhappy with the fees. Mr. Higgs did so, and given that the law clearly precluded the Park Police from attempting to charge such extreme fees, he succeeded in his initial appeal.

Upon remand to the Park Police, Mr. Higgs paid the much lower fee that the Park Police was legally entitled to charge. The Park Police then took over a year to respond to the substance of the request, despite numerous follow-up attempts by counsel in the interim. In its brief eventual response, the Park Police informed Mr. Higgs that it would be withholding its investigative file *in toto*. Mr. Higgs yet again filed an administrative appeal challenging this determination. The FOIA appeals officer took an additional ten months before finally ruling on the appeal in September, 2014. The most recent appeal ruling indicated that, not only had the Park Police failed to fully review the contents of its file during the year-plus in which it was supposedly considering Mr. Higgs's request, they had also substantially miscalculated the number of documents that were responsive to the request. The FOIA appeals office yet again remanded to the Park Police to conduct an appropriate review.

In light of the extreme delay in responding that has characterized the Park Police's activities to date, the most recent appeal opinion directed that the Park Police would have twenty (20) workdays in which to offer its initial response to Mr. Higgs regarding the FOIA request. The Park Police have completely ignored that deadline. Despite further follow-up from counsel, it has become apparent at this point that the Park Police simply are not going to respond to the FOIA request in a remotely timely fashion. While Mr. Higgs would prefer to obtain the Park

21

**A-105**

Police file before filing this motion, thereby permitting him to create a full record of the government's misconduct, such an eventuality is extraordinarily unlikely given the Park Police's conduct. As such, Mr. Higgs is filing this motion based on the information known to him at this moment. As noted above, Mr. Higgs is simultaneously filing a renewed *Brady*/discovery motion to enlist the Court's assistance in obtaining additional documents related to this violation.

## ARGUMENT

I. **RELIEF IS APPROPRIATE UNDER *HAZEL-ATLAS* AND RULE 60(D)(3) AS A RESULT OF THE GOVERNMENT'S FRAUD ON THIS COURT.**

Federal Rule of Civil Procedure 60(d)(3) vests in courts the power to "set aside a judgment for fraud on the court." The fraud on the court doctrine derives from the United States Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). In *Hazel-Atlas*, the Court set aside a fraudulently obtained ruling that was the product of one party's procurement and presentation of false evidence and misrepresentations to the court. *Id.* at 239-43. As the Court described it, the fraud was the product of a "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process." *Id.* at 245-46. The Court set aside the ruling where the fraud perpetuated "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246.

The Fourth Circuit has discussed the fraud on the court doctrine in additional depth. The Fourth Circuit recently made clear that fraud on the court within the meaning of *Hazel-Atlas* "is not your 'garden-variety fraud.'" *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014)

(quoting *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 48 (1st Cir. 1995)).  Instead, it applies to situations "in which the integrity of the court and its ability to function impartially is directly impinged."  *Id.* at 136 (quoting *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)).  A party that alleges "ordinary" fraud as a basis for setting aside a final judgment typically must move for relief under Fed. R. Civ. P. 60(b)(3), which requires that a motion be filed within one year of the entry of the final judgment. *Id.*; *see also* Fed. R. Civ. P. 60(c)(1).  But, "as often happens with a rule, there is an exception." *Fox*, 739 F.3d at 135.  The "savings clause in Rule 60(d)(3) permits a court to exercise its inherent equitable powers to obviate a final judgment after one year for 'fraud on the court.'"  *Id.* at 135-36.  Rule 60(d)(3) fraud is the type of fraud with which *Hazel-Atlas* is concerned.

The government's conduct during these § 2255 proceedings meets the stringent standard for fraud on the court set forth in *Hazel-Atlas* and *Fox*.  In response to Mr. Higgs's very specific *Brady* claim, the government offered misrepresentations intended to cover up its own past misconduct and persuade this Court to uphold a death sentence.  That represents a "deliberately planned and carefully executed scheme" to defraud this Court.  The government was not faced merely with a vague allegation that they failed to turn over all available *Brady* evidence; it was faced with a highly specific claim that Victor Gloria was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government.  It is now virtually certain that these allegations are accurate.  The government, knowing that the allegations were accurate, denied them in written pleadings.  Thus, the government's conduct caused a "subversion of the legal process . . . that we cannot necessarily expect to be exposed by the normal adversary process."  *Great Coastal*, 675 F.2d at 1357.

23

This gambit was successful.  The government's misrepresentations induced this Court to rule that Mr. Higgs's constitutional claim failed because "pure speculation about supposed benefits cannot substitute for hard facts," and because "Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions." *Higgs-3*, 711 F. Supp. 2d at 508.  It certainly is difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255 proceedings.  In other words, "[p]roof of the scheme, and of its complete success up to this date, is conclusive." *Hazel-Atlas*, 322 U.S. at 246.[7]

The law of other circuits regarding the fraud on the court doctrine is both consistent with Fourth Circuit law and instructive here.  In an opinion joined by then-Judge Alito, the Third Circuit set forth a four-factor test for establishing fraud on the court.  In the Third Circuit's formulation, a Rule 60(d)(3) movant must establish: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." *Herring v.*

---

[7]In addition to holding that Mr. Higgs could not establish a causal connection between federal authorities and the decision not to prosecute Mr. Gloria for the murder, the Court also held that Mr. Higgs could not demonstrate prejudice.  *Higgs-3*, 711 F. Supp. 2d at 508-09.  The Court should revisit this determination as well, given that it was also influenced by the government's fraud.

At this juncture, the full extent of the government's misconduct is not yet known.  As noted above however, the government has conceded that it could not have prosecuted Mr. Higgs, let alone secured a conviction or death sentence, without the testimony of Mr. Gloria.  This Court agreed in that assessment, describing Mr. Gloria as the "critical link" in the conviction of Mr. Higgs.  Tr. 11/22/00 at 4.  If evidence demonstrating that the keystone witness literally got away with murder due to the intervention of the prosecution does not rise to the level of a reasonable probability of a different outcome, then *Giglio* is a dead letter.

Moreover, undersigned counsel have provided the information gleaned from the Baltimore Police file to trial counsel, who confirms that counsel would have used this information to impeach Mr. Gloria at trial.  Exhibit 32 (Affidavit/Declaration of Harry Trainor).

24

**A-108**

*United States*, 424 F.3d 384, 386 (3d Cir. 2005); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (five-factor test requiring conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery' itself; 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court.").

Without specifically setting forth multi-factor tests, several other courts of appeals also require misdeeds on the part of an officer of the court to establish fraud within the meaning of *Hazel-Atlas*. *See*, *e.g.*, *Reintjes* 71 F.3d at 47-48 ("*Hazel-Atlas Glass* thus expanded the range of the fraud exception for untimely requests for relief . . . to include fraud committed by 'officers of the court'"); *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995) ("one species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court of jury to impartially judge a case"); *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("fraud on the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication"); *Kerwit Med. Prods., Inc., v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

The fraud at issue here thus meets both the Fourth Circuit's more general formulation and its sister circuits' more specific tests. During Mr. Higgs's § 2255 proceedings, (1) an Assistant United States Attorney; (2) made intentional misstatements; (3) directed to the Court itself; (4) that in fact deceived the Court in its adjudication of Mr. Higgs's claim.

Moreover, as in *Hazel-Atlas*, the government's misdeeds here "involve[d] far more than

25

**A-109**

an injury to a single litigant." *Hazel-Atlas*, 322 U.S. at 246.  First, the federal government's intrusion into the business of the Baltimore City State's Attorney's Office has affected numerous individuals involved with Mr. Creighton's murder.  The Baltimore Police, without the outside pressure applied to it by federal authorities, may well have come to the conclusion that Mr. Gloria was in fact the person who murdered Mr. Creighton.  As such, not only did Mr. Miller and the Scott twins unfairly take the blame for the killing, but Mr. Creighton's friends and family members were deprived of justice for their loved one.

More globally, however, the fraud here constitutes "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas*, 322 U.S. at 246.  The "United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  The United States Attorney "is in a peculiar and very definite sense the servant of the law." *Id.*  While "[s]he may strike hard blows, [s]he is not at liberty to strike foul ones." *Id.*

The attempt by an officer of the United States government to secure a citizen's execution by deception certainly "touch[es] on the public interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136.  As such, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," and the Court should remedy the injustice. *Hazel-Atlas*, 322 U.S. at 246.

II.     **THIS MOTION IS PROPERLY BROUGHT UNDER *HAZEL-ATLAS* AND RULE 60(D)(3); IT IS NOT SUBJECT TO THE "SECOND OR SUCCESSIVE" PETITION RESTRICTIONS OF 28 U.S.C. § 2244(B).**

In *Gonzalez v. Crosby*, 545 U.S. 524, 526 (2005), the Supreme Court granted certiorari to decide "whether, in a habeas case, [Rule 60] motions are subject to the additional restrictions that apply to 'second or successive' habeas corpus petitions under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." After considering the relevant language of the Federal Rules of Civil Procedure and AEDPA, the Court held that some Rule 60 motions should be treated as "second or successive" habeas petitions under AEDPA, but others should not. The Court concluded that "a Rule 60(b)(6) motion in a § 2254 case is not to be treated as a successive habeas petition if it does not assert, or reassert, claims of error in the movant's state conviction." *Id.* at 538.[8]

The Court made plain that a Rule 60 motion that "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," is not barred from review by the second or successive prohibition in AEDPA. The Court specifically ruled that "[f]raud on the federal habeas court is one example of such a defect." *Id.* at 532 n.5 (citing *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (2d Cir. 2001) (a witness's allegedly fraudulent basis for refusing to appear at a federal habeas hearing "relate[d] to the integrity of the federal habeas proceeding, not to the integrity of the state criminal trial.")).

Here, the fraud being alleged represents a defect in the § 2255 proceedings themselves,

---

[8]The *Gonzalez* decision addressed only motions under Rule 60(b), rather than 60(d), and specifically noted that it was limiting its consideration to § 2254, rather than § 2255, cases. *Gonzalez*, 545 U.S. at 529 n.3. It is thus unclear whether the decision impacts motions brought under *Hazel-Atlas* and Rule 60(d)(3) in a § 2255 case. Mr. Higgs includes this discussion in the event that this Court should find that it does.

27

**A-111**

not in the substance of this Court's prior merits ruling.  As such, the fraud falls squarely within the ambit of footnote 5 in *Gonzalez*.  The Assistant United States Attorney's knowing misrepresentations in her habeas filings caused this Court to issue a § 2255 ruling based on inaccurate information.  *Gonzalez* therefore does not bar consideration of this motion.

**CONCLUSION AND PRAYER FOR RELIEF**

As one prominent Court of Appeals judge recently observed in a case involving a *Brady* violation due to the government's failure to provide impeachment material regarding its star witness: "When a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *United States v. Olsen*, 737 F.3d 625, 632 (9th Cir. 2013) (Kozinski, C.J., dissenting from the denial of en banc review).

The government's conduct in this litigation was egregious. It committed a serious *Brady* violation at trial by concealing devastating impeachment material regarding its star witness and then deliberately covered up the violation during post-conviction proceedings. This is not an attenuated violation where one hand did not realize what the other was doing; where the prosecutor, for example, was not aware of the actions of some other law enforcement agency even though she had a duty to learn of them. This is a case where *the trial prosecutor* spoke directly to *the person with the authority and inclination to charge her star witness with first degree murder* and talked him out of it.

When confronted with this allegation during § 2255 proceedings, she perpetrated a fraud on this Court. She signed her name to two different documents, denying in each that any such machinations had taken place. The fraud was successful, as these misrepresentations formed the basis for this Court's decision denying relief.

Mr. Higgs respectfully submits that the allegations and evidence contained in this motion

29

**A-113**

and the exhibits demonstrate his entitlement to relief.  At a minimum, however, he requests that

the Court grant him leave to fully uncover the extent of the government's misconduct and that

the Court provide the opportunity to present argument and evidence at a hearing on the matter.

WHEREFORE, Petitioner, Dustin Higgs, hereby requests that this Court:

A.      Direct the government to respond to this motion;

B.      Permit Petitioner to submit a reply to the government's response;

C.      Schedule oral argument and a hearing;

D.      Set aside the judgment in these proceedings under Fed. R. Civ. P. 60; and

E.      Grant all other and further relief that the Court might deem just, proper, and
        equitable.


Respectfully Submitted,


/s/ Matthew C. Lawry                          /s/ Stephen H. Sachs
Matthew C. Lawry                              Stephen H. Sachs
Federal Community Defender Office             WilmerHale LLP
    for the Eastern District of Pennsylvania  Five Roland Mews
Curtis Center, Suite 545-West                 Baltimore, MD 21210
601 Walnut Street                             (410) 532-8405
Philadelphia, PA 19106                        Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org


Dated:  December 4, 2014


30


**A-114**

**CERTIFICATE OF SERVICE**

I, Matthew C. Lawry, hereby certify that on this 4th day of December, 2014, I

electronically filed the foregoing motion using the Court's CM/ECF system.  Electronic notice

will be provided to the following individuals:

> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Matthew C. Lawry
> Matthew C. Lawry

# Exhibit 1[1]

---

[1]Many of the exhibits included herein originated in the Baltimore Police file pertaining to the murder of Martrelle Creighton.  Counsel for Mr. Higgs received the file in partially redacted format.  Counsel have made further redactions of their own in order to comply with the Court's privacy policy.  Should the Court wish to view the documents in the state in which they were originally received, counsel for Mr. Higgs will gladly file another set of exhibits under seal.

**A-116**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

UNITED STATES OF AMERICA

VS.                         CRIMINAL NO. PJM-98-482

VICTOR GLORIA

DEFENDANT

Greenbelt, Maryland

November 22, 2000

The above-entitled case came on for sentencing

before the Honorable Peter J. Messitte, United States

District Judge

A P P E A R A N C E S

For the Government:

    Deborah A. Johnston, AUSA
    Sandra Wilkinson, AUSA

For the Defendant:

    Paul Kemp, Esquire

Gail A. Simpkins, RPR
Official Court Reporter

**A-117**

2

PROCEEDINGS

THE CLERK:  The matter now pending before this Court is Criminal Action Number PJM-98-0482, United States of America versus Victor Gloria.  The matter now comes before this Court for sentencing.

THE COURT:  All right.  Counsel for the government identify yourselves and then defendant.

MS. JOHNSTON:  Your Honor, Deborah Johnston and Sandra Wilkinson for the government.  Seated with us at counsel table is Captain Robert Rule.

MR. KEMP:  And Paul Kemp for Mr. Gloria, who is present in Court, Your Honor.

THE COURT:  All right.  We are here for sentencing this morning.  Are there any issues with the presentence report, other than a possible 5K1.1 motion?

All right.  The --

MR. KEMP:  Not by the defendant, Your Honor.

THE COURT:  All right.  The Court then adopts the factual findings and Guideline application in the presentence report.  The total adjusted offense level would be 30, a Criminal History Category IV.  The custody range is 100 to 125 months.  The fine range is 12,500 to $125,000.

All right.  Ms. Johnston.

3

MS. JOHNSTON: Yes, Your Honor. Pursuant to the terms of the plea agreement, the government is moving under the Sentencing Guidelines, 5K1.1, for a downward departure for substantial assistance to the government. We are asking the Court to reduce Mr. Gloria's offense level by two, resulting in a criminal offense level of 25, with a sentencing range of 84 to 105 months.

The Court has seen Mr. Gloria testify in both the trials of Mr. Haynes and Mr. Higgs. The government cannot emphasize enough to the Court that Mr. Gloria came forward -- didn't come forward with this information and didn't act as quickly as he should have after the events of January 1996 and, in fact, initially was not cooperative with authorities and lied in terms of where he was the night of the crime.

But in October of 1998, when law enforcement officers confronted him about his involvement, he provided them with a statement acknowledging that he was there, acknowledging what he saw happen that night, and he made that acknowledgment to law enforcement officers when he was not facing any charges in this case, although he had been arrested on a state drug offense, that drug offense being his

4

acting as a lookout for Mr. Haynes' approximately two gram sale of crack cocaine to undercover Officer Mark Coulter.

After being -- after making that statement and being released on the state charges, he was then arrested on a federal charge, came in and immediately agreed to cooperate with the government.

As the Court knows from seeing Mr. Gloria's testimony here in court, and hearing the evidence in this case, the government could not have proceeded and obtain a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria.  Of course with Mr. Haynes' case we did have Mr. Haynes' confession, but Mr. Gloria's testimony was instrumental there as well.

For those reasons we believe that he has provided substantial assistance and is entitled, or the government believes it's justified that he receive some reduction in his criminal offense level, and we believe that a two-level reduction is appropriate.  We would move the Court to reduce his Guideline range by two levels.

THE COURT:  Mr. Kemp.

MR. KEMP:  Your Honor, obviously we certainly don't oppose that motion, and I would like to talk at

**A-120**

5

the appropriate time about the sentence within the range.

THE COURT: All right. Let's hold off one moment.

Does the custody range change at all -- not the custody range. Does the supervised release range change at all? It's still three?

MS. JOHNSTON: I don't believe -- the supervised release doesn't change. The fine range does.

THE COURT: The fine range does, though?

MS. JOHNSTON: Yes, Your Honor. I believe the fine range becomes 10,000 to 100,000.

THE COURT: The government has moved for a two-level downward departure pursuant to Sentencing Guideline 5K1.1 based on defendant's substantial assistance to authorities.

The Court considers the factors that are set out in that Sentencing Guideline, evaluating the significance and usefulness of the defendant's assistance and particularly, the government's evaluation of that assistance, also the truthfulness, completeness and reliability of any information or testimony provided by the defendant and the extent of his assistance, any injury or risk of injury or danger resulting from his assistance, and the timeliness of

6

the defendant's assistance.

Obviously the Court sat through the two death penalty proceedings involving Mr. Haynes and Mr. Higgs, and there is no question that Mr. Gloria's assistance in that regard was critical to their convictions, which was important, and that he was in these proceedings truthful, complete and reliable in regard to what he said.

Obviously there was some risk involved. That became apparent in the course of the trials. Even though there might have not been immediately timeliness, it was timely enough for purposes of this testimony given.

So the Court finds that there is full and adequate reasons to grant the two-level downward departure, which would then, with a total offense level of 25 and a criminal history category of four, result in a custody range of 84 to 105 months, a supervised release range of still the two to three years, and a fine range of 10,000 to $100,000.

All right. On disposition?

MS. JOHNSTON: Thank you, Your Honor.

Under the terms of the plea agreement, the government has reserved the right to recommend any sentence within the Sentencing Guideline range. I'm

A-122

7

not really going to talk about Mr. Gloria's testimony because I think the Court, in granting that two-level downward departure, has taken into account the assistance he has provided to the government, but I would like to share with the Court the government's experience in terms of Mr. Gloria.

He has been incarcerated since October of 1998. Since that time we have had occasion to meet with Mr. Gloria initially a couple of times in 1998, and then again this past year in getting him ready to testify in those two trials.

Between the time that Mr. Gloria was arrested in October of 1998 until his testimony in the Haynes trial, he was in the general population over in the Montgomery County Detention Center. And in preparation for the Haynes trial and anticipating possible cross-examination of him, we did obtain his detention, his records from the Montgomery County Detention Center.

While I don't have them here today, in reviewing them I noted that he had successfully completed a number of programs there, that he in fact was a representative in his dorm and served in that capacity for those individuals.

Since his testimony in the Haynes case, he has

8

been in protective custody.  As a result of his testimony, as a result of the publicity concerning his testimony, he has been in protective custody.  And in meeting with him after that --

Some inmates might resent, some defendants, cooperators might resent the fact that they were being put in protective custody, thinking of it as punishment when they have done something for the government.

But Mr. Gloria's attitude was not of that sort. Instead, he said that he in essence didn't mind being in protective custody.  It gave him an opportunity to read and do some other things that he hadn't had a chance to do before.

In addition to that, between the time that the government first met with Mr. Gloria in, I believe it was November of 1998, late October of 1998, up until his testimony in the Higgs case, which was the last time we had occasion to meet with him, it is appropriate to say that Mr. Gloria has matured significantly during these two years that he spent in jail.  My observations of him were that indeed, he has an appreciation for what had occurred.

I will tell the Court that Mr. Gloria sat in our office at one point and cried over what had happened.

**A-124**

9

He expressed remorse for what had happened to these three young ladies, acknowledged the fact that at least one of them would not have been there if he hadn't been there that night and feels directly responsible in that regard.

Mr. Gloria has a criminal history. There is no disputing that. The government hopes that with this time in prison Mr. Gloria will develop the trades, some trades and some skills so that when he gets out of prison, he will find a way to support himself without being involved in criminal conduct again.

For all of those reasons, the government is going to recommend that he receive a sentence at the low end.

THE COURT: Mr. Kemp.

MR. KEMP: Thank you, Your Honor.

Obviously I will join with the government in that and feel very strongly about it.

First of all, insofar as the fine is concerned, I think based on paragraphs 94 and 95 of the presentence investigative report, the Court make a finding that he is not capable or not able to make, pay any kind of a fine under the circumstances. I just want to deal with that more as a housekeeping issue than anything else.

10

But in line with what the government proffered, at the time he had to be placed in protective custody, he was in several programs which had to be terminated. One of those was a self-awareness program known as More Recognition Therapy. He was in the anger management program, and was taking a spousal abuse seminar, not that he had ever been involved in anything of that ilk, but it was a program that was available to him and he had begun taking it. That all had to be terminated when he was moved to the PC wing of the Montgomery County Detention Center.

In addition to the normal taunts I think that go along with any person cooperating with the government and then word gets out, and then it hits the press and the TV's, which are on constantly over at the detention center or any of the detention centers, resulting in Mr. Gloria receiving inmate taunts, there were even some taunts that came from jail guards that I'm going to take issue with after Mr. Gloria has left that institution because it's very upsetting to me that someone who would set out to do this is receiving trash talk not just from inmates, but from jail guards. That is the kind of thing that I just think should not occur, and I'm going to bring it to the attention of the Internal Affairs Division of the

**A-126**

11

Montgomery County Police and/or the Marshal's Division, Marshal's Department, whoever is the more appropriate agency.

The remorse which he has shown throughout this from my involvement in this case, beginning I guess in late October of 1998, after I was appointed. There was never any story, there was no game playing. By that point he had given a statement to one of the government agents involved in this case that admitted his involvement it in.

I think it's important to point out that he never tried to soft sell his presence, his attempt to, in his drunken state, help them wipe the apartment clean after the time of the commission of this horrible crime, and insofar as his participation was concerned, just was very forthcoming with that.

So there wasn't that normal wall that I have to break through or that defense attorneys commonly have to break through at the very outset of a case, well, how is this going to help me, how is this going to help me? He was much more concerned at that point with the enormity of the crime and his remorse, insofar as I can tell, is very genuine, even though he was not obviously the primary actor in any of the horrible events which took place on that night.

12

Because he has been in protective custody, he may only have visitation after 9 p.m. at night and as a result of that, he has not been able to see his two children.  He has one child who is eight and another child who is much younger, and they cannot come to the detention center at that hour.  And so because of protective custody, that is something that he has sorely missed.

His eight year old child, whose name is Aja, A J A, after he was arrested in this case essentially shut down and became uncommunicative.  I spoke with the mother of that child, whose name is Katrina Haviland.  There have been significant problems, and for that he feels particularly guilty.  This is a situation, as he knows, of his own making and yet, it's being visited upon his eight year old child.

He is a very sensitive young man and I think his honestly is his leading characteristic.  It is rare that somebody just in the middle of a conference thanks a court-appointed attorney but for no reason other than I think he genuinely felt it.

He thanked me a couple of weeks ago when we were getting ready for today and appreciated all the efforts that I had made, which have been, frankly, with a defendant like him, minimal.  He's just an easy

**A-128**

13

client to represent.

He was concerned, unlike so many people, with doing the right thing, given the horrible facts of this case, to try and show his remorse in connection with it.

I would implore the Court to impose a sentence at the lowest end of the Guidelines under the circumstances of this case.

He knows -- he has had a prior record, obviously nothing like this, much more of a record that bespeaks either a drug user, a drug seller at a certain point.

He was involved in the fight down in Marion, Virginia, which had a lot of mitigating circumstances, but nevertheless stands as a conviction.

THE COURT:  There are a number of detainers out, though, as I see.

MR. KEMP:  There is really only one operative detainer.  Well, there is a violation of probation from Marion, Virginia that I think he is going to have to go back and answer for at some point.  That may serve as a detainer.

He has the detainer -- there should be a detainer from Prince George's County for the pending drug charge, and I think that's the totality of it, if I'm not mistaken.

14

It's going to interrupt the time he would have normally in a Bureau of Prisons installation, which has already -- for 25 months he has been kept in local incarceration as part of his preparation for trial on these cases, and that's a long period of time, as long as any that I have seen for somebody who is incarcerated pretrial, Your Honor.

I am going to ask the Court to consider a recommendation both for boot camp -- he would like that. He has heard about it, and I would like that recommendation to be made. I know that the Bureau of Prisons will make that consistent with his security needs insofar as this case is concerned and with the problems that he has had in this case that the Court has already alluded to potentially from other defendants.

Then the Intensive Drug Confinement Program I think would have particular application. The people at Annapolis Junction tell me he would qualify for that, that this offense does not in his case involve use of a weapon. So he is not precluded from entering into that. So I am going to ask the Court to make that recommendation.

I've already mentioned the fine, and I would ask the Court to make a specific finding that he is not

15

capable of paying a fine under the circumstances of this case.  Other than that, I would submit it to the Court's discretion.

THE COURT:  Mr. Gloria, you have an opportunity to address the Court at this time, and I'll hear from you.

THE DEFENDANT:  At first my intentions was to come in and tell you how much I love my family and how much I feel they need me, but I mean even the government is aware of that.

So I just want to right now just apologize to the victims and their families and apologize for being a coward.  I mean maybe if I had done anything, we wouldn't all be here right now.

I want to apologize for not jumping in front of the gun or not walking away, I mean anything, something that could have changed it.  I just want to say I'm sorry.  I never, I never meant for anything like this to happen, you know.  I just pray they can get through it.  That's it.

THE COURT:  All right.  Mr. Gloria, obviously yours is a typical case.  You've got a criminal record, and I can't congratulate you for that obviously.  I mean you come to a very sorry point in your life where, as a young man, you have done enough.

16

You went right to the brink in this case.

I understand you were not a participant as far as conceiving this idea or executing it. You were there and maybe you could have done something, but you ran with some pretty bad people, and they have contributed significantly to some real loss in your own life.

Maybe you will get straight. It sounds to me like in the last couple of years some things have gone right for you. They sure weren't going right up to that point and, as I say, it got worse and worse, until you found yourself in this truly terrible situation.

Having said that, I mean the fact is you were the critical link in the conviction of these two men, who deserved to be convicted. I understand that's at some sacrifice to yourself, and I cannot ignore that. That is the most important thing about you at this point in the sentencing, and it overrides everything else.

I'm going to sentence you to 84 months incarceration and recommend boot camp and the Intensive Drug Confinement Program, and then place you on supervised release for a period of three years thereafter, subject to the standard terms and

17

conditions of supervised release.

You are to commit no crimes, federal, state or local, possess no firearm or dangerous weapon, and you shall satisfactorily participate in any treatment program approved by your probation officer during your supervised release period relating to substance and/or alcohol abuse. This may include evaluation, counseling and testing, as deemed necessary by your probation officer.

I will impose no fine by reason of inability to pay, but there is a $100 --

MS. JOHNSTON: Your Honor, I believe it is $50 because of when the crime occurred.

THE COURT: All right. I will impose no fine by reason of inability to pay, but the special assessment, I'm advised, is $50, which is due and payable immediately.

You are obviously in custody and continue to be. You've waived your right of appeal in this case. Any further matters in that regard, you can take up with Mr. Kemp.

Is there anything more to be said, Ms. Johnston?

MS. JOHNSTON: Your Honor, no. I think this was a single count --

MR. KEMP: It was.

**A-133**

18

MS. JOHNSTON:  -- indictment that the defendant pled guilty to.  There is another pending criminal case, but that's not before the Court, and we will resolve that by documentation.

THE COURT:  All right.  Mr. Gloria, you will have to live with yourself now.  Maybe your life will take a turn for the better.  A small beginning.  Many years ahead.  See what happens.  All right.

(The proceedings concluded.)

- - - - - - - - - -

REPORTER'S CERTIFICATE

I hereby certify that the foregoing transcript in the matter of United States of America vs. Victor Gloria, Defendant, Criminal No. PJM-98-482, before the Honorable Peter J. Messitte, United States District Judge, on November 22, 2000 is true and accurate.

_____

Gail A. Simpkins
Official Court Reporter

# Exhibit 2

**POLICE DEPARTMENT**
**BALTIMORE, MARYLAND**
**18 JULY 1998**

**TO:**      Major Kathleen T. Patek
             Commanding Officer
             Crimes Against Persons Section

**FROM:**    Detective Robert L. Patton
             Detective Kirk Hastings
             Homicide Unit

**SUBJECT:** **HOMICIDE BY STABBING**
             **MARTRELLE LAMAR CREIGHTON**
             **M/B/20 DOB** ███████

             ██ ████████ ▐▀ █████████
             **OCC: 18 JULY 1998 @ 0200 HOURS**
             **301 LIGHT STREET ( SIDE WALK AREA)**
             **CC# 98-1G13258 H-98-172**

**SIR:**

## SYNOPSIS OF INCIDENT:

On the captioned date at 0206 hours Officer Moore was dispatched to the listed location for a reported stabbing. Upon arrival the Officer found the listed victim laying on the side walk suffering from an apparent stab wound to right neck area. Emergency medical Units arrived on the scene and the victim was ultimately transported to University of Maryland Shock Trauma Center by Medic # 12 Unit. Once at the trauma center the victim received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours.

Officer Moore in concert with backup Units secured the crime scene, made the appropriate notifications and were able to locate witnesses who were ultimately transported to the Homicide office for interview. Your Investigators ultimately found that the listed victim had been engaged in a argument and altercation with three unidentified black males and was stabbed once in the right neck area. The unidentified males then ran from the scene and were last seen running in the direction of Pratt Street. The victim next of kin, Ms. Judy Creighton of ████
████████ was notified and given the appropriate information.

## NOTIFICATION OF INCIDENT:

On the 18th of July 1998 at approximately 0215 hours Officer Kevin Moore Unit 7629 contacted the Homicide Units and reported the following information . Officer Moore reported that he was currently investigating a serious stabbing incident that occurred on the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street and requested assistance from the Homicide Unit.

A-136

**PAGE # 2**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

Based on this request your Investigators responded to the scene and initiated a preliminary investigation and ultimately interviewed the primary Officers and witnesses at the scene.

**CASE STATUS:** Open.

**MOTIVE:** Argument / Altercation.

**VICTIM:**  **MARTRELLE LAMAR CREIGHTON**
**M/B/20 DOB** ▮▮▮▮▮

On the captioned date and time the above victim is found suffering from an apparent stab wound to the right front neck area. The victim is transported to University of Maryland Shock trauma Center where he received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours. On this same date the victims body was transported to the O.C.M.E. where a post mortem examination was performed by Doctor David Fowler . Doctor Fowler reported at the conclusion of his examination that the victim sustained a single stab wound to the right front neck area. He added that the single wound lacerated the victims artery which was the cause of death. Doctor Fowler ruled the manner of death was Homicide by stabbing. One vial of the victims blood was recovered and submitted to E.C.S.

**FIRST OFFICERS REPORT:**

Officer Kevin W. Moore, Tactical Unit 7629 reported that on the captioned date and time he was dispatched to the captioned location for a reported stabbing. Upon arrival he found the listed victim suffering from an apparent single stab wound to the neck. Emergency medical assistance was requested and the victim was ultimately transported to university of Maryland Shock Trauma Center by Medic # 12 Unit. Officer Moore reported that he secured the crime scene , located and retained witnesses and made the appropriate notifications and requested assistance from the Homicide Unit.

A-137

**PAGE # 3**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

### CRIME SCENE EXAMINATION:

      The crime scene in reference to the captioned incident is confined to the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street. In this area your Investigators observed several small pools of blood and the victims red baseball cap. The aforementioned area was photographed by the crime lad Unit and the victim baseball cap was recovered and submitted to E.C.S.

### WITNESSES:

DAVID BISHOP
M/B/24 DOB ███



410-██ ███

KEVIN SMITH
M/B/23 DOB ███

NO HOME TELEPHONE

CLARENCE FREDERICK WHITE
M/B/15 DOB ███

410-███

      The above listed witnesses are located at the crime scene and all indicated that they were friends with the listed victim and witnessed the captioned stabbing. All three witnesses stated that they were all at the Inner harbor and in concert with the listed victim had been talking to three unidentified black females. The witnesses indicated that the victim became upset when the unidentified females began talking to another group of black males who the witnesses believe were from the Washington D. C. area . The witnesses indicated that they bases their assumption that the unidentified males were from the Washington D.C. area Solly based on the way they were dressed. The witnesses indicated that the listed victim approached the unidentified males and engaged them in a argument which ultimately lead to a physical altercation. The witnesses indicated that during the altercation the victim was stabbed once in the neck . The witnesses stated that after the victim was stabbed the unidentified males ran from the area in the direction of Pratt. The witnesses indicated that they remained on the scene until emergency medical personnel and Police arrived on the scene.

**A-138**

**PAGE # 4**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

## SUSPECTS:

**(1)** BLACK MALE, 20'S
MEDIUM TO DARK COMPLEXION
THIN BUILD, TALL, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, REPORTEDLY FROM
WASHINGTON DC, NFD.

**(2)** BLACK MALE, 20'S
LIGHT BROWN COMPLEXION, 5'7"
MEDIUM BUILD, ONE GOLD TOOTH,
SILVER OR HAZEL CONTACT LENSES,
BLACK HAIR THAT IS CUT CLOSE,
ALMOST BALLED. REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(3)** MIXED RACE BLACK MALE, 20'S, VERY
LIGHT COMPLEXION, MEDIUM HEIGHT,
MEDIUM BUILD, CURLEY SANDY BLOND
HAIR, AND POSSIBLY A PORTO RICAN ,
SAME IS THE TWIN BROTHER OF SUSPECT
# 4. REPORTEDLY FROM WASHINGTON DC,
LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(4)** MIXED RACE BLACK MALE, THE TWIN
BOTHER OF SUSPECT # 3, VERY LIGHT
COMPLEXION, CURLEY SANDY BLOND
HAIR BREADED TO THE BACK, MEDIUM
BUILD, MEDIUM HEIGHT , POSSIBLY
PORTO RICAN REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING , A WHITE TEE-SHIRT AND
SHORTS, NFD.

## FOLLOW UP INVESTIGATION:

In reference to the follow up investigation your Investigators will attempt to identify the unidentified females and attempt to identify the listed suspects, see follow up reports.

A-139

**PAGE # 5**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

INVESTIGATION TO CONTINUE

_____
SUPERVISOR

_____
DETECTIVE ROBERT PATTON
C.I.B. HOMICIDE UNIT

A-141

# Exhibit 3

A-141

POLICE DEPARTMENT
BALTIMORE, MARYLAND

2 FEBRUARY 1999

TO:        Major Jeffrey Rosen
           Commanding Officer
           Crimes Against Persons Section

FROM:      Detective Robert L. Patton
           Detective Kirk Hastings
           Homicide Unit

SUBJECT:   HOMICIDE BY STABBING
           MARTRELLE LAMAR CREIGHTON
           M/B/20 DOB ███████

           ███ ████████████ ██ ████████████

           OCC: 18 JULY 1998 @ 0200 HOURS
           301 LIGHT STREET ( SIDE WALK AREA)
           CC# 98-1G13258 H-98-172

SIR:

## FOLLOW UP INVESTIGATION/ ARREST OF SUSPECTS

SUSPECTS:        **KEITH MICHAEL SCOTT**
                 M/B/23 DOB█████

                 ████████████

                 ( ARRESTED)

                 **KEVIN LEE SCOTT**
                 M/B/23 DOB ████

                 ████████████

                 (ARRESTED)

                 **KEVIN ANTHONY MILLER**
                 AKA "KEVIN"
                 B/M/22 DOB █████

                 ████████████

                 S.I.D # 1628168

A-142

PAGE TWO
FOLLOW UP INVESTIGATION/
ARREST OF SUSPECTS
2 FEBRUARY 1999
H-98-172

**VICTOR GLORIA**
AKA "VIC."
B/M/24

S.I.D. # 1565443

On the 2nd of February 1999 at 1515 hours Detective Daza of the F.B.I. Fugitive Task Force, Calverton Office contacted the Homicide office and reported the following information. Detective Daza reported on this date at 1500 hours the listed suspects were and arrested in the 200 block of Red Clay Road, Anne Arundel County Maryland. Detective Daza said that the listed suspects were currently being detained at the M.S.P. Waterloo Barracks awaiting transport to Baltimore City.

Based on this information Detective John Thanner in concert with Detective Kirk Hastings responded to the Waterloo Barracks where they took custody of the listed suspects and ultimately transported them to the Baltimore City Homicide office for interview. Once at the Homicide office both suspects waived their rights to counsel and provided statements in which the following information concerning the captioned investigation was gleaned.

Concerning **Keith Michael Scott** he said during his taped interview. That he and his twin brother, Kevin Lee Scott and a third individual identified as **Kevin Anthony Miller, SID # 1628168** left Laurel Maryland together and drove to the Inner Harbor area on the date in question. He stated that his brother Kevin Scott was driving and that they were operating a white late model Chrysler or Plymouth four door vehicle that Kevin Scott had purchased from an individual known as "Paul." Keith Scott continued and stated when they arrived they parked their vehicle within blocks of the Inner Harbor and walked the rest of the way on foot. He said that they arrived sometime after 2100 hours and they walked to several drinking establishments in the vicinity.

Keith Scott continued and stated that several hours later they were walking down the promenade in the direction of where their vehicle was parked. He stated it was during this time they meet and individual known as "Vic.", **Victor Gloria S.I.D. # 1565443** , a friend from Laurel Maryland who was walking in the opposite direction.

A-143

**PAGE THREE**
**FOLLOW UP INVESTIGATION/**
**ARREST OF SUSPECTS**
**2 FEBRUARY 1999**
**H-98-172**

Keith Scott said that they talked to Victor Gloria and continued walking in the direction of their vehicle. He stated it was during this time they encountered three unidentified black females who were later identified as **Ms. Barbara Bailey, Ms. Charnetta Bailey and Ms. Erica Jones**. Keith Scott stated that Victor Gloria was the main person who began conversations with the females. He stated a short time later the listed victim in company with two other individuals approached the group and began making sarcastic remarks toward the females.

Keith Scott stated that the females and the rest of their group walked away from the victim and his associates trying to avoid an altercation. He stated it was during this time the victim re-approached their group and in a threatening manner approached Victor Gloria from behind. He stated at this point Victor Gloria struck the victim once in the face and immediately began running toward the main Street. Keith Scott stated after the victim was struck in the face he started bleeding from the nose and stood in the same area and did not chase after the Victor Gloria.

Keith added that the altercation was over at this point, saying that only one punch was thrown. Keith stated that the only persons involved in any altercation that night was Victor Gloria and the victim. Keith stated that he did not know at the time that the victim was stabbed in the neck and did not see Victor Gloria armed with any type of weapon. He said that he learned of death after Police were looking for him and his brother in Laurel.

Keith stated after the altercation they walked to their vehicle and drove back to Laurel Maryland. He stated that Victor Gloria apparently made his own way home indicating that he did not ride in their vehicle. Concerning Kevin Lee Scott your Investigators will note that he provided the same basic information in his taped interview, see transcripts for detailed information.

**INVESTIGATION TO CONTINUE**

_____          _____
**SUPERVISOR**                          **DETECTIVE ROBERT PATTON**
                                        **C.I.B. HOMICIDE UNIT**

A-144

# Exhibit 4

Police Department
Baltimore, Maryland

CI/209 · Case Number_____

INFORMATION SHEET

Name Clarence Frederick White _____ Nickname Clarence

Race B Sex M Age 15 D.O.B. ████████

Height 5'7" Weight 135 Complexion Med

Address ████████ SS# ████████

Home Phone ████████ Date and time of interview 18 July 98 0355

Parent's name ████████ Address S/A

Boy/girlfriends name ████████ Address ████████

Last School Attended Conrod Weiser Grade 9th

Employer Unemployed Address_____

Employers Phone_____ Hours of employment_____

RELATIVES IN BALTIMORE NOT LIVING WITH WITNESS

Name ████████ Relationship ████████

Address S/A Phone Same

Name ████████ Relationship ████████

Address ████████ Phone ████████

Read and Write Yes X No_____

Under the influence of drugs Yes_____ No X

If yes explain_____

Alcohol Check One Sober_____ Had Been Drinking X Intoxicated_____
2 Beers

Description of clothing at time of Interview (note in bloodstained torn etc.) T.Shirt, Jeans, Tennis Shoes.

Note any injuries None

Meals Provided_____Date_____Time_____Date_____Time_____

Detective Kleinota _____ Detective_____

A-146

# Exhibit 5

Me + Dernieu + Montrel came downtown

We was Drinking.

Met up with Some Girls Near Crazy Johns.

Split up.

Went to Inner Harbor.

Met up with Girls again.

They talking with other Guys.

We All Started Talking

Suspect Became mad

Started to Fight with Victim

V Got Cut in Neck

Suspects Ran away.

it was 3/4 They all Ran Away Together.

Suspect #1

White T-Shirt - White V-Neck on top.   Short Hair
Brown/tan Shorts,   Low Cut Black Chuka Boots.

MB 19 - Slim - 150 Light Skin

Saw him swing at Montrel - Montrel grabbed

his neck - And was bleeding bad.

#2   MB 15   white T-Shirt   Dark Shorts.

#3   MB 15   White T-Shirt   Dark Shorts.

Called 911 from pay phone   Light Rail Entrance.

Flagged down Police Car.

Can recognize if seen again.

1160-10-3                                    A-149                                    Form 71 / 37

# Exhibit 6

Today's date is the 11th of June 1999. The time now is approximately ah, 1347 hours. This is Detective Robert Patton and Detective John Thanner of the Homicide Unit. Ah, we're in Sgt. Barrack's office. We're interviewing Mr. Clarence White in reference to the stabbing incident of Montrell Creighton which occurred down at the Inner Harbor during the summer of 1998.

| Patton: | O. k. for the record ah, Mr. White would you say your full name and address please? |
| --- | --- |
| White: | Clarence White,█████████████ |
| Patton: | O. k. and how old are you Clarence? |
| White: | 16. |
| Patton: | O. k. and ah, what's your date of birth? |
| White: | ██████ |
| Patton: | O. k. alright you remember the incident that happened down at the Inner Harbor where Montrell Creighton who's also known as Tank, was stabbed? Do you remember that? |
| White: | Yes. |
| Patton: | O. k. could you tell me what you remember about that incident? What happened? |
| White: | Um, this, |
| Patton: | And speak up loud. |
| White: | Alright, it was, we arrived like downtown like I guess like 12 or something and. |
| Patton: | Who, who was with you? |
| White: | It was Truck, it was Bishop and me. |
| Patton: | O. k. |
| White: | And we was, we was walking down to the side like I don't recall what street that is. We was, we was walking towards the harbor. And we were drinking and we was walking towards the harbor. We, we seen these females, it was 3 females. And so we were, we were talking to the females and the females was like, one of the girls who Montrell was rap, talking to |

A-151

Page #2
Statement of:         Clarence White

White:          she say that she was married and she was in the army like she was just
                trying to turn him down like easy or whatever but it's like she was just out
                there still trying to talk to males though and he couldn't understand that
                cause like he had that alcohol in him.  So we walked him down and we get
                so towards the harbor like next to the booth where the benches at and we
                walking down and we see the females again and we keep on going we rap.
                We, we get to them a little group where some guys rapping out there were
                rapping, time goes by and the females walked passed us and it's like soon
                as she looked like, he look over to the right and he them so he walked right
                there cause they was like right on the side of us.  He walked over there, he
                talking to them, he's talking to this female and he was like, "Why yall
                messing with them, the guys?"  He was like, "They ain't nobody" and this
                and that.  He say, like he, he was like um, he was like they whores.  He
                asked the, he asked the dudes like why was they rapping to the females, he
                was like they all spoken for like, she married and she in the army and the
                guy he came, he came out his mouth like, like fuck you or something.  So
                Montrell was he was call, he called him out there.  So the guy was like,
                "We can fight."  So it's, they get there to fighting like Truck jabbed him in
                the face and the dude throw his guards up.  When he throw his guards up
                he just swinged, he swinging and it look like he hit him in his neck.  It's like
                he held Truck, grabbed his neck and he say like, "I'm, I'm hit like he , he
                poked me or something."  And he started bleeding.

Patton:         Now,

White:          It's like.

Patton:         where did the guys, the guy go that, that stabbed him in the neck?  What
                did he do after he stabbed Montrell in the neck?

White:          The guy he, he ran.

Patton:         Now he was with some other guys?

White:          He was with two light skinned guys.  He was with those twins that you
                showed me.  He was with them and they all like clammed together like
                come on or whatever and they ran.  Like as if like they knew what he was
                doing.

Patton:         Now did anybody else fight Montrell other, just the one guy fought
                Montrell?

A-152

Page #3
Statement of:        Clarence White

White:        Just the brown skinned guy.

Patton:        O. k. now you said that Montrell swung at him and then the guy swung back and then the fight was over with?

White:        Yes.

Patton:        And then, what did Montrell do after the guy hit him?

White:        He clenched on his neck and he said, the just like he poked me.

Patton:        Huh. Huh.   ·

White:        We well he was sitting there for so long before he said it that, that like we ain't know and it's like they already done ran off.

Patton:        And then he's bleeding from the neck?

White:        Huh. Huh.

Patton:        A lot?

White:        It was a lot.

Patton:        Alright, o. k. now did you know the girls?

White:        No.

Patton:        O. k. had you ever seen those 3 guys before?

White:        Uh. Uh.

Patton:        Were they, had you ever seen the guy that, that stabbed Montrell in the neck before?

White:        No.

Patton:        Did you see what kind of weapon he had in his hands when he hit Montrell in the neck?

White:        Nah.

Page #4
Statement of:            Clarence White

Patton:            Couldn't, you couldn't see it?

White:             Uh. Uh.

Patton:            O. k. but he did hit him in the neck and then after that ah, Montrell stopped fighting and grabbed his neck?

White:             Huh. Huh.

Patton:            O. k. now earlier before we turned on the tape at about ah, 1325 hours which is 1:25 p.m. I showed you a photo line up card ah, that contained 6 black and white photographs, is that correct?

White:             Yes.

Patton:            And o. k. and did you identify anybody on that card?

White:             I identified the 6th picture,

Patton:            O. k. and that, did

White:             on down the bottom.

Patton:            and that's the ah the, the bottom row?

White:             The bottom right hand, hand the 3rd one.

Patton:            O. k. bottom right picture?

White:             Yes.

Patton:            O. k. and this person is the person that?

White:             He stabbed Montrell.

Patton:            O. k. and did you sign your name above the picture?

White:             Yes.

Patton:            O. k. and had you write something on the back?

White:             Yes.

Page #5
Statement of:          Clarance White

Patton:          O. k. and what did, what, what did you write on the back, can you read that?

White:          The guy in the picture that I identified looks like the person that stabbed Truck.

Patton:          O. k. and Truck is Montrell Creighton, right?

White:          Yes.

Patton:          O. k.

White:          Creighton.

Patton:          Creighton, I'm sorry. Now I also showed you 2 more photo line ups and you identified ah, the two light skinned guys is that correct?

White:          Yes.

Patton:          O. k. the, the first one I showed you was at um, 1 ah, 1:32 p.m. and did you identify anybody on that card?

White:          Yes the 3rd person on the top on the right hand side.

Patton:          O. k. and that was one of the guys that was there?

White:          Yes.

Patton:          O. k. and I showed you another one at ah, 1:37 p.m. did you identify anybody on that one?

White:          Yes.

Patton:          O. k. and where was that picture located?

White:          Down the bottom on the first.

Patton:          Bottom where?

White:          On the bottom of the 1st left hand side.

Patton:          O. k. and he was the this person was?

A-155

Page #6
Statement of:   Clarence White

White:    He was, he was the guy that was there.

Patton:    O. k. and you signed your name above each one of those photographs?

White:    Yes.

Patton:    O. k. Um, I also showed you a 4th line up but you couldn't identify anybody is that correct?

White:    Yes.

Patton:    O. k. Now you came down to Police Headquarters ah, or went to the hospital right, after Montrell was stabbed?

White:    Yes.

Patton:    And then ultimately you came down Police Headquarters and talked to the detectives that night,

White:    Yes.

Patton:    or that morning, right?

White:    Yeah.

Patton:    O. k. and you told them what happened?

White:    Yeah.

Patton:    Alright, o. k. um, now I asked you, do was this earlier and you said there was 2 light skinned guys and the guy that stabbed Montrell, was there any other person with them in that group,

White:    Uh. Uh.

Patton:    that you know of ?

White:    Nah if they have it, they would have to be far or something.

Patton:    O. k. so they weren't out in the immediate vicinity?   They weren't involved in what happened?

Page #7
Statement of:            Clarence White

White:              Nah.

Patton:             O. k. alright, o. k. John you have any questions?

Thanner:            **(Inaudible)** at any time Clarence did Detective Patton or myself pointed out anyone direct you to identify anyone,

White:              Uh. Uh.

Thanner:            out of those photographs that you looked at?

White:              No.

Thanner:            Ah, we didn't indicate in any way, shape or form, right?

White:              Right.

Thanner:            And ah, you weren't forced or coerced or threatened to give this statement?

White:              No.

Thanner:            O. k. that's all I have Bobby.

Patton:             O. k. alright the time now is approximately ah, 1356 hours.  We're gonna conclude the interview.

Transcribed by:          Eva E. Cooper

# Exhibit 7

This is a tape statement of David Bishop being taken in the Homicide Unit by Detective Kurt Hastings.  The date is 18th July, 1998 and the time is 0416 hours.  We're in Lieutenant's Lieu's office in the Homicide Unit. For the tape sir state your name?

Bishop:        David Bishop.

Hastings:     Could you speak up sir?

Bishop:        David Bishop.

Hastings:     Your home address?

Bishop:        ███ ████████████

Hastings:     Your age and date of birth?

Bishop:        I'm 24 years old and I was born ███ ██, ███.

Hastings:     Can you read and write sir?

Bishop:        Yes.

Hastings:     How much education do you have?

Bishop:        I graduated from Southwestern High School.

Hastings:     Are you under the influence of drugs or alcohol right now?

Bishop:        No.

Hastings:     Are you giving this statement free and voluntarily?

Bishop:        Yes.

Hastings:     Mr. Bishop I'm investigating an incident that occurred 301 Light Street which is the Inner Harbor.  It happened around 2 AM this morning where a friend of yours Matrella Creighton known to you as Truck was stabbed, what can you tell me about this incident?

Bishop:        Well, we started we, we entered the Harbor from the entrance and started walking down me Truck and my friend Little Man we were walking down talking to some girls alright, than all of a sudden we ran into these girls one of them Truck was trying to talk to than it was some guys standing there one of the guys said something smart to Truck, Truck was ready to fight the guy than

A-159

Statement of Mr. David Bishop
Page 2

Bishop:    they started fighting alright Truck, the guy swung on Truck, Truck swung the guy swung back and it looked like a punch but, he cut him with something in his neck. And, than the other one tried the light skin dude came up and hit him in his head and than they just backed up cause Truck wasn't trying to fight them after they hit him it wasn't trying to fight them so they just backed up cause I guessed they figure they stabbed him they did something to him. And, I didn't realize that he was stabbed until, until um I started fighting the dudes and than they backed off and then I went to my friend and than he, he looked at me and he was black he was like they cut me with something and than that was his last words and than all the blood started shooting out of his neck, and air was coming out of his neck and I tried to put my hand over his neck to try to stop the bleeding and keep his air in. And, than his head, his head started swelling up like a balloon his eyes started getting real big and his face started getting real puffy and blood started coming out of his mouth and his nose. And, it was like he was standing up he was real stiff and when I, when I felt I realize that he was gone so I sat him down, I laid he down on the grass and I tried to ran down the boardwalk to see if I could catch the guys but, by the time they were gone. So I ran back up the boardwalk and that's when the Ambulance gets there.

Hastings:  When you say these three guys describe the guy that was originally fighting with Truck who stuck him as you put it?

Bishop:    I say he was about 5"11, a 160 pounds um, dark complexion um, he was wearing not a hat but, some kind of it looks like some kind of little cap on his head or something it didn't have a wing on it. And, he had some it looked like he had some um some kind of pants or something rolled up to his knees and.

Hastings:  Like sweat pants?

Bishop:    Yea, like sweat pants or something.

A-160

Statement of Mr. David Bishop
Page 3

Hastings:      Did you see what kind of shoes he had
               on?

Bishop:        No, no.

Hastings:      The other two gentleman who, who were
               with them, when we were talking earlier
               you said that they looked like twins?

Bishop:        Yea, they looked like brothers I heard
               one of the girls say that call I heard
               one of the girls say twin, like that so
               I figure that um they were twins but,
               they looked like brothers they were the
               same height, the same complexion and
               they, their, their features were
               similar.

Hastings:      There was a different in their hair
               styles?

Bishop:        Yea one of them had a bush the other had
               braids going down to the back.

Hastings:      The one with the bush how big of bush
               was it?

Bishop:        I say it stood about 5 inches off of
               his, off of his head.

Hastings:      And the other one had braids all the way
               through his hair?

Bishop:        Going to the back, yea, all the way
               through.

Hastings:      Do you remember what either one of them
               was wearing?

Bishop:        No, I can't really remember what they
               were wearing.

Hastings:      Do you recall any words that were spoken
               between any of your friends and the
               suspects?

Bishop:        They were just going back and forth
               talking I mean saying like I don't know,
               Truck I guess Truck, Truck was like why
               do you have to disrespect me and he was
               ready to fight and that was really the
               end, the guy was like what's up and than
               they started fighting.  And it looked
               like it he looked like he punched him

A-161

Statement of Mr. David Bishop
Page 4

| | |
|---|---|
| Bishop: | but, he stabbed him with something. Because I could tell the side that, I could tell the side that he was on that the dark skin dude was the one that stabbed him because the way they were fighting the light skin dude came from the back and, where he was cut that's where, that's where the dark skin dude was hit his at. |
| Hastings: | Right? |
| Bishop: | I seen him hit him. |
| Hastings: | When you met um the girls down the Inner Harbor, did you know any of these girls names? |
| Bishop: | None I just met them. |
| Hastings: | Did you get any nicknames or anything like that? |
| Bishop: | I, I didn't even talk to the girls. |
| Hastings: | How long were you down the Inner Harbor before this happened? |
| Bishop: | About an ½ hour. |
| Hastings: | Have you ever seen any of these suspects before anywhere? |
| Bishop: | Never. |
| Hastings: | Can you think of any questions that I didn't ask you or any information or any information that you can provide me that I didn't go into? |
| Bishop: | If I could remember more I would try but, I told you everything I know, I can't remember (inaudible). |
| Hastings: | Thank you for your cooperation. This tape statement is terminated at 4:23, thank you. |

This tape was transcribed by Secretary III Myrna C. Milburn, Criminal Investigation Bureau, AdmUnit on November 28, 1998.

A-162

# Exhibit 8

Today's date is the 29th of July 1998. The time now is approximately 12:50 hours, this is Detective Robert Patton, the Baltimore City Police Homicide Unit. Ah, I'm conducting an interview with Ms. ah, Barbara Baily in reference to the homicide of Montrell Crighton which occurred at the Inner Harbor on the um, 18th of July 1998 at about 2 o'clock in the morning.

| | |
|---|---|
| Patton: | Just for the record Barbara just tell them your full name, your age and your date of birth? |
| Bailey: | O.k. My name is Barbara Anita Bailey. I'm 18 and my birthday is ███████ |
| Patton: | O.k. um, Barbara we were just conducting ah, ah pre-interview for about 20 minutes and um, you told us some things in reference to what happened down at the Inner Harbor, is that correct? |
| Bailey: | Huh. Huh. |
| Patton: | O.k. just from the beginning tell me what happened in sequential order, what happened that night down at the harbor. |
| Bailey: | O.k. well me and my friends were going down the harbor and we parked on, |
| Patton: | Now I'm gonna interrupt you there, you say me and your friends ah, who was with you? |
| Bailey: | My sister and my best friend. |
| Patton: | And what's your sister's name? |
| Bailey: | Tronetta and my best friend is Erica. |
| Patton: | O.k. Tronette Bailey, |
| Bailey: | Huh. Huh. |
| Patton: | and Erica ? |
| Bailey: | Jones. |
| Patton: | Jones? O.k. |

Page #2
Statement of:          Barbara Bailey

Bailey:          Well, we were on um, Gay Street and we parked, parked on Gay Street and
                 then we started walking towards the harbor and that's when we saw
                 Montrell and David and the other guy. We didn't know them but

Patton:          Is that the first time you had met them?

Bailey:          The first time we had met them and they um, approached us and, well they
                 actually, Montrell approached Erica and we were like come on and trying
                 to egg her to come on with us and stop talking. So um, she just kept
                 talking to him, she kept talk, you know he was like so what are you doing
                 down here, or, or you married or you got a boyfriend and she was like,
                 "I'm married!" and he was like, "You married? What you mean, you
                 married!" She was like, "I'm married!" So um, she, she does have a
                 boyfriend but she called him her husband so we um, they had a
                 conversation for like 15 minutes, but I didn't know what they were talking
                 about cause I wasn't in to it. I wasn't paying attention and then we walked
                 towards the harbor cause we wanted to get something to eat we was all on
                 the Planet Hollywood. The Planet Hollywood was closed so then we was
                 walking toward the Maryland Science Center so, thinking that something
                 else would be opened in the other Pavilion. So that's when we met the
                 other guys that were from D.C. and we started talking to them and they
                 told us that their names and not all of them but there were 2 Kevins and
                 there were a Victor and there was another one. And I don't know his
                 name. And we were talking and then that's when Montrell came over
                 there and we were

Patton:          Where were you, where, where were you exactly in relationship, in
                 relationship to the harbor, where were you specifically?

Bailey:          O.k. um

Patton:          Before anything happened like fight, or anything happened?

Bailey:          Before ah, the fight happened? We were like near, o.k. we were past the
                 Pavilion. We were closer towards the Maryland Science Center on one of
                 those benches. That's where we were sitting at and then, then that's when
                 Montrell, Montrell and David came over there talking to us and Montrell
                 was like, "You suppose to be married what you doing talking to them?"
                 And he, she was like, "These my boys!" and he was like um, "I don't give
                 a

Page #3
Statement of:    Barbara Bailey

Bailey:      fuck who they are!" and he was like, "Fuck them! I don't give a fuck!" and then the um, the guys that were from D.C. they was just chilled for a minute, they were chilling and then Kevin was like, "I don't know about that!" you know, if referring to when he was like, "Fuck them, I don't give a fuck about them!" And then that's when David was like, "Man he got a mouth over here, he talking over here", like he was egging them, instigating them or something. And um, then I noticed that something might happen so I got my girls together, Erica and, Da, and Shawnetta and I told them to come on and go. And that's when Montrell was like, "Your man look better than me?" asking Erica that, "Your man look better?" and she didn't answer him, she was just like, "He was drunk or whatever." She just was trying to ignore that. And so he was like, "Man FUCK YOU THEN!" cause she didn't answer. He was just like, "Fuck you! Fuck you!"

Patton:      Are you guys walking away? Walking towards the,

Bailey:      We were walking back towards the Gay Street I guess, you, you know.

Patton:      Towards where Pavilion( **please check**) was?

Bailey:      Yeah, back towards the Pavilion and um, well, David was like, "Man she ain't nothing but a 2000.00 dollar whore, fuck her, she ain't nothing but a 2000.00 dollar whore." and you know, I guess boys, you know how they are they support each other just so, so he doesn't feel bad. He was like you know, kept saying that or whatever and my friend was like appalled you know. She was like "HA!" you know, had this like expression on her face like, oh my GOD, so we just kept on walking and then, and he was um, trying to um, talk to my sister like, "Man you down here too? You suppose to have a boyfriend man, fuck you too, you suppose to have a boyfriend and you down here talking to other guys!" And so she was like, my sister was just like, "Man get out of my face! Get off of me!" And so then, that's when um, Kevin and them was like, "Yoe, yall need to chill out you know like, that's not necessary or whatever" and then that's when David was like, "Man he got a mouth over here again!" and then that's when the altercation happened. But before the altercation happened Victor was the one that ran off because I get he saw that something was gonna happen. So he ran off towards Gay Street I guess or where ever they parked and um, he ran, and then that's when they started fighting but they started moving back towards the Maryland Science Center and we were

Page #4
Statement of:       Barbara Bailey

Bailey:        moving towards Gay Street so it was like a distance and when they started fighting and I turned around and I saw Kevin punch Montrell. I saw him punch Montrell and then my sister was like, "Oh, he bleeding, he punched him good!" And they was like that's what he get, you know what I mean, cause we thinking that he got punched.

Patton:       Did, did Kevin have something in his hands or was he wearing a ring or

Bailey:       No he didn't.

Patton:       did you see, did you what he had in his hand?

Bailey:       No we were to far to see. It looked like a punch to us we didn't see that he had anything in his hand. So I thought he might have punched him in his mouth and his mouth was bleeding cause he had blood all over his shirt but my sister saw that I really couldn't see, my sister she, you know, she good with detail so I was like, "Come on!" and we saw that the guys from D.C. started running so we figured that maybe David and Montrell were gonna go to that car and get a gun or something so we started walking faster because we had on heels we couldn't run any faster than we, than our heels permitted us to.

Patton:       So the guys from D.C. past you up (inaudible)?

Bailey:       Yeah and then, we, they past us. They ran and they were like gone. They were shew out of there. I was like, "I wonder why they ran?" They, they punched the guy and they ran off you know. So we just started running (inaudible) to our car.

Patton:       Now did you see them after that, the guys from D.C. after that?

Bailey:       Uh. Uh, we ain't see them.

Patton:       O.k. now during your conversation with these guys, did they give you guys ah, their pager numbers, their home numbers, their telephone numbers at work or anything like that?

Bailey:       No.

Page #5
Statement of:       Barbara Bailey

Patton:             Or any

Bailey:             We didn't, uh. uh. We didn't

Patton:             You guys give them numbers?

Bailey:             No we didn't give them any numbers.  We didn't have a chance.  We were just talking you know when we first saw them we were just having a conversation about the harbor or downtown you know just being down there, they were like, what are yall doing?  Cause the conversation wasn't even focused on do yall have boyfriends and who yall down here with and can we get in touch with yall later on.  It wasn't focused on that until Montrell came back over there and was like, "Yall supposed to be married" and then you know.

Patton:             Right. Now you said there was 4 guys,

Bailey:             Huh. Huh.

Patton:             o.k. and one of them, 2 of them were named Kevin and you said two of them were twins,

Bailey:             Huh. Huh.

Patton:             right?  Let's deal with them twin guys first.  One of the twins you say had a name of Kevin?

Bailey:             Kevin, yeah.

Patton:             Alright, and can you describe those two guys to me,

Bailey:             Well um,

Patton:             the twins?

Bailey:             The twins, they were skinny, they were light skinned, they look like they were mixed or something, they had wavy hair but it was like a sandy blonde wavy hair.

Patton:             Sandy blonde?

**A-168**

Page #6
Statement of:          Barbara Bailey

Bailey:          Huh. Huh.

Patton:          **(Inaudible)** color?

Bailey:          **(Inaudible)** color.

Patton:          And how was the, how did they wear their hair?

Bailey:          One of them had like a short blow out. He just wore his hair wild wavy and um, the other one had corn rows that was going back and they were long corn rows. They probably reached down to his shoulders and he had them corn rowed back. But um,

Patton:          And this sandy,

Bailey:          They were both

Patton:          sandy blonde hair?

Bailey:          Yeah it was like sandy, huh, huh.

Patton:          Both of them had the same colored hair?

Bailey:          Yeah, same color hair, they

Patton:          But one had like it, was it like in a blow out?

Bailey:          Yeah, but his wasn't as long as his brothers, his was short. And they both kind of quiet, they ain't really didn't say much, they were quiet.

Patton:          O.k. and the guy, did you know of his second twin's name, did he ever say what his name was?

Bailey:          Ah, not that I remember. I he had

Patton:          Do you know which one, which one of the twins was Kevin?

Bailey:          No, I can't remember that. I can't

Patton:          Did they look like they were mixed black?

**A-169**

Page #7
Statement of:     Barbara Bailey

Bailey:     Yeah.

Patton:     Mixed?

Bailey:     Yeah, they looked like they were mixed or they had some other nationality in them like Puerto Rican or something.

Patton:     But they did have sandy blonde hair?

Bailey:     Huh. Huh.

Patton:     O.k. what about the guy Victor who ran off just as the fight started?

Bailey:     Well he was light skinned and had an even tone. He had some contacts in his eyes. They were, they were like silver or something they were a real, like the pupil of it, it wasn't like the normal size of a pupil it was like real big you know how you can see the pupil it's, it's kind of small?

Patton:     Right.

Bailey:     But this one like big so we knew it wasn't real you know and he, he admitted that, that wasn't real and he a real close haircut but

Patton:     And he was light skinned?

Bailey:     Yeah.

Patton:     Did he look like he was mixed also?

Bailey:     He looked like he could have been mixed.

Patton:     Did he say what his nationality was?

Bailey:     He said that he was half black and half Puerto Rican.

Patton:     Did he say where he lived, Victor?

Bailey:     Victor said he um, he lived out in D.C. but he use to live out in New York.

Patton:     Excuse me. Ah, the two twins they, they also said they were from D.C.?

Page #8
Statement of:           Barbara Bailey

Bailey:                 Huh. Huh.  Well they was even, they were on the same **(inaudible)** the only thing with them was my sister had pointed out something.  She was like, "Where yall from?" cause they had on white slouch socks and nobody in Baltimore wears white slouch socks and so she said, "Are yall from D.C. or something or where yall from?" and he was like, "D.C." , and he was like, "How did you know?" and she was like, "Because yall dress different", she aint wanna really offend him but then she was like you know and, "Plus yall have on white slouch socks" and so um,

Patton:                 And the guy, there was the dark skinned guy that's named Kevin?

Bailey:                 Huh. Huh.

Patton:                 O.k. can you describe him?

Bailey:                 Can I describe him?

Patton:                 Other than he was dark skinned.

Bailey:                 He, he had um, he had like a , a, thick close haircut, kept waves, he had like wavy hair but it was um, it was close.  It wasn't long and it wasn't real short.  It was just close.  I could tell.

Patton:                 Were they all about the same age?  Or the same approximate age?

Bailey:                 Huh. Huh.

Patton:                 They're all in their twenties?

Bailey:                 They're all in their twenties.  That's what they look like.

Patton:                 Did they say what kind of car they were driving?

Bailey:                 Uh. Uh.

Patton:                 They never bragged about what kind of car they had?

Bailey:                 They didn't, they sure didn't.

A-171

Page #9
Statement of:  Barbara Bailey

Patton: Did any of those guys have any distinguishable features other than the two twins had sandy blonde hair and Victor had curly black hair ah, correction

Bailey: Uh. Uh.

Patton: O.k. I'm sorry

Bailey: No.

Patton: the twins had good curly sandy blonde hair?

Bailey: Huh. Huh.

Patton: And ah, Victor's hair was ah,

Bailey: Close cut.

Patton: Close cut.

Bailey: Close cut, he didn't have any hair you might as well say cause it was a real close cut.

Patton: Black?

Bailey: Huh. Huh.

Patton: O.k. so they were from D.C. you don't know what kind of car, they didn't brag about what kind of car they were driving, they didn't have a chance to give you guys any telephone numbers?

Bailey: Uh. Uh.

Patton: Did they say where they worked at or, you know how guys brag about themselves when they're talking to women they always,

Bailey: Yes.

Patton: put themselves forward first. Do you remember anything significant about what they may have said,

A-172

Page #10
Statement of:          Barbara Bailey

Bailey:          No they didn't

Patton:          about themselves?

Bailey:          Nope.  No.

Patton:          And you'd never seen those guys before?

Bailey:          Never.

Patton:          That was the first time you ever seen?

Bailey:          The first time we met both of them groups.

Patton:          Did they say where they had came from and where they had been before they met you guys?

Bailey:          Um, not that I can remember.  I don't remember if they said anything
about          anything except they were just hanging out.

Patton:          Now who was basically really engaged in a deep conversation with those guys from D.C., which one of them your sister or Erica?

Bailey:          Um, probably, first it was my sister and then it was Erica.  I mean, cause my sister was talking to Victor at first but then when Montrell came over there and he started like you know getting rowdy, Erica tried to kind of ignore him so she was talking more to Victor than any, than any of us. Cause Victor he was the more talkative one, he was the one that approached us first and then the other one, the twins were the quiet ones and Kevin he was try, trying talking but I think he was smoking something, I'm not sure what he was smoking but he had, I think he had a cigarette or something in his hand.  But he was basically chilling

Patton:          Right.

Bailey:          the um, the dark skinned Kevin.  He was just like, whatever, smoking.

Page #11
Statement of:       Barbara Baily

Patton:          Right.  O.k. Um, is there anything else you can remember about these guys that I didn't ask you that may help to identify them, thing about them? **(Please check).**  OH! there is, in our pre-interview you indicated that they were all wearing,

Bailey:         Oh, yeah, huh.huh, they were all wearing white t-shirts.

Patton:          White t-shirts?

Bailey:         Yeah.

Patton:          And shorts?

Bailey:         And shorts.

Patton:          And tennis shoes?

Bailey:         And tennis shoes

Patton:          And socks?

Bailey:         And some of them had white slouch socks on.

Patton:          Slouch socks on?  Those are the socks that hang down and drooped down

Bailey:         Yeah.

Patton:          towards your ankle.

Bailey:         Yeah, yeah, yeah. **(Inaudible).**

Patton:          You remember anything with heavy writing on their t-shirts of any kind?

Bailey:         No I, they were as simplest, you know, simplest white t-shirts **(inaudible).**

Patton:          Did you notice any of them had any, did they have any tatoos?

Bailey:         Uh. Uh. Nope!  Usually if I see one I'll look at it

Patton:          Right.

Page #12

Statement of:      Barbara Bailey

Bailey:      and then I'll remember.

Patton:      What about earrings and gold teeth?

Bailey:      Maybe, maybe Victor had one.

Patton:      Earring or gold teeth?

Bailey:      Oh earring?

Patton:      Yeah earring, Victor had an earring?

Bailey:      No. No.

Patton:      Oh, Victor had

Bailey:      I think he had a gold in his mouth. I think he had one.

Patton:      In the front?

Bailey:      One on the side, on um, yeah on the side (Inaudible). And, and ah,

Patton:      Alright um, we're gonna conclude the interview now. But if you think of anything after the interview I, I would appreciate that you give me a call. You have my telephone number, give me a call just let me know. Sometimes you remember things afterwards you know like,

Bailey:      Huh.Huh.

Patton:      something about it, oh yeah, he said he was, he had Alexis and mother worked at GM or something you know,

Bailey:      Huh. Huh.

Patton:      something like. Anything like that, I appreciate you ah, telephone call. Alright we're gonna conclude the interview, the time now is approximately ah, 1308 hours.

Transcribed by:      Eva E. Cooper

# Exhibit 9

The 12th of August 1998 the time now is approximately 11:38 hours.  This is Detective Robert Patton Baltimore City Police Homicide Unit. Ah, conducting an interview with Ms. Charnetta Bailey in reference to the homicide stabbing of Montrell Crighton which occurred on the 18th of July 1998 at 0200 hours in the Inner Harbor Downtown Baltimore.

Patton:     O.k. Ms. Bailey for the record just tell me your full name your age your date of birth and your address?

Bailey:     I'm Charnetta Bailey my birthday is ████, I live at ███████████ and I'm 16.

Patton:     Sixteen. O.k.  ah were you in the Inner Harbor on the 18th of July about 2 o'clock in the morning were an incident occurred where a person was ultimately stabbed, Montrell?

Bailey:     Yes I was.

Patton:     O.k. tell me in your own words exactly what happened that night.

Bailey:     O.k.

Patton:     From beginning to end wherever you want to start at but basically from when you guys get down there and, and you encounter everybody.

Bailey:     Well my sister and good a friend of ours named Erica, we parked on Gay Street and we walked on Gay Street and Montrell and Derrick and um, Schuggie was the first three guys that we met down there.  We was on our way to Planet Hollywood but it happened to be closed, so before we got down there, we was talking to them the guy ah, Montrell was trying to talk to my friend Erica, um, Schuggie was trying to talk to me and the guy Derrick was trying to talk to my sister.  And ah, they were conversating, all of us was conversating we all told them we had boyfriends but the ah, my friend Erica told him that she had a husband and she was married.  So Montrell (inaudible) he was o.k. he told us that um, um, he was gonna leave us alone, he respect that we have boyfriends, I'll let yall go about yall business but it was nice meeting yall.  So we walked on and we was going to Planet Hollywood we found out it was closed so we just said we was gonna walk around the Harbor.  So we walked around the Harbor and stopped, my sister seen a couple of friends that she knew so we stopped and we was sitting on the bench.  While they were talking um, Montrell, Derrick and Schuggie came back and Montrell was more hostile then.  He was more like um, "What yall doing down here talking to them?"  And was gossiping with us and my friend Erica was like, "This my spiritual brother, we're on a different level than us, down grading Montrell. So I thought that might have made him more pumper and um Schuggie was like, "Don't down grade my man! You don't know what kind of knowledge my man got in his head!

A-177

Page #2
Statement of:          Charnetta Bailey

Bailey:       Don't do that to my man!" And I was looking like why is Erica, you know, doing
              this. So um, they left us alone then and walked on or whatever. Then we stopped
              holding conversation with them we walked towards the Science Center. Then we
              turned back around and we seen a group of guys about 4 of them. One name was
              Victor. They were friendly light skinned. We called them Pretty Boys. They all
              had on white shorts , (inaudible) shoes and slouch socks. So we figured they
              were from D.C. Then we hold ah, slightly conversation with them and they told
              us that they were um, they were from D.C. and um, we found their names. One
              was um, Victor and one was Kevin and it was two Kevins and a Kiwi. Two, a
              Kevin and Kiwi were twins and then there was another Kevin.

Patton:       Kiwi?

Bailey:       Nick name.

Patton:       Nick name was Kiwi?

Bailey:       I guess so.

Patton:       So what did

Bailey:       (Inaudible). And they told us that we was a nice bunch that he was like um,
              usually the guys, the  girls that they meet down there have knuckleheads or
              chicken heads, don't got good heads on their shoulders. They was like that's a
              nice bunch they like the way we carried ourselves and pronounced our names and
              they was just talking and we were real proper. And um, um then Montrell,
              Derrick and Schuggie came over there. Montrell was more hostile then. He was
              talking to us with a um, aggressive tone, disrespecting us, calling us high priced
              whores and telling us that we, we can't talk to nobody cause, I guess he was trying
              to mess up our rap. Te, telling the guys that we had boyfriends, one was married
              and my sister had a boyfriend also. And was like, "Don't talk to them" and the
              other guys in the background, they didn't say anything to him. They just was like,
              " Um, we don't need this tonight!" And the guy , it was like, Schuggie was like,
              "Calm down Montrell, calm down!" And um, Schuggie um, Montrell was like,
              "Nah fuck them  niggas, we don't we, I don't care about them! They married, they
              married, they ain't nothing but high priced whores. They come down here with a
              1000.00 dollar outfit on trying to be cute!" And it um, it, it escalated then it
              calmed down. And

Page #3
Statement of:     Charnetta Bailey

Bailey:     then um, Montrell and his friends walked a different way we walked the opposite way and Montrell came running back towards us and got in our face and the guy, guy was like, "I don't need this tonight" he was like, "No what's up with us?" **(Inaudible)** was saying, "Come on fellows, come one fellows!" calling his fellows over there and Montrell and the guy named Kevin, the tall one not the twin they were walking around in a circle. A beef, a beef like circle. Then I didn't see anymore. I turned around cause um, I was trying to gather up everybody and then Erica was like, "OOOOH he got banged in his mouth!" And then I turned around I seen the blood. Not here but here

Patton:     On his neck?

Bailey:     Yeah, he had on a white T-shirt so it was like real noticeable and um, the guy Victor, he, before the guy had got stabbed the guy named Victor um, ran off, but we didn't know he got stabbed we thought he was hit in the mouth. And he was like um, the Kevin was like, "Ain't nobody to big to take, we could take down. Ain't nobody to big we could take down!" Cause Kevin was skinnier than ah, Montrell. And um, they started walking with a upper pace and they kept looking back. And when I looked back Montrell was still standing so therefore I didn't know the knowledge that he was you know hurt or any. Then um, we went, they walked towards the valet parking and we walked, we walked the same way but they ran across the, um that street, I'm not sure what that street is, that wide street towards valet parking and we ran towards Gay Street. And we got in our car and we was still circling around trying to find them. We heard the ambulance going on and we didn't think it was nothing severe. I thought somebody finally called security and was you know, trying to calm everything down. We heard the ambulance going on and we got in the car trying to ride around trying to find Victor and them we were, we road around for like 25 minutes trying to find them. We went, we went inside valet parking asking did a couple of guys leave and they didn't say anything. They didn't tell us that no one left or nothing. And um, then, that's about it and we went on home that evening **(inaudible).**

Patton:     Now there's 2 Kevin's ah, and a Kiwi?

Bailey:     Huh. Huh.

Patton:     Alright one Kevin was the one that was actually fighting with Montrell,

Bailey:     Huh. Huh.

Page #4
Statement of:       Charnetta Baily

Patton:       right?

Bailey:       Huh. Huh.

Patton:       Then there were the 2 twins?

Bailey:       Huh. Huh.

Patton:       And then there's Victor?

Bailey:       Right.

Patton:       Now which of the two twins was Kiwi?  Now one of them had their hair braided?

Bailey:       The light skinned one.

Patton:       O.k.

Bailey:       The light skinned one.

Patton:       The one that had his hair braided back?

Bailey:       Yeah, the one that had his hair braided back.

Patton:       O.k. that was Kiwi?

Bailey:       Huh.Huh.

Patton:       O.k. and Victor, you said his name was Victor

Bailey:       Huh. Huh.

Patton:       but then his friend said

Bailey:       I don't even, I think that was the other Kevin with the short hair was like calling Vicdamone.

Patton:       Vicdamone?  But you don't believe that was his last name cause that's an actor.

Bailey:       Huh.Huh.

Page #5
Statement of:          Charnetta Bailey

Patton:     Did they ever confirm the fact that they were from D.C. while you were talking to
            them. I mean did that ever come out that they

Bailey:     Huh.Huh.

Patton:     were in fact from D. C.

Bailey:     Huh. Huh. Yeah.

Patton:     Victor

Bailey:     Was originally from New York. He had said he was down here with these boys
            that's from D.C.

Patton:     And that was victim that you talked to?

Bailey:     Huh. Huh.

Patton:     Ah, did you see a knife or anything in anybody's hands? In the guy Kevin's
            hands when they were, before they started fighting?

Bailey:     The distance that we were and how the energy that was there, I just thought it was
            a fist fight and I was scared that Kevin was gonna get hurt because Montrell was
            bigger than him you know, that's what my first thought was in my head. And
            then when I seen Kevin, not Kevin, Montrell bent over like this, I said, "Oh that's
            right he was drunk and he was already worked up." So I'm thinking that he
            wasn't gonna last long anyway when I seen Kevin walking away, I'm like that's
            probably why he was like, he was you know bent over some. I didn't even
            realize, and I didn't see any **(inaudible)** or knife or nothing.

Patton:     Alright, now had you ever seen those guys before that day, the guys from D.C.?

Bailey:     No.

Patton:     Alright, but you knew Montrell and them before?

Bailey:     Uh. Uh.

Patton:     You didn't? That was the first time you met them also?

**A-181**

Page#6
Statement of:        Charnetta Bailey

Bailey:        That was (inaudible). Huh.Huh. But um, Derrick said he re, remembered my sister from somewhere. But I'm not sure where he, where he remembered her from. I guess later on he remembered her from Mondawmin or something.

Patton:        Mondawmin. Alright. Is there anything else you wanna tell me that ah, may help us identify these guys. Anything you can remember?  Like they never, did they ever give you a phone number or anything?

Bailey:        No numbers, it never got that far.

Patton:        They never bragged about what kind of car they were driving?

Bailey:        Nope.

Patton:        What they did for a living?

Bailey:        No.

Patton:        I mean usual guy stuff that they, you know how guys start bragging about who they are and what they did.

Bailey:        All we did is exchange names. But then that's when Montrell came over there. We asked them what they were getting into tonight and they said, "Nothing, what are yall getting into?" And we was like nothing.

Patton:        Did they say, did they say where they had been before they came down there?

Bailey:        Uh. Uh.

Patton:        They never talked about what kind of car they were driving?

Bailey:        (Didn't hear an answer).

Patton:        Alright, ah, we're gonna conclude the interview. The time now is 11:48 hours.

Transcribed by:        Eva E. Cooper

A-182

# Exhibit 10

Today's date is the 2nd of February 1999. The time now is approximately 1935 hours. This is Detective Robert Patton and Detective Kirk Hastings, of the Homicide Unit. We're in Lieutenant Cook's office. We're conducting an interview with Mr. Keith Mike, Michael Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, sometime about 0200 hours, in the Baltimore Inner Harbor area.

Patton: Okay and for the record ah, Keith could you tell us your full name, your age, and your date of birth please?

Scott: My name is Keith Michael Scott. My birthdate is ██████

Patton: And ah, how old are you?

Scott: Oh 23 years old.

Patton: Okay and were do you live sir?

Scott: ██ ████████.

Patton: Okay ah, and you do you have a telephone there sir?

Scott: Yes, my telephone number is █████

Patton: Okay and do you have a brother?

Scott: Yes.

Patton: What's his name?

Scott: Kevin Scott.

**A-184**

Page - 2
STATEMENT OF:  Keith Scott


Patton:    Okay and he, is he your twin brother?

Scott:     Yes he is.

Patton:    Alright, before we get started I wanna go over
           your rights form with you. Okay earlier this evening
           at about 1835 hours, which is 6:35 p.m., we advised
           you of your rights, is that correct?

Scott:     Yes.

Patton:    Okay and we went, you read allow all 5 of your rights,
           is that correct?

Scott:     Yes.

Patton:    And you put, wrote the word yes and put your initials
           at the end of each one of those rights, is that correct?

Scott:     Yes.

Patton:    Okay and you signed your name underneath those rights
           indicating that you fully understood them, is that
           correct?

Scott:     Yes.

Patton:    Okay and you also signed your name on that form,
           indicating that you wanna to give a statement without
           having a Lawyer present, is that also correct?

Scott:     Yes.

Patton:    Okay, now I'm just gonna go over your rights form with
           you one more time. Number 1, You have the absolute right
           to remain silent. Do you understand that?

Scott:     Yes.

Patton:    Ah, you have to speak up louder?

Scott:     Yes I do.

Patton:    Okay, Number 2, Anything you say or write may be used
           against you in a Court of Law. Do you understand Mr.
           Scott?

A-185

Page - 3
STATEMENT OF:  Keith Scott


Scott:      Yes I do.

Patton:     Okay, You have the right to talk with a Lawyer at
            any time, before any questioning, before answering any
            questions, or during any questions. Do you understand
            that?

Scott:      Yes I do.

Patton:     Okay, If you want a Lawyer and can not afford to hire
            one you will not be asked any questions and the Court
            will be, will be requested to appoint a Lawyer for you.
            Do you understand that sir?

Scott:      Yes.

Patton:     Okay, If you agree to answer questions, you may stop
            at anytime and the request a Lawyer, and no further
            questions will be asked of you. Do you understand that
            sir?

Scott:      Yes.

Patton:     Ah, do you fully understand your rights sir?

Scott:      Yes I do.

Patton:     Okay now ah, on this form also, it indicates that you
            there's a sentence underneath that indicating that that
            you are willing to answer questions and you do not want
            an Attorney at this time. And your decision to answer
            questions without having an Attorney present is free and
            voluntarily on your part. Is that correct?

Scott:      Yes.

Patton:     You concur with that?

Scott:      Yes.

Patton:     Okay, and you signed your name under that statement,
            is that correct?

Scott:      Yes.


A-186

Page - 4
STATEMENT OF:  Keith Scott


Patton:     Okay, now we also told you that your under arrest. Did
            you understand that sir?

Scott:      Yes.

Patton:     Okay and we also told you that your being charged with
            the murder of Mr. Martrell Kreighton, is that, your
            understanding?

Scott:      Yes.

Patton:     Okay and ah, knowing all that do you still wanna give
            your statement about what happened at the Inner Harbor
            sir?

Scott:      Yes.

Patton:     Okay, alright ah, just start from the beginning ah,
            Mr. Scott and tell us about that morning, or that late
            evening at the Inner Harbor. First of all, do you
            remember what day of the week it was when?

Scott:      No I don't.

Patton:     Okay, alright just go ahead and start from the beginning
            about what happened, and who you were with? Alright go
            ahead sir?

Scott:      Okay.

Patton:     Alright before you got to the Inner Harbor where were
            you?

Scott:      I was around he Laurel area.

Patton:     Okay and how did you get to the Inner Harbor?

Scott:      We had drove up there.

Patton:     Alright and who was with you when you drove up there?

Scott:      It was me, my brother Kevin, a friend of mine name
            Kevin.

Patton:     Okay and your friend ah, your friend Kevin, what is
            his full name?


A-187

Page - 5
STATEMENT OF:  Keith Scott


Scott:     Kevin Anthony Miller.

Patton:    Okay and ah, were does he live?

Scott:     In the Laurel area.

Patton:    Do you know his address or what apartment complex he
           lives in?

Scott:     No I don't.

Patton:    Okay how old is he about?

Scott:     He's in his 20's, 21.

Patton:    Okay and how long have you known ah, Kevin Anthony
           Miller?

Scott:     I've known him for about 3 or 4 years.

Patton:    Okay, now ah, who's car were you driving?

Scott:     We was in ah, a white car and my brother had drove
           up there.

Patton:    Was it your brother car or something or a friends car
           or what?

Scott:     No, we had brought it from a guy we know.

Patton:    Okay and what's his name?

Scott:     His name is Paul.

Patton:    Okay and what kind of car was it that you were driving?

Scott:     It was a 8, 86 **inaudible** Dodge, Dodge Aries, or Reliant,
           Dodge, Reliant.

Patton:    Okay, alright and ah, were did you guys park your car
           at when you got downtown Baltimore?

Scott:     It was one of the side streets.

Patton:    Now tell me from that point were you parked the car,
           or what your guys did after your parked the car that
           night?

**A-188**

Page - 6
STATEMENT OF:  Keith Scott


Scott:      We parked the car, we got out the car and went into
            the Harbor. Walked around for a while, you know having
            fun whatever. We went and had a couple of drinks.

Patton:     Did you go into a Bar?

Scott:      Yes.

Patton:     Do you know which Bar you went into?

Scott:      Ah, ump.

Patton:     I'm sorry, yes or no.

Scott:      No, no I don't.

Patton:     Okay go ahead sir, I'm sorry.

Scott:      And then after about a hour or so, we we was leaving
            the Harbor and we bumped into a guy we know from
            out Laurel name Vick. And inaudible what ever, what
            you doing up here. And about couple seconds, couple
            minutes went pass. Like 3 or 4 girls walked pass. And
            he had stopped them and was talking to them.

Patton:     Who is he?

Scott:      Vick had stopped the girls.

Patton:     Okay.

Scott:      And he was talking and about a couple minutes later
            so, 3 guys approached us, they was loud, drunk, yelling
            at the girls and us.

Patton:     You know what they were saying to you guys?

Scott:      No they was talking to the girls saying, you couldn't
            talk to me and all this, but you can talk to them.

Patton:     Who was saying that **inaudible.**

Scott:      The big guy, say his name was.

Patton:     There was a big guy and and 2 smaller guys?


**A-189**

Page - 7
STATEMENT OF:  Keith Scott


Scott:      Yes.

Patton:     Okay, so what happened after that?

Scott:      They they was arguing.

Patton:     Who, who was arguing?

Scott:      The big guy, he was talking to the girl.

Patton:     Okay.

Scott:      Saying why you couldn't mess with me, thought you
            was married and some other stuff I can't recall.
            So then, the girls had pulled off, like come on.
            And we had start walking off. And he was still yelling
            at them, he started coming up behind us. That's when
            he had approached Kevin Miller. We turn around and
            see Vick punch him and he ran off.

Patton:     Now when he approached Kevin Miller did he, did he
            and Kevin exchange blows?

Scott:      Nope.

Patton:     They argue?

Scott:      No.

Patton:     Did they have any words between them?

Scott:      No.

Patton:     So he approaches Kevin and does what? Kevin Miller I
            mean.

Scott:      He approached him like he was about to swing on him.

Patton:     Yeah, and then what happened?

Scott:      And that's when I see Vick hit him.

Patton:     Were did Vick hit him at?

Scott:      He punched him like on the side of his face.


**A-190**

Page - 8
STATEMENT OF:  Keith Scott


Patton:   How many times did Vick hit him?

Scott:    He just hit him one time.

Patton:   Did the guy start bleeding after Vick hit him?

Scott:    Yeah he was like his nose was bleeding.

Patton:   And then what happened?

Scott:    Then the girl started laughing saying that's what
          he get, or whatever. And then everybody just walked
          off.

Patton:   Did you walk or run?

Scott:    Started walking and then we started running.

Patton:   Then were did you go?

Scott:    We got in our car and left.

Patton:   Who, who got in the car with you?

Scott:    Me, my brother, and Kevin.

Patton:   Okay and were did ya'll go?

Scott:    Came back to Laurel. Dropped our friend off and went
          home.

Patton:   Were did ah, Vick go?

Scott:    I don't know were he went.

Patton:   Were did the girls go?

Scott:    I don't know were they went.

Patton:   Now this guy Vick do you know what his real name is?

Scott:    All I know is they call him Vick.

Patton:   Okay, and describe Vick to me?

Scott:    He's light skin, almost white, short hair, and a gold
          tooth.


**A-191**

Page - 9
STATEMENT OF:  Keith Scott


Patton:   Is he, how old is he about?

Scott:    He about 23, 24, I'm not sure.

Patton:   Do you know were he lives?

Scott:    He stayed in the Tall Oaks Apartments.

Patton:   I mean Vick? Were does Victor live?

Scott:    That's were he was staying at.

Patton:   In the Tall Oaks Apartments in Laurel?

Scott:    Yeah.

Patton:   Okay, do you know if he has a car?

Scott:    Yes he had a grey 4 door Delta 88.

Patton:   Do you know what year it was about? No.

Scott:    89, something.

Patton:   Now so basically your saying that, just to recap that
          the only person that was with you, that hit the tall
          guy, the guy that approached Kevin was Vick. Vick was
          the only one?

Scott:    Approached the other guy.

Patton:   Yeah was Vick the only one that hit anybody?

Scott:    Yes.

Patton:   Did you or your brother Kevin, Kevin Scott, hit the guy?

Scott:    No.

Patton:   Or exchange blows with anybody?

Scott:    Not at all.

Patton:   What about Kevin Miller, did he fight anybody?

Scott:    Not that I can recall, no.


A-192

Page - 10
STATEMENT OF:  Keith Scott

Patton:   I'm sorry?

Scott:    No he didn't.

Patton:   So the only person that was fighting was, was who?

Scott:    It really wasn't a fight, he just punch him and ran.

Patton:   He just hit him one time?

Scott:    Punched the guy and ran.

Patton:   And ran. Did Vick have anything in his hand?

Scott:    Not that I seen.

Patton:   Was he wearing any kind of big rings, or anything
          like that, or did he have a knife or ice pick, or?

Scott:    No he didn't.

Patton:   Or a weapon of some kind in his hand?

Scott:    No he didn't.

Patton:   Now did you see the, did the guy fall on the ground,
          fall down after Vick hit him?

Scott:    No not when he hit him.

Patton:   Was he bleeding?

Scott:    I seen blood on his face.

Patton:   Blood on his face?

Scott:    Well it look like blood.

Patton:   It look like blood. Was it a lot of blood or a little
          blood?

Scott:    Just a little bit, I think.

Patton:   Now what did the 2 smaller guys do when all of this
          was going on, what did they do?

A-193

Page - 11
STATEMENT OF:  Keith Scott

Scott:     I think they was standing on the side too?

Patton:    Did they fight?

Scott:     No.

Patton:    They grab anybody? They, they ain't try to fight you
           or your brother?

Scott:     No.

Patton:    Okay ah, now we had started talking to you earlier
           before we turned the tape on, did a little oral
           interview with you and I asked you tell me everything
           you know about Victor, right?

Scott:     Right.

Patton:    Had Victor been arrested before?

Scott:     Not that I know of.

Patton:    Is he in jail now?

Scott:     Yes he's currently incarcerated.

Patton:    And were at?

Scott:     I'm not sure were he's at.

Patton:    Were inaudible, do you know were he was arrested
           at, what County he's arrested?

Scott:     Yes his, he was arrested in PG County.

Patton:    You know what he's arrested for?

Scott:     No I don't.

Patton:    Did you tell us he was arrested in reference to
           some girls being killed in PG County? Did you say
           that?

Scott:     Yes from what I heard on the News, yes.

Patton:    And he was arrested with another individual that you
           know?

Page - 12
STATEMENT OF:  Keith Scott


Scott:     Yes.

Patton:    And that persons name was?

Scott:     Willis.

Patton:    Willis, you know his last name?

Scott:     I believe it's Haze, Hanes.

Patton:    Haze or Hanes?

Scott:     Yes.

Patton:    Okay now you, right now your wearing your hair
           braided to the back. Was you wearing your hair the
           same way that night this happened?

Scott:     No I wasn't.

Patton:    How was your hair?

Scott:     My hair was shorter than this.

Patton:    Was it braided up?

Scott:     Bush, not it wasn't braided at all.

Patton:    How was your brother Kevin Scott wearing his hair
           that night?

Scott:     I think he had his hair braided that night.

Patton:    Okay.

Scott:     In a pony tail.

Patton:    Describe, describe Kevin Miller, Kevin Anthony Miller
           for me, how tall is he about?

Scott:     About 6 foot, brown skin, like short hair.

Patton:    And is he light skin or dark skin?

Scott:     He's brown skin.

A-195

Page - 13
STATEMENT OF:  Keith Scott

Patton:    Brown skin, is he darker than you?

Scott:     Yes.

Patton:    And his hair was cut real close?

Scott:     Yes

Patton:    He is thick build, or thin build?

Scott:     No he's thin.

Patton:    Thin, do you remember what you were wearing that night?

Scott:     No I don't.

Patton:    Do you remember what Kevin was wearing that night?
           Your brother Kevin?

Scott:     No.

Patton:    Do you remember what Kevin Miller was wearing that night?

Scott:     Nope.

Patton:    Do you know if you had on long pants or shorts?

Scott:     I think I had on shorts.

Patton:    Do you know what kind of socks that you had on, had
           on that night?

Scott:     Ut-um.

Patton:    Did Kevin have on, Kevin Miller have on shorts?

Scott:     I think we all had on short, if I remember right,
           I'm not sure.

Patton:    What about Victor?

Scott:     Yes he had on shorts.

Patton:    Now when you guys left Laurel, did Victor leave Laurel
           with you guys the same time?

**A-196**

Page - 14
STATEMENT OF:  Keith Scott

Scott:      No he didn't.

Patton:     Did you, did you plan to meet Victor downtown at the
            Inner Harbor that day?

Scott:      No I didn't, no I didn't.

Patton:     So you just by happen to chance just ran into him,
            Victor?

Scott:      Yes.

Patton:     Okay now earlier you told us that Kevin Anthony Miller
            lived at the Fox Restwood Apartments in Laurel?

Scott:      Yes.

Patton:     Is that correct, okay. And you said he live with his
            mother?

Scott:      Yes.

Hastings:   I don't have any questions.

Patton:     Okay, um, now I just wanna recap this real quick. Did
            you that night fight and swing, hit anybody?

Scott:      No I didn't.

Patton:     Did your brother?

Scott:      No he didn't.

Patton:     Did Kevin Miller?

Scott:      No he didn't.

Patton:     Did Victor?

Scott:      Yes he swung on the guy.

Patton:     Is there anything else you wanna tell us about that night
            that we've didn't ask you about? Is there anything else?
            You have to say yes or no?

Scott:      No not at this moment, no.

Page - 15
STATEMENT OF:  Keith Scott


Patton:    Okay, Victor how long have you known this guy Victor?

Scott:     I say for about not even a year, half a year of so.

Patton:    You know how much he had to drink that night?

Scott:     A few cups.

Patton:    A few what?

Scott:     A few cups.

Patton:    Of what?

Scott:     I think Remey Martin, I'm not sure, I don't remember.

Patton:    Were you drunk?

Scott:     I wasn't intoxicated, I had been drinking.

Patton:    Was your brother drunk?

Scott:     Yeah he was drinking too?

Patton:    What about Victor?

Scott:     I can't recall.

Patton:    Okay ah, we're gonna conclude the interview with Mr.
           ah, Keith Michael Scott. Time now is 1955 hours.



Tape transcribed by Jackie Taylor on 2/25/99.

# Exhibit 11

Today's date is the 2nd of February 1999. The time now is ah, 2055 hours. This is Detective Robert Patton, and Detective Kirk Hastings, of the Homicide Unit. We're conducting an interview with Mr. ah, Kevin Lee Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, at the Baltimore Inner Harbor Pavilion, on the ah, Promenade.

Patton:     Okay for the record ah, Kevin just tell us your full name, your age, and your date of birth please?

Scott:      Kevin Lee Scott.

Patton:     And your age?

Scott:      23.

Patton:     Okay and your birth date?

Scott:      ███████.

Patton:     Okay and were do you live?

Scott:      At ███ ██████████.

Patton:     Okay and were is that located?

Scott:      Lanham, Maryland.

Patton:     Lanham, Maryland, okay. What's you telephone number there?

Scott:      Ah, ████████

Patton:     Okay.

Scott:      Area code 301.

Patton:     301, okay do you have a brother?

Page - 2
STATEMENT OF:  Kevin Smith

Scott:      Yes I do.

Patton:     Okay, what's your brother's name?

Scott:      His name is Keith Michael Scott.

Patton:     Okay and do you have a nickname?

Scott:      Ah, common nickname is Twin, that's it.

Patton:     Twin, does your brother have a nickname?

Scott:      He go by the same.

Patton:     What?

Scott:      Twin.

Patton:     Twin? Okay, alright ah, on the ah, day I just
            told you the 18th of July, ah, you were down at
            the Inner Harbor, is that correct?

Scott:      Correct.

Patton:     Okay um, just tell me from the beginning ah,
            what you know, what you did that evening leading
            up to an altercation down ah, Inner Harbor?

Scott:      Leading up to what.

Patton:     To leading up to the altercation. There was a fight
            apparently at the Inner Harbor, right?

Scott:      Okay, right.

Patton:     Okay, now let me ask you first, you, you left
            Laurel to come to Baltimore, is that correct?

Scott:      Yes.

Patton:     That day, who was with you?

Scott:      Me, my brother and a friend of ours Kevin.

Patton:     Kevin, what's his last name?

A-201

Page - 3
STATEMENT OF:   Kevin Smith

Scott:          Miller.

Patton:         Kevin Miller

Scott:          Yeah.

Patton:         Okay and ya'll came to Baltimore Inner Harbor, right?

Scott:          Correct.

Patton:         Okay and were'd you park your car?

Scott:          I believe it was a block and a half or two away from the Harbor.

Patton:         Okay, and do you know about what time you got down to Baltimore Harbor?

Scott:          I say it was between 7 and 9.

Patton:         Okay.

Scott:          I'm not sure.

Patton:         So tell me what did you guys do when you got down.

Scott:          When we got there we walked around for awhile. We had a few drinks, we stood by the water. On the way out, we ran into 2 guys.

Patton:         Okay and who were those 2 guys you ran into?

Scott:          That was Vick.

Patton:         Vick, you ran into a guy name Vick?

Scott:          Yeah.

Patton:         Okay.

Scott:          And a buddy of his.

Patton:         You know his buddies name?

Scott:          Nah, I'm not sure.

A-202

Page - 4
STATEMENT OF:  Kevin Smith


Patton:    Had you ever seen him before, the buddy of
           Vick?

Scott:     Yeah, I think I seen him before, but I'm not sure
           who he exactly is.

Patton:    And do you know Vick's last name?

Scott:     No I don't.

Patton:    Okay, do you know were Vick lives?

Scott:     No I don't. I know he stayed in the area of Laurel.

Patton:    Okay, do you know what kind of car he, he drives
           or use to drive?

Scott:     Yes he use to drive a 4 door grey, Cutless or
           Oldsmobile.

Patton:    Okay alright so your walking out, you say your
           on your way out of the Harbor when you run into
           Vick and, and a friend of his?

Scott:     Correct.

Patton:    What happened after that, inaudible Vick.?

Scott:     He stopped us, asked what we was doing, what's
           up. And was we like nothing, what's up. We was
           getting ready to leave out and the same time um,
           these 3 girls walked passed. Well a few minutes
           later, 3 girls, I don't, I don't remember if it was
           2 or 3. They came pass, Vick called them out, they
           stopped, they was talking to him for, I say maybe
           maybe close to 5 minutes. And that's when these
           other 3 guys came up. A big tall dude, and 2 short
           guys. And he was being loud, I can't remember what
           he was saying to the girl, but he was saying
           something to the girls as if, like it was his
           girlfriend or something. So by that time he was
           yelling yelling, girls said something, something
           to him. I guess, I don't know if they know him or
           they didn't and they pulled Vick away. And then
           them 4 was walking, or them 3. I'm not sure how
           many girls it was. And um, so we start walking,

A-203

Page - 5
STATEMENT OF:   Kevin Smith

               keep walking the way we was going leaving out. So **inaudible**, the big dude still yelling, **inaudible** him yelling. And he was coming up behind ah, he was over to my left I believe or my right. He came up was yelling, had his guards up to big boy or whoever that was. And ah, I glanced back and see Vick swinging, hit him up in this area somewhere.

Patton:             In the face?

Scott:              In the face, facial area. So and he, he just broke after that.

Patton:             Who broke Vick?

Scott:              Vick ran, he took off running. And recall the girls laughing like hah hah. And you know we still, I wasn't, I was paying attention, but I wasn't paying attention. So they stated laughing, we still walking. Two dudes, two dudes chased Vick or I don't know if they were with Vick or them guys, I'm not, that's, that's what I'm not sure of. They they chased him and that's was that. We preceded on to our car, got in the vehicle and left, came on back to Laurel.

Patton:             You said the tall, the big guy that was arguing with the girls, or was having words with those girls came up to to to Vick and his friend as there walking away with the girls?

Scott:              Yeah.

Patton:             From behind?

Scott:              Yeah.

Patton:             And then you saw Vick hit the guy, hit the big tall guy in the, in the face?

Scott:              Yeah.

Patton:             Now did anybody else hit, hit him?

Scott:              **Inaudible.**

A-204

Page - 6
STATEMENT OF:  Kevin Smith

Patton:        Did anybody else fight?

Scott:         That that, that was it.

Patton:        So the only that was throwing any punches was
               Vick and the tall guy?

Scott:         Yeah.

Patton:        The guy, the guy that was arguing with the girls?

Scott:         Right.

Patton:        Okay, now did you or your brother or Kevin Miller
               fight anybody?

Scott:         No.

Patton:        Did you guys hit anybody?

Scott:         No.

Patton:        Did any of the friends that were with the victim,
               the big tall guy approach you guys and try to
               fight you guys?

Scott:         No.

Patton:        No.

Scott:         Not 2 words was said to me and I didn't say 2
               words.

Patton:        Okay, so the only person that was.

Scott:         Matter fact ah, was I, see I was drunk, I don't
               remember, I think I was, I might of been talking
               to one of the little dudes. As far as like what's
               going on. I said inaudible. I remember, I think I
               remember, it keep flashing back that I, I think
               I talk to the smallest, was it big dude, another
               dude, you know like a younger dude. And I think
               I recall myself talking to him as in like, what's
               going on, you know we not trying to mess, we didn't
               know that was you girl and that's it. And then we
               left.

A-205

Page - 7
STATEMENT OF:   Kevin Smith


Patton:          Now when you left, were was the big guy, what
                 did he do? After, after Vick hit him, what did
                 he do?

Scott:           He ain't do noting, he was just standing there.

Patton:          Did you see him bleeding or anything like that?

Scott:           No sir.

Patton:          You see anybody, anybody bleeding?

Scott:           I ain't see no blood. All I saw was a hit, run,
                 girl started laughing and that was that. And I
                 ain't think nothing of it.

Patton:          Did Vick have anything in his hands or have a
                 knife, or ice pick, or, or ring or something on
                 his hand?

Scott:           No.

Patton:          That you could see?

Scott:           No.

Patton:          Now describe Vick to me, how does he look?

Scott:           How does he look.

Patton:          Yeah.

Scott:           About medium build, near my height 5-10, 5-11,
                 hispanic um, Puerto Rican or Spanish, I'm not
                 sure which one.

Patton:          Is he light complexed?

Scott:           Real light complexed.

Patton:          Lighter than you?

Scott:           Yes.

Patton:          And how old is he about?


A-206

Page - 8
STATEMENT OF:  Kevin Smith


Scott:          Some where in his 20's.

Patton:         Okay, now describe Kevin Miller, how does he
                look?

Scott:          He's a maybe 6 foot, medium build, brown skin.

Patton:         How old is he about?

Scott:          Ah, I believe he's 21 now.

Patton:         Now you say there's a, a guy that's with Vick.
                How, can you describe what he look like, do you
                remember what he look like?

Scott:          Ah, he was brown skin, he had low hair and may
                have been 6 foot or under, ain't no taller.

Patton:         How as Vick wearing, how was Vick wearing his hair?

Scott:          How was he wearing his hair.

Patton:         Yeah, what style?

Scott:          It was real low, close cut.

Patton:         What about Kevin Miller, how is his hair?

Scott:          How was his hair, I believe it was low cut too.
                Like its all around shape up.

Patton:         Did you know those girls before you met them that
                night?

Scott:          No.

Patton:         Okay.

Scott:          I ain't know them.

Patton:         Had you ever seen the big guy or his friends
                before that night?

Scott:          I ain't seen none of them before that night.


A-207

Page - 9
STATEMENT OF:  Kevin Smith


Patton:      And the only person you really knew was Vick
             and had seen the guy that was with him before,
             but you don't know his name or anything?

Scott:       Yeah.

Patton:      That was with Vick?

Scott:       Correct.

Patton:      And the only person that you saw hit anybody was
             who?

Scott:       It was Vick punching him.

Patton:      I'm sorry?

Scott:       Vick was punching the, the um, tall guy.

Patton:      Did the tall guy swing back?

Scott:       Nah, Vick took off.

Patton:      Alright so Vick hit him, and just one punch
             thrown and that was it?

Scott:       That was it, that was it.

Patton:      And you guys went back to Laurel after that?

Scott:       Correct.

Patton:      Did you meet, meet up with those girls later?

Scott:       Nah.

Patton:      Did you ever call those girls later?

Scott:       No I didn't, I never talked to them.

Patton:      Did you guys ever give those girls your telephone
             numbers or anything like that?

Scott:       No.

Patton:      Alright um, I just want to back up a little bit.


A-208

Page - 10
STATEMENT OF:  Kevin Smith

Scott:          Um-hum.

Patton:         Um, before we conducted the taped interview um,
                we advised you of your rights, is that correct?

Scott:          Correct.

Patton:         Okay and we read you your rights. You read your
                right allow to us, is that correct?

Scott:          Yes.

Patton:         Okay and you put the, your initials on each one
                of the rights indicating that you understood each
                one of them?

Scott:          Yeah.

Patton:         And you signed your name on that form in 2 places?

Scott:          Yeah.

Patton:         Okay, now I'm, and on the Rights form you indicated
                that you wanted to talk to us without having a
                Lawyer present, is that correct?

Scott:          Correct.

Patton:         And that was free and voluntarily on your part,
                is that correct?

Scott:          Correct.

Patton:         Okay.

Scott:          I like to do both, I just, I like to talk now and
                I want, you know I just, wanna get, get it going.

Patton:         Okay um, did we force you to give this statement?

Scott:          No sir.

Patton:         Okay, and you understand that your under arrest,
                is that correct?

Scott:          Yeah I understand.

Page - 11
STATEMENT OF:  Kevin Smith


Patton:        That I told you that before we turned on the tape
               recorder, is that correct?

Scott:         Yes.

Patton:        And I told you your being charged with murder,
               is that correct?

Scott:         Yes.

Patton:        Okay and I told you who's murder your being charged
               with?

Scott:         Yeah.

Patton:        Okay, and you, when I read you, when you read the
               rights, you fully understood them, is that correct?

Scott:         Yes.

Patton:        Now let me ask you another question, do you know
               were Vick is now?

Scott:         Do I know.

Patton:        Yeah?

Scott:         I know he's locked up, but I couldn't tell you
               were at, or nothing like that.

Patton:        And how do you know that he's locked up?

Scott:         We saw it over Laurel and I seen it on the News
               for myself.

Patton:        Okay and he's locked up for what, do you know?

Scott:         Believe committing another murder crime in PG
               area.

Patton:        Okay.

Scott:         Three girls.

Patton:        Right now since that incident down the Inner Harbor
               had you seen Vick?


A-210

Page - 12
STATEMENT OF:  Kevin Smith


Scott:          I seen him.

Patton:         Yeah.

Scott:          Since that night.

Patton:         The the night down at the Harbor?

Scott:          Ah, I may have seen him once or twice, driving.

Patton:         Did you talk to him?

Scott:          No.

Patton:         What about Kevin Miller, did you talk to Kevin
                Miller after that night?

Scott:          Yeah I talk to him.

Patton:         What did Kevin have to say about what happened
                that night?

Scott:          Ah that, we didn't talk about that.

Patton:         You didn't talk about what happened?

Scott:          I mean that, that wasn't nothing, I mean.

Patton:         Did you know that anyone died as a result of that
                fight you had down at the Harbor or was witnessed.

Scott:          No sir. That's why it seemed kind a inaudible, and
                its to me it was just funny cause he hit him and
                ran. It was like, hit and run incident. The girls
                laughed, I mean wasn't, wasn't no gun displayed,
                no knife, nothing. It, it was like simple punch and
                left. And we just come to find out that he stabbed
                him, so.

Patton:         Do you know if Vick had some keys?

Scott:          Some keys.

Patton:         Yeah.

Page - 13
STATEMENT OF:  Kevin Smith


Scott:          I mean I wouldn't know what he had with him or
                anything, only think I can tell you is what he was
                wearing that night. And we just, you know bumped
                into him on the way out.

Patton:         What were you wearing that night?

Scott:          I don't know, I can't tell you what I was wearing.
                In the summertime, I know I had to have on some
                shorts.

Patton:         Do you know what your brother had on and Kevin
                Miller was wearing that night?

Scott:          Shorts.

Patton:         Kevin Miller was wearing shorts too?

Scott:          Ah, I think so, sometime.

Patton:         And your brother was wearing shorts also?

Scott:          I don't see why not.

Patton:         Okay, is there anything else about what happened
                that that night at the Harbor that ah, you can
                tell us that we've not asked you about? Is there
                anything else that you remember about what happened
                that night?

Scott:          Ah.

Patton:         That we didn't talk about?

Scott:          Nah I don't think so.

Patton:         Okay, Detective Hastings you have any questions?

Hastings:       No I don't.

Patton:         Okay, alright um, the time now is approximately ah,
                2110 hours. We're gonna conclude the interview.


Tape transcribed by Jackie Taylor on 2/25/99.

# Exhibit 12

Today's date is the 7th of April, 1999, the time is now approximately 1135 hours. This is Detective Robert Patton and Detective John Riddick of the Homicide Unit. We're conducting an interview with Mr. Kevin Anthony Miller, in reference to the homicide of Martrell Lamar Crayton, which occurred at ah Baltimore City Inner Harbor.

Patton:     Okay ah, for the record Kevin, could you state your full name, your age and your date of birth, please.

Miller:     Kevin Anthony Miller, ███████████ █ ███.

Patton:     How old are you, Kevin?

Miller:     22.

Patton:     Okay, and your current address?

Miller:     Inaudible.

Patton:     Okay, um first let me advise you on a couple of things that we've already talked about. Ah first I want you to understand that you are under arrest, do you understand that?

Miller:     Yes.

Patton:     Okay, and I told you earlier that you're going to be, your charges are murder and deadly weapons violation is that correct?

Miller:     I didn't know I had weapon charges too.

Patton:     That's a collateral cause it's a stabbing homicide, but you understand that, and that's what I told you is that correct?

Miller:     Yes.

Patton:     And do you understand what you are charged with?

Miller:     Yes.

Patton:     Okay. Now at about 10:00 this morning, we went over your inaudible rights form, is that correct?

Miller:     Yes.

Patton:     Okay, I'm going to just go over and touch over the rights again now. Um number 1, you have the absolute right to remain silent, do you understand that?

Page 2
Statement of Mr. Miller

Miller:          Yes.

Patton:          Okay. Number 2 anything you say or write may be used against you in a court of law, do you understand that, Kevin?

Miller:          Yes.

Patton:          Okay, you have the right to talk with a lawyer at any time before any questioning or answering any question or during any questioning, do you understand that sir?

Miller:          Yes.

Patton:          Okay, if you want a lawyer and cannot afford to hire one, you will not be asked any questions and the court will be request appoint a lawyer for you, do you understand that sir?

Miller:          Yes.

Patton:          Okay, if you agree to answer questions you may stop at any time and request a lawyer and no further questions will be asked of you, do you understand that sir?

Miller:          Yes.

Patton:          Okay, all of the five rights I just read to you, we've already read, went over this 10:00 this morning and you've placed your ah word yes and your initials on each one of those rights indicating that you understood is that correct?

Miller:          Yes.

Patton:          Okay, underneath that could you read that sentence underneath that for me?

Miller:          I have read the above explanations and the rights and fully understand them.

Patton:          Okay, do you fully understand your rights, sir?

Miller:          Yes.

Patton:          Okay, and you've signed your name underneath that indicating that you did?

Page 3
Statement of Mr. Miller


Miller:        Yes.

Patton:        Okay, and ah underneath that there's another
               sentence, could you read that sentence for me?

Miller:        I am willing to answer questions and I do not want
               any attorney at this time, my decision to answer
               any questions without having an attorney present
               is free and voluntary on my part.

Patton:        Okay, and you signed your name under that sentence
               also sir?

Miller:        Yes.

Patton:        And you willing to give a statement is that
               correct?

Miller:        Yes.

Patton:        Alright um first thing I'd like to go through with
               you sir is tell me what happen at the Inner
               Harbor, and I'd like for you to start from the
               beginning ah you watched over the game from the
               time that you guys met up, came to the Harbor
               something happen and everything after that, okay.
               And could you please do it in great detail for me
               sir?

Miller:        Ah I don't remember where we actually met up at
               but I remember Vic saying let's go to the to the
               Harbor and see some girls, talk to some girls.

Patton:        Where did you guys inaudible?

Miller:        Inaudible, I don't remember what kind and all
               that.

Patton:        Who all was?

Miller:        Me, Keith, Kevin, and Vic Lucky.

Patton:        Do you know Kevin's name ?

Miller:        Keith Scott, I don't know Vic's last name.

Patton:        And who's car were you in?

Miller:        Vic.


A-216

Page 4
Statement of Mr.Miller

| | |
|---|---|
| Patton: | Vic, and what type of car was it? |
| Miller: | Inaudible, I believe. |
| Patton: | And it was his car? |
| Miller: | Yes. |
| Patton: | And you left all all together? |
| Miller: | Yes. |
| Patton: | And who's idea was it to go to the Largo? |
| Miller: | Vic. |
| Patton: | Vic, and why did he want to go there? |
| Miller: | To meet some girls. |
| Patton: | Okay, alright do you know what time it was when you left Largo to come down to the Inner Harbor? |
| Miller: | All I know is night time. |
| Patton: | Okay, well tell me what happened? You got in the car and? |
| Miller: | Got in the car and went to the Harbor. |
| Patton: | Where did you park at? |
| Miller: | Parked in the garage, right across the street from the Harbor. |
| Patton: | Do you know the name of the garage? |
| Miller: | No I do not. We went to the Harbor, walked around went into this little bar, got a couple of drinks, met some couple girls in there, went outside left them girls, walked around the Harbor outside near the water. We saw some girls on a bench or they or they seen us I don't remember. |
| Patton: | How many girls was it? |
| Miller: | Three. And we was talking to them, I wasn't, they was, they was talking and um. |

A-217

Page 5
Statement of Mr. Miller

Patton:     Who's they, who was talking?

Miller:     Vic, Vic was mainly talking to this one girl we
            just lotty dottying with the other girls and um
            then three then three boys came up on us, talking
            about yall like these boys, yall don't like yall
            have boyfriends.

Patton:     They came up to the girls and started talking to
            the girls?

Miller:     Yeah, talking to the girls saying what yall got
            boyfriends, why yall didn't want to talk to us, I
            thought they knew the girls how they was talking,
            then they was then they was kept getting smart, I
            don't remember all what they was saying but they
            kept getting smart, I kept saying what ever, what
            ever, what ever then um.

Patton:     What was he saying exactly, who was doing most of
            the talking?

Miller:     It was the big light skin dude, he kept saying all
            you can tell a weed boys, I don't know he just
            kept getting smart, then the girls pulled Vic away
            like come on, then they like come on yall, so we
            walking away.

Patton:     Which way were you walking towards the parking
            garage or back towards the?

Miller:     Towards the garage, but we wasn't leaving  we was
            walking towards that way and um then one of them
            ran back and pointed at me saying which one kept
            talking trash, pointing at me and then one of the
            little dudes like him pointing at me saying him
            then the big dude came in my face, got in looked
            down inaudible, turned around and something. I
            don't remember how we got to fighting, for real I
            remember um the dark skin dude came in my face,
            Vic, I know I don't know what happened the light
            skin dude was towards to me Vic punched him he
            came to me that's how I know he didn't get
            stabbed, he came to me after Vic punched him the
            other dude, I know I swung at the one dude, we
            both had our hands up, I swung at him, he like
            that's all you got, he said that then I like and
            then the light skin dude came in my face after Vic
            punched him. So I know,I don't know about all that
            skirting stuff. And then he stopped and put his



A-218

Page 6
Statement of Mr. Miller

hands down and called his friend like come here come here, oh when Vic punched him he ran and I was standing there by myself, Twin standing towards the side they didn't even get in it, then I know dude came up to me I had two of them in my face after Vic punched him and then big man that one yall claim he got stabbed put his hands down call his friend like come here, Twin start calling me like come on come on we ran and left we ran to the car, got in the car and went home. Vic never said he stabbed, I never knew somebody got stabbed until Twins got locked up, called me and told me everything and they wanted me to be a witness.

Patton:     Alright now let's just go back over this a little bit, alright now you guys are?

Miller:     The girls was laughing.

Patton:     Inaudible some where and you see three girls sitting on a bench?

Miller:     I never, I never walked to the bench, I don't know I know we met three girls after we came.

Patton:     Now was there any guys talking to the girls when you guys approached the girls?

Miller:     No.

Patton:     No, did you see the big guy and his friends before you guys approached the girls?

Miller:     Oh we seen them some some boys rapping but I don't know it was about twenty of them was rapping and big man was watching them, I was watching all them rap but we ain't have no altercation or talk to them or nothing like that.

Patton:     Right, so now you said that Vic, he approached the girls first?

Miller:     After we came out inaudible, after we came out the um the um little Baha thing, I think he approached them after that.

Patton:     So you guys are talking to the girls?

A-219

Page 7
Statement of Mr. Miller

Miller:        Right

Patton:        And Vic is doing most of the talking you said.

Miller:        And talking to the one girl.

Patton:        Okay, are you talking to any of the girls?

Miller:        I think I talked to one of them, but I ain't not
               no trying to get a number.

Patton:        So inaudible guys. So while you're talking or
               while your friend and you are talking to the girls
               you say that the big guy, he just came over?

Miller:        Talking to the girl, not us at first.

Patton:        Now were they sarcastic, were they cursing at
               them?

Miller:        He was drunk I think, think he was drunk.

Patton:        What did he say, do you remember what he said to
               the girls?

Miller:        He was saying I ignoring him at first, he was
               saying did yall have boyfriends and kept saying
               somewhere of where he's from, kept saying some
               where's he's from, I don't know where he from.Kept
               saying where he from.

Patton:        I mean did the girls, I mean was he being rude and
               sarcastic to them or?

Miller:        What to the girls?

Patton:        Yes.

Miller:        Ah I can't really say, now he kept getting smart
               with me and my friends.

Patton:        Okay, they started talking to you guys cause you
               guys were talking to, I mean what was the gist of,
               why were they upset or why were they ?

Miller:        Cause the girls were talking to us and not them.
               At first I thought they knew them until we stop
               having a conversation and we said we would find
               out they ain't know them.

A-220

Page 8
Statement of Mr. Miller

Patton:      Now you said that you started to walk away?

Miller:      Yeah the girls pulled on me like come on.

Patton:      Alright so the girls are walking, all three of the
             girls are walking with Vic?

Miller:      No the one girl was walking with Vic, and the two
             girls was walking with us three.

Patton:      Yall walked away?

Miller:      Yeah cause Vic and the other girl was inaudible.

Patton:      And where was the the guys?

Miller:      They stayed there.

Patton:      Stayed by the bench?

Miller:      By the bench while we walking up they ran back up
             on us pointing at me.

Patton:      Okay, who was pointing at you?

Miller:      One of the dark skin boys, I don't know which one
             I know he was dark skin inaudible. Matter of fact
             it was the smallest dark skin one pointing at me
             like him him him.

Patton:      You were saying you because you?

Miller:      I kept saying whatever, every time he would say
             his name I would say what ever.

Patton:      Okay so when he said something sarcastic, you'd go
             sarcastically whatever?

Miller:      What ever.

Patton:      Alright igging him on. Alright okay so he now you
             guys stop and he get in your face?

Miller:      Yes.

Patton:      Right, the the one short dark skin guy, so what
             happens at that point? You guys fight, what?

Miller:      We never fought, inaudible he was like I don't
             know how, all I know is the big man came in my

A-221

Page 9
Statement of Mr. Miller

face.

Patton:    Naw, I'm talking about the short guy right now
           that came in your face. Did the big guy come with
           him, they came together?

Miller:    Yeah he was like him he says I don't I don't
           actually recall what he said all I remember is him
           pointing at me like him, he the one, talking trash
           they were like him, I don't even know what big man
           said, I don't remember.

Patton:    Alright, so when they got to you what did he do?

Miller:    I know I turned to Vic and then turned, then I had
           the dark skin dude in my face I don't I don't
           understand, I don't remember all the details.

Patton:    So you saying that the big guy, try to understand
           this, when the big guy and the dark skin guy are
           initially talking to you?

Miller:    Right.

Patton:    Threatening you?

Miller:    Right.

Patton:    And then you said the big guy turned to Vic and
           said something to Vic?

Miller:    I believe so, and then he turned back.

Patton:    And then he turned back towards you.

Miller:    And then Vic.

Patton:    And then Vic.

Miller:    But I know my hands were up, and the dark skin
           dude when the big guy came to me, naw I seen Vic
           punch him.

Patton:    Alright so what I'm trying to determine when the
           punch took place, now did the big guy big guy
           comes to you and the dark skin guy comes to you
           then they each are pointing at you saying him him,
           then the big guy turns around towards Vic, steps
           towards Vic.

A-222

Page 10
Statement of Mr. Miller

Miller: No he came to me first.

Patton: Naw I'm saying after he stepped towards you, you said he, the big guy and the dark skin guy were first in your face.

Miller: Right.

Patton: Then you said that he turned towards Vic.

Miller: Yeah, but they ain't, I don't know if they did anything cause the.

Patton: Then he turned back towards you?

Miller: Right, and Vic punched him.

Patton: Vic hit him in the neck or hit him in the face?

Miller: Vic punched him.

Patton: Then what did he do after Vic punched him, how did describe?

Miller: He came, after he punched him.

Patton: Did he put his hands on his face, was he bleeding?

Miller: Naw, not yet, he rocked him like stunned him, I'm like I'm like yeah, I'm like I'm like damn.

Patton: He was staggering a little bit, like he was going to fall down, inaudible hit a little harder?

Miller: Yeah look like, and then um he came back towards me.

Patton: Did you hear him hit?

Miller: Yeah he hit him bop.

Patton: He hit him real hard?

Miller: Yeah and then Vic ran after he, soon after he punched him he ran. And then big man came towards me after Vic punched him and I swung on, I don't know how but I swung on the dark skin dude and the big man told the dark skin, so the dark, the big man had to been behind me inaudible, I know some kind of way they almost jumped me. The twins

A-223

Page 11
Statement of Mr. Miller

was looking, I'm mad at them cause I'm about to get jumped and big man just stopped and has his hand on his neck, stop said call his friend over, he friend had stopped, went over to him turned like come on come on inaudible and they ran off and the girls were laughing, we laughing and run damn Vic can hit.

Patton:    Did the girls go tho the car with yall?

Miller:    Naw, we left.

Patton:    Yall ran, left the girls?

Miller:    Yeah we ran off at twin car.

Patton:    So Vic hits him and then runs?

Miller:    Um hum straight run.

Patton:    Now do you see where he he running towards what the cars?

Miller:    Yeah we met up with him like at the corner or some shit, he was gone.

Patton:    And then all you guys got in the car together?

Miller:    Right.

Patton:    Now when you guys met up with Vic, what did he say what did yall talk about?

Miller:    Inaudible can hit like a motherfucker.

Patton:    And then he said?

Miller:    He start laughing.

Patton:    And then what you guys do after that?

Miller:    And then we all went home, we all went home.

Patton:    Now did you see Vic with any type of weapon or anything in his hand or pocket knife, ah fingernail clipper knife anything?

Miller:    No.

Patton:    Did he say he had something in his hand, keys?

A-224

Page 12
Statement of Mr, Miller

Miller: Naw I know I know he ain't have car keys in his hand, but I know he had keys inaudible got there, but I ain't know he stabbed him, I thought he just punched him, he never told us he stabbed him.

Patton: So you guys, he didn't say anything about him having any kind of weapon in his hand when you guys get in the car?

Miller: No he did not.

Patton: And then you guys get in the car and drive and drive back to Largo, and you don't remember anything, you don't know anything about this, didn't hear anything about this until after the twins were arrested?

Miller: Right.

Patton: You see Vic after that, before the twins got arrested?

Miller: He was already locked up.

Patton: Vic was?

Miller: Yes. Hold on there was something else naw.

Patton: Did you know those girls?

Miller: No I did not.

Patton: Did ah did the girls ever call you?

Miller: No they did not.

Patton: Did did did the twins say the same thing about the girls inaudible.

Miller: No they did not.

Patton: Did they ever call the girls? Did they ever give them their number?

Miller: I think they gave them their number or that was the other girl, I don't we met three girls that night, three sets so I don't know if that was the set they gave their number to or not.

A-225

Page 13
Statement of Mr. Miller

Patton:       Now when all this is going on the altercation
              part of it, did you hit the big guy, grab his
              neck, did you hit anybody?

Miller:       No I did not, I didn't touch him, I didn't touch
              him, I ain't swing on at, I swung at the dark skin
              dude that had his hands up in my face.

Patton:       Um hum. Now did Kevin or Keith, Scott, the twins
              did they hit anybody?

Miller:       No they did not, they wasn't even, they was
              spectators you might as well say.

Patton:       They hit the big guy?

Miller:       No they did not. It was one swing two swings, I
              swung at the dark skin dude, Vic swung at the
              light skin, I don't know if the light skin dude
              swung at Vic or not because the light skin person,
              I meant the dark skin dude was in my face, and I
              had my back towards them.

Patton:       The exchange between Vic and the big light skin
              guy, how many punches are we talking?

Miller:       From what I seen one, Vic.

Patton:       Vic hit him one time and then ran?

Miller:       And ran, I thought he just inaudible that's the
              truth.

Patton:       I'm sorry?

Miller:       I said that's the truth I gave you he just punched
              him inaudible.

Patton:       I didn't understand you mumble.

Miller:       I said I thought he could punch real hard, he he
              he  he hit him whop.

Patton:       He hit him real hard?

Miller:       Yeah and ran.

Patton:       And ran?

Miller:       Studded him but.

Page 14
Statement of Mr. Miller

Patton:     When you say studded, he was stumble?

Miller:     Studded and then he came towards me after he
            punched him.

Patton:     When he came towards you did you hit him?

Miller:     No I did not, he stopped after he came towards me,
            looked like I was about to get jumped for a
            second, main man put his hands down called his
            friend like come here, he went to his friend or
            not he but the friend went to the big man and they
            called the twins called me like come on and that
            was it.

Patton:     Alright, at about ah 11:25 I showed you a photo
            line-up card is that correct?

Miller:     Yes it is. Yes.

Patton:     And on that photo line-up card it contains 6 black
            and white pictures is that correct?

Miller:     Yes.

Patton:     On that same card did you identify anybody?

Miller:     Vic.

Patton:     You identified Vic and where is his picture up
            here on that card?

Miller:     In the right hand bottom side.

Patton:     Bottom right picture?

Miller:     Yes.

Patton:     Did you sign your name above this picture?

Miller:     Yes.

Patton:     Did you put the date on there?

Miller:     Yes.4-7-99.

Patton:     Did you put a time on there?

Miller:     11:25 a.m.

A-227

Page 15
Statement of Mr.Miller

Patton:          Alright, on the front of the card did you write
                 something on the front of the card?

Miller:          Yes I did.

Patton:          Can you read what you wrote on the card for me
                 please?

Miller:          Ah Vic punched the man in the in the right side
                 of his neck and ran, me and the twins followed him
                 to the car, we laughed and talked about what
                 happen, Vic never said that he stabbed him.

Patton:          And you signed your name on that?

Miller:          Yes I did.

Patton:          Okay, there a couple of spots where you ah
                 scratched out something.

Miller:          I signed above every scratch I made.

Patton:          Okay. Now since the twins have been locked up,had
                 you talked to them?

Miller:          Ah at least 3 times, they wanted some lawyer money
                 and wanted me to be their witness to the case.

Patton:          So tell me about what you guys talked about.

Miller:          We talked about they wanted some.

Patton:          When they asked you, excuse me, which twin called
                 you Kevin or Keith?

Miller:          They together right now.

Patton:          Okay.

Miller:          They in the same cell. They um I talked to both of
                 them.

Patton:          Okay.

Miller:          One come on, then the other one come on, but we
                 mainly don't talk about what happen, we already
                 discussed that the first time we talked.

Patton:          Okay, when the first time you talked, what did you

A-228

Page 16
Statement of Mr. Miller

                talk about?

Miller:             Um we talked about they need fifteen hundred dollars for a lawyer and they wanted some um video, they wanted me send them some um tapes or some, yeah tapes, I had to buy the tapes and send the receipt with the tapes.

Patton:            What kind of tapes, cassette tapes?

Miller:             Yeah cassette tapes ah they like no limit soldiers and um.

Patton:            And what did they, what did you guys talk about?

Miller:             Just talked about their babies coming in June and they about to get an apartment this month or their girlfriends going to be there so when they come home they they got somewhere to stay. You know.

Patton:            Did they talk about the incident?

Miller:             We was on the three way. Not over the phone no. Yeah yeah yes we did that was over the phone we talked about that over the phone.

Patton:            What did yall talk about this thing down at the Inner Harbor.

Miller:             Hold up, we didn't talk about the case over the phone, we couldn't talk, I know their girlfriends told me everything about their statements and stuff, their girlfriends told me that's that's why I was on the phone with their girlfriends after they hung up, they told me about their statements and everything they said, they wrote me a letter.

Patton:            What did they say in the letter?

Miller:             Same thing about the tapes and I don't think they really need a lawyer but they needed um some lawyer money, they didn't say how much then, they wrote um what happened, what they said happened how they, they wrote how they got to the Harbor, they ain't write about what what happened, they just wrote that they saying that they got to the Harbor.

Patton:            Did they tell you something different then what?

Page 17
Statement of Mr. Miller

Miller:      Yes they did.

Patton:      Then what you told us?

Miller:      Yes they did.

Patton:      What did they tell you?

Miller:      They said they got to the Harbor in a white car by
             this man named Paul and they still wanted me to be
             their witness.

Patton:      Why do they, why do they say that do you know,when
             it wasn't true?

Miller:      I guess they trying to be as innocent as they can
             be.

Patton:      Okay is there anything else about this incident
             that you want to tell me that I've not asked you?

Miller:      Um you didn't ask me did I stab him, and I did
             not. You didn't ask me was there a knife, I didn't
             see a knife. Um you didn't ask me did I see blood,
             you asked me before the tape recorder came on but
             you ain't ask me while the tape recorder on did I
             see blood inaudible.

Patton:      Did you see blood coming from the tall light skin
             guy inaudible or anything?

Miller:      No I did not.

Patton:      After after ah Vic hit him?

Miller:      No I did not.

Patton:      Did you see Vic with a knife or any type of weapon
             in his hand?

Miller:      No I did not.

Patton:      Did I ask did you stab him?

Miller:      No you didn't ask me that either. And I did not
             stab him. You you didn't even ask me if I was
             innocent.

Patton:      Are you innocent Kevin?

Page 18
Statement of Mr. Miller

Miller:      Yes I am innocent.

Patton:      Okay. Is there anything else that you want to tell
             me that I didn't ask you?

Miller:      Yes I swung at the dark skin person in self
             defense cause I I was about to get jumped, so I
             swung at him and if I thought the big man got
             stabbed how can he get stabbed after getting
             punched in his neck and still coming towards my
             face trying to fight me and then stop and call his
             friends and then I could see a little bit when he
             stopped and called his friends but you saying how
             the way he got stabbed he should have just dropped
             dead and he didn't he just came towards my face
             and you told me that yall have surveillance
             cameras at the Inner Harbor showing everything
             that happen, then you told me that yall should
             have the females testify or not testify about yall
             have them and they test, they statement, yall
             should show that they laughed after Vic punched
             him.

Patton:      Did you see a little blood?

Miller:      I saw a little blood come out of his nose.

Patton:      A little blood come out, that's after?

Miller:      When Vic punched him.

Patton:      Correct you saw a little bit of blood?

Miller:      That's that's not when he first came towards me
             that's after.

Patton:      After Vic hit him?

Miller:      After,no no after he called his friend like come
             here, come here.

Patton:      So you saw a little bit of blood coming out of his
             nose?

Miller:      Coming out of his nose.

Patton:      Alright ah the time now is approximently 12:05 and
             this will conclude the interview.

A-231

A-232

Page 19
Statement of Mr.Miller


This tape was transcribed by CSO Angela Powell on 5-22-99.

# Exhibit 13

**DISTRICT COURT OF MARYLAND FOR** (City/County)

LOCATED AT (COURT ADDRESS)

| | |
|---|---|
| | 5E0005 941 |
| | DISTRICT COURT CASE NUMBER |

RELATED CASES:

**COMPLAINANT/APPLICANT**

Name **Michael B. Washburn** (Print)

Address (Number and Street)

City, State, and Zip Code          Telephone

Agency, Sub-Agency, and I.D. #     (Officer Only)

**DEFENDANT**

Name **Victor Gloria**

Address (Number and Street)

City, State, and Zip Code          Telephone
CC#

DEFENDANT'S DESCRIPTION: Driver's License #.......... Sex **M** Race **H** Ht. **5-7** Wt. **150**
Hair **BL** Eyes **Br** Complexion.......... Other.......... D.O.B.......... ID

## APPLICATION FOR STATEMENT OF CHARGES          Page 1 of **2**

I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about **9/27/96   11:45 PM**
at **Applebees  7300 Baltimore Ave  college Park**, the above named Defendant
(Date & Time)
(Place)
**Assult with a rock leading to injuries around and**
(Concise statement of facts showing that there is probable cause to believe that a crime has been committed and that the Defendant has committed it))

inclusing **Right eye requiring multiple stitches. While leaving Applebees**
**restaurant, the defendant confronted me and the witnesses listed below.**
**He asked if we had a problem. Our answer was no and we continued**
**to get into our car and leave. On our way out, the defendant**
(Continued on attached.......... pages) (DC/CR 1A)

I solemnly affirm under the penalties of perjury that the contents of this Application are true to the best of my knowledge, information and belief.

**9/28/96**
Date                                                    Officer's Signature

I have read or had read to me and I understand the Notice on the back of this form.

**9/28/96**
Date                                                    Applicant's Signature

Subscribed and sworn to before me this **28th** day of **Sept**, 19 **96**
Time: **5:30 P** M   Judge/Commissioner **RC Lansbury**          I.D. **5057**

I understand that a charging document has been issued and that I must appear for trial ☐ on ..........
Date
at .......... ☒ when notified by the Clerk, at the Court location shown at the top of this form.
Time

X **M. B. Washburn**
Applicant's Signature

☐ I declined to issue a charging document because of lack of probable cause.

Date                                                    Commissioner          I.D.

Witnesses' Names and Addresses:

Name **Jonathan Washburn**          Number and Street/Agency/Sub-agency/I.D.          City, State, Zip

Name **Maruf Singer**          Number and Street/Agency/Sub-agency/I.D.          City, State, Zip

Name **Cassandra Strus**          Number and Street/Agency/Sub-agency/I.D.          City, State, Zip

A-234          TRACKING NUMBER

DC/CR 1 (Rev. 8/94)                                        COURT COPY

**DISTRICT COURT OF MA(  `ND FOR** ..........................................................( ........................................ (City/County)

| LOCATED AT (COURT ADDRESS) | | SE0005499 |
|---|---|---|
| | | DISTRICT COURT CASE NUMBER |

DEFENDANT'S NAME (LAST, FIRST, M.I.)

Gloria, Victor

**APPLICATION FOR STATEMENT OF CHARGES (CONTINUED)   Page ____ of____**

Came towards the Car and threw a rock, hitting me on the Right side of my face at the right eye, Shattering my glasses Causing multiple laserations and trauma to my right eye. ~~cross~~ Next, the defendant walked to the ~~cross~~ drivers side of the Car, and pulled out a knife and asked the driver " You want Some of this shit!", The driver told him "No" and proceeded to the entrance to Applebes Restaurant. The incident was also witnessed by a female aquaintuce of the defendant. An officer filled out a report # 96-271-1594 - Officer Cpl. A. Graham # 15 98.

9/28/96

Date

M. [signature]

Applicant's Signature

| 96/00/752056 |
|---|
| TRACKING NUMBER |

DC/CR 1A (Rev. 8/94)

A-235

A-236

# Exhibit 14

2 FEB 99

U.S. Park Police CIB (office # ████████████)
Det. RYDE ABT
*Det. JOE GREEN (PGR # ████████████
                  (office # ████████████)
primary →

JAN '96 - 3/B/F VICTIMS
              shot to death rt BW Pkwy

Dec '98 → 3 ARREST MADE
  1) ████████ HAYNES
     PG County ID # 805070
     PG County Sheriff ID # 201890

  2) ████████ HESS, M/13/20?

  3) VICTOR Gloria   SID # 1565443
     AKA: VICTOR MORALES FBI# 953670RA7
     AKA: Pretty VIC
     DOB: ████████

  ARRESTS in following JURISDICTIONS:
  1) MARYLAND — A.A. County — Howard County
  2) VIRGINIA
  3) NEW YORK

Det. Joe Green H
[Front Desk]

# Exhibit 15

For
Baltimore City
Police

Det's Thanner
or
Det. Patton

Will Pick up on
2/4/99

A-240

## REQUEST FOR PHOTO SPREAD

Offense _Homicide_ CCN _2243-96_

Location of Off. _Rt 197_ Date of Off. _1-27-96_

Filler Photographs Selected by Investigator:

1. _45067_ .   2. _45100_ .   3. _44963_ .   4. _44933_ .

5. _45147_ .   6. _43739_ .   7. _43701_ .   8. _Suspect_ .

9. _____ .   10. _____ .   11. _____ .   12. _____ .

Special Instruction: _For Baltimore City_

Requested By: _Jn Green_ .   Date: _2/8/99_ .

Date Completed: _2/3/98_ .   ID Tech: _JS_





USMS   35417037   FBI NO. 953670RA7   DOB

NAME   GLORIA, VICTOR NMN

SEX M   RACE B   HAIR BLK   EYES BRO   HGT 5'7   WGT 150

 








**A-243**

A-244

# Exhibit 16

WITH ? OR INVOLVEMENT OR
SAY'S SHE HASN'T BEEN
KEPT INFORMED ? WE
HAD QUITE A CONVERSATION
IN THIS AREA!
③ WE WILL HAVE TO
DISCUSS THE ENTIRE
CONVERSATION. I TOLD
HER YOU WOULD CALL
HER. ④ SHE HAS INFORMATION
REFERENCE TO SUSPECTS.  JB



SA Brad Sheafe
Calverton office







# Exhibit 17

Photo line up of victim alone —

Victor Gloria "Vick"
B/M/ ███████ ㉔
██████████████████
SID # 1565443
FBI # 95367∘RA7

Currently charged with Murder
and is being held by U.S. Marshal/s

Det Joe Green AS Park Police

Kevin Anthony Miller
DOB ████████  M/B/ ██
████████████████████████
SID 1628168
FBI 425320 KAS

Arrest Laurel PD 9500023 - 3-22-95
Arrested PG County 1-?-?8

Kevin → 2nd unk subject with "Vick"
          Kevin Miller was driving car

Keith → Kevin Scott was driving car
         had recently Purchased car from
         Subject known as Paul

Did not indicate there was a
Second subject with "Vick"

A-247

# Exhibit 18

1st leg IRONS   LT. LEWIS
1st. leg IRON'S   Sgt. NOLANS
1 set Cuffs — THANNER (Homicide)
1 set Cuffs — D. TOWNSend VCTF

3-B-F'S
JAN 96

AKA: Victor MORALES
Victor GLORIA (Pretty Vic)
SSID # 1565443

FBI #
95 36 70 RA 7

A.A. Count
Howard
N-Y.
VA
MD

T/O#
S. PARK Police (CIB)
Det. RYDI ABT
T/p#

PRIMARY:
Det. Joseph Green
Pger

Willis HAYNES
PG County ID 805890
PG " Sheriff ID#
261890

DUSTIN HESS
M/B

# Exhibit 19

— Things to Do —

① Call Det. Joe Green
   U.S. Park Police

② Request Photo Line up of
   Kevin Anthony Miller
   SID #

③ Request BWRit for Keith
   and Kevin Scott          SID
   ~~20 April 99 Keith Scott (~~   )
   ~~22 April 99 Kevin Scott (~~   )

④ ~~Set up CVSA for~~
   ~~Kevin and Keith Scott~~

⑤ Show Photo Line up of
   Kevin Miller to David Bixby

A-251

# Exhibit 20

Directions to U.S. Park
Police

S/B

295 — south to Wash. D.C.

get off Howard Rd.
EXIT

make a Right onto Howard Rd
go through traffic light
to South Capital St. Bridge
go over Bridge (exit to Right)
move to Right
Service Rd... to M St. make
a Right,
go to 2nd traffic light make a
Right turn into the Navy Yard.
Bldg. 136

**A-253**

A-254

# Exhibit 21

4/12/99

B661

Re Victor Gloria

1. I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-D's Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-D's

2. AUSA Johnston stated that it is possible that Co-D's - Scott, Scott + Miller are blaming Gloria because they are friends of D's in her case especially Haynes. She suggested that we talk to

   ① Joe Green Park Police
      B - ▓▓▓▓▓▓▓▓▓▓

   ② Brad Sheaf - FBI
      B - ▓▓▓▓▓▓▓▓▓▓

   - they could give us background on case.

3. After you talk to these officers, we will decide on our next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.

4. Please call me

   Marl Coh

A-255

A-256

# Exhibit 22

File copy



# CIB - HOMICIDE
## POLICE DEPARTMENT
### BALTIMORE, MARYLAND
#### Progress Report

**TO:**  Commanding Officer
Homicide Unit

**FROM:**  Detective Patton, Robert Detective
& Hastings, Kirk Detective

**SUBJECT:**  Progress Report
Homicide Investigation

**SUSPECTS** (Name, DOB, Race, Sex, Age, Address):

| | | |
|---|---|---|
| Scott, Kevin Lee ███ | B/ M 23 | ████ |
| Scott, Keith Michael ███ | B/ M 23 | ████ |
| Gloria, Victor ███ | B/ M 23 | ████ |

**VICTIMS** (Name, DOB, Race, Sex, Age, Address):

| | | |
|---|---|---|
| Creighton, Martrelle Lamar ███ | B/ M 20 | ████ |
| | | |
| | | |

**OCCURRED:**  07/18/98  0206
301  Light Street

| | | | | |
|---|---|---|---|---|
| **CC Number:** | 981G13258 | | **Case Number:** | 98H0172 |
| **District:** | CD | | **Post:** | 112 |

FOLLOW UP INVESTIGATION SUSPECT RE-INTERVIEW

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder. Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.I.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

**Page: 1**

**Date: 04/21/99**

A-257

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.

This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

In addition A.S.A. Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your Investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.

On the 21st of April 1999 your Investigator in concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview.

Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and stated that their attorney's told them not to talk to the Police and to stand by their original statements.

Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.

Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

SUPERVISOR

DETECTIVE ROBERT PATTON

Respectfully,

**CIB - Homicide**

Page: 2

Date: 04/21/99

**A-258**

# Exhibit 23

(MURDER, DW)

# State of Maryland,

### City of Baltimore, to wit:

---

The State of Maryland

-vs-

KEITH MICHAEL SCOTT

KEVIN LEE SCOTT

Defendant(s)

---

Date of offense: __July 18, 1998__

Location: __301 Light Street (Sidewalk)__

Complainant: __MARTRELLE LAMAR CREIGHTON__

---

## I N D I C T M E N T

The Jurors of the State of Maryland for the body of the City of Baltimore, do on their oath present that the aforesaid DEFENDANT(S) late of said City, heretofore on or about the date of offense set forth above, at the location set forth above, in the City of Baltimore, State of Maryland, feloniously, wilfully and of deliberately premeditated malice aforethought did kill and murder one _____Martrelle Lamar Creighton_____, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sec. 616; 407-413 Common Law) 2 0900

### SECOND COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City on the said date(s) at the said place, at the City aforesaid, unlawfully did wear and carry concealed upon and about (his/her/their) person(s), a certain dangerous and deadly weapon to wit: _____Sharp Object_____; contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sect. 36) 1-5202

### THIRD COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City, on the said date(s), at the said place, at the City aforesaid, unlawfully did wear and carry openly with the intent and purpose of injuring the aforesaid Complainant, a certain dangerous and deadly weapon to wit: _____Sharp Object_____; contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sec. 36) 1-5200

_Patricia C. Jessamy_

The State's Attorney for the City of Baltimore

A-260

A-261

# Exhibit 24

(MURDER, D/W)

# State of Maryland,

### City of Baltimore, to wit:

---

The State of Maryland

-vs-

KEVIN ANTHONY MILLER

Defendant(s)

Date of offense: ___July 18, 1998___

Location: ___301 Light Street (Sidewalk)___

Complainant: ___MARTRELLE LAMAR CREIGHTON___

## I N D I C T M E N T

The Jurors of the State of Maryland for the body of the City of Baltimore, do on their oath present that the aforesaid DEFENDANT(S) late of said City, heretofore on or about the date of offense set forth above, at the location set forth above, in the City of Baltimore, State of Maryland, feloniously, wilfully and of deliberately premeditated malice aforethought did kill and murder one ___Martrelle Lamar Creighton___, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sec. 616; 407-413 Common Law) 2 0900

### SECOND COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City on the said date(s) at the said place, at the City aforesaid, unlawfully did wear and carry concealed upon and about (his/xxxxxxxxx) person(s), a certain dangerous and deadly weapon to wit: ___Unknown Sharp Object___ ; contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sect. 36) 1-5202

### THIRD COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City, on the said date(s), at the said place, at the City aforesaid, unlawfully did wear and carry openly with the intent and purpose of injuring the aforesaid Complainant, a certain dangerous and deadly weapon to wit: ___Unknown Sharp Object___ ; contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sec. 36) 1-5200

*Patricia C. Jessamy*

The State's Attorney for the City of Baltimore

A-262

# Exhibit 25

Circuit Court of Maryland
Go Back

**Case Information**

Court System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199062008**  Case Status: **CLOSED**
Status Date:   **08/30/1999**
Tracking Number: **981002174784**   Complaint No: **1G13258**
District Case No:  **2B00323920**
Filing Date: **03/03/1999**

**Defendant Information**

Defendant Name: **SCOTT, KEITH MICHAEL**
Race:**BLACK**        Sex: **MALE**
DOB: ▓▓▓▓
Address: ▓▓▓▓
City: ▓▓▓▓  State: ▓  Zip Code: ▓▓▓

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No:        1
CJIS/Traffic Code: 2 0900                      Arrest/Citation No:  000000
Description:     **MURDER-FIRST DEGREE**
Disposition:     **LESSER INCLUDED OFFENSES**
Disposition Date: **08/30/1999**

Charge No:        2
CJIS/Traffic Code: 1 5202                      Arrest/Citation No:  000000
Description:     **DEADLY WEAPON-CONCEAL**
Disposition:     **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:        3
CJIS/Traffic Code: 1 5200                      Arrest/Citation No:  000000
Description:     **DEADLY WEAPON-INT INJURE**
Disposition:     **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:        4
CJIS/Traffic Code: 1 1415                      Arrest/Citation No:  000000
Description:     **ASSAULT-SEC DEGREE**
Plea:           **GUILTY**  Plea Date: **08/30/1999**
Disposition:     **SENTENCED**
Disposition Date: **08/30/1999**
Verdict:        **GUILTY**  Verdict Date: **08/30/1999**
Sentence Starts: **02/02/1999**   Sentence Date:**08/30/1999**
Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC**

**Related Person Information**

Name:**SCOTT, KEVIN LEE**
Connection:**CODEFENDANT**
Address: ▓▓▓▓
City: ▓▓▓▓  State:▓  Zip Code: ▓▓▓

Name:**VOLATILE, GERARD**
Connection:**ASST STATES ATTORNEY**

Address: ███████████████████
City: ██████████ State: ██ Zip Code: ██████

Name:**BARRICK, JOHN DET SGT**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**HASTINGS, KIRK DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**KLEINOTA, JOSEPH DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**RIVERA, LISSETTA TECH**
Connection:**POLICE OFFICER**
Address:**LD**

Name:**SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**PATTON, ROBERT DET**
Connection:**PRIMARY POLICE OFFICER**
Address:**CID**

**Event History Information**

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423 |
| CASI | 03/03/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 990311 |
| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

# Exhibit 26

Circuit Court of Maryland
Go Back

**Case Information**

Court System: **Circuit Court for Baltimore City – Criminal System**
Case Number: **199062009**  Case Status: **CLOSED**
Status Date:   **08/30/1999**
Tracking Number: **981002174773**   Complaint No: **1G13258**
District Case No:  **1B00323919**
Filing Date: **03/03/1999**

**Defendant Information**

Defendant Name: **SCOTT, KEVIN LEE**
Race:**BLACK**        Sex: **MALE**
DOB:███████
Address:████████████████
City:███████ State:███ Zip Code:██████

ALIAS:
Address:█████████████
City:███████ State:███ Zip Code:██████

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No:        **1**
CJIS/Traffic Code: **2 0900**              Arrest/Citation No:  **0000000**
Description:      **MURDER-FIRST DEGREE**
Disposition:      **LESSER INCLUDED OFFENSES**
Disposition Date: **08/30/1999**

Charge No:        **2**
CJIS/Traffic Code: **1 5202**              Arrest/Citation No:  **0000000**
Description:      **DEADLY WEAPON-CONCEAL**
Disposition:      **CLOSED – JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:        **3**
CJIS/Traffic Code: **1 5200**              Arrest/Citation No:  **0000000**
Description:      **DEADLY WEAPON-INT INJURE**
Disposition:      **CLOSED – JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:        **4**
CJIS/Traffic Code: **1 1415**              Arrest/Citation No:  **0000000**
Description:      **ASSAULT-SEC DEGREE**
Plea:             **GUILTY** Plea Date: **08/30/1999**
Disposition:      **SENTENCED**
Disposition Date: **08/30/1999**
Verdict:          **GUILTY** Verdict Date: **08/30/1999**
Sentence Starts: **02/02/1999**  Sentence Date:**08/30/1999**
Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC**

**Related Person Information**

Name:**SCOTT, KEITH MICHAEL**
Connection:**CODEFENDANT**
Address:████████████

City: ▮▮▮▮  State: ▮  Zip Code: ▮▮▮▮

Name: **VOLATILE, GERARD**
Connection: **ASST STATES ATTORNEY**
Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
City: ▮▮▮▮▮  State: ▮  Zip Code: ▮▮▮▮▮

Name: **BARRICK, JOHN DET SGT**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **GORDON, DONALD DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **HASTING, KIRK DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **KLEINOTA, JOSEPH DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **RIVERA, LISSETTE**
Connection: **POLICE OFFICER**
Address: **LD**

Name: **SERIO, SCOTT DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **PATTON, ROBERT DET**
Connection: **PRIMARY POLICE OFFICER**
Address: **CID**

**Event History Information**

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423 |
| CASI | 03/03/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 990311 |
| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

**A-268**

# Exhibit 27

Circuit Court of Maryland
Go Back

**Case Information**

Court·System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199110054**  Case Status: **CLOSED**
Status Date:  **12/14/1999**
Tracking Number: **991001198865**   Complaint No: **1G13258**
District Case No:  **0B00359961**
Filing Date: **04/20/1999**

**Defendant Information**

Defendant Name: **MILLER, KEVIN ANTHONY**
Race:**BLACK**        Sex: **MALE**
DOB:█████████
Address:████████████████████
City:██████  State:███  Zip Code:████████

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No:        **1**
CJIS/Traffic Code: **2 0900**
Description:     **MURDER-FIRST DEGREE**
Disposition:     **LESSER INCLUDED OFFENSES**
Disposition Date: **10/18/1999**

Charge No:        **2**
CJIS/Traffic Code: **1 5202**
Description:     **DEADLY WEAPON-CONCEAL**
Disposition:     **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **12/10/1999**

Charge No:        **3**
CJIS/Traffic Code: **1 5200**
Description:     **DEADLY WEAPON-INT INJURE**
Disposition:     **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **12/10/1999**

Charge No:        **4**
CJIS/Traffic Code: **1 0999**
Description:     **MURDER-2ND DEGREE**
Plea:           **GUILTY**  Plea Date: **10/18/1999**
Disposition:     **PROBATION AFTER CONVICTION**
Disposition Date: **12/10/1999**
Verdict:         **GUILTY**  Verdict Date: **10/18/1999**
Sentence Starts: **04/07/1999**   Sentence Date:**12/10/1999**
Sentence Time: Yrs: **20**  Mos: **00**  Days: **00**  Confinement : **NC**
Suspended Time: Yrs: **15**  Mos: **00**  Days: **00**
Probation Time: Yrs: **03**  Mos: **00**  Days: **00**  Type: **Supervised**

**Related Person Information**

Name:**CROWLEY, KIRK D**
Connection:**DEFENSE ATTORNEY**
Address:████████████████
City:████████  State:███  Zip Code: ██████

A-270

Name:**STEWART, NELSON R**
Connection:**ASST PUBLIC DEFENDER**
Address: ██████████████████
City ████████   State: ██   Zip Code: ██████

Name:**COHEN, MARK**
Connection:**ASST STATES ATTORNEY**
Address ██████████████
City: ████████   State: ██  Zip Code: ██████

Name:**BARRICK, JOHN SGT**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**HASTINGS, KIRK DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**KLEINOTA, JOSEPH**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**PATTON, ROBERT DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**RIVERA, LISSETTE TECH**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Event History Information

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CASI | 04/20/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 19990426 |
| MOTF | 05/13/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/13/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/13/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/13/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/13/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/13/1999 | DEMAND FOR CHEMIST |
| FILE | 05/13/1999 | FILED APD - STEWART, NELSON R , ESQ 809167 |
| MOTF | 05/25/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/25/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/25/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/25/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/25/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/25/1999 | DEMAND FOR CHEMIST |
| HCAL | 06/04/1999 | P30;0930;451 ;ARRG; ;TSET; ;MURDOCK, M. BRO;8B3 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ; ;POST;PX ;HELLER, ELLEN ;848 |
| HWNO | 08/30/1999 | HICKS (MARYLAND RULE 4-271) NOT WAIVED |
| HCAL | 10/18/1999 | P27;0900;406 ;JT ;GP;SUBC; ;QUARLES, WILLIA;8A9 |
| FILE | 10/18/1999 | FILED ADF - CRAWLEY, KIRK D , ESQ 174390 |
| HCAL | 12/10/1999 | P27;0930;406 ;DISP;DS;JUDG; ;QUARLES, WILLIA;8A9 |
| CCAS | 12/14/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

A-271

# Exhibit 28

# MARYLAND SENTENCING GUIDELINES WORKSHEET

| OFFENDER | | SEX | RACE | BIRTHDATE | JURISDICTION |
|---|---|---|---|---|---|
| Miller | Kevin | 1 2 | 1 2 3 4 | | |

| PSI | DATE OF OFFENSE | DATE OF SENTENCING | DISPOSITION TYPE | AOC USE ONLY, DO NOT WRITE IN SPACE BELOW |
|---|---|---|---|---|

1 Yes  2 No   0 1 1 9 9 0    1 2 1 6 9 0    1. Plea agreement - state nature of

2  Plea, no agreement
3  Court trial
4  Jury trial

**AT THIS SENTENCING NUMBER OF:**
CONVICTED OFFENSES: 0 1
CRIMINAL EVENTS: 0 1
WORKSHEET # 1 OF
CRIMINAL EVENT # 1

INO _____
SUS _____
ACT _____
STA ____ CON ____
PRO ____ RAN ____
FI _____
REST ____
CS _____

## CONVICTED OFFENSE TITLE

| | | AOC CODE | MD. CODE, ART. & SECTION | STAT. MAX. | DOCKET NUMBER |
|---|---|---|---|---|---|
| 1st | MURDER-SECOND DEGREE | | 27/411 | 30Y | 19011001Z |
| 2nd | | | | | |
| 3rd | | | | | |

| OFFENSE SCORE(S) (Offense Against a Person Only) | | | | OFFENDER SCORE | GUIDELINES RANGE | ACTUAL SENTENCE | Imposed, suspended, time served, probation, fine, restitution and/or community service |
|---|---|---|---|---|---|---|---|

**OFFENSE SCORE(S)**

| 1st Off | 2nd Off | 3rd Off | A. Seriousness Category |
|---|---|---|---|
| 01 | 01 | 01 | = V - VII |
| 03 | 03 | 03 | = IV |
| 05 | 05 | 05 | = III |
| 08 | 08 | 08 | = II |
| 10 | 10 | 10 | = I |

**B. Victim Injury**

| 0 | 0 | 0 | = No Injury |
| 1 | 1 | 1 | = Injury, Non-Permanent |
| 2 | 2 | 2 | = Permanent Injury or Death |

**C. Weapon Usage**

| 0 | 0 | 0 | = No Weapon |
| 1 | 1 | 1 | = Weapon Other Than Firearm |
| 2 | 2 | 2 | = Firearm or Explosive |

**D. Special Vulnerability of Victim**

| 0 | 0 | 0 | = No |
| 1 | 1 | 1 | = Yes |

OFFENSE SCORE (S)

**OFFENDER SCORE**

**A. Relationship to CJS When Instant Count Occurred**
0 = None or Pending Cases
1 = Court or Other Criminal Justice Supervision

**B. Juvenile Delinquency**
0 = Not More Than One Finding of Delinquency or over age 25
1 = Two or More Findings, No or One Commitment
2 = Two or More Commitments

**C. Prior Adult Criminal Record**
0 = None    1 = Minor
3 = Moderate    5 = Major

**D. Prior Adult Parole/Probation Violations**
0 = No    1 = Yes

0 1 OFFENDER SCORE

**GUIDELINES RANGE**

1st Offense: 15Y TO 30Y
2nd Offense: ____ TO ____
3rd Offense: ____ TO ____

**OVERALL GUIDELINES RANGE** (For Multiple Counts Only): ____ TO ____

**ACTUAL SENTENCE**

1st Convicted Offense — Subsequent offender  1 Yes  2 No
20/5/3

2nd Convicted Offense — Subsequent offender  1 Yes  2 No

3rd Convicted Offense — Subsequent offender  1 Yes  2 No

| 01 | 02 | USE | SUS | ACT | CON __ PRO | FI | REST | CS | SUS | ACT | CON __ PRO __ | FI | REST | CS | TLRANGE | TURANGE | TOTALI | TOTALS | TOTALN | TFI | TREST | TCS | TRANGE | TOUTI | TOUT2 | TUSE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## REASON IF ACTUAL SENTENCE DEPARTS FROM GUIDELINES RANGE

Modified factual statement basis for
things that Skinner did and the
Deft. was involved.

W/D Order

SENTENCING JUDGE                    SIGNATURE

## INSTITUTIONAL/PAROLE RECOMMENDATION/ADDITIONAL INFO.

Stephen P. Shadasz, Senior Agent

WORKSHEET COMPLETED BY                    TITLE

COPIES: White-Judge; Blue-AOC; Green-Attach to Commitment or Probation Order; Yellow-File; Pink-Prosecution; Gold-Defense

(Rev. 7/87)

A-273

A-274

# Exhibit 29

**A-274**

☐ **CIRCUIT COURT** ☐ **DISTRICT** **)URT OF MARYLAND FOR** _York Co_

Located at **Court Address** [REDACTED]  **Zip Code** 27.6.3  **Telephone** 336-2712

**State of Maryland**

**vs.**

**Defendant** Kevin Miller  **D.O.B.** [REDACTED]

**Case No(s).** 199/16054

**Tracking No.** 99/03/1712863

**Date Sentence Imposed** 12/10/99

**I.D. No.** 924-160; 510" 60/693168

## COMMITMENT RECORD

TO: ☑ Commissioner of Correction ☐ Warden/Sheriff of [_____] Jail/Detention Center
YOU ARE DIRECTED to receive the above named Defendant who has been sentenced and is hereby committed to your custody by JUDGE _William D. Quarles_ The Defendant has been found guilty as to:

| Case/Count/Offense No. | 199/16054 - Ct 1 | Charge | 2nd Murder | Art. 27 | Sec. 41 |
|---|---|---|---|---|---|

Sentence | 30 yrs | Concurrent with Consecutive to Case/Count/Offense No. | |
☐ PAROLE ELIGIBILITY RESTRICTIONS Art. [ ] Sec. [ ] (PROVIDE DETAILS IN ADDITIONAL SENTENCING INFORMATION)

| Case/Count/Offense No. | | Charge | | Art. | Sec. |
|---|---|---|---|---|---|

Sentence | | Concurrent with Consecutive to Case/Count/Offense No. | |
☐ PAROLE ELIGIBILITY RESTRICTIONS Art. [ ] Sec. [ ] (PROVIDE DETAILS IN ADDITIONAL SENTENCING INFORMATION)

**SPLIT SENTENCE**
All but [ 5 yrs ] is/are suspended and the Defendant is placed on probation for a period of [ 2 yrs ] commencing upon:

CHECK ONE:
1. ✓ Release of Defendant from physical incarceration.
2. ___ Release of Defendant from parole, or mandatory supervision pursuant to Art. 41, Sec 4-612.

The total time to be served is [ 5 yrs ] , to run:

**SELECT ONLY ONE**

A. ☑ concurrent with any other outstanding or unserved sentence and begin on [ 4-7-99 ]

B. ☐ consecutive to the last sentence to expire of all outstanding and unserved Maryland sentences.

C. ☐ consecutive to the sentence imposed in Case No. [_____]

The Defendant has been awarded [____] days credit for time served prior to and not including date of sentence (Art. 27, Sec. 638C).

**ADDITIONAL SENTENCING INFORMATION:** PROVIDE PAROLE ELIGIBILITY RESTRICTIONS OR PAROLE RECOMMENDATIONS, IF ANY:

$ _____ court cost(s) have been waived due to indigency.

☐ Commitment is for execution of previously suspended sentence after Defendant was found in violation of probation.
☐ Sentencing modification. This Commitment supersedes commitment issued on: [_____]

ATTACHMENTS HERETO INCLUDE: ☐ Additional Sentence(s) ☑ Order For Probation ☐ Conditions of Parole
☐ Order For Reimbursement of Public Defender ☐ Other: [_____]
☐ Victim Notification Request

TRULY taken from the record of this Court.
WITNESS my Hand and the Seal of said Court this date:

☐ Appeal Bond set at $ [____]

**CC-DC/CR 28** (Rev. 7/97)  Clerk/Judge

A-275

# Exhibit 30



# Department of Public Safety and Correctional Services

### Data Management Unit
6776 REISTERSTOWN ROAD • SUITE 314 • BALTIMORE, MARYLAND 21215-2342
(410) 585-3350 • FAX (410) 764-4220 • TOLL FREE (877) 379-8635 • V/TTY (800) 735-2258 •www.dpscs.maryland.gov

S STATE OF MARYLAND

MARTIN O'MALLEY
GOVERNOR

ANTHONY G. BROWN
LT. GOVERNOR

GREGG L. HERSHBERGE
SECRETARY

PATRICIA DONOVAN
DEPUTY SECRETARY
ADMINISTRATION

CARROLL PARRISH
DEPUTY SECRETARY
OPERATIONS

RHEA L HARRIS
ASSISTANT SECRETARY
CHIEF OF STAFF

DAVID N. BEZANSON
ASSISTANT SECRETARY
CAPITAL PROGRAMS

WAYNE WEBB
EXECUTIVE DIRECTOR
NORTH REGION

WENDELL M. FRANCE
EXECUTIVE DIRECTOR
CENTRAL REGION

PATRICIA A. VALE
EXECUTIVE DIRECTOR
SOUTH REGION

DR. SHARON BAUCOM
EXECUTIVE DIRECTOR
CLINICAL SERVICES

PATRICIA A. MOORE
DIRECTOR
ADMINISTRATIVE SERVICE

ERNEST ELEY, JR.
DIRECTOR
COMMUNITY SUPERVISIO
SUPPORT

RANDALL L, WATSON
DIRECTOR
PROGRAMS AND SERVICE

TINA M. STUMP
DIRECTOR
SECURITY OPERATIONS

STEPHEN M. SHILOH, CCI
CHIEF EXECUTIVE OFFICE
MARYLAND CORRECTION
ENTERPRISES

## MEMORANDUM

TO:     Whom it May Concern

FROM:   Lt. Necole Haggie, Administrator, Data Management Unit

DATE:   June 20, 2014

RE:     Inmate Information


REF:    KEVIN ANTHONY MILLER
DOC #:  289908


Listed below is the requested information under the authority of the Annotated Code of Maryland, Family Law Article, Section 12-105 for the above named individual.

**Social Security No:** – ███████
**Date of Birth:** – ████████
**Admission Date:** – 12/17/1999
**Length of Sentence:** – 005y 0m 0d
**Sentence Start Date:** – 04/07/1999
**Release Date:** – 07/29/2002
**Institution Released from:** – JPRU


**Prepared By:** Sannan Andrews, Data Management Unit,
If additional information is needed, please contact (410) 585-3105.

A-277

# Exhibit 31



**U.S. Departmen °Justice**



*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Lynne A. Battaglia*
*United States Attorney*

*Deborah A. Johnston*
*Assistant United States Attorney*

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*301-344-4433*

*301-344-4032*
*FAX 301-344-4518*

January 21, 1999

Mr. Timothy Sullivan, Esquire
█████████████████████
█████████████████████

Harry Trainor
█████████████████
█████████████████

      Re:   **United States v. Dustin Higgs**
            **Crim. No. PJM-98-0520**

Dear Mr. Trainor and Mr. Sullivan:

    We write to set forth the conditions on which the Government is willing to make discovery in this case. Under Rule 16 of the Federal Rules of Criminal Procedure, discovery is to be given "upon request", and we understand that you do request discovery. Therefore, we also request discovery pursuant to Rule 16(b).

The Government will provide discovery pursuant to and as defined in Rule 16 on the following basis:

    Jencks material as defined in 18 U.S.C. § 3500, along with related Giglio material such as witness' plea agreements, criminal convictions and prior inconsistent statements, will be provided no later than one week prior to trial. However, the government reserves the right to delay provision of any such materials if the government believes that disclosure of the information will pose a security risk to any witness. Brady material which is not otherwise included in the Rule 16, Jencks or Giglio material referred to above will be provided if and when discovered. Jencks material is defined for purposes of this agreement in accordance with the specific provisions of 18 U.S.C. § 3500. Jencks material is given on agreement that reciprocal Rule 26.2 material will be provided by you at the same time we provide Jencks material.

    The government agrees that at the same time that it provides Rule 16 material, it will provide notice of the existence of alleged other crimes, wrongs or acts committed by your client pursuant to Rule 404(b) of the Federal Rules of Evidence, along with copies of all physical and documentary evidence believed by the government to fall within the ambit of Rule 404(b) which the

government intends to introduce at trial in its case-in-chief. The government acknowledges its continuing duty to disclose Rule 404(b) evidence as it is recognized as such after the time period in which the government has provided Rule 16 material.

The government reserves the right to provide later notice of Rule 404(b) material if the government believes that disclosure of such information will pose a security risk to any witness. As to any such witness, the government will disclose all **Jencks** material and all Rule 404(b) evidence at the same time.

All discovery is provided on the condition that counsel will not give copies of this material to the client or to anyone outside counsel's office, absent prior approval of this office. Counsel may, of course, review this material with the client at any time or place.

Should counsel file any routine motion with the Court which seeks discovery pursuant to Rule 16 or <u>Brady</u>, then this discovery agreement will be void, and the Government is not bound by any of the provisions herein. Specifically, <u>Jencks</u> and <u>Giglio</u> material may not be provided until the first day of trial if the defendant should file such a motion.

The Government may be providing, as a courtesy, material which is not discoverable under Rule 16, <u>Jencks</u>, <u>Giglio</u> or <u>Brady</u>. The fact that certain non-discoverable materials are provided in no way obligates the Government to provide all non-discoverable materials, and the fact that certain non-discoverable materials are provided should never be taken as a representation as to the existence or non-existence of any other non-discoverable materials.

Please note that it is the policy of this Office that the government will not stipulate to a three level reduction in offense level pursuant to §3E1.1 of the United States Sentencing Guidelines unless the defendant has entered into a signed written plea agreement with the government on or before the date set for the filing of pretrial motions.

Please indicate your consent to this discovery agreement by signing and returning to us a copy of this letter. We urge you to call or write me with any questions that arise, as we may be able to resolve any questions without the filing of motions and responses with the Court.

Very truly yours,

LYNNE A. BATTAGLIA
UNITED STATES ATTORNEY

Deborah A. Johnston
Sandra Wilkinson
Assistant United States Attorneys

A-280

Accepted:

Harry Trainor, Esquire                      DATE: 2/4/99

Accepted:

Timothy Sullivan, Esquire                   DATE: 2/4/99

cc: Court file

# Exhibit 32

**AFFIDAVIT/DECLARATION OF HARRY TRAINOR
PURSUANT TO 28 U.S.C. § 1746**

I, Harry Trainor, do hereby declare and verify as follows:

1.     My name is Harry Trainor.  Timothy Sullivan and I represented Dustin Higgs at his federal capital trial.

2.     Victor Gloria was the government's most important witness at trial.  He made numerous assertions at trial that were central to the government's theory of the case.  Challenging his credibility and veracity were of paramount importance to our defense strategy.

3.     Prior to the trial, we received some information that Mr. Gloria may have been present at the scene of an unrelated homicide in Baltimore.  It was our understanding that this homicide occurred after the homicides for which Mr. Higgs was on trial, but prior to trial itself.  We had very little detail about the incident, and I do not recall receiving any information from the government about this issue.

4.     Recently, current counsel for Mr. Higgs have shared information with me that suggests that Mr. Gloria was not only present, but was in fact a suspect in the Baltimore homicide.  The information recently shared with me further suggests that the federal authorities responsible for Mr. Higgs's capital prosecution intervened with Baltimore authorities in order to prevent Mr. Gloria from being charged with the murder.

5.     I consider receiving a free pass on a murder charge to be an extraordinary benefit for a witness.  Had we been made aware of this benefit received by Mr. Gloria, we would have asked for all appropriate discovery relevant to the benefit, we would have fully investigated the issue, and we

1

**A-283**

A-284

certainly would have made significant use of the benefit to challenge Mr. Gloria's credibility during Mr. Higgs's trial.

6.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. §1746.


Harry Traitor

Dated: Dec. 3, 2014

2

**A-284**

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

_____

|                                    |   |                          |
|------------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA,          | : |                          |
|                                    | : |                          |
| Respondent,                        | : | Criminal No. PJM-98-0520 |
|                                    | : |                          |
| v.                                 | : | Peter J. Messitte, U.S.D.J. |
|                                    | : |                          |
| DUSTIN JOHN HIGGS,                 | : | Greenbelt Division       |
|                                    | : |                          |
| Petitioner.                        | : |                          |

_____:

**PETITIONER'S RENEWED MOTION FOR PRODUCTION OF EXCULPATORY
EVIDENCE AND RENEWED MOTION FOR DISCOVERY**

Petitioner, Dustin John Higgs, hereby renews his previously-denied requests for the

production of exculpatory evidence and for discovery.  In support of this motion, Mr. Higgs

states the following:

**INTRODUCTION**

Contemporaneously with this motion, Mr. Higgs is filing *Petitioner's Motion for Relief*

*from Final Judgment Pursuant to Hazel-Atlas Glass Co. v. Hartford-Empire Co. and Federal*

*Rule of Civil Procedure 60(d)* (hereinafter "Rule 60(d) motion").  The Rule 60(d) motion

describes in detail through Petitioner's proffer the manner in which it is believed that the

government withheld critical impeachment material regarding star witness Victor Gloria at trial,

and then; the government attempted to cover up its violation during § 2255 proceedings.  The

Rule 60(d) motion includes a detailed procedural history, along with a lengthy statement of the

facts that give rise to this set of renewed requests.  Mr. Higgs does not repeat those recitations

here, but instead incorporates them by reference.  For purposes of this renewed motion, it suffices

1

**A-285**

to say that the government did not provide defense counsel with information that Mr. Gloria was a suspect in an unrelated homicide in Baltimore, but was not charged. Petitioner avers that federal officials with knowledge and control of the evidence of that other crime knew of Mr. Gloria's involvement in the crime. The government had a duty to provide this information at trial pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny. The government also had a duty to provide this information during § 2255 proceedings, and to respond truthfully to Mr. Higgs's post-conviction *Brady* claim. *See Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.").

As set forth in the 60(d) motion, Mr. Higgs has now obtained evidence from the Baltimore Police Department that reveals that the government did not turn over all of the evidence it was required to at trial, and further reveals that the government did not respond truthfully to Mr. Higgs's post-conviction *Brady* claim. Given the nature of the evidence located within the Baltimore Police file, it is virtually certain that additional *Brady* material is currently in the possession of the government. Further, given the government's demonstrated lack of candor regarding Mr. Gloria and the Baltimore homicide, it is appropriate to question what additional exculpatory or impeachment evidence the government has in its possession that Mr. Higgs has not been fortunate enough to discover.

As such, Mr. Higgs hereby makes the following renewed requests:

I.    THE COURT SHOULD ORDER THE GOVERNMENT TO TURN OVER ALL EVIDENCE IN
      ITS POSSESSION REGARDING ITS KNOWLEDGE OF AND ACTIONS RELATING TO
      BALTIMORE AUTHORITIES' INVESTIGATION OF VICTOR GLORIA.

2

**A-286**

As noted above, the government had duty to provide all *Brady* and *Giglio* material in its possession to the defense at the time of trial.  This duty continued during post-conviction proceedings.  Moreover, the government had an ethical duty to respond truthfully to Mr. Higgs's post-conviction claims.  As fully described in the Rule 60(d) motion, the government breached their duty and the full extent of the government's misconduct is yet to be determined.

Mr. Higgs therefore respectfully requests that the Court order the government to turn over the materials that they should have turned over at trial, and that they certainly should have turned over during § 2255 proceedings.  Specifically, Mr. Higgs requests that the government be ordered to turn over:

A. Any reports, memoranda, notes (including handwritten notes), or record of any type (paper, electronic, audio/visual, or in any format whatsoever) of any contact (whether in person, by telephone, in writing, electronically, or otherwise) between federal officials and state or local officials pertaining in any way to Martrelle Creighton's murder and/or the resulting investigation;

B. Any reports, memoranda, notes (including handwritten notes) or record of any type (paper, electronic, audio/visual, or in any format whatsoever) detailing communication by federal officials with Victor Gloria and/or his attorney regarding Martrelle Creighton's murder and/or the resulting investigation;

C. Any reports, memoranda, notes (including handwritten notes), or record of any type (paper, electronic, audio/visual, or in any format whatsoever) of communications between or among federal law enforcement officials discussing anything having to do with the Martrelle Creighton murder and/or the resulting investigation;

D. Any reports, memoranda, notes (including handwritten notes) or record of any type (paper, electronic, audio/visual, or in any format whatsoever) detailing any independent investigation that any federal agency conducted into Martrelle Creighton's murder;

E. Any and all previously undisclosed benefits received by Victor Gloria in exchange for his testimony, whether or not he had been formally promised those benefits prior to testifying;

**A-287**

F.      Any and all previously undisclosed *Brady* and *Giglio* material pertaining to any other witness or issue in the litigation

II.     **THE COURT SHOULD REOPEN MR. HIGGS'S PREVIOUSLY-DENIED DISCOVERY REQUESTS AND GRANT ACCESS TO THE ITEMS SOUGHT THEREIN.**

During the course of the § 2255 proceedings in this case, Mr. Higgs filed a motion for discovery. (Doc. 509). The Court denied the motion in its entirety. *Higgs v. United States*, 711 F. Supp. 2d 479, 557 (D.Md. 2010). Mr. Higgs respectfully submits that the information set forth in his Rule 60(d) motion, along with the questions that now arise about what additional information the government has failed to disclose, place the entire case in a different light. As such, Mr. Higgs respectfully requests that the Court reopen and reconsider the discovery requests made by Mr. Higgs during § 2255 proceedings that were previously denied. *Cf. Harris v. Nelson*, 394 U.S. 286, 291 (1969) ("[t]he very nature of the writ [of habeas corpus] demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.").

4

**A-288**

WHEREFORE, Petitioner Dustin Higgs respectfully requests that the Court order the

government to provide the discovery requested in this motion.

Respectfully Submitted,


/s/ Matthew C. Lawry                                       /s/ Stephen H. Sachs
Matthew C. Lawry                                          Stephen H. Sachs
Federal Community Defender Office                         WilmerHale LLP
      for the Eastern District of Pennsylvania            Five Roland Mews
Curtis Center, Suite 545-West                             Baltimore, MD 21210
601 Walnut Street                                         (410) 532-8405
Philadelphia, PA 19106                                    Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org

Dated: December 4, 2014

5

**A-289**

**CERTIFICATE OF SERVICE**

I, Matthew C. Lawry, hereby certify that on this 4th day of December, 2014, I

electronically filed the foregoing motion using the Court's CM/ECF system.  Electronic notice

will be provided to the following individuals:

> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Matthew C. Lawry
> Matthew C. Lawry

**A-290**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


UNITED STATES OF AMERICA        :

                                         **CIVIL NO. PJM-05-3180**

    v.                          :        **CRIMINAL NO. PJM-98-0520**


DUSTIN JOHN HIGGS              :


                                  :

                          **...oOo...**


**GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(d) AND PETITIONER'S RENEWED MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE AND RENEWED MOTION FOR DISCOVERY**

Comes now the United States of America, by and through undersigned counsel, and in opposition to the petitioner Dustin John Higgs's Motion for Relief From Final Judgment Pursuant To Federal Rule Of Civil Procedure 60(d) (ECF 579) and petitioner's Renewed Motion For Production Of Exculpatory Evidence And Renewed Motion For Discovery (ECF 580), states as follows:

**I.      INTRODUCTION**

On January 3, 2001, this Court issued a judgment imposing the jury's sentence of death upon petitioner/defendant Dustin John Higgs.  Subsequently, this Court, the U.S. Court of Appeals, and the U.S. Supreme Court repeatedly rejected Higgs's requests to set aside his conviction and death sentence.

On December 4, 2014, two years after his final petition for certiorari was denied, the defendant filed a desperate petition, based upon supposition and speculation, asking this Court to exercise the extraordinary authority of Fed. R. Civil P. 60(d) to set aside its § 2255 judgment and to reopen the proceedings.  Higgs does not (nor can he) make out a claim of actual innocence, nor does he claim that the government failed to disclose evidence that would have mitigated against

**A-291**

imposition of a death sentence.   Rather, he speculates, as he did in his original § 2255 petition, that the government failed to disclose impeachment evidence relating to eyewitness Victor Gloria. The sole allegation is that the Assistant United States Attorney allegedly convinced the Baltimore City State's Attorney's Office not to charge Victor Gloria with murder.   Based upon this allegation, the defendant asks this Court to set aside the judgment and to reopen the § 2255 proceedings.   There is neither a legal nor a factual basis upon which to grant his request.

As a legal matter, Higgs has not and cannot meet the extraordinary burden imposed on moving parties under Rule 60(d), as articulated by the Supreme Court in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944) (setting aside a fraudulently-obtained ruling by finding that it was the product of one party's "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process").   The defendant has failed to establish the existence of any "scheme," much less a scheme that was deliberately planned and executed.   Neither can he establish that the integrity of the judicial process was undermined by any government actions in this case.

Simply stated, there cannot be any fraud upon the Court because the government never requested, convinced, or otherwise persuaded the Baltimore City State's Attorney's Office to refrain from charging Victor Gloria.   Without that factual predicate, the defendant cannot succeed on his claim.   Moreover, this Court has already held that even if the allegation that the government failed to disclose information relating to a Baltimore City homicide were true, the defendant was not prejudiced and therefore was not entitled to post-conviction relief.   *See* ECF 547 at 35 ("Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality.").   As a result, there is no basis for the extraordinary relief that

2

Higgs requests.   His motions should be denied without a hearing.

## II.   PROCEDURAL BACKGROUND

On or about October 11, 2000, a jury convicted Higgs of three counts of first-degree premeditated murder (18 U.S.C. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping (18 U.S.C. § 1111(a)), three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)(2)), and three counts of using a firearm "during and in relation to [a] crime of violence."   18 U.S.C. § 924(c).   The jury recommended a death sentence.   This Court accordingly sentenced Higgs to death.   In a published opinion, the Fourth Circuit affirmed the conviction and sentence in full.   *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (hereinafter "*Higgs-I*").   On November 29, 2004, the Supreme Court denied the defendant's petition for writ of certiorari.   *Higgs v. United States*, ___ U.S. ___, 125 S. Ct. 627, 160 L. Ed. 2d 456 (2004).

During the pendency of his direct appeal, Higgs discovered new evidence that he claimed, by way of motion for new trial filed in this Court, demonstrated the equal culpability of co-defendant Haynes, who had not received a death sentence.   This Court denied the new trial motion, and the Fourth Circuit affirmed that decision by way of an unpublished opinion.   *See United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (hereinafter "*Higgs-II*").   Again, the Supreme Court refused to grant review.

On November 28, 2005 (364 days after the Supreme Court denied a writ of certiorari from his second appeal), Higgs filed a 122-page Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 (ECF 492, referred to herein as "Mot."), which asserted 24 claims of error.   On April 7, 2010, this Court issued an Order and written opinion denying all of Higgs's claims and entering final judgment.   *See United States v. Higgs*,

3

711 F. Supp. 2d 479 (D. Md. 2010).   On May 4, 2010, Higgs filed a motion seeking a certificate of appealability (ECF 550), and a motion for reconsideration and to alter or amend the judgment (ECF 551).   On July 20, 2010, this Court denied the defendant's motion for request for a certificate of appealability and motion for reconsideration.   ECF 560, 561.   Higgs noted a timely appeal.   ECF 564.

The Fourth Circuit granted the certificate of appealability only as to issue II, which related to lead bullet analysis.   On November 23, 2011, the court of appeals denied the defendant's appeal and issued its mandate.   ECF 572.   The mandate took effect on January 30, 2012, after the Court denied the defendant's request for rehearing and rehearing en banc.   ECF 575.   On December 10, 2012, the Supreme Court denied the defendant's petition for writ of certiorari.

Almost two years later, on December 4, 2014, the defendant filed the pending Motion for Relief from Final Judgment (ECF 579) and Motion for Release of *Brady* Materials (ECF 580).

## III.   FACTS

### A.   <u>The Murders</u>[1]

On the evening of Friday, January 26, 1996, Dustin John Higgs, Willie Mark Haynes, and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington, D.C.   Arriving in the city in Higgs's blue Mazda MPV van, the men picked up Tanji Jackson, Tamika Black, and Mishann Chinn.   Jackson knew Higgs, and they had arranged for Haynes to date Black and for Gloria to date Chinn.   After stopping at a liquor store, the couples returned to Higgs's apartment to drink alcohol and listen to music.   The men also

---

[1]   The Statement of Facts set forth in Sections A and B herein is drawn from the Fourth Circuit's first opinion in this case, *see Higgs-I*, 353 F.3d at 289-94.

smoked marijuana.[2]

Early on January 27, Higgs and Jackson began to argue, prompting Jackson to grab a knife from the kitchen.   Hearing the commotion, Haynes, who had been in a bedroom with Black, broke up the fight, convincing Jackson to surrender the knife.   Jackson, however, remained angry, and the three women left the apartment.   As Jackson exited, "[s]he stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat."   The remark led Higgs to comment that Jackson "do know a lot of n-----s." Higgs saw Jackson stop and copy the license plate number of his van.   Angered, Higgs commented aloud about Jackson's actions, which Gloria interpreted as concern that Jackson intended some retaliation.

Higgs said, "f---- that," retrieved his coat, and urged the men to come with him.   Before leaving the apartment, Higgs took a silver .38 caliber firearm from the end table drawer and put it in his pocket.   With Higgs driving the MPV van, Haynes in the front passenger seat, and Gloria behind Higgs, the men pursued the three women.   Seeing the women walking on the side of the road, Higgs instructed Haynes to get them in the vehicle.   Haynes complied, and the three women got into the back seat of the vehicle, which Higgs drove toward Washington, D.C.

---

[2]   Following a 1998 arrest on federal drug charges, Gloria agreed to cooperate in the government's murder case against Higgs and Haynes.   Gloria's testimony was partially corroborated by Chinn's mother and by a friend of the Jackson family, both of whom saw the victims enter a blue Mazda MPV van.   Gloria pleaded guilty to being an accessory after the fact to the murders and received 84 months' incarceration and three years of supervised release.

5

**A-295**

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and quietly conversed. Higgs, though, drove past the Baltimore-Washington Parkway into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. When he pulled over at a secluded location, one of the girls asked if they were trying to "make [them] walk from [t]here?" Higgs responded, "Something like that." When the women exited the van, Higgs handed his gun to Haynes, who put it behind his back and left the van. Moments later, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings in the rearview mirror. Gloria put his head down and listened to more shots and the sound of a woman screaming.

When the shooting ended, Haynes reentered the van and closed the door. He or Higgs then commented that they had to "get rid of the gun." Higgs drove to the Anacostia River, where he or Haynes threw the gun into the water. Higgs then drove back to his apartment, where the three men proceeded to sanitize of evidence. They wiped the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as CDs, videotapes, and liquor bottles. The men left the apartment and dropped the trash by a dumpster. Higgs and Haynes left Gloria at a fast food restaurant with an admonition to "keep [his] mouth shut."

Around 4:30 a.m., a motorist found the murdered women's bodies strewn about a roadway and contacted the Park Police. Jackson's day planner was found at the scene. It contained Higgs's nickname and telephone number, as well as a note that read "13801 'MAZDA' 769GRY" — the street number of Higgs's apartment and the tag number for his van. The

6

police also recovered a .38 caliber wadcutter bullet at the scene.   According to the medical examiner, Jackson and Black each had been shot once in the chest and once in the back.   Chinn had been shot once in the back of the head.

### B.    The Investigation

Although Higgs was almost immediately suspected, the police investigated the murders for nearly three years before arresting him.   On March 21, 1996, Park Police officers interviewed Higgs at his apartment.   Higgs acknowledged his acquaintance with Jackson and said he could have talked to her the night before her death.   He, however, denied that she had ever visited his apartment.   Higgs said that he first heard of the murders while watching the ten o'clock news on Saturday, January 27, 1996, while at a party hosted by his girlfriend, Phyllis Smith.   Higgs recalled immediately commenting to another party guest that he thought he knew "that Tanji girl."   Higgs' mentioning of the victim's name revealed his guilty knowledge as the names and photos of the three victims were not released to the media until January 28, 1996.

After concluding the interview, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank frauds.   In addition to cash and documents, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45, and .38 caliber weapons.   On May 12, 1997, Higgs pleaded guilty to possession with intent to distribute cocaine base, for which he received 17 years' imprisonment.

The Park Police turned their attention to Higgs's girlfriend, Phyllis Smith, who initially provided a false alibi for the defendant.   Smith claimed Higgs had been with her and her family on the night of the killings, helping clean her home for a party the following night.   She instructed her relatives to confirm the alibi.   Later, Smith testified to the grand jury that Higgs was with her at 5:00 a.m. on January 27.   At trial, however, Smith recanted both accounts and

7

testified that Higgs called her after his arrest and asked her to provide an alibi for the night of January 26.   Smith complied, believing that the police were investigating drug charges.   Once she learned that the officers' questions pertained to a triple murder, however, Smith admitted her lies.   At trial, Smith testified that Higgs was not with her when she cleaned her house on the evening of the 26th, when she went to bed at 1:30 a.m. on the 27th, or when she awoke three and one-half hours later to care for her son.   Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs in her home.

Officers also interviewed Enidsia Darby, Higgs's former girlfriend and the mother of his son.   Higgs telephoned Darby after his March 1996 arrest and told her that he was in custody on drug charges.   Darby, however, had seen news reports about the arrest that included photographs of the murder victims.   When she asked Higgs about the women, he responded by asking if Darby remembered that he had been with her at the hospital on the night of the murders.   When Darby later visited Higgs in jail, he admitted having been present at the shootings.   He said that Jackson had been invited to his house to smoke and drink because she had been "snitching on one of them."   Higgs also told Darby that he did not know the other two victims, explaining, "They were just for his friends."

Darby also testified that Higgs had leveled death threats against his criminal accomplices. Indeed, she and Higgs had perpetrated a bank fraud in the fall of 1995 with the assistance of a woman named Andrea Waters.   Waters received a percentage of the criminal proceeds, until Higgs defrauded her.   When Waters announced her intention to contact the police, Higgs responded with a threat to kill her.   In a separate scheme, Darby had charged the merchandise of her employer to a credit card number she received from Higgs.   When the fraud prompted an investigation, Higgs threatened to kill Darby if she identified him.

**A-298**

The investigation into Higgs's involvement in the murders revealed his participation in two shootings involving .38 caliber weapons, the same caliber of firearm used in the homicides. On November 20, 1995, about two months before the murders, Higgs got into an argument outside the Chaconia Nightclub in Washington, D.C., and shot out the windows of a vehicle from his van.   During a search of the damaged vehicle, the police recovered a .38 caliber bullet.   An accomplice to the shooting, Wondwossen Kabtamu, threw Higgs's gun out the window of the van after the crime.   The men returned to get the weapon at Higgs's insistence.   Higgs was later charged with the shooting and explained to Domenick Williams, a jailhouse lawyer, that he did not want to plead guilty to it "because they would try to use the gun in another case."   When Williams learned of the Indictment for the murders of the three women, Higgs commented to him, "You see why I can't plead guilty to that charge?"   A second shooting occurred on Cherry Lane in Laurel, Maryland, on December 10, 1995, when Higgs and Haynes fired at a man named Rodney Simms following a verbal dispute over a woman.   At the scene, the police later recovered nine millimeter and .38 caliber bullets and bullet casings.

The .38 caliber bullets at the Cherry Lane and Chaconia sites had five lands and grooves, with a right twist, just like the slugs recovered in connection with the three murders.   Despite identifying the common caliber and rifling characteristics, firearms examiners could not definitively conclude that all the projectiles were fired from the same weapon.   Nonetheless, the fact remained that the bullets recovered in connection with the murders were also .38 caliber with five lands and grooves and a right twist.[3]

---

[3]   In April 1997, Higgs pleaded guilty to the Cherry Lane shooting.   During the plea hearing, the prosecutor stated that Haynes had fired the nine millimeter handgun and that Higgs had fired the .38 caliber handgun.   Higgs did not contest the facts of the shooting, but gratuitously asserted that he "didn't have a .38.   It was the other way around."

9

While awaiting trial in the D.C. jail, Higgs made comments to Domenick Williams evincing the Higgs's consciousness of guilt.   He told Williams that he had rebuffed an offer to cooperate against Haynes.   When Williams said that the authorities would likely extend a similar offer to Haynes, Higgs responded "that his youngan would hold up," and "that the Government wouldn't offer a deal to the trigger man."   Higgs asked Williams, in reference to Gloria, what his chances would be "if the witness after the fact wasn't there."   Williams told him that "his chances would be good," but Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because" former D.C. Jail inmates Melvin Grayson and "T" "would be out there to handle anything that he needed."   Williams told the police about these conversations and produced letters in which Higgs reported that the Chaconia case had been dismissed, and that while Higgs had not heard from "T", "Mel has been in my corner." Through visitation records, authorities learned that Grayson had visited Higgs in jail in February and March 1999.   The Chaconia charges were dismissed in May 1999.

### C.     The § 2255 Claims Relating to Victor Gloria

As noted above, on November 28, 2005, Higgs filed a 122-page Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 (ECF 492),[4] which asserted 24 claims of error.   The only claim relevant to his present motion to set aside the § 2255 judgment was his claim that the prosecution suppressed evidence of consideration it provided to Victor Gloria in exchange for Gloria's testimony.   ECF 492 at 31-33.   Of particular relevance here, Higgs, in his § 2255 petition, claimed that as an additional benefit to Gloria, the federal government did not disclose that Gloria "received further benefits in the form of charges that were never brought against him," referring to Gloria's having been a suspect in

---

[4]   Higgs also filed a Brief in Support of his Motion, which is docketed at ECF 504.

an unrelated homicide in Baltimore, Maryland. ECF 492 at 33; ECF 504 at 44.    The defendant

argued that Gloria "was presumably never charged with this homicide in an effort to preserve his

status as a testifying witness in this federal capital triple homicide case" and that the

government's "failure to disclose this consideration violated due process."    ECF 504 at 44.

In its response, the government addressed these allegations as follows:

> Significantly, Higgs's vague descriptions of the supposed benefits conferred on
> Gloria largely fail to demonstrate any connection to this trial or federal officials.
> Higgs observes that Smyth County, Virginia has failed to execute an arrest
> warrant against Gloria and that Gloria received a one-year prison sentence in a
> Prince George's County drug case that carried a 10-year exposure.    Higgs,
> however, does not allege or demonstrate a causal link between Gloria's
> cooperation in this case and the actions of local officials in others.    Indeed,
> Higgs essentially concedes that he has based his claim on speculation, asserting
> only that the treatment of Gloria "strongly suggests" the existence of undisclosed
> benefits.    Elsewhere, Higgs states in conclusory fashion that Baltimore City
> officials did not arrest Gloria in connection with a murder to preserve the
> witness's "status" in this case.    But, as the Fourth Circuit has recognized,
> speculation about the Government's knowledge or actions does not suffice to
> discharge a defendant's burden on collateral review, and will not merit relief.
> *See Roane*, 378 F.3d at 401.    Higgs apparently has no alternative but speculation,
> as he has not offered a declaration from the only person who could speak to
> Victor Gloria's expectations at the time of trial — Victor Gloria [himself].

ECF 520 at 88.

The government further argued that even assuming there were undisclosed promises or

consideration given to Gloria, the defendant could not establish that this undisclosed

consideration would have created a reasonable probability that its disclosure would have resulted

in a more favorable verdict.    *See* ECF 520 at 87-89.    Having considered this claim, this Court

concluded that:

> Higgs also claims that the Government offered Gloria benefits in relation to state
> charges pending against him in Virginia, as well as charges he potentially faced in
> Baltimore.
>
> Specifically, he submits that Virginia officials were never notified of Gloria's
> whereabouts during the Higgs prosecution, when presumably they should have

been, and that state charges were never brought against Gloria for a homicide in Baltimore.  Again, pure speculation about supposed benefits cannot substitute for hard facts.  *See Roane*, 378 F.3d at 401.  Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.  *Even if the Court were to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality.  Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination.*  Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do."  Unquestionably, counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly.  In other words, *any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a 'reasonable probability' of a more favorable verdict.*  *See Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. at 678).

*Higgs*, 711 F. Supp. 2d at 508 (emphases added).

### D.      Higgs's Claim of Fraud: the Baltimore Homicide Investigation

Pursuant to a FOIA request, the defendant obtained the Baltimore City Police Department's file relating to the homicide of Martelle Creighton, which occurred on July 18, 1998.  Higgs alleges that the Assistant United States Attorney (AUSA) assigned to his case contacted the Assistant State's Attorney (ASA) in Baltimore City and convinced the ASA not to charge Gloria in relation to that homicide, in order to preserve Gloria's status as a witness in the *Higgs* case.  The defendant bases his claim on two pieces of paper that reflect contact between the ASA and the AUSA.  However, a review of the Baltimore City Police Department records reveals the absence of *any* evidence that the federal prosecutor convinced the local prosecutor not to charge Gloria in order to preserve his status as a federal witness.  To the contrary, the records establish that Victor Gloria was not a participant in the altercation that resulted in the death of Martelle Creighton.  The pertinent facts related to the Creighton murder and investigation are summarized as follows, as well as in the timeline attached as **Exhibit 1**.

During the early morning hours of July 18, 1998, David Bishop and Clarence White were with the victim, Martelle Creighton, in the Inner Harbor area of Baltimore City.   There were also some females in the area speaking with another group of males.   An altercation occurred between Creighton and the other group of males.   One of the males, who was described as having a medium- to dark-complexion, struck victim Creighton one time in the neck.   The perpetrator fled with his two light-skinned associates.   Police responded to the scene.   Martelle Creighton died as a result of a stab wound to his neck, which struck his carotid artery.

Investigators interviewed David Bishop shortly after the incident.   Bishop provided a statement that included a description of the three individuals who fled.   Bishop described the perpetrator as medium-complexioned and the other two individuals as twins.   **Exhibit 2** at 2. Bishop subsequently contacted the investigators and provided contact information for Barbara Bailey, who was one of the women present at the time of the murder.

On July 29, 1998, Barbara Bailey was interviewed and gave a recorded statement.   *See* **Exhibit 3**.   Bailey described the individual who struck Creighton as a medium- to dark-complexioned male.   **Exhibit 3** at 8.   Bailey described one of the individuals as "Vic," who was light-complexioned.   **Exhibit 3** at 7.   She also described two other individuals who were light-skinned.   **Exhibit 3** at 5-7.   In describing the incident, Bailey said that "before the altercation happened Victor was the one that ran off because I get [sic] he saw that something was about to happen."   **Exhibit 3** at 3.

On August 12, 1998, investigators interviewed Charnita Bailey, who provided a recorded statement.   *See* **Exhibit 4**.   Charnita Bailey described meeting four men:   two were named Kevin; the third was named Kiwi, and was a twin of one of the Kevins; and the fourth was Victor.   **Exhibit 4** at 2.   Charnita Bailey described how the victim (Creighton) and Kevin, "the

13

tall one not the twin," were walking around in a circle, in "[a] beef, beef like circle.   Then I didn't see anymore."   **Exhibit 4** at 3.   She further stated that "before the guy got stabbed, the guy Victor, um, ran off."   **Exhibit 4** at 3.

On November 16, 1998, eyewitness Bishop was shown photographic lineups and identified Kevin and Keith Scott as being with the perpetrator.   *See* **Exhibit 5**.   On November 20, 1998, Barbara Bailey and Charnita Bailey were also shown photographic lineups and identified Kevin and Keith Scott as accompanying the individual who struck the victim.   **Exhibit 6**.   Based upon these identifications, investigators obtained arrest warrants for Kevin and Keith Scott.

On February 2, 1999, the Scott brothers were arrested.   Both brothers gave statements stating that Kevin Miller was present at the time of Creighton's assault, but that Victor Gloria struck the victim one time, and they did not see a weapon.   **Exhibit 7** at 9; **Exhibit 8** at 7.   Kevin Scott told investigators that Victor was locked up in Prince George's County for the murder of three girls.   **Exhibit 7** at 11.   Keith Scott also said that he knew Victor Gloria was locked up for the murder of three girls and that he was locked up with Willis Hanes [*sic*], whom Keith Scott knew.   **Exhibit 8** at 11-12.   One of the Scott brothers also told police detectives that "Kevin told him not to say his name."   **Exhibit 9**.   Police notes reflected contact information for the FBI case agent and for the Park Police officers involved in the federal murder case.   **Exhibit 10**.

In fact, on the very next day, U.S. Park Police Detective Joseph Green provided a photographic lineup of Victor Gloria to the Baltimore City Police.   **Exhibit 11**.

Photographic lineups of Victor Gloria and Kevin Miller were assembled.   On March 19, 1999, Barbara Bailey was shown the photographs and did not identify either Gloria or Miller. **Exhibit 12**.   Charnita Bailey was shown the same photographic lineups.   She did not identify Victor Gloria but she did identify Kevin Miller, stating:   "[H]e looks like the guy who may have

14

had the knife." **Exhibit 13**. Based upon the identification, investigators obtained an arrest warrant for Kevin Miller.

On April 7, 1999, Kevin Miller was arrested and gave a recorded statement. *See* **Exhibit 14**. In his statement, Miller said Gloria was the one who struck the victim. **Exhibit 14** at 5-6, 9-10, 13. Miller also acknowledged discussing the murder and what to say with Kevin and Keith Scott. **Exhibit 14** at 15-17.

A handwritten note from ASA Marc Cohen to Detective Patton, dated April 12, 1999, exists, which summarizes a conversation between ASA Cohen (who is now deceased) and AUSA Deborah Johnston. *See* **Exhibit 15**. According to this note, AUSA Johnston provided information that could be relevant to the State homicide investigation. Specifically, the AUSA informed the ASA that Victor Gloria had pled guilty to being an accessory after the fact in a triple murder case, and that his plea agreement was sealed. AUSA Johnston further stated that "it is possible that co-defendant Scott, Scott + Miller are blaming Gloria because they are friends of defendant's in her case, especially Haynes." ASA Cohen's memo indicated that the AUSA suggested that detectives contact the case agents in the federal case for background information. **Exhibit 15**. ASA Cohen's memo further indicated what he was going to do: "After we talk to these officers, we will decide on the next course of action, that is either writ Gloria and charge him or talk to his lawyer about the case." **Exhibit 15**. ASA Cohen's own notes revealed, in other words, that there was no request by the federal government for the State prosecutors not to charge Gloria, nor was there any agreement between State and federal authorities not to charge Gloria in deference to the pending federal case. Indeed, ASA Cohen's notes reflect the contrary: *State* officials would decide whether or not to charge Gloria. **Exhibit 15**.

The only other identified reference to the United States Attorney's Office appeared in a progress report prepared by Detective Patton approximately ten days later. *See* **Exhibit 16**. In this report, Detective Patton indicated that federal authorities had information suggesting that the Scott brothers and Miller were close friends with Haynes and Higgs, and that these men were aware Gloria was going to testify against Haynes and Higgs. Accordingly, federal officials believed that the men's implication of Gloria was a form of retaliation. **Exhibit 16** at 2. The report continued, stating that ASA Cohen and Detective Patton believed that "the AUSA may be on track with their assumption." **Exhibit 16** at 2. There was no indication in Detective Patton's report that federal authorities requested any action by the Baltimore City prosecution team. Nor was there any evidence that the Baltimore City authorities agreed not to charge Victor Gloria. To the contrary, Detective Patton described what they would do to "finally discern who actually stabbed the victim." **Exhibit 16**.

On June 8, 1999, eyewitness David Bishop was shown photographic lineups of Kevin Miller and of Victor Gloria. Without hesitation, Bishop identified Miller as the perpetrator. **Exhibit 17**. Bishop failed to identify Victor Gloria. **Exhibit 18**. Likewise, on June 11, 1999, another eyewitness, Clarence White, was shown photographic lineups. White identified Kevin Miller's photograph as looking like the person who stabbed the victim. **Exhibit 19**. He also identified Kevin Scott and Keith Scott as being there. **Exhibit 20**. White did not identify Victor Gloria. **Exhibit 21**.

On June 16, 1999, the Baltimore City authorities conducted re-interviews and polygraphs of Kevin and Keith Scott. **Exhibit 22**. Both failed the polygraph examinations. **Exhibit 22**.

On August 30, 1999, Keith Scott and Kevin Scott pled guilty to second degree assault and were each sentenced to 6 months and 29 days of imprisonment. **Exhibit 23**. On October 18,

16

1999, Kevin Miller pled guilty to 2d degree murder and on December 10, 1999, was sentenced to five years' imprisonment.   **Exhibit 24**.

## III.   ARGUMENT

### A.   Applicable Law

Higgs has filed his motion for relief pursuant to Fed. R. Civ. P. 60(d)(3), which provides that a court may set aside a judgment for fraud on the court.   The fraud-upon-the-court doctrine was articulated in the Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford –Empire Co.*, 322 U.S. 238 (1944).   There, the Court made clear that the authority to set aside judgments under Rule 60(d)(3) is limited to fraud that is a "wrong against the institutions set up to protect and safeguard the public."   *Id.* at 246.   The Court determined that the lower court judgment in that case had to be set aside because there was conclusive proof of a deliberately planned and carefully executed scheme that successfully defrauded not only the Patent Office but also the Circuit Court of Appeals.   *Id.* at 245-46.

The Fourth Circuit has made it clear that Rule 60(d) should be narrowly construed and "is typically confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged."   *Great Coastal Express Inc. v. International Brotherhood of Teamsters* 675 F.2d 1349, 1356 (4th Cir. 1982) (describing "perjury and fabricated evidence" as "reprehensible" and unquestionable "evils," but nonetheless finding the circumstances of the case under review to be inadequate to grant relief as a fraud upon the court). Similarly, in *Cleveland Demolition Co. v. Azcon Scrap Corp.*, the Fourth Circuit defined fraud on the court as involving "corruption of the judicial process itself" and not encompassing allegations involving a "routine evidentiary conflict."   827 F.2d 984, 986 (4th Cir. 1987)

17

**A-307**

(internal quotation marks omitted). Indeed, the Fourth Circuit recently reiterated the strict requirements for a fraud upon the court claim, holding that "not only must [the] fraud on the court involve an intentional plot to deceive the judiciary, but it must also touch on the public interest in a way that fraud between individual parties generally does not." *Fox v. Elk Run Coal Company Inc.*, 739 F.3d 131, 136 (4th Cir. 2014) (Elk Run's failure to disclose unfavorable expert findings to its testifying expert did not support a finding of fraud upon the court.).

In *United States v. Herring*, the Third Circuit articulated similar requirements for a fraud-on-the-court finding under Rule 60(d): "a showing of (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) that in fact deceives the court." *Herring v. United States*, 424 F.3d 384, 386-87 (3d Cir. 2005). The court further concluded that "a determination of fraud on the court may be justified only by 'the most egregious misconduct directed to the court itself,' and that it 'must be supported by clear, unequivocal and convincing evidence.'" *Id.* (internal footnote and citations omitted). Other courts of appeals have reached similar conclusions. *See*, *e.g.*, *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir. 1995) (holding that "'fraud on the court,' whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud[, *i.e.*,] . . . a showing of conscious wrongdoing — what can properly be characterized as a deliberate scheme to defraud — before relief from a final judgment is appropriate under the *Hazel–Atlas* standard"); *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009) ("Fraud on the court which justifies vacating a judgment is narrowly defined as 'fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury.'") (quoting *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985)); *United States. v. Estate of Stonehill,* 660 F.3d 415, 454 (9th Cir. 2011) ("Any misrepresentations or false

18

statements made by government witnesses or attorneys were on largely tangential issues and did not substantially undermine the judicial process by preventing the district court or this court from analyzing the case.").

In response, Higgs cites *Demanjuk v. Petrovosky*'s five-factor test, which does not require intentional false conduct but instead recognizes conduct that is "willfully blind to the truth or is in reckless disregard for the truth" as adequate to support a finding of fraud upon the court.   10 F.3d 338, 348 (6th Cir. 1993).   But Higgs's proposed expansion of the "fraud upon the court" concept to include reckless disregard of the truth and willful blindness is directly contrary to settled Fourth Circuit law, which requires "an intentional plot to deceive the judiciary, [that] . . . must also touch on the public interest in a way that fraud between individual parties generally does not."   *Elk Run Coal Company Inc.*, 739 F.3d at 136; *see also Great Coastal Express*, 675 F.2d at 1356 (the fraud in that case did not "present a *deliberate* scheme to directly subvert the judicial process, sufficient to constitute fraud on the court") (emphasis added); *United States v. MacDonald*, 161 F.2d 4, 1998 WL 637184 * 3 (4th Cir. 1998) (unpub.) (expressly rejecting *Demanjuk* as "at odds with our decision in *Great Coastal*").

The moving party bears the burden of proving a fraud upon the court by clear and convincing evidence.   *See MacDonald*, 1998 WL 637184 * 2 (citing *Shepherd v. American Broadcasting Co.*, *Inc.*, 62 F.2d 1469, 1477 (D.C. Cir. 1995) (collecting cases)); *Square Const. Co. v. Washington*, 657 F.2d 68, 71 (4th Cir. 1981).

As described below, the defendant has failed to establish *any* false statements by the government in this case, much less ones that were the product of an "intentional plot to deceive" this Court or intended to "subvert[ ] the judicial process."

19

**B.      Preliminarily, Higgs Has Failed to Establish That Gloria Was Not Charged in Baltimore City as Consideration for Gloria's Testimony in the Triple Homicide Case.**

The defendant alleges that the government engaged in fraud upon the court when, in response to his 2255 petition, the prosecutor denied "any knowledge of or any ability to influence any benefits conferred on Mr. Gloria by local authorities in Baltimore."   ECF 579 at 2-3.   Higgs repeatedly claims that Victor Gloria "was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government," ECF 579 at 23; "that Mr. Gloria was not charged in the Baltimore homicide, almost certainly as a result of federal authorities' intervention," ECF 579 at 17; and that "Mr. Gloria was not charged with this homicide at the behest of the [federal] government 'in an effort to preserve his status as a testifying witness in this federal capital case.'"   ECF 579 at 18 (quoting ECF 520 at 88).

These are serious allegations.   Indeed, any defendant who levels such grave accusations of prosecutorial misconduct — especially one who is counseled — should have a good faith basis before doing so.   But neither Higgs nor his lawyers have *anything* concrete to offer in the way of carrying the defendant's burden of demonstrating a fraud on the court.   That is because Higgs has not and *cannot* establish that Gloria was not charged in the Baltimore City homicide case as consideration for his testimony in the federal case.   To the contrary, the entire record regarding the Creighton homicide is clear:   Gloria was not charged because Gloria did not participate in the assault and murder.   The Creighton assailants' own guilty pleas definitely establish this truth. Without the factual predicate that Gloria was not charged as consideration for his federal testimony, Higgs cannot prevail on his instant claim.   Contrary to Higgs's baseless assertion, a review of the Baltimore City Police file reflects that local authorities conducted a thorough and independent investigation of the Creighton homicide, and that their decision not to charge Victor

20

Gloria was based upon their independent evaluation of the evidence — not in response to a federal request.  (Indeed, left completely unexplained is *why* State officials would have agreed to allow an alleged murderer like Gloria escape prosecution (and potentially return to the streets) simply so that another sovereign could prosecute another set of defendants in another violent crime case.)

It bears emphasizing that immediately after Creighton's murder, which occurred on July 18, 1998, eyewitness David Bishop described three males present, two of whom confronted the victim.  **Exhibit 2** at 2.  On July 29, 1998, in a recorded statement, Barbara Bailey described four men, including an individual named Vic, as being present.  **Exhibit 3** at 5-8.  Bailey stated that Vic ran off before the altercation.  **Exhibit 3** at 3.  Bailey's sister was interviewed on August 12, 1998.  **Exhibit 4**.  Charnita Bailey also said that Victor ran off before the altercation.  **Exhibit 4** at 3.  On November 16, 1998, eyewitness Bishop was shown photographic lineups and identified Kevin and Keith Scott as being with the person who struck the victim.  **Exhibit 5**.  On November 20, 1998, Barbara Bailey and Charnita Bailey were shown photographic lineups separately and each identified Kevin Scott and Keith Scott as accompanying the individual who struck the victim.  **Exhibit 6**.  Based upon the identifications, arrest warrants were obtained for the Scotts.

On February 2, 1999, the Scott brothers were arrested.  Both gave statements stating that Kevin Miller was present during the Creighton murder but that Victor Gloria struck the victim one time, and that neither saw a weapon.  **Exhibit 7** at 9; **Exhibit 8** at 7.  One of the brothers also told detectives that "Kevin told him not to say his name."  **Exhibit 9**.  Police notes reflected contact information for the FBI case agent and Park Police officers involved in the federal murder case. Exhibit 10.  In fact, on the very next day, United States Park Police Detective Joseph Green provided a photographic lineup of Victor Gloria to the Baltimore City Police.  **Exhibit 11**.  A photographic lineup of Kevin Miller was also assembled.

On March 19, 1999, Barbara Bailey was shown the photographic lineups and did not identify either Gloria or Miller.   **Exhibit 12**.   Charnita Bailey was shown the same photographic lineups.   She did not identify Victor Gloria, but she did identify Kevin Miller, stating that "he looks like the guy who may have had the knife."   **Exhibit 13**.   Based upon the identification, an arrest warrant was obtained for Kevin Miller.

On April 7, 1999, Kevin Miller was arrested and gave a recorded statement.   **Exhibit 14**. During his recorded statement, Miller stated that Gloria was the one who struck the victim. **Exhibit 14** at 5-6, 9-10.   Miller also acknowledged discussing the murder and what to say with Kevin and Keith Scott.   **Exhibit 14** at 15-17.

As described above, there exists a handwritten memo dated April 12, 1999 describing communications between the assigned Assistant State's Attorney (Marc Cohen) and the prosecutor who handled Higgs's federal case, Deborah Johnston.   According to the note sent to homicide Detective Patton, AUSA Johnston provided information that might be relevant to the State homicide investigation.   Specifically, she advised the State prosecutor that Victor Gloria had pled guilty to being an accessory after the fact in a federal triple murder case and that Gloria's plea agreement was sealed.   As ASA Cohen's notes reflect, AUSA Johnston further stated that it was possible that "co-defendant Scott, Scott and Miller are blaming Gloria because they are friends of defendant's in [the federal] case, especially Haynes."   The memo also indicated that AUSA Johnston suggested that detectives contact the case agents in the federal case for background information.   **Exhibit 15**.

ASA Cohen's memo further indicated what he planned to do:   "After we talk to these officers, we will decide on the next course of action, that is either writ Gloria + charge him or talk to his lawyer about the case."   **Exhibit 15**.   Clearly, nothing in ASA Cohen's memorandum

22

suggests that federal officials ever asked State officials not to charge Gloria, nor do ASA Cohen's words indicate any agreement not to charge Gloria in deference to the pending federal case. To the contrary, Cohen indicated that *his* team would make the final call. **Exhibit 15**.

The only other identified reference to the United States Attorney's Office in the materials submitted by the defendant in support of his Rule 60(d) claim is a progress report prepared by Detective Patton approximately ten days after ASA Cohen's memo. **Exhibit 16**. In this report, Patton indicated that federal authorities had information that the Scott brothers and Miller were close friends with Haynes and Higgs, and that they were aware Gloria was going to testify against Haynes and Higgs in the federal case. Detective Patton further noted that investigators had interviewed the Scott brothers and Miller and specifically observed that the three men's statements "are very similar in nature and appeared to have been rehearsed." **Exhibit 16** at 2. Accordingly, Detective Patton noted his concurrence, along with ASA Cohen's, in the federal prosecutor's belief that "the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria." **Exhibit 16** at 2. Again, the defendant has put forward no evidence indicating that federal authorities requested any action by the Baltimore City prosecution team. Neither is there any evidence that the Baltimore City authorities agreed not to charge Victor Gloria, let alone at anyone's behest. To the contrary, Detective Patton described the steps his team would take to "finally discern who actually stabbed [Creighton]." **Exhibit 16** at 2.

Again, as described above, on June 8, 1999, eyewitness David Bishop was shown photographic lineups of Kevin Miller and of Victor Gloria. Bishop identified Miller as the perpetrator. **Exhibit 17**. Bishop failed to identify Victor Gloria. **Exhibit 18**. Likewise, on June 11, 1999, another eyewitness, Clarence White, was shown photographic lineups. White identified Kevin Miller's photograph as looking like the person who stabbed the victim. **Exhibit**

**19**.  White identified Kevin Scott and Keith Scott as being there, too.  **Exhibit 20**.  White did not identify Victor Gloria.  **Exhibit 21**.  On June 16, 1999, the Baltimore authorities also re-interviewed and polygraphed Kevin and Keith Scott.  **Exhibit 22**.  Both failed the polygraph.

It is clear that the Baltimore City authorities' decision not to prosecute Victor Gloria was based upon the evidence — two eyewitnesses said Gloria left the scene before the altercation began, while three eyewitnesses identified Kevin Miller as the individual who struck the victim.  Indeed, the only individuals implicating Gloria were Kevin Miller himself, and Miller's associates, Kevin and Keith Scott.  Moreover, the written impressions of both ASA Cohen and Detective Patton indicate that they were independently evaluating the evidence and making their own decisions.  There is no evidence that the decision not to charge Gloria was based upon a request from federal authorities.  Higgs has failed to show that federal authorities solicited and/or obtained the Baltimore City's prosecutor's agreement not to charge Gloria in return for Gloria's testimony in the federal case.  Without this factual predicate, Higgs's Rule 60(d) claim must fail.

C.      **The Defendant Has Failed to Establish Fraud Upon the Court.**

As set forth above, the defendant bears the burden of proving "a deliberately planned and carefully executed scheme" to defraud the court and severely undermine its "integrity." *Hazel-Atlas Glass Co*., 322 U.S. at 245-46.  Moreover, the fraud must be material and deliberate. *Great Coastal Express*, 675 F.2d at 1353-56.

1.      The Defendant Has Failed to Establish a Deliberately Planned
        Scheme to Defraud the Court.

The government's statements in its response to the defendant's § 2255 petition and his related request for discovery were not false or misleading.  With respect to the Baltimore City homicide (Creighton), the government's assertions were limited to the following:

Elsewhere, Higgs states in conclusory fashion that Baltimore City officials did not

24

**A-314**

arrest Gloria in connection with a murder to preserve the witness's "status" in this case. But, as the Fourth Circuit has recognized, speculation about the Government's knowledge or actions does not suffice to discharge a defendant's burden on collateral review, and will not merit relief. *See Roane*, 378 F.3d at 401. Higgs apparently has no alternative but speculation, as he has not offered a declaration from the only person who could speak to Victor Gloria's expectations at the time of trial – Victor Gloria [himself].

ECF 520 at 88. The defendant has failed to establish that these statements were false or that they were in any way misleading (let alone materially so). Neither can he so demonstrate, because *the federal government never sought any consideration from the Baltimore City prosecutors*. Indeed, ASA Cohen's own notes belie the existence of such a request or promise in stating that "*we* will decide on the next course of action, that is either writ Gloria and charge him or talk to his lawyer about the case." **Exhibit 15** (emphasis added).

As purported evidence of fraud on the court, the defendant also cites the government's response to his motion for discovery, in which the government stated that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." ECF 579 at 19 (citing ECF 513 at 5). The defendant has failed to establish that these statements were false or misleading. Indeed, these statements remain true today. There is simply no evidence that Gloria was promised anything in regard to the Baltimore City homicide. Nor is there any evidence the government procured or attempted to procure consideration for Gloria from the Baltimore City authorities. Higgs's conclusion that the government's statements — and his suppositions of a cover up — are wholly inadequate to establish a deliberately planned scheme to defraud the court.[5]

---

[5] The defendant repeatedly asserts a *Brady* violation, but he has failed to satisfy the essential elements of such a claim. As this Court well knows, a defendant who wishes to prevail on a *Brady* claim must establish that (1) the evidence was favorable to the defendant; (2) the evidence was suppressed by the government; and (3) that it was material. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). More than supposition is required to establish a *Brady* violation. *Wood v. Bartholomew*, 516 U.S. 1, 7-8 (1995) (failure to disclose government witnesses' polygraph

2.      The Defendant Has Not Established Government Conduct That
        Directly Impinged the Integrity of the Court.

Assuming arguendo that the defendant has presented clear and convincing evidence of a

deliberate plot to mislead the court, which he has not, Higgs's claim still must fail because he has

failed to establish that the government's actions "directly impinged the integrity of the court or its

ability to function impartially."   *Great Coastal Express*, 675 F.2d at 1356.   Indeed, the defendant

does not assert his actual innocence.   Instead, he merely argues that his attorney could have

cross-examined Gloria about the fact that Gloria was a suspect in the Creighton murder, and about

the alleged possible consideration Gloria received.   *See* ECF 579 at 24 n.7.

In its ruling on the defendant's § 2255, however, this Court preempted any claim that the

alleged consideration would have impacted its decision and thereby impacted the integrity of the

court's proceedings.   This Court specifically ruled that

---

results not a *Brady* violation).   "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."   *United States v. Bagley*, 473 U.S. 667, 682 (1985) (remanded for determination whether undisclosed promise of renumeration created a reasonable probability that cross-examination regarding the promise created a reasonable probability the result of the trial would have been different); *see also United States v. Salem*, 643 F.3d 221, 225-26 (7th Cir. 2011) (finding no *Brady* violation where the defendant failed to show that cross-examination of the government's star witness about his involvement in the homicide of a rival gang member would have been likely to change the outcome of the case); *cf. United States v. Robinson*, 627 F.3d 941, 949 (4th Cir. 2010) (observing that it is a "rare case" in which "newly discovered impeachment evidence is enough for a retrial" and citing cases); *United States v. Cavazos*, 542 Fed. Appx. 263, 271-72 (4th Cir. 2013) (unpub.) (affirming district court's denial of defendant's motion for new trial because cross-examination on information found in interview memoranda of key witness discovered and produced after trial "would [not] have enabled defense counsel to cast any significant further doubt on the truth of [the witness's] testimony . . . ").   The government would emphasize that its non-disclosure of communications with the Baltimore City prosecutor did not violate *Brady*.   Moreover, as this Court has squarely observed, "[A]ny evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a 'reasonable probability' of a more favorable verdict." *Higgs*, 711 F. Supp. 2d at 508-09.

26

[E]ven were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably, counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict.

*Higgs*, 711 F. Supp. 2d at 508-09.

As a result, the defendant has failed to prove that the non-disclosure of communication with the Baltimore City prosecution team was material or somehow subverted the judicial process. *Cf. Stonehill*, 660 F.3d at 454 ("Any misrepresentations or false statements by the government witnesses or attorneys were on largely tangential issues and did not substantially undermine the district court or this court from analyzing the case"); *United States v. MacDonald*, 161 F.3d 4, 1998 WL 637184 (4th Cir. 1998) (unpub.) (table); *United States v. Burke*, 321 Fed. Appx. 125, 2009 WL 921289 (3d Cir. 2009) (unpub.) (*Hazel-Atlas* claim denied, because even assuming the veracity of an affidavit stating that the government knew and condoned a witness's intent to lie on the stand, the defendant "failed to present 'clear unequivocal and convincing evidence' of an intentional fraud upon the court by federal prosecutors").

The Fourth Circuit's decision in *MacDonald*, 1998 WL 637184, is informative. There, the defendant, who through years of litigation steadfastly maintained his innocence, sought to set aside the denial of his original § 2255 claim and reopen the § 2255 proceedings on the basis of an alleged fraud upon the court. *Id* at *2. MacDonald alleged that new evidence established that a government agent had lied in an affidavit, which the district court relied upon in denying his § 2255 petition. Specifically, the agent knowingly did not disclose contradictory information in

27

his affidavit.   Relying upon *Great Coastal Express*, the Court determined that, in order to prevail under Rule 60, MacDonald at a minimum had to establish that "the fraud was material and deliberate."   *Id.* at *4.   The Court then affirmed the district court's denial of MacDonald's Rule 60 motion, finding "insufficient evidence in this record to even potentially establish that the government, through agent Malone, deliberately deceived the [district] court."   *Id.* at *6.   The Court also determined that the evidence was not "material to the question of [MacDonald's] innocence and therefore was not material to the outcome of his 1990 petition for habeas corpus relief."   *Id.* at *4.

Higgs, of course, does not allege that he is actually innocent of the murders.   Rather, he simply argues that the government's non-disclosure of (a routine and immaterial) communication with a local prosecutor constitutes a fraud upon the court.   As in *MacDonald*, the defendant has failed to show a deliberate deception of the court, much less a scheme to defraud the court. Moreover, Higgs cannot show that the non-disclosed information (*i.e.*, the communications between ASA Cohen and AUSA Johnston) was material to this Court's ruling regarding his § 2255 petition.   Indeed, in ruling on Higgs's § 2255 petition, this Court specifically found that, even assuming Gloria received some consideration in the Baltimore City homicide investigation, this fact "could not have further undermined [Gloria's] already low credibility, nor would it have created a 'reasonable probability' of a more favorable verdict."   *Higgs*, 711 F. Supp. 2d at 508.

## IV.   HIGGS'S MOTION FOR DISCOVERY

The defendant has also filed a "renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery."   ECF 580.   Once again, he avers that "federal officials with knowledge and control of the evidence of that other crime knew of Mr. Gloria's involvement in the crime."   ECF 580 at 2.   He has presented no evidence to support his bald assertions that

28

federal officials had control over the Baltimore City murder evidence or that they knew of Gloria's involvement in Creighton's murder.   To the contrary, the Baltimore City Police department had the evidence, as set forth in their files.   Indeed, the evidence in the Baltimore City homicide file actually establishes that Victor Gloria was *not* involved in Creighton's murder.   In fact, Gloria was not even present at the time of Creighton's stabbing.

To the extent Rule 60(d) has no discovery provision, the government assumes the defendant is seeking discovery under the assumption that this Court reopens his § 2255 claim. For the reasons set forth above, there is no basis to reopen the § 2255 proceedings and, therefore, the request for discovery should be denied.   Indeed, the defendant's requests relating to the Baltimore City homicide case will not further his claim as he cannot establish that additional cross-examination of Gloria would have created a reasonable probability that the outcome of his trial would have been different.

Alternatively, under well-settled law, a habeas petitioner is not entitled to discovery as a matter of course.  *Bracy v. Gramley*, 520 U.S. 899 (1997).   Rather, the defendant must show good cause.  *See* Rule 6(a) of the Rules Governing § 2255 Cases.   "Good cause" exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate he is entitled to relief."  *Bracey*, 520 U.S. at 908-09 (*citing Harris v. Nelson*, 394 U.S. 286, 295(1969)).   Discovery is not to be allowed so that a petitioner can "explore [his] case in search of its existence."  *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999); *accord United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

Higgs has made general, overbroad requests, and he has failed to establish the requisite good cause to support his discovery requests.   Instead, he seeks to engage in a fishing expedition in hopes of finding a case.   For these reasons, as well as those set forth in the government's

29

response to the defendant's original motion for discovery, Higgs's renewed motion for discovery should be denied.

## V.     CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny Higgs's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 60(d), as well as his renewed motion for discovery, without a hearing.[6]

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____
James A. Crowell IV
Assistant United States Attorney

---

[6]   As the Fourth Circuit observed in *MacDonald*, a district court can properly deny a Rule 60 motion without a hearing if, "assuming the new facts [the petitioner] asserts to be true, such facts could not establish fraud by clear and convincing evidence." 1998 WL 637184 at * 2. Indeed, as explained above, a successful Rule 60 motion must establish not only a fraud on the court — which Higgs has failed to do — but also that it was "material and deliberate." *Id*. at *4 (citing *Great Coastal Express*, 675 F.2d at 1353-56). Because Higgs cannot establish materiality even if his claims are true, he has failed to state a claim under Rule 60 and this Court should deny his motion without a hearing.

30

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2015, a copy of Government's Response to Petitioner's Motion for Relief from Final Judgment was electronically filed in this case and was served by ECF to defense counsel.

_____/s/_____
James Crowell IV
Assistant United States Attorney

# EXHIBIT 1

## Timeline of Creighton Murder Investigation

| Date | Event | Detail | Exhibit |
|---|---|---|---|
| July 18, 1998 | Victim Creighton murdered | Cause of death: stabbed once in the neck. | 2 |
| July 18, 1998 | David Bishop interviewed | Friend of victim. Described altercation with 3 black males and that one hit Creighton in the neck. | 2 |
| July 29, 1998 | Barbara Bailey interviewed | Friend of victim. Described 4 males being present, including Victor. Victor ran off before the altercation. | 3 |
| August 12, 1998 | Charnita Bailey interviewed | Friend of victim. Described 4 males being present: Kewi, Victor, and two men named Kevin; one Kevin was a twin. The Kevin who was not the twin confronted the victim. Victor left before the altercation. | 4 |
| November 16, 1998 | David Bishop shown photographic lineup | Identified Keith and Kevin Scott as being with the perpetrator. | 5 |
| November 20, 1998 | Barbara Bailey shown photographic lineup | Identified Kevin and Keith Scott. | 6 |
| November 20, 1998 | Charnita Bailey shown photographic lineup | Identified Kevin and Keith Scott. | 6 |
| February 2, 1999 | Kevin Scott arrested | Gave statement implicating Victor and stating Kevin Miller was present. | 7 |
| February 2, 1999 | Keith Scott arrested | Gave statement implicating Victor and stating Kevin Miller was present. Also stated that he knew Victor Gloria was locked up with Willis Haynes, whom Scott knew, for the murder of three girls. | 8 |

| February 3, 1999 | US Park Police prepared a photographic lineup of Victor Gloria | Provided to investigators in Creighton murder. | 11 |
|---|---|---|---|
| March 19, 1999 | Charnita Bailey interviewed | Identified Kevin Miller as "the guy who may have had the knife." Did not identify Victor Gloria | 13 |
| March 19, 1999 | Barbara Bailey interviewed | Did not identify Kevin Miller or Victor Gloria. | 12 |
| April 7, 1999 | Kevin Miller arrested | Gave statement implicating Victor Gloria. Acknowledged discussing version of incident with the Scott brothers. | 14 |
| April 14, 1999 | AUSA conversation with State Prosecutor (ASA) | AUSA told ASA that it is possible the Scott brothers and Miller are blaming Gloria because they are friends of Gloria's co-defendants, particularly Haynes. | 15 |
| April 14, 1999 | State Prosecutor (ASA) memo to Homicide Detective Patton | ASA directed detective to speak to Park Police. ASA stated "We will decide on the next course of action, that is either writ Gloria + charge him or talk to his lawyer about the case" | 15 |
| April 21, 1999 | Memo written by Detective Patton | "A.U.S.A. may be on track with their assumption." | 16 |
| June 8, 1999 | David Bishop shown photographic lineups | Identified Kevin Miller, without hesitation, as the perpetrator. Does not identify Victor Gloria | 17,18 |
| June 11, 1999 | Clarence White interviewed and shown photographic lineups | Identified photo of Kevin Miller as looking like the person who stabbed the victim. Does not identify the photograph of Victor Gloria. Identified Kevin and Keith Scott as being with the person who stabbed the victim. | 19,21<br><br><br><br><br>20 |

A-325

| June 16, 1999 | Keith Scott and Kevin Scott reinterviewed | Keith Scott and Kevin Scott fail polygraph examinations | 22 |
|---|---|---|---|
| August 30, 1999 | Keith Scott pled guilty | Second degree assault of Creighton | 23 |
| August 30, 1999 | Kevin Scott pled guilty | Second degree assault of Creighton | 23 |
| October 18, 1999 | Kevin Miller pled guilty | Second degree murder of Creighton | 24 |
| December 10, 1999 | Kevin Miller sentenced | Receives 5 years of imprisonment. | 24 |

# EXHIBIT 2

This is a tape statement of David Bishop being taken in the Homicide Unit by Detective Kurt Hastings.  The date is 18th July, 1998 and the time is 0416 hours.  We're in Lieutenant's Lieu's office in the Homicide Unit. For the tape sir state your name?

Bishop:          David Bishop.

Hastings:        Could you speak up sir?

Bishop:          David Bishop.

Hastings:        Your home address?

Bishop:          ███████████████████.

Hastings:        Your age and date of birth?

Bishop:          I'm 24 years old and I was born ████
                 ██, ███.

Hastings:        Can you read and write sir?

Bishop:          Yes.

Hastings:        How much education do you have?

Bishop:          I graduated from Southwestern High School.

Hastings:        Are you under the influence of drugs or alcohol right now?

Bishop:          No.

Hastings:        Are you giving this statement free and voluntarily?

Bishop:          Yes.

Hastings:        Mr. Bishop I'm investigating an incident that occurred 301 Light Street which is the Inner Harbor.  It happened around 2 AM this morning where a friend of yours Matrella Creighton known to you as Truck was stabbed, what can you tell me about this incident?

Bishop:          Well, we started we, we entered the Harbor from the entrance and started walking down me Truck and my friend Little Man we were walking down talking to some girls alright, than all of a sudden we ran into these girls one of them Truck was trying to talk to than it was some guys standing there one of the guys said something smart to Truck, Truck was ready to fight the guy than

A-328

Statement of Mr. David Bishop
Page 2

Bishop:     they started fighting alright Truck, the guy swung on Truck, Truck swung the guy swung back and it looked like a punch but, he cut him with something in his neck. And, than the other one tried the light skin dude came up and hit him in his head and than they just backed up cause Truck wasn't trying to fight them after they hit him it wasn't trying to fight them so they just backed up cause I guessed they figure they stabbed him they did something to him. And, I didn't realize that he was stabbed until, until um I started fighting the dudes and than they backed off and then I went to my friend and than he, he looked at me and he was black he was like they cut me with something and than that was his last words and than all the blood started shooting out of his neck, and air was coming out of his neck and I tried to put my hand over his neck to try to stop the bleeding and keep his air in. And, than his head, his head started swelling up like a balloon his eyes started getting real big and his face started getting real puffy and blood started coming out of his mouth and his nose. And, it was like he was standing up he was real stiff and when I, when I felt I realize that he was gone so I sat him down, I laid he down on the grass and I tried to ran down the boardwalk to see if I could catch the guys but, by the time they were gone. So I ran back up the boardwalk and that's when the Ambulance gets there.

Hastings:   When you say these three guys describe the guy that was originally fighting with Truck who stuck him as you put it?

Bishop:     I say he was about 5"11, a 160 pounds um, dark complexion um, he was wearing not a hat but, some kind of it looks like some kind of little cap on his head or something it didn't have a wing on it. And, he had some it looked like he had some um some kind of pants or something rolled up to his knees and.

Hastings:   Like sweat pants?

Bishop:     Yea, like sweat pants or something.

**A-329**

Statement of Mr. David Bishop
Page 3

Hastings:      Did you see what kind of shoes he had
               on?

Bishop:        No, no.

Hastings:      The other two gentleman who, who were
               with them, when we were talking earlier
               you said that they looked like twins?

Bishop:        Yea, they looked like brothers I heard
               one of the girls say that call I heard
               one of the girls say twin, like that so
               I figure that um they were twins but,
               they looked like brothers they were the
               same height, the same complexion and
               they, their, their features were
               similar.

Hastings:      There was a different in their hair
               styles?

Bishop:        Yea one of them had a bush the other had
               braids going down to the back.

Hastings:      The one with the bush how big of bush
               was it?

Bishop:        I say it stood about 5 inches off of
               his, off of his head.

Hastings:      And the other one had braids all the way
               through his hair?

Bishop:        Going to the back, yea, all the way
               through.

Hastings:      Do you remember what either one of them
               was wearing?

Bishop:        No, I can't really remember what they
               were wearing.

Hastings:      Do you recall any words that were spoken
               between any of your friends and the
               suspects?

Bishop:        They were just going back and forth
               talking I mean saying like I don't know,
               Truck I guess Truck, Truck was like why
               do you have to disrespect me and he was
               ready to fight and that was really the
               end, the guy was like what's up and than
               they started fighting.  And it looked
               like it he looked like he punched him

A-330

Police Department
Baltimore, Maryland

CI/209                                          Case Number_____

INFORMATION SHEET

Name_David Bishop_____      Nickname_Black___

Race_B___   Sex_M___   Age_24___   D.O.B. ████████

Height_5-11___      Weight_170___   Complexion_____

Address ████████████████   SS#_____

Home Phone (410)35█████   Date and time of interview_18 Aug 93 / 0354___

Parent's name ████████   Address ████████

Boy/girlfriends name_____   Address_____

Last School Attended_S.W.N.S._____   Grade_12th____

Employer_Bennagins_____   Address_Wardon____

Employers Phone_____   Hours of employment_None___

RELATIVES IN BALTIMORE NOT LIVING WITH WITNESS

Name_____   Relationship_____

Address_____   Phone_____

Name_____   Relationship_____

Address_____   Phone_____

Read and Write      Yes_✓___      No_____

Under the influence of drugs   Yes_____   No_✓___

If yes explain_____

Alcohol Check One Sober____ Had Been Drinking_✓_ *2 BEERS* Intoxicated____

Description of clothing at time of Interview (note in bloodstained torn etc.)_____

Note any injuries_____

Meals Provided____Date____Time____Date____Time____

NEW Pager # 390-3509

Detective_SERIO_____   Detective_____

**A-331**

This is a tape statement of David Bishop being taken in the Homicide Unit by Detective Kurt Hastings. The date is 18th July, 1998 and the time is 0416 hours. We're in Lieutenant's Lieu's office in the Homicide Unit. For the tape sir state your name?

Bishop:        David Bishop.

Hastings:      Could you speak up sir?

Bishop:        David Bishop.

Hastings:      Your home address?

Bishop:        ██  ████████████

Hastings:      Your age and date of birth?

Bishop:        I'm 24 years old and I was born ███
               ██, ██.

Hastings:      Can you read and write sir?

Bishop:        Yes.

Hastings:      How much education do you have?

Bishop:        I graduated from Southwestern High
               School.

Hastings:      Are you under the influence of drugs or
               alcohol right now?

Bishop:        No.

Hastings:      Are you giving this statement free and
               voluntarily?

Bishop:        Yes.

Hastings:      Mr. Bishop I'm investigating an incident
               that occurred 301 Light Street which is
               the Inner Harbor. It happened around 2
               AM this morning where a friend of yours
               Matrella Creighton known to you as Truck
               was stabbed, what can you tell me about
               this incident?

Bishop:        Well, we started we, we entered the
               Harbor from the entrance and started
               walking down me Truck and my friend
               Little Man we were walking down talking
               to some girls alright, than all of a
               sudden we ran into these girls one of
               them Truck was trying to talk to than it
               was some guys standing there one of the
               guys said something smart to Truck,
               Truck was ready to fight the guy than

A-332

Statement of Mr. David Bishop
Page 2

Bishop:    they started fighting alright Truck, the guy swung on Truck, Truck swung the guy swung back and it looked like a punch but, he cut him with something in his neck. And, than the other one tried the light skin dude came up and hit him in his head and than they just backed up cause Truck wasn't trying to fight them after they hit him it wasn't trying to fight them so they just backed up cause I guessed they figure they stabbed him they did something to him. And, I didn't realize that he was stabbed until, until um I started fighting the dudes and than they backed off and then I went to my friend and than he, he looked at me and he was black he was like they cut me with something and than that was his last words and than all the blood started shooting out of his neck, and air was coming out of his neck and I tried to put my hand over his neck to try to stop the bleeding and keep his air in. And, than his head, his head started swelling up like a balloon his eyes started getting real big and his face started getting real puffy and blood started coming out of his mouth and his nose. And, it was like he was standing up he was real stiff and when I, when I felt I realize that he was gone so I sat him down, I laid he down on the grass and I tried to ran down the boardwalk to see if I could catch the guys but, by the time they were gone. So I ran back up the boardwalk and that's when the Ambulance gets there.

Hastings:  When you say these three guys describe the guy that was originally fighting with Truck who stuck him as you put it?

Bishop:    I say he was about 5"11, a 160 pounds um, dark complexion um, he was wearing not a hat but, some kind of it looks like some kind of little cap on his head or something it didn't have a wing on it. And, he had some it looked like he had some um some kind of pants or something rolled up to his knees and.

Hastings:  Like sweat pants?

Bishop:    Yea, like sweat pants or something.

A-333

Statement of Mr. David Bishop
Page 3

Hastings:      Did you see what kind of shoes he had
               on?

Bishop:        No, no.

Hastings:      The other two gentleman who, who were
               with them, when we were talking earlier
               you said that they looked like twins?

Bishop:        Yea, they looked like brothers I heard
               one of the girls say that call I heard
               one of the girls say twin, like that so
               I figure that um they were twins but,
               they looked like brothers they were the
               same height, the same complexion and
               they, their, their features were
               similar.

Hastings:      There was a different in their hair
               styles?

Bishop:        Yea one of them had a bush the other had
               braids going down to the back.

Hastings:      The one with the bush how big of bush
               was it?

Bishop:        I say it stood about 5 inches off of
               his, off of his head.

Hastings:      And the other one had braids all the way
               through his hair?

Bishop:        Going to the back, yea, all the way
               through.

Hastings:      Do you remember what either one of them
               was wearing?

Bishop:        No, I can't really remember what they
               were wearing.

Hastings:      Do you recall any words that were spoken
               between any of your friends and the
               suspects?

Bishop:        They were just going back and forth
               talking I mean saying like I don't know,
               Truck I guess Truck, Truck was like why
               do you have to disrespect me and he was
               ready to fight and that was really the
               end, the guy was like what's up and than
               they started fighting.  And it looked
               like it he looked like he punched him

A-334

Statement of Mr. David Bishop
Page 4

Bishop:        but, he stabbed him with something.
               Because I could tell the side that, I
               could tell the side that he was on that
               the dark skin dude was the one that
               stabbed him because the way they were
               fighting the light skin dude came from
               the back and, where he was cut that's
               where, that's where the dark skin dude
               was hit his at.

Hastings:      Right?

Bishop:        I seen him hit him.

Hastings:      When you met um the girls down the Inner
               Harbor, did you know any of these girls
               names?

Bishop:        None I just met them.

Hastings:      Did you get any nicknames or anything
               like that?

Bishop:        I, I didn't even talk to the girls.

Hastings:      How long were you down the Inner Harbor
               before this happened?

Bishop:        About an ½ hour.

Hastings:      Have you ever seen any of these suspects
               before anywhere?

Bishop:        Never.

Hastings:      Can you think of any questions that I
               didn't ask you or any information or any
               information that you can provide me that
               I didn't go into?

Bishop:        If I could remember more I would try
               but, I told you everything I know, I
               can't remember (inaudible).

Hastings:      Thank you for your cooperation.  This
               tape statement is terminated at 4:23,
               thank you.

This tape was transcribed by Secretary III Myrna C.
Milburn, Criminal Investigation Bureau, AdmUnit on
November 28, 1998.

A-335

# EXHIBIT 3

Today's date is the 29th of July 1998.  The time now is approximately 12:50 hours, this is Detective Robert Patton, the Baltimore City Police Homicide Unit.  Ah, I'm conducting an interview with Ms. ah, Barbara Baily in reference to the homicide of Montrell Crighton which occurred at the Inner Harbor on the um, 18th of July 1998 at about 2 o'clock in the morning.

Patton:         Just for the record Barbara just tell them your full name, your age and your date of birth?

Bailey:         O.k. My name is Barbara Anita Bailey.  I'm 18 and my birthday is ███████

Patton:         O.k. um, Barbara we were just conducting ah, ah pre-interview for about 20 minutes and um, you told us some things in reference to what happened down at the Inner Harbor, is that correct?

Bailey:         Huh. Huh.

Patton:         O.k. just from the beginning tell me what happened in sequential order, what happened that night down at the harbor.

Bailey:         O.k. well me and my friends were going down the harbor and we parked on,

Patton:         Now I'm gonna interrupt you there, you say me and your friends ah, who was with you?

Bailey:         My sister and my best friend.

Patton:         And what's your sister's name?

Bailey:         Tronetta and my best friend is Erica.

Patton:         O.k. Tronette Bailey,

Bailey:         Huh. Huh.

Patton:         and Erica ?

Bailey:         Jones.

Patton:         Jones? O.k.

Page #2
Statement of:          Barbara Bailey

Bailey:          Well, we were on um, Gay Street and we parked, parked on Gay Street and then we started walking towards the harbor and that's when we saw Montrell and David and the other guy.  We didn't know them but

Patton:          Is that the first time you had met them?

Bailey:          The first time we had met them and they um, approached us and, well they actually, Montrell approached Erica and we were like come on and trying to egg her to come on with us and stop talking.  So um, she just kept talking to him, she kept talk, you know he was like so what are you doing down here, or, or you married or you got a boyfriend and she was like, "I'm married!" and he was like, "You married? What you mean, you married!" She was like, "I'm married!" So um, she, she does have a boyfriend but she called him her husband so we um, they had a conversation for like 15 minutes, but I didn't know what they were talking about cause I wasn't in to it.  I wasn't paying attention and then we walked towards the harbor cause we wanted to get something to eat we was all on the Planet Hollywood.  The Planet Hollywood was closed so then we was walking toward the Maryland Science Center so, thinking that something else would be opened in the other Pavilion.  So that's when we met the other guys that were from D.C. and we started talking to them and they told us that their names and not all of them but there were 2 Kevins and there were a Victor and there was another one.  And I don't know his name.  And we were talking and then that's when Montrell came over there and we were

Patton:          Where were you, where, where were you exactly in relationship, in relationship to the harbor, where were you specifically?

Bailey:          O.k. um

Patton:          Before anything happened like fight, or anything happened?

Bailey:          Before ah, the fight happened?  We were like near, o.k. we were past the Pavilion.  We were closer towards the Maryland Science Center on one of those benches.  That's where we were sitting at and then, then that's when Montrell, Montrell and David came over there talking to us and Montrell was like, "You suppose to be married what you doing talking to them?" And he, she was like, "These my boys!" and he was like um, "I don't give a

Page #3
Statement of:        Barbara Bailey

Bailey:        fuck who they are!" and he was like, "Fuck them! I don't give a fuck!" and then the um, the guys that were from D.C. they was just chilled for a minute, they were chilling and then Kevin was like, "I don't know about that!" you know, if referring to when he was like, "Fuck them, I don't give a fuck about them!" And then that's when David was like, "Man he got a mouth over here, he talking over here", like he was egging them, instigating them or something. And um, then I noticed that something might happen so I got my girls together, Erica and, Da, and Shawnetta and I told them to come on and go. And that's when Montrell was like, "Your man look better than me?" asking Erica that, "Your man look better?" and she didn't answer him, she was just like, "He was drunk or whatever." She just was trying to ignore that. And so he was like, "Man FUCK YOU THEN!" cause she didn't answer. He was just like, "Fuck you! Fuck you!"

Patton:        Are you guys walking away? Walking towards the,

Bailey:        We were walking back towards the Gay Street I guess, you, you know.

Patton:        Towards where Pavilion( **please check**) was?

Bailey:        Yeah, back towards the Pavilion and um, well, David was like, "Man she ain't nothing but a 2000.00 dollar whore, fuck her, she ain't nothing but a 2000.00 dollar whore." and you know, I guess boys, you know how they are they support each other just so, so he doesn't feel bad. He was like you know, kept saying that or whatever and my friend was like appalled you know. She was like "HA!" you know, had this like expression on her face like, oh my GOD, so we just kept on walking and then, and he was um, trying to um, talk to my sister like, "Man you down here too? You suppose to have a boyfriend man, fuck you too, you suppose to have a boyfriend and you down here talking to other guys!" And so she was like, my sister was just like, "Man get out of my face! Get off of me!" And so then, that's when um, Kevin and them was like, "Yoe, yall need to chill out you know like, that's not necessary or whatever" and then that's when David was like, "Man he got a mouth over here again!" and then that's when the altercation happened. But before the altercation happened Victor was the one that ran off because I get he saw that something was gonna happen. So he ran off towards Gay Street I guess or where ever they parked and um, he ran, and then that's when they started fighting but they started moving back towards the Maryland Science Center and we were

Page #4
Statement of:      Barbara Bailey

Bailey:      moving towards Gay Street so it was like a distance and when they started fighting and I turned around and I saw Kevin punch Montrell. I saw him punch Montrell and then my sister was like, "Oh, he bleeding, he punched him good!" And they was like that's what he get, you know what I mean, cause we thinking that he got punched.

Patton:      Did, did Kevin have something in his hands or was he wearing a ring or

Bailey:      No he didn't.

Patton:      did you see, did you what he had in his hand?

Bailey:      No we were to far to see. It looked like a punch to us we didn't see that he had anything in his hand. So I thought he might have punched him in his mouth and his mouth was bleeding cause he had blood all over his shirt but my sister saw that I really couldn't see, my sister she, you know, she good with detail so I was like, "Come on!" and we saw that the guys from D.C. started running so we figured that maybe David and Montrell were gonna go to that car and get a gun or something so we started walking faster because we had on heels we couldn't run any faster than we, than our heels permitted us to.

Patton:      So the guys from D.C. past you up (inaudible)?

Bailey:      Yeah and then, we, they past us. They ran and they were like gone. They were shew out of there. I was like, "I wonder why they ran?" They, they punched the guy and they ran off you know. So we just started running (inaudible) to our car.

Patton:      Now did you see them after that, the guys from D.C. after that?

Bailey:      Uh. Uh, we ain't see them.

Patton:      O.k. now during your conversation with these guys, did they give you guys ah, their pager numbers, their home numbers, their telephone numbers at work or anything like that?

Bailey:      No.

**A-340**

Page #5
Statement of:       Barbara Bailey

Patton:        Or any

Bailey:        We didn't, uh. uh. We didn't

Patton:        You guys give them numbers?

Bailey:        No we didn't give them any numbers.  We didn't have a chance.  We were just talking you know when we first saw them we were just having a conversation about the harbor or downtown you know just being down there, they were like, what are yall doing?  Cause the conversation wasn't even focused on do yall have boyfriends and who yall down here with and can we get in touch with yall later on.  It wasn't focused on that until Montrell came back over there and was like, "Yall supposed to be married" and then you know.

Patton:        Right. Now you said there was 4 guys,

Bailey:        Huh. Huh.

Patton:        o.k. and one of them, 2 of them were named Kevin and you said two of them were twins,

Bailey:        Huh. Huh.

Patton:        right?  Let's deal with them twin guys first.  One of the twins you say had a name of Kevin?

Bailey:        Kevin, yeah.

Patton:        Alright, and can you describe those two guys to me,

Bailey:        Well um,

Patton:        the twins?

Bailey:        The twins, they were skinny, they were light skinned, they look like they were mixed or something, they had wavy hair but it was like a sandy blonde wavy hair.

Patton:        Sandy blonde?

Page #6
Statement of:     Barbara Bailey

Bailey:     Huh. Huh.

Patton:     **(Inaudible)** color?

Bailey:     **(Inaudible)** color.

Patton:     And how was the, how did they wear their hair?

Bailey:     One of them had like a short blow out. He just wore his hair wild wavy and um, the other one had corn rows that was going back and they were long corn rows. They probably reached down to his shoulders and he had them corn rowed back. But um,

Patton:     And this sandy,

Bailey:     They were both

Patton:     sandy blonde hair?

Bailey:     Yeah it was like sandy, huh, huh.

Patton:     Both of them had the same colored hair?

Bailey:     Yeah, same color hair, they

Patton:     But one had like it, was it like in a blow out?

Bailey:     Yeah, but his wasn't as long as his brothers, his was short. And they both kind of quiet, they ain't really didn't say much, they were quiet.

Patton:     O.k. and the guy, did you know of his second twin's name, did he ever say what his name was?

Bailey:     Ah, not that I remember. I he had

Patton:     Do you know which one, which one of the twins was Kevin?

Bailey:     No, I can't remember that. I can't

Patton:     Did they look like they were mixed black?

A-342

Page #7
Statement of:          Barbara Bailey

Bailey:          Yeah.

Patton:          Mixed?

Bailey:          Yeah, they looked like they were mixed or they had some other nationality in them like Puerto Rican or something.

Patton:          But they did have sandy blonde hair?

Bailey:          Huh. Huh.

Patton:          O.k. what about the guy Victor who ran off just as the fight started?

Bailey:          Well he was light skinned and had an even tone.  He had some contacts in his eyes.  They were, they were like silver or something they were a real, like the pupil of it, it wasn't like the normal size of a pupil it was like real big you know how you can see the pupil it's, it's kind of small?

Patton:          Right.

Bailey:          But this one like big so we knew it wasn't real you know and he, he admitted that, that wasn't real and he a real close haircut but

Patton:          And he was light skinned?

Bailey:          Yeah.

Patton:          Did he look like he was mixed also?

Bailey:          He looked like he could have been mixed.

Patton:          Did he say what his nationality was?

Bailey:          He said that he was half black and half Puerto Rican.

Patton:          Did he say where he lived, Victor?

Bailey:          Victor said he um, he lived out in D.C. but he use to live out in New York.

Patton:          Excuse me.  Ah, the two twins they, they also said they were from D.C.?

A-343

**Page #8**
**Statement of:**        Barbara Bailey

Bailey:        Huh. Huh.  Well they was even, they were on the same **(inaudible)** the only thing with them was my sister had pointed out something.  She was like, "Where yall from?" cause they had on white slouch socks and nobody in Baltimore wears white slouch socks and so she said, "Are yall from D.C. or something or where yall from?" and he was like, "D.C." , and he was like, "How did you know?" and she was like, "Because yall dress different", she aint wanna really offend him but then she was like you know and, "Plus yall have on white slouch socks" and so um,

Patton:        And the guy, there was the dark skinned guy that's named Kevin?

Bailey:        Huh. Huh.

Patton:        O.k. can you describe him?

Bailey:        Can I describe him?

Patton:        Other than he was dark skinned.

Bailey:        He, he had um, he had like a , a, thick close haircut, kept waves, he had like wavy hair but it was um, it was close.  It wasn't long and it wasn't real short.  It was just close.  I could tell.

Patton:        Were they all about the same age?  Or the same approximate age?

Bailey:        Huh. Huh.

Patton:        They're all in their twenties?

Bailey:        They're all in their twenties.  That's what they look like.

Patton:        Did they say what kind of car they were driving?

Bailey:        Uh. Uh.

Patton:        They never bragged about what kind of car they had?

Bailey:        They didn't, they sure didn't.

Page #9
Statement of:      Barbara Bailey

Patton:      Did any of those guys have any distinguishable features other than the two twins had sandy blonde hair and Victor had curly black hair ah, correction

Bailey:      Uh. Uh.

Patton:      O.k. I'm sorry

Bailey:      No.

Patton:      the twins had good curly sandy blonde hair?

Bailey:      Huh. Huh.

Patton:      And ah, Victor's hair was ah,

Bailey:      Close cut.

Patton:      Close cut.

Bailey:      Close cut, he didn't have any hair you might as well say cause it was a real close cut.

Patton:      Black?

Bailey:      Huh. Huh.

Patton:      O.k. so they were from D.C. you don't know what kind of car, they didn't brag about what kind of car they were driving, they didn't have a chance to give you guys any telephone numbers?

Bailey:      Uh. Uh.

Patton:      Did they say where they worked at or, you know how guys brag about themselves when they're talking to women they always,

Bailey:      Yes.

Patton:      put themselves forward first. Do you remember anything significant about what they may have said,

A-345

Page #10
Statement of:      Barbara Bailey

Bailey:      No they didn't

Patton:      about themselves?

Bailey:      Nope. No.

Patton:      And you'd never seen those guys before?

Bailey:      Never.

Patton:      That was the first time you ever seen?

Bailey:      The first time we met both of them groups.

Patton:      Did they say where they had came from and where they had been before they met you guys?

Bailey: about      Um, not that I can remember. I don't remember if they said anything anything except they were just hanging out.

Patton:      Now who was basically really engaged in a deep conversation with those guys from D.C., which one of them your sister or Erica?

Bailey:      Um, probably, first it was my sister and then it was Erica. I mean, cause my sister was talking to Victor at first but then when Montrell came over there and he started like you know getting rowdy, Erica tried to kind of ignore him so she was talking more to Victor than any, than any of us. Cause Victor he was the more talkative one, he was the one that approached us first and then the other one, the twins were the quiet ones and Kevin he was try, trying talking but I think he was smoking something, I'm not sure what he was smoking but he had, I think he had a cigarette or something in his hand. But he was basically chilling

Patton:      Right.

Bailey:      the um, the dark skinned Kevin. He was just like, whatever, smoking.

**A-346**

Page #11
Statement of:          Barbara Baily

Patton:          Right.  O.k. Um, is there anything else you can remember about these guys that I didn't ask you that may help to identify them, thing about them? **(Please check).**  OH! there is, in our pre-interview you indicated that they were all wearing,

Bailey:          Oh, yeah, huh.huh, they were all wearing white t-shirts.

Patton:          White t-shirts?

Bailey:          Yeah.

Patton:          And shorts?

Bailey:          And shorts.

Patton:          And tennis shoes?

Bailey:          And tennis shoes

Patton:          And socks?

Bailey:          And some of them had white slouch socks on.

Patton:          Slouch socks on?  Those are the socks that hang down and drooped down

Bailey:          Yeah.

Patton:          towards your ankle.

Bailey:          Yeah, yeah, yeah. **(Inaudible).**

Patton:          You remember anything with heavy writing on their t-shirts of any kind?

Bailey:          No I, they were as simplest, you know, simplest white t-shirts **(inaudible).**

Patton:          Did you notice any of them had any, did they have any tatoos?

Bailey:          Uh. Uh. Nope!  Usually if I see one I'll look at it

Patton:          Right.

A-347

Page #12
Statement of:          Barbara Bailey

Bailey:          and then I'll remember.

Patton:          What about earrings and gold teeth?

Bailey:          Maybe, maybe Victor had one.

Patton:          Earring or gold teeth?

Bailey:          Oh earring?

Patton:          Yeah earring, Victor had an earring?

Bailey:          No. No.

Patton:          Oh, Victor had

Bailey:          I think he had a gold in his mouth. I think he had one.

Patton:          In the front?

Bailey:          One on the side, on um, yeah on the side **(Inaudible)**. And, and ah,

Patton:          Alright um, we're gonna conclude the interview now. But if you think of anything after the interview I, I would appreciate that you give me a call. You have my telephone number, give me a call just let me know. Sometimes you remember things afterwards you know like,

Bailey:          Huh.Huh.

Patton:          something about it, oh yeah, he said he was, he had Alexis and mother worked at GM or something you know,

Bailey:          Huh. Huh.

Patton:          something like. Anything like that, I appreciate you ah, telephone call. Alright we're gonna conclude the interview, the time now is approximately ah, 1308 hours.

Transcribed by:          Eva E. Cooper

# EXHIBIT 4

The 12th of August 1998 the time now is approximately 11:38 hours. This is Detective Robert Patton Baltimore City Police Homicide Unit. Ah, conducting an interview with Ms. Charnetta Bailey in reference to the homicide stabbing of Montrell Crighton which occurred on the 18th of July 1998 at 0200 hours in the Inner Harbor Downtown Baltimore.

Patton:         O.k. Ms. Bailey for the record just tell me your full name your age your date of birth and your address?

Bailey:         I'm Charnetta Bailey my birthday is ███ , I live at █████████ and I'm 16.

Patton:         Sixteen. O.k. ah were you in the Inner Harbor on the 18th of July about 2 o'clock in the morning were an incident occurred where a person was ultimately stabbed, Montrell?

Bailey:         Yes I was.

Patton:         O.k. tell me in your own words exactly what happened that night.

Bailey:         O.k.

Patton:         From beginning to end wherever you want to start at but basically from when you guys get down there and, and you encounter everybody.

Bailey:         Well my sister and good a friend of ours named Erica, we parked on Gay Street and we walked on Gay Street and Montrell and Derrick and um, Schuggie was the first three guys that we met down there. We was on our way to Planet Hollywood but it happened to be closed, so before we got down there, we was talking to them the guy ah, Montrell was trying to talk to my friend Erica, um, Schuggie was trying to talk to me and the guy Derrick was trying to talk to my sister. And ah, they were conversating, all of us was conversating we all told them we had boyfriends but the ah, my friend Erica told him that she had a husband and she was married. So Montrell (inaudible) he was o.k. he told us that um, um, he was gonna leave us alone, he respect that we have boyfriends, I'll let yall go about yall business but it was nice meeting yall. So we walked on and we was going to Planet Hollywood we found out it was closed so we just said we was gonna walk around the Harbor. So we walked around the Harbor and stopped, my sister seen a couple of friends that she knew so we stopped and we was sitting on the bench. While they were talking um, Montrell, Derrick and Schuggie came back and Montrell was more hostile then. He was more like um, "What yall doing down here talking to them?" And was gossiping with us and my friend Erica was like, "This my spiritual brother, we're on a different level than us, down grading Montrell. So I thought that might have made him more pumper and um Schuggie was like, "Don't down grade my man! You don't know what kind of knowledge my man got in his head!

Page #2
Statement of:          Charnetta Bailey

Bailey:          Don't do that to my man!" And I was looking like why is Erica, you know, doing
this. So um, they left us alone then and walked on or whatever. Then we stopped
holding conversation with them we walked towards the Science Center. Then we
turned back around and we seen a group of guys about 4 of them. One name was
Victor. They were friendly light skinned. We called them Pretty Boys. They all
had on white shorts , (inaudible) shoes and slouch socks. So we figured they
were from D.C. Then we hold ah, slightly conversation with them and they told
us that they were um, they were from D.C. and um, we found their names. One
was um, Victor and one was Kevin and it was two Kevins and a Kiwi. Two, a
Kevin and Kiwi were twins and then there was another Kevin.

Patton:          Kiwi?

Bailey:          Nick name.

Patton:          Nick name was Kiwi?

Bailey:          I guess so.

Patton:          So what did

Bailey:          (Inaudible). And they told us that we was a nice bunch that he was like um,
usually the guys, the  girls that they meet down there have knuckleheads or
chicken heads, don't got good heads on their shoulders. They was like that's a
nice bunch they like the way we carried ourselves and pronounced our names and
they was just talking and we were real proper. And um, um then Montrell,
Derrick and Schuggie came over there. Montrell was more hostile then. He was
talking to us with a um, aggressive tone, disrespecting us, calling us high priced
whores and telling us that we, we can't talk to nobody cause, I guess he was trying
to mess up our rap. Te, telling the guys that we had boyfriends, one was married
and my sister had a boyfriend also. And was like, "Don't talk to them" and the
other guys in the background, they didn't say anything to him. They just was like,
" Um, we don't need this tonight!" And the guy , it was like, Schuggie was like,
"Calm down Montrell, calm down!" And um, Schuggie um, Montrell was like,
"Nah fuck them  niggas, we don't we, I don't care about them! They married, they
married, they ain't nothing but high priced whores. They come down here with a
1000.00 dollar outfit on trying to be cute!" And it um, it, it escalated then it
calmed down. And

Page #3
Statement of:          Charnetta Bailey

Bailey:     then um, Montrell and his friends walked a different way we walked the opposite way and Montrell came running back towards us and got in our face and the guy, guy was like, "I don't need this tonight" he was like, "No what's up with us?" **(Inaudible)** was saying, "Come on fellows, come one fellows!" calling his fellows over there and Montrell and the guy named Kevin, the tall one not the twin they were walking around in a circle. A beef , a beef like circle. Then I didn't see anymore. I turned around cause um, I was trying to gather up everybody and then Erica was like, "OOOOH he got banged in his mouth!" And then I turned around I seen the blood. Not here but here

Patton:     On his neck?

Bailey:     Yeah, he had on a white T-shirt so it was like real noticeable and um, the guy Victor, he, before the guy had got stabbed the guy named Victor um, ran off, but we didn't know he got stabbed we thought he was hit in the mouth. And he was like um, the Kevin was like, "Ain't nobody to big to take, we could take down. Ain't nobody to big we could take down!" Cause Kevin was skinnier than ah, Montrell. And um, they started walking with a upper pace and they kept looking back. And when I looked back Montrell was still standing so therefore I didn't know the knowledge that he was you know hurt or any. Then um, we went, they walked towards the valet parking and we walked, we walked the same way but they ran across the, um that street, I'm not sure what that street is, that wide street towards valet parking and we ran towards Gay Street. And we got in our car and we was still circling around trying to find them. We heard the ambulance going on and we didn't think it was nothing severe. I thought somebody finally called security and was you know, trying to calm everything down. We heard the ambulance going on and we got in the car trying to ride around trying to find Victor and them we were, we road around for like 25 minutes trying to find them. We went, we went inside valet parking asking did a couple of guys leave and they didn't say anything. They didn't tell us that no one left or nothing. And um, then, that's about it and we went on home that evening **(inaudible).**

Patton:     Now there's 2 Kevin's ah, and a Kiwi?

Bailey:     Huh. Huh.

Patton:     Alright one Kevin was the one that was actually fighting with Montrell,

Bailey:     Huh. Huh.

**A-352**

Page #4
Statement of:          Charnetta Baily

Patton:     right?

Bailey:     Huh. Huh.

Patton:     Then there were the 2 twins?

Bailey:     Huh. Huh.

Patton:     And then there's Victor?

Bailey:     Right.

Patton:     Now which of the two twins was Kiwi?  Now one of them had their hair braided?

Bailey:     The light skinned one.

Patton:     O.k.

Bailey:     The light skinned one.

Patton:     The one that had his hair braided back?

Bailey:     Yeah, the one that had his hair braided back.

Patton:     O.k. that was Kiwi?

Bailey:     Huh.Huh.

Patton:     O.k. and Victor, you said his name was Victor

Bailey:     Huh. Huh.

Patton:     but then his friend said

Bailey:     I don't even, I think that was the other Kevin with the short hair was like calling Vicdamone.

Patton:     Vicdamone?  But you don't believe that was his last name cause that's an actor.

Bailey:     Huh.Huh.

Page #5
Statement of:          Charnetta Bailey

Patton:     Did they ever confirm the fact that they were from D.C. while you were talking to them.  I mean did that ever come out that they

Bailey:     Huh.Huh.

Patton:     were in fact from D. C.

Bailey:     Huh. Huh. Yeah.

Patton:     Victor

Bailey:     Was originally from New York.  He had said he was down here with these boys that's from D.C.

Patton:     And that was victim that you talked to?

Bailey:     Huh. Huh.

Patton:     Ah, did you see a knife or anything in anybody's hands?  In the guy Kevin's hands when they were, before they started fighting?

Bailey:     The distance that we were and how the energy that was there, I just thought it was a fist fight and I was scared that Kevin was gonna get hurt because Montrell was bigger than him you know, that's what my first thought was in my head.  And then when I seen Kevin, not Kevin, Montrell bent over like this, I said, "Oh that's right he was drunk and he was already worked up."  So I'm thinking that he wasn't gonna last long anyway when I seen Kevin walking away, I'm like that's probably why he was like, he was you know bent over some.  I didn't even realize, and I didn't see any (inaudible) or knife or nothing.

Patton:     Alright, now had you ever seen those guys before that day, the guys from D.C.?

Bailey:     No.

Patton:     Alright, but you knew Montrell and them before?

Bailey:     Uh. Uh.

Patton:     You didn't?  That was the first time you met them also?

A-354

Page#6

Statement of:          Charnetta Bailey

Bailey:       That was **(inaudible)**. Huh.Huh. But um, Derrick said he re, remembered my
              sister from somewhere. But I'm not sure where he, where he remembered her
              from. I guess later on he remembered her from Mondawmin or something.

Patton:       Mondawmin. Alright. Is there anything else you wanna tell me that ah, may help
              us identify these guys. Anything you can remember? Like they never, did they
              ever give you a phone number or anything?

Bailey:       No numbers, it never got that far.

Patton:       They never bragged about what kind of car they were driving?

Bailey:       Nope.

Patton:       What they did for a living?

Bailey:       No.

Patton:       I mean usual guy stuff that they, you know how guys start bragging about who
              they are and what they did.

Bailey:       All we did is exchange names. But then that's when Montrell came over there.
              We asked them what they were getting into tonight and they said, "Nothing, what
              are yall getting into?" And we was like nothing.

Patton:       Did they say, did they say where they had been before they came down there?

Bailey:       Uh. Uh.

Patton:       They never talked about what kind of car they were driving?

Bailey:       **(Didn't hear an answer).**

Patton:       Alright, ah, we're gonna conclude the interview. The time now is 11:48 hours.

Transcribed by:       Eva E. Cooper

# EXHIBIT 5

| SUPPLEMENT REPORT<br>Form 87 / 7   1160-25-53 | POLICE DEPARTMENT<br>BALTIMORE, MARYLAND | | 1. Arrest/Custody No. | 2. Post<br>112 | 3. Complaint No.<br>98-1G13258 |
|---|---|---|---|---|---|

**TYPE OF REPORT.**
☐ Misc. Incident
☒ Crime Against Persons
☐ Crime Against Property

☐ Missing Person
☐ Custody
☐ Vehicle
☐ Accident

4. ☐ Continuation
☒ Follow-Up

6. Page   1   of   1

5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business)
CREIGHTON , MARTRELLE LAMAR

7. Crime/Incident
HOMICIDE BY STABBING

8. Crime/Incident Changed From

| 9. Date of Original Report<br>18 JULY 1998 | 10. Date/Time of This Report<br>16 NOVEMBER 1998 1503 | 11. Total Property Stolen<br>N/A | 12. Total Property Recovered<br>$ N/A | 13. Multiple Clearance<br>☐ Yes   ☐ No |
|---|---|---|---|---|

Item No.

14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

****** PHOTOGRAPHIC LINE UP ******

On the 12th of November 1998 at 1503 hours Mr. David Bishop was shown two photographic line up cards which contained color photographs of Kevin Lee Scott, SID # 1515718 and Keith Michael Scott, SID #1511964. Mr. Bishop viewed the line up cards and without hesitation positively identified Kevin Lee Scott, SID # 1515718 and Keith Michael Scott SID # 1511964 as being two of the subjects involved in the satbbing death of the captioned victim. The line up was conducted at 6930 Glenheights Avenue and witnessed by Detective Robert Patton and Detective Kirk Hastings of the Homicide Unit. The line up cards were placed in E.C.S. and stored under property number # 98060338

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)   Seq. No.   Assignment<br>DET. ROBERT PATTON C792   CIB HOMICIDE UNIT | 19. Status<br>☒ Open   ☐ Suspended   ☐ Closed | 20. Referred | 21. Teletype No |
|---|---|---|---|
| 22. Reporting Officer (Sign)   Assignment   Address-Zip<br>Det. Patton   CIB Homicide   601E Fayett St | 23. Supervisor Approving   Seq. No | 24. Reviewer |

# EXHIBIT 6

| SUPPLEMENT REPORT | POLICE DEPARTMENT | 1. Arrest/Custody No. | 2. Post | 3. Complaint No. |
|---|---|---|---|---|
| Form 87/7   1160-25-53 | BALTIMORE, MARYLAND | | 112 | 98-1G13258 |

**TYPE OF REPORT:**
☐ Missing Person   4. ☐ Continuation   ☒ Follow-Up

☐ Misc. Incident   ☐ Custody
☒ Crime Against Persons   ☐ Vehicle
☐ Crime Against Property   ☐ Accident

5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business)
CREIGHTON, MARTRELLE LAMAR

6. Page  1 of 1

7. Crime/Incident
HOMICIDE BY STABBING

8. Crime/Incident Changed From
N/A

| 9. Date of Original Report | 10. Date/Time of This Report | 11. Total Property Stolen | 12. Total Property Recovered | 13. Multiple Clearance |
|---|---|---|---|---|
| 18 JULY 1998 | 20 NOVEMBER 1998 | $ N/A | $ N/A | ☐ Yes   ☐ No |

Item No.

14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

****** PHOTOGRAPHIC LINE UP ******

On the 20th of November 1998 at 1110 hours Ms. Barbara Bailey was shown two photographic line up cards which contained color photographs of Kevin Lee Scott, SID # 1515718 and Keith Michael Scoot , SID # 1511964. Ms. Bailey viewed the both line up cards and without hesitation positively identified Kevin Lee Scott, SID # 1515718 and Keith Michael Scott, SID # 1511964 as being two of the subjects involved in the stabbing death of the captioned victim. The line up was conducted at 100 N. Calvert Street, room 308. The line up was witnessed by Detective Robert Patton and Detective Donald Gordon of the Homicide Unit. The photographic line up card was placed in E.C.S. and under property number # 98060338

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|
| 18. Reporting Officer (Print)   Seq. No.   Assignment<br>DET, ROBERT PATTON C792  C.I.B. HOMICIDE | 19. Status ☒ Open ☐ Suspended ☐ Closed | 20. Referred | 21. Teletype No |
| 22. Reporting Officer (Sign)   Assignment   Address-Zip<br>Det. CIB 601 E Fayett. st 21202 | 23. Supervisor Approving   Seq. No. | 24. Reviewer |

**A-359**

**SUPPLEMENT REPORT**
Form 87 / 7   1160-25-53

**POLICE DEPARTMENT**
**BALTIMORE, MARYLAND**

| 1. Arrest/Custody No. | 2. Post 112 | 3. Complaint No. 98-1G13258 |
|---|---|---|

| TYPE OF REPORT: | | | |
|---|---|---|---|
| ☐ Misc. Incident | ☐ Missing Person | 4. ☐ Continuation | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) |
| | ☐ Custody | ☒ Follow-Up | **CREIGHTON, MARTRELLE LAMAR** |
| ☒ Crime Against Persons | ☐ Vehicle | 6. Page 1 of 1 | 7. Crime/Incident HOMICIDE BY STABBING | 8. Crime/Incident Changed From N/A |
| ☐ Crime Against Property | ☐ Accident | | | |

| 9. Date of Original Report 18 JULY 1998 | 10. Date/Time of This Report 20 NOVEMBER 1998 | 11. Total Property Stolen $ N/A | 12. Total Property Recovered $ N/A | 13. Multiple Clearance ☐ Yes ☐ No |
|---|---|---|---|---|

| Item No. | 14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any. |
|---|---|

****** PHOTOGRAPHIC LINE UP ******

On the 20th of November 1998 at 1100 hours Ms. Charnetta Bailey was shown two photographic line up cards which contained color photographs of Kevin Lee Scott, SID# 1515718 and Keith Michael Scott, SID # 1511964. Ms. Bailey viewed both line up cards and without hesitation positively identified Kevin Lee Scott, SID # 1515718 and Keith Michael Scott, SID #1511964 as being two of the subjects involved in the stabbing death of the captioned victim. The line up was conducted at 100 N. Calver Street, room 308 and was witnessed by Detective Robert Patton and Detective Donald Gordon of the Homicide Unit. The line up cards were placed in E.C.S. and stored under property number # 9806938

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print) DET ROBERT PATTON | Seq. No. C792 | Assignment CIB HOMICIDE UNIT | 19. Status ☒ Open ☐ Suspended ☐ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|---|---|
| 22. Reporting Officer (Sign) Det. | Assignment CIB | Address-Zip 601 E Fayette St | 23. Supervisor Approving | Seq. No. | 24. Reviewer |

**A-360**

# EXHIBIT 7

Today's date is the 2nd of February 1999. The time now is ah, 2055 hours. This is Detective Robert Patton, and Detective Kirk Hastings, of the Homicide Unit. We're conducting an interview with Mr. ah, Kevin Lee Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, at the Baltimore Inner Harbor Pavilion, on the ah, Promenade.

Patton:        Okay for the record ah, Kevin just tell us your full name, your age, and your date of birth please?

Scott:         Kevin Lee Scott.

Patton:        And your age?

Scott:         █████

Patton:        Okay and your birth date?

Scott:         ███████

Patton:        Okay and were do you live?

Scott:         █████████████████

Patton:        Okay and were is that located?

Scott:         ████████████

Patton:        ███████████████████  What's you telephone number there?

Scott:         Ah, ████████

Patton:        Okay.

Scott:         Area code 301.

Patton:        301, okay do you have a brother?

Page - 2
STATEMENT OF:  Kevin Smith

Scott:          Yes I do.

Patton:         Okay, what's your brother's name?

Scott:          His name is ████████████████

Patton:         Okay and do you have a nickname?

Scott:          Ah, common nickname is Twin, that's it.

Patton:         Twin, does your brother have a nickname?

Scott:          He go by the same.

Patton:         What?

Scott:          Twin.

Patton:         Twin? Okay, alright ah, on the ah, day I just
                told you the 18th of July, ah, you were down at
                the Inner Harbor, is that correct?

Scott:          Correct.

Patton:         Okay um, just tell me from the beginning ah,
                what you know, what you did that evening leading
                up to an altercation down ah, Inner Harbor?

Scott:          Leading up to what.

Patton:         To leading up to the altercation. There was a fight
                apparently at the Inner Harbor, right?

Scott:          Okay, right.

Patton:         Okay, now let me ask you first, you, you left
                Laurel to come to Baltimore, is that correct?

Scott:          Yes.

Patton:         That day, who was with you?

Scott:          Me, my brother and a friend of ours Kevin.

Patton:         Kevin, what's his last name?

Page - 3
STATEMENT OF:  Kevin Smith

Scott:     Miller.

Patton:    Kevin Miller

Scott:     Yeah.

Patton:    Okay and ya'll came to Baltimore Inner Harbor, right?

Scott:     Correct.

Patton:    Okay and were'd you park your car?

Scott:     I believe it was a block and a half or two away from the Harbor.

Patton:    Okay, and do you know about what time you got down to Baltimore Harbor?

Scott:     I say it was between 7 and 9.

Patton:    Okay.

Scott:     I'm not sure.

Patton:    So tell me what did you guys do when you got down.

Scott:     When we got there we walked around for awhile. We had a few drinks, we stood by the water. On the way out, we ran into 2 guys.

Patton:    Okay and who were those 2 guys you ran into?

Scott:     That was Vick.

Patton:    Vick, you ran into a guy name Vick?

Scott:     Yeah.

Patton:    Okay.

Scott:     And a buddy of his.

Patton:    You know his buddies name?

Scott:     Nah, I'm not sure.

**A-364**

Page - 4
STATEMENT OF:  Kevin Smith


Patton:     Had you ever seen him before, the buddy of
            Vick?

Scott:      Yeah, I think I seen him before, but I'm not sure
            who he exactly is.

Patton:     And do you know Vick's last name?

Scott:      No I don't.

Patton:     Okay, do you know were Vick lives?

Scott:      No I don't. I know he stayed in the area of Laurel.

Patton:     Okay, do you know what kind of car he, he drives
            or use to drive?

Scott:      Yes he use to drive a 4 door grey, Cutless or
            Oldsmobile.

Patton:     Okay alright so your walking out, you say your
            on your way out of the Harbor when you run into
            Vick and, and a friend of his?

Scott:      Correct.

Patton:     What happened after that, **inaudible** Vick.?

Scott:      He stopped us, asked what we was doing, what's
            up. And was we like nothing, what's up. We was
            getting ready to leave out and the same time um,
            these 3 girls walked passed. Well a few minutes
            later, 3 girls, I don't, I don't remember if it was
            2 or 3. They came pass, Vick called them out, they
            stopped, they was talking to him for, I say maybe
            maybe close to 5 minutes. And that's when these
            other 3 guys came up. A big tall dude, and 2 short
            guys. And he was being loud, I can't remember what
            he was saying to the girl, but he was saying
            something to the girls as if, like it was his
            girlfriend or something. So by that time he was
            yelling yelling, girls said something, something
            to him. I guess, I don't know if they know him or
            they didn't and they pulled Vick away. And then
            them 4 was walking, or them 3. I'm not sure how
            many girls it was. And um, so we start walking,

Page - 5
STATEMENT OF:   Kevin Smith


|  |  |
|---|---|
|  | keep walking the way we was going leaving out. So inaudible, the big dude still yelling, inaudible him yelling. And he was coming up behind ah, he was over to my left I believe or my right. He came up was yelling, had his guards up to big boy or whoever that was. And ah, I glanced back and see Vick swinging, hit him up in this area somewhere. |
| Patton: | In the face? |
| Scott: | In the face, facial area. So and he, he just broke after that. |
| Patton: | Who broke Vick? |
| Scott: | Vick ran, he took off running. And recall the girls laughing like hah hah. And you know we still, I wasn't, I was paying attention, but I wasn't paying attention. So they stated laughing, we still walking. Two dudes, two dudes chased Vick or I don't know if they were with Vick or them guys, I'm not, that's, that's what I'm not sure of. They they chased him and that's was that. We preceded on to our car, got in the vehicle and left, came on back to Laurel. |
| Patton: | You said the tall, the big guy that was arguing with the girls, or was having words with those girls came up to to to Vick and his friend as there walking away with the girls? |
| Scott: | Yeah. |
| Patton: | From behind? |
| Scott: | Yeah. |
| Patton: | And then you saw Vick hit the guy, hit the big tall guy in the, in the face? |
| Scott: | Yeah. |
| Patton: | Now did anybody else hit, hit him? |
| Scott: | Inaudible. |

Page - 6
STATEMENT OF:  Kevin Smith


Patton:        Did anybody else fight?

Scott:         That that, that was it.

Patton:        So the only that was throwing any punches was
               Vick and the tall guy?

Scott:         Yeah.

Patton:        The guy, the guy that was arguing with the girls?

Scott:         Right.

Patton:        Okay, now did you or your brother or Kevin Miller
               fight anybody?

Scott:         No.

Patton:        Did you guys hit anybody?

Scott:         No.

Patton:        Did any of the friends that were with the victim,
               the big tall guy approach you guys and try to
               fight you guys?

Scott:         No.

Patton:        No.

Scott:         Not 2 words was said to me and I didn't say 2
               words.

Patton:        Okay, so the only person that was.

Scott:         Matter fact ah, was I, see I was drunk, I don't
               remember, I think I was, I might of been talking
               to one of the little dudes. As far as like what's
               going on. I said inaudible. I remember, I think I
               remember, it keep flashing back that I, I think
               I talk to the smallest, was it big dude, another
               dude, you know like a younger dude. And I think
               I recall myself talking to him as in like, what's
               going on, you know we not trying to mess, we didn't
               know that was you girl and that's it. And then we
               left.

A-367

Page - 7
STATEMENT OF:  Kevin Smith


Patton:       Now when you left, were was the big guy, what
              did he do? After, after Vick hit him, what did
              he do?

Scott:        He ain't do noting, he was just standing there.

Patton:       Did you see him bleeding or anything like that?

Scott:        No sir.

Patton:       You see anybody, anybody bleeding?

Scott:        I ain't see no blood. All I saw was a hit, run,
              girl started laughing and that was that. And I
              ain't think nothing of it.

Patton:       Did Vick have anything in his hands or have a
              knife, or ice pick, or, or ring or something on
              his hand?

Scott:        No.

Patton:       That you could see?

Scott:        No.

Patton:       Now describe Vick to me, how does he look?

Scott:        How does he look.

Patton:       Yeah.

Scott:        About medium build, near my height 5-10, 5-11,
              hispanic um, Puerto Rican or Spanish, I'm not
              sure which one.

Patton:       Is he light complexed?

Scott:        Real light complexed.

Patton:       Lighter than you?

Scott:        Yes.

Patton:       And how old is he about?

**A-368**

Page - 8
STATEMENT OF:  Kevin Smith


Scott:          Some where in his 20's.

Patton:         Okay, now describe Kevin Miller, how does he
                look?

Scott:          He's a maybe 6 foot, medium build, brown skin.

Patton:         How old is he about?

Scott:          Ah, I believe he's 21 now.

Patton:         Now you say there's a, a guy that's with Vick.
                How, can you describe what he look like, do you
                remember what he look like?

Scott:          Ah, he was brown skin, he had low hair and may
                have been 6 foot or under, ain't no taller.

Patton:         How as Vick wearing, how was Vick wearing his hair?

Scott:          How was he wearing his hair.

Patton:         Yeah, what style?

Scott:          It was real low, close cut.

Patton:         What about Kevin Miller, how is his hair?

Scott:          How was his hair, I believe it was low cut too.
                Like its all around shape up.

Patton:         Did you know those girls before you met them that
                night?

Scott:          No.

Patton:         Okay.

Scott:          I ain't know them.

Patton:         Had you ever seen the big guy or his friends
                before that night?

Scott:          I ain't seen none of them before that night.


**A-369**

Page - 9
STATEMENT OF:   Kevin Smith


Patton:        And the only person you really knew was Vick
               and had seen the guy that was with him before,
               but you don't know his name or anything?

Scott:         Yeah.

Patton:        That was with Vick?

Scott:         Correct.

Patton:        And the only person that you saw hit anybody was
               who?

Scott:         It was Vick punching him.

Patton:        I'm sorry?

Scott:         Vick was punching the, the um, tall guy.

Patton:        Did the tall guy swing back?

Scott:         Nah, Vick took off.

Patton:        Alright so Vick hit him, and just one punch
               thrown and that was it?

Scott:         That was it, that was it.

Patton:        And you guys went back to Laurel after that?

Scott:         Correct.

Patton:        Did you meet, meet up with those girls later?

Scott:         Nah.

Patton:        Did you ever call those girls later?

Scott:         No I didn't, I never talked to them.

Patton:        Did you guys ever give those girls your telephone
               numbers or anything like that?

Scott:         No.

Patton:        Alright um, I just want to back up a little bit.


A-370

Page - 10
STATEMENT OF:  Kevin Smith

Scott:        Um-hum.

Patton:       Um, before we conducted the taped interview um,
              we advised you of your rights, is that correct?

Scott:        Correct.

Patton:       Okay and we read you your rights. You read your
              right allow to us, is that correct?

Scott:        Yes.

Patton:       Okay and you put the, your initials on each one
              of the rights indicating that you understood each
              one of them?

Scott:        Yeah.

Patton:       And you signed your name on that form in 2 places?

Scott:        Yeah.

Patton:       Okay, now I'm, and on the Rights form you indicated
              that you wanted to talk to us without having a
              Lawyer present, is that correct?

Scott:        Correct.

Patton:       And that was free and voluntarily on your part,
              is that correct?

Scott:        Correct.

Patton:       Okay.

Scott:        I like to do both, I just, I like to talk now and
              I want, you know I just, wanna get, get it going.

Patton:       Okay um, did we force you to give this statement?

Scott:        No sir.

Patton:       Okay, and you understand that your under arrest,
              is that correct?

Scott:        Yeah I understand.

Page - 11
STATEMENT OF:  Kevin Smith


Patton:      That I told you that before we turned on the tape
             recorder, is that correct?

Scott:       Yes.

Patton:      And I told you your being charged with murder,
             is that correct?

Scott:       Yes.

Patton:      Okay and I told you who's murder your being charged
             with?

Scott:       Yeah.

Patton:      Okay, and you, when I read you, when you read the
             rights, you fully understood them, is that correct?

Scott:       Yes.

Patton:      Now let me ask you another question, do you know
             were Vick is now?

Scott:       Do I know.

Patton:      Yeah?

Scott:       I know he's locked up, but I couldn't tell you
             were at, or nothing like that.

Patton:      And how do you know that he's locked up?

Scott:       We saw it over Laurel and I seen it on the News
             for myself.

Patton:      Okay and he's locked up for what, do you know?

Scott:       Believe committing another murder crime in PG
             area.

Patton:      Okay.

Scott:       Three girls.

Patton:      Right now since that incident down the Inner Harbor
             had you seen Vick?

Page - 12
STATEMENT OF:  Kevin Smith


Scott:          I seen him.

Patton:         Yeah.

Scott:          Since that night.

Patton:         The the night down at the Harbor?

Scott:          Ah, I may have seen him once or twice, driving.

Patton:         Did you talk to him?

Scott:          No.

Patton:         What about Kevin Miller, did you talk to Kevin
                Miller after that night?

Scott:          Yeah I talk to him.

Patton:         What did Kevin have to say about what happened
                that night?

Scott:          Ah that, we didn't talk about that.

Patton:         You didn't talk about what happened?

Scott:          I mean that, that wasn't nothing, I mean.

Patton:         Did you know that anyone died as a result of that
                fight you had down at the Harbor or was witnessed.

Scott:          No sir. That's why it seemed kind a inaudible, and
                its to me it was just funny cause he hit him and
                ran. It was like, hit and run incident. The girls
                laughed, I mean wasn't, wasn't no gun displayed,
                no knife, nothing. It, it was like simple punch and
                left. And we just come to find out that he stabbed
                him, so.

Patton:         Do you know if Vick had some keys?

Scott:          Some keys.

Patton:         Yeah.

Page - 13
STATEMENT OF:  Kevin Smith


Scott:       I mean I wouldn't know what he had with him or anything, only think I can tell you is what he was wearing that night. And we just, you know bumped into him on the way out.

Patton:      What were you wearing that night?

Scott:       I don't know, I can't tell you what I was wearing. In the summertime, I know I had to have on some shorts.

Patton:      Do you know what your brother had on and Kevin Miller was wearing that night?

Scott:       Shorts.

Patton:      Kevin Miller was wearing shorts too?

Scott:       Ah, I think so, sometime.

Patton:      And your brother was wearing shorts also?

Scott:       I don't see why not.

Patton:      Okay, is there anything else about what happened that that night at the Harbor that ah, you can tell us that we've not asked you about? Is there anything else that you remember about what happened that night?

Scott:       Ah.

Patton:      That we didn't talk about?

Scott:       Nah I don't think so.

Patton:      Okay, Detective Hastings you have any questions?

Hastings:    No I don't.

Patton:      Okay, alright um, the time now is approximately ah, 2110 hours. We're gonna conclude the interview.


Tape transcribed by Jackie Taylor on 2/25/99.


A-374

# EXHIBIT 8

Today's date is the 2nd of February 1999. The time now is approximately 1935 hours. This is Detective Robert Patton and Detective Kirk Hastings, of the Homicide Unit. We're in Lieutenant Cook's office. We're conducting an interview with Mr. Keith Mike, Michael Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, sometime about 0200 hours, in the Baltimore Inner Harbor area.

Patton:   Okay and for the record ah, Keith could you tell us your full name, your age, and your date of birth please?

Scott:    My name is Keith Michael Scott. My birthdate is ███████

Patton:   And ah, how old are you?

Scott:    Oh ██ years old.

Patton:   Okay and were do you live sir?

Scott:    ████████████

Patton:   Okay ah, and you do you have a telephone there sir?

Scott:    Yes, my telephone number is ████████

Patton:   Okay and do you have a brother?

Scott:    Yes.

Patton:   What's his name?

Scott:    Kevin Scott.

Page - 2
STATEMENT OF:  Keith Scott


Patton:     Okay and he, is he your twin brother?

Scott:      Yes he is.

Patton:     Alright, before we get started I wanna go over
            your rights form with you. Okay earlier this evening
            at about 1835 hours, which is 6:35 p.m., we advised
            you of your rights, is that correct?

Scott:      Yes.

Patton:     Okay and we went, you read allow all 5 of your rights,
            is that correct?

Scott:      Yes.

Patton:     And you put, wrote the word yes and put your initials
            at the end of each one of those rights, is that correct?

Scott:      Yes.

Patton:     Okay and you signed your name underneath those rights
            indicating that you fully understood them, is that
            correct?

Scott:      Yes.

Patton:     Okay and you also signed your name on that form,
            indicating that you wanna to give a statement without
            having a Lawyer present, is that also correct?

Scott:      Yes.

Patton:     Okay, now I'm just gonna go over your rights form with
            you one more time. Number 1, You have the absolute right
            to remain silent. Do you understand that?

Scott:      Yes.

Patton:     Ah, you have to speak up louder?

Scott:      Yes I do.

Patton:     Okay, Number 2, Anything you say or write may be used
            against you in a Court of Law. Do you understand Mr.
            Scott?

Page - 3
STATEMENT OF: Keith Scott

Scott:      Yes I do.

Patton:     Okay, You have the right to talk with a Lawyer at
            any time, before any questioning, before answering any
            questions, or during any questions. Do you understand
            that?

Scott:      Yes I do.

Patton:     Okay, If you want a Lawyer and can not afford to hire
            one you will not be asked any questions and the Court
            will be, will be requested to appoint a Lawyer for you.
            Do you understand that sir?

Scott:      Yes.

Patton:     Okay, If you agree to answer questions, you may stop
            at anytime and the request a Lawyer, and no further
            questions will be asked of you. Do you understand that
            sir?

Scott:      Yes.

Patton:     Ah, do you fully understand your rights sir?

Scott:      Yes I do.

Patton:     Okay now ah, on this form also, it indicates that you
            there's a sentence underneath that indicating that that
            you are willing to answer questions and you do not want
            an Attorney at this time. And your decision to answer
            questions without having an Attorney present is free and
            voluntarily on your part. Is that correct?

Scott:      Yes.

Patton:     You concur with that?

Scott:      Yes.

Patton:     Okay, and you signed your name under that statement,
            is that correct?

Scott:      Yes.

A-378

Page - 4
STATEMENT OF:  Keith Scott


Patton:     Okay, now we also told you that your under arrest. Did
            you understand that sir?

Scott:      Yes.

Patton:     Okay and we also told you that your being charged with
            the murder of Mr. Martrell Kreighton, is that, your
            understanding?

Scott:      Yes.

Patton:     Okay and ah, knowing all that do you still wanna give
            your statement about what happened at the Inner Harbor
            sir?

Scott:      Yes.

Patton:     Okay, alright ah, just start from the beginning ah,
            Mr. Scott and tell us about that morning, or that late
            evening at the Inner Harbor. First of all, do you
            remember what day of the week it was when?

Scott:      No I don't.

Patton:     Okay, alright just go ahead and start from the beginning
            about what happened, and who you were with? Alright go
            ahead sir?

Scott:      Okay.

Patton:     Alright before you got to the Inner Harbor where were
            you?

Scott:      I was around he Laurel area.

Patton:     Okay and how did you get to the Inner Harbor?

Scott:      We had drove up there.

Patton:     Alright and who was with you when you drove up there?

Scott:      It was me, my brother Kevin, a friend of mine name
            Kevin.

Patton:     Okay and your friend ah, your friend Kevin, what is
            his full name?

Page - 5
STATEMENT OF:  Keith Scott


Scott:      Kevin Anthony Miller.

Patton:     Okay and ah, were does he live?

Scott:      In the ████████ area.

Patton:     Do you know his address or what apartment complex he lives in?

Scott:      No I don't.

Patton:     Okay how old is he about?

Scott:      He's in his ███████.

Patton:     Okay and how long have you known ah, Kevin Anthony Miller?

Scott:      I've known him for about 3 or 4 years.

Patton:     Okay, now ah, who's car were you driving?

Scott:      We was in ah, a white car and my brother had drove up there.

Patton:     Was it your brother car or something or a friends car or what?

Scott:      No, we had brought it from a guy we know.

Patton:     Okay and what's his name?

Scott:      His name is Paul.

Patton:     Okay and what kind of car was it that you were driving?

Scott:      It was a 8, 86 inaudible Dodge, Dodge Aries, or Reliant, Dodge, Reliant.

Patton:     Okay, alright and ah, were did you guys park your car at when you got downtown Baltimore?

Scott:      It was one of the side streets.

Patton:     Now tell me from that point were you parked the car, or what your guys did after your parked the car that night?


**A-380**

Page - 6
STATEMENT OF:  Keith Scott


Scott:      We parked the car, we got out the car and went into
            the Harbor. Walked around for a while, you know having
            fun whatever. We went and had a couple of drinks.

Patton:     Did you go into a Bar?

Scott:      Yes.

Patton:     Do you know which Bar you went into?

Scott:      Ah, ump.

Patton:     I'm sorry, yes or no.

Scott:      No, no I don't.

Patton:     Okay go ahead sir, I'm sorry.

Scott:      And then after about a hour or so, we we was leaving
            the Harbor and we bumped into a guy we know from
            out Laurel name Vick. And inaudible what ever, what
            you doing up here. And about couple seconds, couple
            minutes went pass. Like 3 or 4 girls walked pass. And
            he had stopped them and was talking to them.

Patton:     Who is he?

Scott:      Vick had stopped the girls.

Patton:     Okay.

Scott:      And he was talking and about a couple minutes later
            so, 3 guys approached us, they was loud, drunk, yelling
            at the girls and us.

Patton:     You know what they were saying to you guys?

Scott:      No they was talking to the girls saying, you couldn't
            talk to me and all this, but you can talk to them.

Patton:     Who was saying that inaudible.

Scott:      The big guy, say his name was.

Patton:     There was a big guy and and 2 smaller guys?


A-381

Page - 7
STATEMENT OF:  Keith Scott


Scott:      Yes.

Patton:     Okay, so what happened after that?

Scott:      They they was arguing.

Patton:     Who, who was arguing?

Scott:      The big guy, he was talking to the girl.

Patton:     Okay.

Scott:      Saying why you couldn't mess with me, thought you
            was married and some other stuff I can't recall.
            So then, the girls had pulled off, like come on.
            And we had start walking off. And he was still yelling
            at them, he started coming up behind us. That's when
            he had approached Kevin Miller. We turn around and
            see Vick punch him and he ran off.

Patton:     Now when he approached Kevin Miller did he, did he
            and Kevin exchange blows?

Scott:      Nope.

Patton:     They argue?

Scott:      No.

Patton:     Did they have any words between them?

Scott:      No.

Patton:     So he approaches Kevin and does what? Kevin Miller I
            mean.

Scott:      He approached him like he was about to swing on him.

Patton:     Yeah, and then what happened?

Scott:      And that's when I see Vick hit him.

Patton:     Were did Vick hit him at?

Scott:      He punched him like on the side of his face.

Page - 8
STATEMENT OF:  Keith Scott


Patton:     How many times did Vick hit him?

Scott:      He just hit him one time.

Patton:     Did the guy start bleeding after Vick hit him?

Scott:      Yeah he was like his nose was bleeding.

Patton:     And then what happened?

Scott:      Then the girl started laughing saying that's what
            he get, or whatever. And then everybody just walked
            off.

Patton:     Did you walk or run?

Scott:      Started walking and then we started running.

Patton:     Then were did you go?

Scott:      We got in our car and left.

Patton:     Who, who got in the car with you?

Scott:      Me, my brother, and Kevin.

Patton:     Okay and were did ya'll go?

Scott:      Came back to Laurel. Dropped our friend off and went
            home.

Patton:     Were did ah, Vick go?

Scott:      I don't know were he went.

Patton:     Were did the girls go?

Scott:      I don't know were they went.

Patton:     Now this guy Vick do you know what his real name is?

Scott:      All I know is they call him Vick.

Patton:     Okay, and describe Vick to me?

Scott:      He's light skin, almost white, short hair, and a gold
            tooth.


A-383

Page - 9
STATEMENT OF:  Keith Scott


Patton:    Is he, how old is he about?

Scott:     He about 23, 24, I'm not sure.

Patton:    Do you know were he lives?

Scott:     He stayed in the Tall Oaks Apartments.

Patton:    I mean Vick? Were does Victor live?

Scott:     That's were he was staying at.

Patton:    In the Tall Oaks Apartments in Laurel?

Scott:     Yeah.

Patton:    Okay, do you know if he has a car?

Scott:     Yes he had a grey 4 door Delta 88.

Patton:    Do you know what year it was about? No.

Scott:     89, something.

Patton:    Now so basically your saying that, just to recap that
           the only person that was with you, that hit the tall
           guy, the guy that approached Kevin was Vick. Vick was
           the only one?

Scott:     Approached the other guy.

Patton:    Yeah was Vick the only one that hit anybody?

Scott:     Yes.

Patton:    Did you or your brother Kevin, Kevin Scott, hit the guy?

Scott:     No.

Patton:    Or exchange blows with anybody?

Scott:     Not at all.

Patton:    What about Kevin Miller, did he fight anybody?

Scott:     Not that I can recall, no.

Page - 10
STATEMENT OF:  Keith Scott


Patton:   I'm sorry?

Scott:    No he didn't.

Patton:   So the only person that was fighting was, was who?

Scott:    It really wasn't a fight, he just punch him and ran.

Patton:   He just hit him one time?

Scott:    Punched the guy and ran.

Patton:   And ran. Did Vick have anything in his hand?

Scott:    Not that I seen.

Patton:   Was he wearing any kind of big rings, or anything
          like that, or did he have a knife or ice pick, or?

Scott:    No he didn't.

Patton:   Or a weapon of some kind in his hand?

Scott:    No he didn't.

Patton:   Now did you see the, did the guy fall on the ground,
          fall down after Vick hit him?

Scott:    No not when he hit him.

Patton:   Was he bleeding?

Scott:    I seen blood on his face.

Patton:   Blood on his face?

Scott:    Well it look like blood.

Patton:   It look like blood. Was it a lot of blood or a little
          blood?

Scott:    Just a little bit, I think.

Patton:   Now what did the 2 smaller guys do when all of this
          was going on, what did they do?

Page - 11
STATEMENT OF:  Keith Scott


Scott:     I think they was standing on the side too?

Patton:    Did they fight?

Scott:     No.

Patton:    They grab anybody? They, they ain't try to fight you
           or your brother?

Scott:     No.

Patton:    Okay ah, now we had started talking to you earlier
           before we turned the tape on, did a little oral
           interview with you and I asked you tell me everything
           you know about Victor, right?

Scott:     Right.

Patton:    Had Victor been arrested before?

Scott:     Not that I know of.

Patton:    Is he in jail now?

Scott:     Yes he's currently incarcerated.

Patton:    And were at?

Scott:     I'm not sure were he's at.

Patton:    Were inaudible, do you know were he was arrested
           at, what County he's arrested?

Scott:     Yes his, he was arrested in PG County.

Patton:    You know what he's arrested for?

Scott:     No I don't.

Patton:    Did you tell us he was arrested in reference to
           some girls being killed in PG County? Did you say
           that?

Scott:     Yes from what I heard on the News, yes.

Patton:    And he was arrested with another individual that you
           know?

Page - 12
STATEMENT OF:  Keith Scott


Scott:      Yes.

Patton:     And that persons name was?

Scott:      Willis.

Patton:     Willis, you know his last name?

Scott:      I believe it's Haze, Hanes.

Patton:     Haze or Hanes?

Scott:      Yes.

Patton:     Okay now you, right now your wearing your hair braided to the back. Was you wearing your hair the same way that night this happened?

Scott:      No I wasn't.

Patton:     How was your hair?

Scott:      My hair was shorter than this.

Patton:     Was it braided up?

Scott:      Bush, not it wasn't braided at all.

Patton:     How was your brother Kevin Scott wearing his hair that night?

Scott:      I think he had his hair braided that night.

Patton:     Okay.

Scott:      In a pony tail.

Patton:     Describe, describe Kevin Miller, Kevin Anthony Miller for me, how tall is he about?

Scott:      About 6 foot, brown skin, like short hair.

Patton:     And is he light skin or dark skin?

Scott:      He's brown skin.

Page - 13
STATEMENT OF:  Keith Scott


Patton:    Brown skin, is he darker than you?

Scott:     Yes.

Patton:    And his hair was cut real close?

Scott:     Yes

Patton:    He is thick build, or thin build?

Scott:     No he's thin.

Patton:    Thin, do you remember what you were wearing that night?

Scott:     No I don't.

Patton:    Do you remember what Kevin was wearing that night?
           Your brother Kevin?

Scott:     No.

Patton:    Do you remember what Kevin Miller was wearing that night?

Scott:     Nope.

Patton:    Do you know if you had on long pants or shorts?

Scott:     I think I had on shorts.

Patton:    Do you know what kind of socks that you had on, had
           on that night?

Scott:     Ut-um.

Patton:    Did Kevin have on, Kevin Miller have on shorts?

Scott:     I think we all had on short, if I remember right,
           I'm not sure.

Patton:    What about Victor?

Scott:     Yes he had on shorts.

Patton:    Now when you guys left Laurel, did Victor leave Laurel
           with you guys the same time?

Page - 14
STATEMENT OF:  Keith Scott


Scott:     No he didn't.

Patton:    Did you, did you plan to meet Victor downtown at the
           Inner Harbor that day?

Scott:     No I didn't, no I didn't.

Patton:    So you just by happen to chance just ran into him,
           Victor?

Scott:     Yes.

Patton:    Okay now earlier you told us that Kevin Anthony Miller
           lived at the Fox Restwood Apartments in Laurel?

Scott:     Yes.

Patton:    Is that correct, okay. And you said he live with his
           mother?

Scott:     Yes.

Hastings:  I don't have any questions.

Patton:    Okay, um, now I just wanna recap this real quick. Did
           you that night fight and swing, hit anybody?

Scott:     No I didn't.

Patton:    Did your brother?

Scott:     No he didn't.

Patton:    Did Kevin Miller?

Scott:     No he didn't.

Patton:    Did Victor?

Scott:     Yes he swung on the guy.

Patton:    Is there anything else you wanna tell us about that night
           that we've didn't ask you about? Is there anything else?
           You have to say yes or no?

Scott:     No not at this moment, no.

Page - 15
STATEMENT OF:  Keith Scott


Patton:    Okay, Victor how long have you known this guy Victor?

Scott:     I say for about not even a year, half a year of so.

Patton:    You know how much he had to drink that night?

Scott:     A few cups.

Patton:    A few what?

Scott:     A few cups.

Patton:    Of what?

Scott:     I think Remey Martin, I'm not sure, I don't remember.

Patton:    Were you drunk?

Scott:     I wasn't intoxicated, I had been drinking.

Patton:    Was your brother drunk?

Scott:     Yeah he was drinking too?

Patton:    What about Victor?

Scott:     I can't recall.

Patton:    Okay ah, we're gonna conclude the interview with Mr. ah, Keith Michael Scott. Time now is 1955 hours.



Tape transcribed by Jackie Taylor on 2/25/99.


A-390

# EXHIBIT 9

Victor in Jail P.G. County     Dec'on Jam

Willis Hayes, Haines, killing three Girls
                                  shooting 1996

Delta 88
old Delt. Grey 4Door

Victor                              mixed
            Apt complex       Kevin
Tall oaks #198 AA county

                              Tall 6'1 on 6'2"
Kevin Anthony Miller          short Hair
M/B/ 20 to 21                 Bro skin
                              thin

Fox Westwoods Apts  Laurel MD
Lives with muther
4to unh

Drove/ Kevin  white
              Dodge Rislon to 86 4 Door
              Paul is owner

1835
1840  Start oRal            Taped( 19 35 hrs
1920  End oral                     18 55 hrs

Kevin told him Not say his name

# EXHIBIT 10



2 FEB 99 —

U.S. Park Police CIB (office # 202-690-5050)
Det. RYDI ABT
primary * Det. JOE GREEN (pgr # 202-592-9780)
(office 202-401-5958 xt 649)

JAN '96 — 3/B/r VICTIMS
shot to death rt BW Pkwy

Dec '98 3 ARREST MADE
1) ▮▮▮▮ HAYNES
PG County ID # 805870
PG County Sheriff ID # 261890

2) ▮▮▮▮ HIGGS , m/15/20 >

3) VICTOR GLORIA SID # 1565443
AKA: VICTOR MORALES FBI # 953670RA7
AKA: Pretty VIC
DOB: 10/2/74
10/2/75
10/7/75
ARRESTS IN following JURISDICTIONS;
1) MARYLAND — A.A. COUNTY
— Howard County
2) VIRGINIA
3) NEW YORK

Det.
Joe GREEN H
Front Desk

A-394

WITH THE INVESTIGATION
SAY'S SHE HASN'T BEEN
KEPT INFORMED ? WE
HAD QUITE A CONVERSATION
IN THIS AREA !
③ WE WILL HAVE TO
DISCUSS THE ENTIRE
CONVERSATION. I TOLD
HER YOU WOULD CALL
HER. ④ SHE HAS INFORMATION
REFERENCE TO SUSPECTS.



F:11 Ins

JS25 367 622 030
3 425 - 603 003 770



301

301

S/A Brad Sheafe
Calverton office
Case Agent

Det
T.D.   T.D.
Harding
301 - 925 -
5167
PG County
Police

S/A Brad Sheafe
FBI Calverton
office
Case Agent
for Victor
Gloria
301 -
301 - 701 - 0001
301 - 701 - 0017 Fax.
10 Feb 99

1 set leg IRONS  LT. LEWIS
1 set. leg IRON'S  Sgt. NOLAN'S
1 set cuffs — THANOER (Homicide)
1 set cuffs — D. TOWNSEND VCTF

3-B-F'S
JAN 96

AKA: Victor MORALES
Victor GLORIA (Pretty Vic)
SSID # 156 5443

FBI#
95 367ORA7

A.A. Count
Howard
N.Y.
VA
MD

T/P# 301-344-4250
S. PARK Police (CIB)
Det. RYDI ABT
T/P# 202-690-5050

ATTORNEY:
Det. JOSEPH
Green
Page
202-592-9780

Willis HAYNES
PG County ID 805870
PG " Sheriff ID#
261890
11-6-77

DUSTIN HESS
M/B

Directions to U.S. Park
                    Police

S/B

295 — south to Wash. D.C

get off Howard Rd
                    EXIT

make a Right onto Howard Rd
go through traffic light
to South Capital St. Bridge
go over Bridge (exit to Right)
    move to Right
Service Rd. to M St. make
a Right,
go to 2nd traffic light make a
Right turn into the Navy Yard.
            Bldg. 136

**A-397**

202-401-5958-(649)

Photo Line Up of Victor Gloria —

Victor Gloria "Vick"
B/M/ ▓▓▓▓▓ (24)
▓▓▓▓▓▓▓▓▓▓▓▓
SID # 1565443
FBI # 953670 RA7

Currently charged with Murder
and is being held by U.S. Marshalls

Det Joe Green BS Park Police


Kevin Anthony Miller
DOB ▓▓▓▓▓▓ M/B/ (29)
▓▓▓▓▓▓▓▓▓▓▓▓
SID 1628168
FBI 425 320 KAS

Arrest Laurel PD 9500023 - 3-22-95
Arrested PG County 1-9-98

Kevin → 2nd unk subject with "Vick"
        Kevin Miller was driving car

Keith → Kevin Scott was driving car
        had Keith Pankford car from
Subject known as Paul

Did not indicate there was a
second subject with "Vick"

# EXHIBIT 11

For
Baltimore City
Police

Det's Thenner
or
Det. Patton

Will Pick up on
2/4/99

**A-401**

Case 8:98-cr-00520-PJM Document 585-1 Filed 02/19/15 Page 3 of 6

## REQUEST FOR PHOTO SPREAD

Offense _Homicide_                                           CCN _2243-96_

Location of Off. _Rt 197_                                    Date of Off. _1-27-96_

Filler Photographs Selected by Investigator:

1. _45067_       2. _45100_        3. _44963_        4. _44933_

5. _45147_       6. _43739_        7. _43701_        8. _Suspect_

9. _____     10. _____     11. _____     12. _____

Special Instruction: _For Baltimore City_

_____

Requested By: _JM Green_                          Date: _2/2/99_

Date Completed: _2/3/99_          ID Tech: ~~████~~ _JG_



USMS   █████   FBI NO. 953670RA7   DOB  ████

NAME.   GLORIA, VICTOR NMN

SEX M   RACE B   HAIR BLK   EYES BRO   HGT 5'7   WGT 150










**A-404**

 

**A-405**

# EXHIBIT 12

| SUPPLEMENT REPORT<br>FORM 87/7 1160-25-53 | | | POLICE DEPARTMENT<br>BALTIMORE, MARYLAND | | 1. ARREST/CUSTODY NO. | | 2. POST<br>112 | 3. COMPLAINT NO.<br>98-1G13258 |
|---|---|---|---|---|---|---|---|---|

**TYPE OF REPORT:**
- ☐ Missing Person
- ☐ Misc. Incident
- ☐ Custody
- ☐ Crime Against Persons  ☐ Vehicle
- ☐ Crime Against Property  ☐ Accident

4. ☐ Continuation  ☒ Follow-up

6. Page  1  of  1

5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business)
**CREIGHTON, MARTRELL  LAMAR**

7. Crime/Incident
**HOMICIDE BY STABBING**

8. Crime/Incident Changed From
**N/A**

9. Date of Original Report
**18 JULY 1998**

10. Date/Time of This Report
**19 MARCH 1999 @ 1007 HOURS**

11. Total Property Stolen
**$N/A**

12. Total Property Recovered
**$N/A**

13. Multiple Clearance  ☐ Yes  ☐ No

**Item No.**

**14. NARRATIVE:** Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

PHOTOGRAPHIC          LINE          UP

On the 19th of March 1999 Ms. Barbara Bailey was shown two digital photographic line up cards which contained M.V.A. photographs of Kevin Anthony Miller and Victor Gloria. The photographic line ups were conducted at Calvert and Fayette streets, Clarence M. Mitchell Courthouse, Room 207. The line ups were witnessed by Detective Robert Patton and Detective John McGrath, V.C.D. Homicide Unit.

The photographic line up card containing the photograph of Kevin Anthony Miller was shown to Ms. Bailey at 0955 hours. Ms. Bailey viewed the line up card and was unable to make an identification.

The photographic line up card containing the photograph of Victor Gloria was shown to Ms. Bailey at 1000 hours. Ms. Bailey viewed the line up card and was unable to make an identification.

The above photographic line up cards were placed in E.C.S. under property number # 99013066

15. Complaint No. Dispatched Under Other Than Original

16. Copies To:

17. Classification

18. Reporting Officer (Print)
**DET. ROBERT PATTON**

Seq. No.
**C792**

Assignment
**VCD HOMICIDE UNIT**

19. Status:  ☐ Open  ☐ Suspended  ☒ Closed

20. Referred

21. Teletype No.

22. Reporting Officer (Sign)

Assignment      Address – zip
VCD HOMICIDE UNIT 601 E. FAYETTE ST. BALTO 21202

23. Supervisor Approving

Seq. No.

24. Reviewer

**A-407**

# EXHIBIT 13

| SUPPLEMENT REPORT FORM 87/7 1160-25-53 | | POLICE DEPARTMENT BALTIMORE, MARYLAND | | 1. ARREST/CUSTODY NO. | 2. POST 112 | 3. COMPLAINT NO. 98-1G13258 |
|---|---|---|---|---|---|---|

| TYPE OF REPORT: ☑ Misc. Incident ☐ Crime Against Persons ☐ Crime Against Property | ☐ Missing Person ☐ Custody ☐ Vehicle ☐ Accident | 4. ☐ Continuation ☒ Follow-up | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) CREIGHTON, MARTRELL LAMAR | | |
|---|---|---|---|---|---|
| | | 6. Page 1 of 1 | 7. Crime/Incident HOMICIDE BY STABBING | | 8. Crime/Incident Changed From N/A |
| 9. Date of Original Report 18 JULY 1998 | 10. Date/Time of This Report 19 MARCH 1999 @ 1007 HOURS | 11. Total Property Stolen $N/A | 12. Total Property Recovered $N/A | | 13. Multiple Clearance ☐ Yes  ☐ No |

**14. NARRATIVE:** Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

PHOTOGRAPHIC  ·  LINE  UP

On the 19th of March 1999 Ms. Charnetta Bailey was shown two digital photographic line up cards which contained M.V.A. photographs of Kevin Anthony Miller

and Victor Gloria. The photographic line ups were conducted at Calvert and Fayette streets, Clarence M. Mitchell Courthouse, Room 207. The line ups were

witnessed by Detective Robert Patton and Detective John McGrath, V.C.D. Homicide Unit.

The photographic line up card containing the photograph of Kevin Anthony Miller was shown to Ms. Bailey at 1007 hours. Ms. Bailey viewed the line up card and

without any hesitation positively identified Kevin Anthony Miller, S.I.D. # 1628168 as being one of four subjects involved in the captioned Homicide.

The photographic line up card containing the photograph of Victor Gloria was shown to Ms. Bailey at 1012 hours. Ms. Bailey viewed the line up card and was

unable to make an identification.

The above photographic line up cards were placed in E.C.S. under property number # 99013066

| 15. Complaint No. Dispatched Under Other Than Original | | 16. Copies To: | | 17. Classification |
|---|---|---|---|---|
| 18. Reporting Officer (Print) DET. ROBERT PATTON | Seq. No. C792 | Assignment VCD HOMICIDE UNIT | 19. Status: ☐ Open ☐ Suspended ☒ Closed | 20. Referred | 21. Teletype No. |
| 22. Reporting Officer (Sign) | Assignment VCD HOMICIDE UNIT | Address – zip 601 E. FAYETTE ST. BALTO 21202 | 23. Supervisor Approving | Seq. No. | 24. Reviewer |

A-409

# EXHIBIT 15

4/12/99

Bobby

Re Victor Gloria

1. I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-D's Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify ast. Co-D'

2. AUSA Johnston stated that it is possible that Co-D's - Scott, Scott + Miller are blaming Gloria because they are friends of D's in her case especially Haynes. She suggested that we talk to

① Joe Green Park Police
   B - 202 - 592-9780

③ Brad Sheafe - FBI
   B - 301 - 701 - 0017

— they could give us background on case

After you talk to these officers, we will decide on the next course of action, that is, either wait Gloria + charge him or talk to his lawyer about the case.

4. Please call me

Mark Cohen

**A-411**

# EXHIBIT 16

File copy



# CIB - HOMICIDE
## POLICE DEPARTMENT
## BALTIMORE, MARYLAND
### Progress Report

**TO:**  Commanding Officer
Homicide Unit

**FROM:**  Detective Patton, Robert Detective
& Hastings, Kirk  Detective

**SUBJECT:**  Progress Report
Homicide Investigation

**SUSPECTS**(Name, DOB, Race, Sex, Age, Address):

| Scott, Kevin  Lee | | 9719   Narragansett Pkw |
|---|---|---|
| Scott, Keith   Michael | | 8818   Cherry Lane |
| Gloria, Victor | | 8882   Hunting Lane |

**VICTIMS**(Name, DOB, Race, Sex, Age, Address):

| Creighton, Martrelle  Lamar | | |
|---|---|---|
| | | |
| | | |

**OCCURRED:**  07/18/98  0206
301   Light Street

| **CC Number:** | 981G13258 | **Case Number:** | 98H0172 |
|---|---|---|---|
| **District:** | CD | **Post:** | 112 |

FOLLOW UP INVESTIGATION SUSPECT RE-INTERVIEW

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder.  Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.I.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria  stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

Date: 04/21/99

**A-413**

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.

This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

In addition A.S.A. Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your Investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.

On the 21st of April 1999 your Investigator in concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview.

Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and stated that their attorney's told them not to talk to the Police and to stand by their original statements.

Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.

Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

SUPERVISOR

DETECTIVE ROBERT PATTON

Respectfully,

**CIB - Homicide**

# EXHIBIT 17

| SUPPLEMENT REPORT | POLICE DEPARTMENT | 1. Arrest/Custody No. | 2. Post | 3. Complaint No. |
|---|---|---|---|---|
| Form 87 / 7 | BALTIMORE, MARYLAND | | 112 | 981G13258 |

| TYPE OF REPORT: | ☐ Missing Person | 4. ☐ Continuation | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) | | |
|---|---|---|---|---|---|
| ☐ Misc. Incident | ☐ Custody | ☒ Follow-Up | Creighton, Martrelle Lamar | | |
| ☒ Crime Against Persons | ☐ Vehicle | 6. Page | 7. Crime/Incident | 8. Crime/Incident Changed From | |
| ☐ Crime Against Property | ☐ Accident | 1 of 1 | Homicide Stab/Cut | | |

| 9. Date of Original Report | 10. Date/Time of This Report | 11. Total Property Stolen | 12. Total Property Recovered | 13. Multiple Clearances |
|---|---|---|---|---|
| 07/18/98 | 06/08/99 1040 hours | $ | $ | ☐ Yes ☐ No |

| Item No. | 14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any. |
|---|---|

## PHOTOGRAPHIC LINE-UP

On the 8th of June 1999 and in reference to the above incident Mr. David Bishop was show a photographic line-up which contained the below listed color digital photographs.

| PHOTOGRAPH POSITION | STATE IDENTIFICATION NUMBERS |
|---|---|
| 1 | 463167 |
| 2 | 1653475 |
| 3 | 1833968 |
| 4 | 1870157 |
| 5 | 1625422 |
| 6 | 1628168 |

Mr. Bishop viewed the photographic array and without hesitation pointed to photograph #6, S.I.D. 1628168 and positively identified this subject as the person who stabbed the above listed victim. Photograph # 6, S.I.D. 1628168 is listed to Kevin Anthony Miller, Black Male, ██████████████████████████
The photographic Line-up was conducted at the Homicide office and witnessed by Detective Robert Patton and Detective Chris Bieling. The Photographic Line-Up was placed in E.C.S. and stored under property number 99028176

## INVESTIGATION TO CONTINUE

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print) Seq. No. Assignment | 19. Status: ☐ Open ☐ Suspended ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|
| Patton, Robert Detective - C792 Homicide Unit | | | |

| 22. Reporting Officer (Sign) Assignment Address-Zip | 23. Supervisor Approving Seq. No. | 24. Reviewer |
|---|---|---|
| Det. Patton Homicide 601 E Fayette St | | |

A-416

# EXHIBIT 18

| SUPPLEMENT REPORT<br>Form 87 / 7 | POLICE DEPARTMENT<br>BALTIMORE, MARYLAND | | 1. Arrest/Custody No. | 2. Pct<br>1-12 | 3. Complaint No.<br>981G13258 |
|---|---|---|---|---|---|

| TYPE OF REPORT: | ☐ Missing Person | 4. ☐ Continuation | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) | | |
|---|---|---|---|---|---|
| ☐ Misc. Incident | ☐ Custody | ☒ Follow-Up | **Creighton, Martrelle Lamar** | | |
| ☒ Crime Against Persons | ☐ Vehicle | 6. Page | 7. Crime/Incident | 8. Crime/Incident Changed From | |
| ☐ Crime Against Property | ☐ Accident | 1 of 1 | **Homicide Stab/Cut** | | |

| 9. Date of Original Report<br>07/18/98 | 10. Date/Time of This Report<br>06/08/99 1030 hours | 11. Total Property Stolen<br>$ | 12. Total Property Recovered<br>$ | 13. Multiple Clearances<br>☐ Yes  ☐ No |
|---|---|---|---|---|

**14. NARRATIVE:** Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

### PHOTOGRAPHIC LINE-UP

On the 8th of June 1999 @ 1030 hours Mr. DAVID BISHOP was shown a Photographic Line-up which contained six digital M.V.A. photographs . One of the aforementioned photographs was of a subject identified as Mr. Victor Gloria , Black Male , DOB ████ of ███████████████ Mr. Gloria was identified as being a principle in the captioned Stabbing Homicide and did not have a current photograph on file with this agency. Mr. Bishop viewed the Photographic Line-up card and stated that he did not see anyone on the Line-up card that was either present or involved in the captioned Homicide.

The photographic line up was conducted at the Homicide office and witnessed by Detective Robert Patton and Detective John Thanner. The Photographic Line-up card was placed in E.C.S. under property number, 9902817ⵁ

### INVESTIGATION TO CONTINUE

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)   Seq. No.   Assignment | 19. Status:  ☐ Open<br>☐ Suspended  ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|
| Robert Patton   C792 : Homicide   Homicide | | | |

| 22. Reporting Officer (Sign)   Assignment   Address-Zip | 23. Supervisor Approving   Seq. No. | 24. Reviewer |
|---|---|---|
| Homicide   601 E Fayette St | | |

A-418

# EXHIBIT 19

| SUPPLEMENT REPORT | POLICE DEPARTMENT | | 1. Arrest/Custody No. | 2. Post | 3. Complaint No. |
|---|---|---|---|---|---|
| Form 87 / 7 | BALTIMORE, MARYLAND | | | 112 | 981G13258 |

| TYPE OF REPORT: | | 4. ☐ Continuation ☒ Follow-Up | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) |
|---|---|---|---|
| ☐ Misc. Incident | ☐ Missing Person ☐ Custody | | **Creighton, Martrelle Lamar** |
| ☐ Crime Against Persons | ☐ Vehicle | 6. Page | 7. Crime/Incident | 8. Crime/Incident Changed From |
| ☐ Crime Against Property | ☐ Accident | 1  of  1 | **Homicide Stab/Cut** | |

| 9. Date of Original Report | 10. Date/Time of This Report | 11. Total Property Stolen | 12. Total Property Recovered | 13. Multiple Clearances |
|---|---|---|---|---|
| **07/18/98** | **06/11/1999 1325 Hours** | $ | $ | ☐ Yes   ☐ No |

**14. NARRATIVE:** Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

## PHOTOGRAPHIC LINE-UP

On the 11th of June 1999 at 1325 hours and in reference to the above incident Mr. CLARENCE WHITE was show a photographic line-up which contained the below listed black and white digital photographs.

| PHOTOGRAPH POSITION | STATE IDENTIFICATION NUMBERS |
|---|---|
| 1 | 463167 |
| 2 | 1653475 |
| 3 | 1833968 |
| 4 | 1870157 |
| 5 | 1625422 |
| 6 | 1628168 |

Mr. WHITE viewed the photographic array and without hesitation pointed to photograph #6, S.I.D. 1628168 and stated that the subject in photograph # 6, looks like the person who stabbed the above victim. Photograph # 6, S.I.D. 1628168 is listed to Kevin Anthony Miller, Black Male, ████████████████
The photographic Line-up was conducted at the Homicide office and witnessed by Detective Robert Patton and Detective John Thanner. The Photographic Line-Up was placed in E.C.S. and stored under property number 9902817 6

## INVESTIGATION TO CONTINUE

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)  Seq. No.  Assignment | 19. Status: ☐ Open ☐ Suspended ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|
| **Patton, Robert Detective - C.792  Homicide** | | | |
| 22. Reporting Officer (Sign)  Assignment  Address-Zip | 23. Supervisor Approving  Sgt. No. | 24. Reviewer | |
| Det. ... Homicide 601 E Fayette | | | |

TA-420

# EXHIBIT 20

| SUPPLEMENT REPORT<br>Form 87 / 7 | POLICE DEPARTMENT<br>BALTIMORE, MARYLAND | 1. Arrest/Custody No. | 2. Post<br>112 | 3. Complaint No.<br>981G13258 |
|---|---|---|---|---|

| TYPE OF REPORT: | 4. ☐ Continuation<br>☒ Follow-Up | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business)<br>Creighton, Martrelle Lamar | | |
|---|---|---|---|---|
| ☐ Missing Person ☐ Misc. Incident ☐ Custody<br>☒ Crime Against Persons ☐ Vehicle<br>☐ Crime Against Property ☐ Accident | 6. Page<br>1  of  1 | 7. Crime/Incident<br>Homicide Stab/Cut | 8. Crime/Incident Changed From | |

| 9. Date of Original Report<br>07/18/98 | 10. Date/Time of This Report<br>06/11/99 1337 HOURS | 11. Total Property Stolen<br>$ | 12. Total Property Recovered<br>$ | 13. Multiple Clearances<br>☐ Yes   ☐ No |
|---|---|---|---|---|

**Item No.**

**14. NARRATIVE:** Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any.

PHOTOGRAPHIC LINE-UP

On the 11th of June 1999 @ 1337 hours  Mr. Clarence White was shown a Photographic Line-up which contained the below listed photographs .

| PHOTOGRAPH POSITION | STATE IDENTIFICATION NUMBER |
|---|---|
| 1 | 1975107 |
| 2 | 2006545 |
| 3 | 2006509 |
| 4 | 1511964 |
| 5 | 1629486 |
| 6 | 1831030 |

Mr. White viewed the Photographic Line-Up card and pointed to photograph # 4 and  stated that the subject in photograph #4, S.I.D. # 1511964 was present when the captioned  stabbing murder occurred. Photograph # 4, S.I.D. # 1511964 is listed KEITH MICHAEL SCOTT, B/M/█████████████████████ ███████ The Photographic Line-Up was conducted  at the Homicide office and witnessed by Detective Robert Patton and Detective John Thanner, V.C.D. Homicide Unit. The Photographic LIne-Up card was placed in E.C.S. under property number, 99028176

INVESTIGATION TO CONTINUE

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)      Seq. No.      Assignment<br>Robert Patton  C792 : Homicide | 19. Status: Open<br>☐ Suspended ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|

| 22. Reporting Officer (Sign)      Assignment      Address-Zip<br>Det. White  Homicide  601 E Fayette St | 23. Supervisor Approving  Seq. No. | 24. Reviewer |
|---|---|---|

**A-422**

| SUPPLEMENT REPORT<br>Form 87 / 7 | **POLICE DEPARTMENT**<br>BALTIMORE, MARYLAND | | 1. Arrest/Custody No. | 2. Post<br>112 | 3. Complaint No.<br>981G13258 |
|---|---|---|---|---|---|

| TYPE OF REPORT:<br>☐ Misc. Incident<br>☐ Crime Against Persons<br>☐ Crime Against Property | ☐ Missing Person<br>☐ Custody<br>☐ Vehicle<br>☐ Accident | 4. ☐ Continuation<br>☒ Follow-Up<br><br>6. Page<br>1  of  1 | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business)<br>**Creighton, Martrelle Lamar**<br>7. Crime/Incident<br>**Homicide Stab/Cut** | 8. Crime/Incident Changed From | |

| 9. Date of Original Report<br>07/18/98 | 10. Date/Time of This Report<br>06/11/99 1332 Hours | 11. Total Property Stolen<br>$ | 12. Total Property Recovered<br>.$ | 13. Multiple Clearances<br>☐ Yes    ☐ No |
|---|---|---|---|---|

| Item No. | 14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any. |
|---|---|

**PHOTOGRAPHIC LINE-UP**

On the 11th of June 1999 @ 1332 hours  Mr. Clarence White was shown a Photographic Line-up which contained the below listed photographs .

| PHOTOGRAPH POSITION | STATE IDENTIFICATION NUMBER |
|---|---|
| 1 | 1668493 |
| 2 | 1715258 |
| 3 | 1515718 |
| 4 | 1681708 |
| 5 | 1809859 |
| 6 | 1717977 |

Mr. White viewed the Photographic Line-Up card and pointed to photograph # 3 and  stated that the subject in photograph #3, S.I.D. # 1515718 was present when the captioned  stabbing murder occurred. Photograph # 3, S.I.D. # 1515718 is listed  KEVIN LEE SCOTT, B/M/23, DOB 06-15-75 OF 9323 WYATT DRIVE LAUREL MARYLAND , 20706. The Photographic Line-Up was conducted  at the Homicide office and witnessed by Detective Robert Patton and Detective John Thanner, V.C.D. Homicide Unit. The Photographic LIne-Up card was placed in E.C.S. under property number, 9902 8176

**INVESTIGATION TO CONTINUE**

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)     Seq. No.     Assignment<br>Robert Patton   C792 : Homicide   *Homicide* | 19. Status:   ☐ Open<br>☐ Suspended  ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|

| 22. Reporting Officer (Sign)   Assignment   Address-Zip | 23. Supervisor Approving   Seq. No. | 24. Reviewer |
|---|---|---|

A-425

# EXHIBIT 21

| SUPPLEMENT REPORT | **POLICE DEPARTMENT** | | 1. Arrest/Custody No. | 2. Post | 3. Complaint No. |
|---|---|---|---|---|---|
| Form 87 / 7 | **BALTIMORE, MARYLAND** | | | 112 | 981G13258 |

| TYPE OF REPORT: | | 4. ☐ Continuation | 5. Complainant/Victim's Name (Last, First, Middle) (Firm Name if Business) | | |
|---|---|---|---|---|---|
| ☐ Misc. Incident | ☐ Missing Person ☐ Custody | ☒ Follow-Up | **Creighton, Martrelle Lamar** | | |
| ☐ Crime Against Persons | ☐ Vehicle | 6. Page | 7. Crime/Incident | 8. Crime/Incident Changed From | |
| ☐ Crime Against Property | ☐ Accident | 1   of   1 | **Homicide Stab/Cut** | | |

| 9. Date of Original Report | 10. Date/Time of This Report | 11. Total Property Stolen | 12. Total Property Recovered | 13. Multiple Clearances |
|---|---|---|---|---|
| 07/18/98 | 06/11/99 1343 hours | $ | $ | ☐ Yes   ☐ No |

| Item No. | 14. NARRATIVE: Record your activity and all developments in the case subsequent to last report. List property first. Describe any property recovered. Show disposition of recovered property and list property numbers. Enter names and arrest numbers of any persons arrested. Explain any crime/incident classification change. Recommend case status. If multiple clearance, list complaint numbers. Indicate "Item Number Continued" at left, if any. |
|---|---|

**PHOTOGRAPHIC LINE-UP**

On the 11th of June 1999 @ 1343 hours Mr. CLARENCE WHITE was shown a Photographic Line-up which contained six digital M.V.A. photographs . One of the aforementioned photographs was of a subject identified as Mr. Victor Gloria , Black Male , DOB ███ of ████████████████ . Mr. Gloria was identified as being a principle in the captioned  Stabbing Homicide and did not have a current photograph on file with this agency. Mr. White viewed the Photographic Line-up card and  stated that he did not see anyone on the Line-up card that was either present or involved in the captioned Homicide.

The photographic line up was conducted at the Homicide office and witnessed by Detective Robert Patton and Detective John Thanner. The Photographic Line-up  card was placed in E.C.S. under property number, 99028176

**INVESTIGATION TO CONTINUE**

| 15. Complaint No. Dispatched Under Other Than Original | 16. Copies To: | 17. Classification |
|---|---|---|

| 18. Reporting Officer (Print)   Seq. No.   Assignment | 19. Status:   ☐ Open   ☐ Suspended   ☒ Closed | 20. Referred | 21. Teletype No. |
|---|---|---|---|
| Robert Patton   C792 : Homicide   Homicide | | | |

| 22. Reporting Officer Sign   Assignment   Address-Zip | 23. Supervisor Approving   Seq. No. | 24. Reviewer |
|---|---|---|
| Det. _____ Homicide   601 E. Fayette | | |

A-425

# EXHIBIT 22

POLICE DEPARTMENT
BALTIMORE, MARYLAND

16 June 1999

TO:        Major Jeffrey S. Rosen
           Commanding Officer
           V.C.D. Homicide Unit

FROM:      Detective Robert L. Patton
           V.C.D. Homicide Unit

SUBJECT:   HOMICIDE BY STABBING
           MARTRELLE LAMAR CREIGHTON
           M/B/█ DOB █████████

           ████████████████████████████

           OCC: 18 JULY 1998 @ 0200 HOURS
           301 LIGHT STREET (SIDE WALK AREA)
           CC# 98-1G13258 H-98-172
SIR:

FOLLOW UP INVESTIGATION/ SUSPECTS REINTERVIEW/
           POLYGRAPH EXAMINATION


SUSPECTS:       Keith Michael Scott

                ████████████████████

                LAUREL MARYLAND 20706

                Kevin Anthony Scott

                ████████████████████

                LAUREL MARYLAND 20706

                Kevin Anthony Miller

                ████████████████████


                Victor Gloria

                ████████████████████

                (Currently in federal Custody)

A-427

**PAGE TWO**
**FOLLOW UP INVESTIGATION**
**SUSPECTS REINTERVIEWED**
**POLYGRAPH EXAMINATION**
**16 JUNE 1999**
**H-98-172**

On the 16th of June 1999 at 0900 hours and in furtherance of the captioned investigation. Your Investigators obtained the appropriate legal documents and transported Keith and Kevin Scott from the Baltimore City Detention Center to the Homicide office. Your Investigators planed to initiate a marathon interrogation initiative and administer polygraph examination on both suspects.

Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.

Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements they make no reference to Victor Gloria. Prior to the polygraph examination your investigators interviewed the Scott brothers in an effort to determine if there was any changes in their original statements.

Your Investigators ultimately found that both suspects continue to maintain that Victor Gloria was the stabber and was the only person who engaged the victim in altercation. At this point we initiated the polygraph examination starting with Keith Scott. Keith Scott was then moved to the polygraph examination room where Detective J.T. Brown initiated the polygraph examination.

Your Investigators will note that while Keith was taking the polygraph examination your Investigators continued the interrogation of Kevin Scott. After an extensive examination Det. Brown reported that Keith Scott was given the examination a total of three times and ultimately failed all three examinations. At this point Kevin Scott was then taken to the polygraph examination room and Keith Scott was moved back to he Homicide office.

**PAGE THREE**
**FOLLOW UP INVESTIGATION**
**SUSPECTS REINTERVIEWED**
**POLYGRAPH EXAMINATION**
**16 JUNE 1999**
**H-98-172**

In reference to Kevin Scott he was ultimately given the
same number of examinations and also failed each examination.
Your Investigators will note that while Kevin Scott was in the
polygraph room your Investigators continued the interrogation of
Keith Scott and were ultimately unable to rehabilitate him.
Kevin Scott was ultimately moved back to the Homicide office
where your investigators continued the interrogation that
ultimately yielded the same results. Your Investigators will
note that the entire process encompassed several hours of
comprehensive interrogation and interview, which ultimately had
negative results. At conclusion the Scott brothers were
transported back to B.C.D.C. with their conspiracy intact.

**INVETIAGTION TO CONTINUE**

_____
**SUPERVISOR**

**DETECTIVE ROBERT PATTON**
**V.C.D. HOMICIDE UNIT**

**A-429**

# EXHIBIT 23

Circuit Court of Maryland
Go Back

## Case Information

Court System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199062008**   Case Status: **CLOSED**
Status Date: **08/30/1999**
Tracking Number: **981002174784**        Complaint No: **1G13258**
District Case No: **2B00323920**
Filing Date: **03/03/1999**

## Defendant Information

Defendant Name: **SCOTT, KEITH MICHAEL**
Race: **BLACK**          Sex: **MALE**
DOB: ██████████
Address: ██████████████
City: **LAUREL**   State: **MD**   Zip Code: **20706**

## Charge and Disposition Information

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No: **1**
CJIS/Traffic Code: **2 0900**                Arrest/Citation No: **000000**
Description: **MURDER-FIRST DEGREE**
Disposition: **LESSER INCLUDED OFFENSES**
Disposition Date: **08/30/1999**

Charge No: **2**
CJIS/Traffic Code: **1 5202**                Arrest/Citation No: **000000**
Description: **DEADLY WEAPON-CONCEAL**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No: **3**
CJIS/Traffic Code: **1 5200**                Arrest/Citation No: **000000**
Description: **DEADLY WEAPON-INT INJURE**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No: **4**
CJIS/Traffic Code: **1 1415**                Arrest/Citation No: **000000**
Description: **ASSAULT-SEC DEGREE**
Plea: **GUILTY**          Plea Date: **08/30/1999**
Disposition: **SENTENCED**
Disposition Date: **08/30/1999**
Verdict: **GUILTY**   Verdict Date: **08/30/1999**
Sentence Starts: **02/02/1999**          Sentence Date: **08/30/1999**

Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC**

## Related Person Information

Name:**SCOTT, KEVIN LEE**
Connection:**CODEFENDANT**
Address:███████████████
City: **COLLEGEPAR**  State: **MD**  Zip Code: **20740**

Name:**VOLATILE, GERARD**
Connection:**ASST STATES ATTORNEY**
Address:**120 E BALTIMORE ST #1019**
City: **BALTIMORE**  State: **MD**  Zip Code: **21202**

Name:**BARRICK, JOHN DET SGT**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**HASTINGS, KIRK DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**KLEINOTA, JOSEPH DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**RIVERA, LISSETTA TECH**
Connection:**POLICE OFFICER**
Address:**LD**

Name:**SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**PATTON, ROBERT DET**
Connection:**PRIMARY POLICE OFFICER**
Address:**CID**

## Event History Information

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | **CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330** |
| CONV | 01/01/1900 | **CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423** |
| CASI | 03/03/1999 | **CASE ADDED THROUGH ON-LINE ON THIS DATE 990311** |

| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

Circuit Court of Maryland
Go Back

## Case Information

Court System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199062009**   Case Status: **CLOSED**
Status Date: **08/30/1999**
Tracking Number: **981002174773**          Complaint No: **1G13258**
District Case No: **1B00323919**
Filing Date: **03/03/1999**

## Defendant Information

Defendant Name: **SCOTT, KEVIN LEE**
Race: **BLACK**          Sex: **MALE**
DOB: █████████████████
Address: █████████████████
City: **COLLEGEPAR**   State: **MD**   Zip Code: **20740**

ALIAS:
Address: █████████████
City: **LANHAM**   State: **MD**   Zip Code: **20706**

## Charge and Disposition Information

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No: **1**
CJIS/Traffic Code: **2 0900**          Arrest/Citation No: **0000000**
Description: **MURDER-FIRST DEGREE**
Disposition: **LESSER INCLUDED OFFENSES**
Disposition Date: **08/30/1999**

Charge No: **2**
CJIS/Traffic Code: **1 5202**          Arrest/Citation No: **0000000**
Description: **DEADLY WEAPON-CONCEAL**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No: **3**
CJIS/Traffic Code: **1 5200**          Arrest/Citation No: **0000000**
Description: **DEADLY WEAPON-INT INJURE**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No: **4**
CJIS/Traffic Code: **1 1415**          Arrest/Citation No: **0000000**
Description: **ASSAULT-SEC DEGREE**

Case 8:98-cr-00520-PJM   Document 585-23   Filed 02/19/15   Page 6 of 7

Plea: **GUILTY**          Plea Date:**08/30/1999**
Disposition: **SENTENCED**
Disposition Date: **08/30/1999**
Verdict: **GUILTY**  Verdict Date: **08/30/1999**
Sentence Starts:**02/02/1999**          Sentence Date:**08/30/1999**
Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC**

## Related Person Information

Name:**SCOTT, KEITH MICHAEL**
Connection:**CODEFENDANT**
Address:█████████████████
City: ███████ State: **MD**  Zip Code: **20706**

Name:**VOLATILE, GERARD**
Connection:**ASST STATES ATTORNEY**
Address:**120 E BALTIMORE ST #1019**
City: **BALTIMORE**  State: **MD**  Zip Code: **21202**

Name:**BARRICK, JOHN DET SGT**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**HASTING, KIRK DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**KLEINOTA, JOSEPH DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**RIVERA, LISSETTE**
Connection:**POLICE OFFICER**
Address:**LD**

Name:**SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**CID**

Name:**PATTON, ROBERT DET**
Connection:**PRIMARY POLICE OFFICER**
Address:**CID**

## Event History Information

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423 |
| CASI | 03/03/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 990311 |
| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

# EXHIBIT 24

Circuit Court of Maryland
Go Back

## Case Information

Court System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199110054**   Case Status: **CLOSED**
Status Date: **12/14/1999**
Tracking Number: **991001198865**          Complaint No: **1G13258**
District Case No: **0B00359961**
Filing Date: **04/20/1999**

## Defendant Information

Defendant Name: **MILLER, KEVIN ANTHONY**
Race: **BLACK**          Sex: **MALE**
DOB: █████████████████████
Address: ████████████████████████
City: ██████████   State: **MD**   Zip Code: **20708**

## Charge and Disposition Information

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No: **1**
CJIS/Traffic Code: **2 0900**
Description: **MURDER-FIRST DEGREE**
Disposition: **LESSER INCLUDED OFFENSES**
Disposition Date: **10/18/1999**

Charge No: **2**
CJIS/Traffic Code: **1 5202**
Description: **DEADLY WEAPON-CONCEAL**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **12/10/1999**

Charge No: **3**
CJIS/Traffic Code: **1 5200**
Description: **DEADLY WEAPON-INT INJURE**
Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **12/10/1999**

Charge No: **4**
CJIS/Traffic Code: **1 0999**
Description: **MURDER-2ND DEGREE**
Plea: **GUILTY**          Plea Date: **10/18/1999**
Disposition: **PROBATION AFTER CONVICTION**
Disposition Date: **12/10/1999**
Verdict: **GUILTY**   Verdict Date: **10/18/1999**
Sentence Starts: **04/07/1999**          Sentence Date: **12/10/1999**

Sentence Time: Yrs: **20**  Mos: **00**  Days: **00**  Confinement : **NC**

Suspended Time: Yrs: **15**  Mos: **00**  Days: **00**

Probation Time: Yrs: **03**  Mos: **00**  Days: **00**  Type: **Supervised**

## Related Person Information

Name:**CROWLEY, KIRK D**

Connection:**DEFENSE ATTORNEY**

Address: ███████████████

City: **BALTIMORE**  State: **MD**  Zip Code: **21202**

---

Name:**STEWART, NELSON R**

Connection:**ASST PUBLIC DEFENDER**

Address:**201 SAINT PAUL PLACE**

City: **BALTIMORE**  State: **MD**  Zip Code: **21202**

---

Name:**COHEN, MARK**

Connection:**ASST STATES ATTORNEY**

Address:**STATE'S ATTY OFFICE**

City: **BALTIMORE**  State: **MD**  Zip Code: **21202**

---

Name:**BARRICK, JOHN SGT**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**GORDON, DONALD DET**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**HASTINGS, KIRK DET**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**KLEINOTA, JOSEPH**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**PATTON, ROBERT DET**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**RIVERA, LISSETTE TECH**

Connection:**POLICE OFFICER**

Address:**TACT**

---

Name:**SERIO, SCOTT DET**

Connection:**POLICE OFFICER**

Address:**TACT**

---

## Event History Information

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CASI | 04/20/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 19990426 |
| MOTF | 05/13/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/13/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/13/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/13/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/13/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/13/1999 | DEMAND FOR CHEMIST |
| FILE | 05/13/1999 | FILED APD - STEWART, NELSON R , ESQ 809167 |
| MOTF | 05/25/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/25/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/25/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/25/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/25/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/25/1999 | DEMAND FOR CHEMIST |
| HCAL | 06/04/1999 | P30;0930;451 ;ARRG; ;TSET; ;MURDOCK, M. BRO;8B3 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ; ;POST;PX ;HELLER, ELLEN ;848 |
| HWNO | 08/30/1999 | HICKS (MARYLAND RULE 4-271) NOT WAIVED |
| HCAL | 10/18/1999 | P27;0900;406 ;JT ;GP;SUBC; ;QUARLES, WILLIA;8A9 |
| FILE | 10/18/1999 | FILED ADF - CRAWLEY, KIRK D , ESQ 174390 |
| HCAL | 12/10/1999 | P27;0930;406 ;DISP;DS;JUDG; ;QUARLES, WILLIA;8A9 |
| CCAS | 12/14/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | Crim. No. **PJM-98-0520** |
| | * | Civ. No. **PJM-05-3180** |
| | * | |
| DUSTIN JOHN HIGGS, | * | |
| | * | |
| Petitioner | * | |
| | * | |


**MEMORANDUM OPINION**


Following Dustin John Higgs's conviction for the kidnapping and murder of Tanji Jackson, Tamika Black, and Mischann Chinn, a jury concluded that he should receive the death penalty. His conviction and sentence were affirmed on appeal. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) *cert. denied*, 543 U.S. 999, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). The Court denied Higgs's Motion to Vacate Pursuant to 28 U.S.C. § 2255, *see United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010). Two years later, Higgs filed his pending Motion for Relief pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) and Federal Rule of Civil Procedure 60(d). In his Motion, Higgs asks the Court to revisit his Motion to Vacate because he claims to have unearthed evidence from a police file that he says proves the U.S. Government committed fraud on the Court during the §2255 proceedings. ECF No. 579. He also asks the Court to order discovery. ECF No. 580. Because the Court agrees with the Government that Higgs has failed to establish even colorable fraud on the Court, his Motions are **DENIED**.

-1-

# I.

## Background

The Court need not recite all the facts underlying Higgs's conviction, but to the extent it is helpful for understanding Higgs's pending motion, the following summary will be helpful.

On the evening of January 26, 1996 Higgs, Willis Haynes, and Victor Gloria drove from Higgs's apartment in Laurel, Maryland, to Washington, D.C. Once there, they arranged for Tanji Jackson, Tamika Black, and Mischann Chinn and to join them at Higgs's apartment to drink alcohol and listen to music. In the early hours of next morning, Higgs and Jackson began arguing, prompting Jackson to grab a knife from the kitchen. Haynes persuaded Jackson to drop the knife but Jackson remained angry and all three women, upset, left the apartment on foot. As Jackson left, she supposedly made some sort of threat against the men, which angered Higgs.

Shortly after the women left, Higgs grabbed his coat and a silver .38 caliber handgun and urged Haynes and Gloria to come with him to catch up with the women. Higgs, Haynes and Gloria then got into Higgs's car and, with Higgs driving, Haynes in the front passenger seat, and Gloria behind Higgs in the back seat, pursued the three women. Not far from Higgs's apartment they caught up with them and ordered them into the car, drove into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States, and pulled over at a secluded spot. One of the young women asked if they were trying to "make [them] walk from there," to which Higgs responded, "Something like that." The women then got out of the car.

Higgs meanwhile handed his gun to Haynes, who put it behind his back and got out of the car. Moments later, Gloria, who remained in the back seat of the car, heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria

-2-

**A-442**

turned to ask Higgs what he was doing, and saw Higgs holding the steering wheel, watching the

shootings in the rearview mirror. Gloria, still in the back seat, put his head down and heard more

shots and the sound of women screaming. The three men then drove away, leaving the women,

all of whom had apparently been shot, at the secluded spot.

Afterwards, the three men drove to the Anacostia River and threw the guns in, then drove

back to Higgs's apartment to clean the place of evidence. Higgs and Haynes left Gloria with a

warning to "keep [his] mouth shut." Around 4:30 am, a driver found the dead women's bodies

strewn along Maryland Route 197, which runs through the Patuxent National Wildlife Refuge.

At the scene, Park Police found Jackson's day planner, which contained Higgs's nickname and

telephone number, as well as a note of the street number of his apartment and the license plate

number for his car.

On December 21, 1998 Higgs and Haynes were indicted on three counts each of first-

degree premeditated murder, *see* 18 U.S.C.A. § 1111(a), first-degree murder committed in the

perpetration or attempted perpetration of a kidnapping, *see id.*, kidnapping resulting in death, *see*

18 U.S.C.A. § 1201(a)(2), and using a firearm while committing a crime of violence, *see* 18

U.S.C. § 924(c). Haynes was tried first. On August 24, 2000, after finding him guilty on all three

counts in the guilt phase, the jury failed to reach a unanimous verdict on the death sentence in the

penalty phase. The Court thereafter sentenced Haynes to concurrent life terms on the first-degree

murder and kidnapping counts and forty-five years consecutive on the firearm offenses.

At Higgs's separate trial, which began five weeks later, a different jury returned guilty

verdicts on all counts. Gloria's eyewitness testimony about the night of the murders was

unquestionably significant to the jury's deliberations. At the guilt phase of the trial, Gloria told

the jury, among other things, that following the argument with Jackson, Higgs wanted to have

the victims killed; that he (Gloria) rode in the back seat of Higgs's car; and that he saw Higgs hand a gun to Haynes while whispering something to Haynes. During cross-examination, Higgs's counsel attacked Gloria's credibility, highlighting his criminal past, including his use and sale of drugs and his violation of probation, previous false statements he made to police investigating the murders, as well as his willingness to lie to authorities in general. The jury also heard that Gloria faced 15 years in prison for his involvement in the triple homicide, as well as over 30 years in jail for unrelated federal and state drug charges, and that in exchange for his cooperation in the Higgs case, the Government had agreed to seek a lighter sentence for Gloria for his role in the homicides.[1]

On October 26, in the penalty phase of his case, the jury determined that Higgs should receive the death penalty on each of the murder and kidnapping charges. The Court entered judgment on the jury's verdict and Higgs appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed both the conviction and sentence. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ("*Higgs I*"). The Supreme Court denied Higgs's petition for writ of certiorari. *Higgs v. United States*, 543 U.S. 99, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). While his appeal was pending, Higgs filed a Motion for a New Trial, which this Court denied, and the Fourth Circuit affirmed. See *United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004), *cert. denied*, *Higgs v. United States*, 543 U.S. 1004, 125 S. Ct. 608, 160 L.Ed.2d 465 (2004) ("*Higgs II*").

---

[1] On November 22, 2000, the Court sentenced Gloria to 84 months in prison for his role in the *Higgs/Haynes* murders, followed by three years of supervised release.

**The § 2255 Proceedings**

On November 28, 2005, Higgs filed a 122-page Motion to Vacate under 28 U.S.C. §

2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 asserting twenty-five claims of error.[2]

The only claim relevant to the motion presently before the Court was Higgs's allegation that the

Government had failed to turn over all the material relating to Gloria that it was required to

under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and

their progeny. Pet.'s Mot. Vacate § 2255, ECF No. 492. While preparing the § 2255 Motion,

defense counsel claim to have learned Gloria had been a suspect in the 1998 killing of one

Martrelle Creighton, who was stabbed during a fight in the Baltimore Inner Harbor. In his

Motion, Higgs alleged that Gloria was not charged with this murder at the behest of the

Government in *Higgs* "in an effort to preserve his status as a testifying witness in [the] federal

capital triple homicide case," and that the Government's failure to disclose this consideration

violated Higgs's due process rights.  Pet.'s Mot. Vacate § 2255 at 33, ECF No. 492. Had the

Government disclosed this alleged understanding, Higgs argued, defense counsel would have

used it to further impeach Gloria as a witness, which would have had a material effect on the

outcome of his trial. *Id.*

In response, the Government described Higgs's claims as "speculation about the

Government's knowledge or actions," arguing that "vague descriptions of the supposed benefits

conferred on Gloria largely fail to demonstrate any connection to this trial and federal officials."

Govt.'s Resp. Mot. Vacate § 2255 at 88, ECF No. 520. The Government further argued that

"[c]ertainly, the Constitution required the prosecutors to disclose any consideration promised to

Gloria in exchange for his testimony" but that prosecutors "had no duty or ability to predict,

---

[2] Higgs also sought discovery on various issues raised in his petition, which the court denied. *See* ECF Nos. 509, 548.

much less inform Higgs of the benefits, or acts of grace, that coincidentally flowed to the witness after this trial." *Id*. at 86. In response to Higgs's discovery request, the Government said "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial." Govt.'s Resp. Mot. Disc. at 5, ECF No. 513.

The Court agreed with the Government and denied Higgs's motion in all respects, including the alleged *Brady* violations regarding Gloria. *See Higgs v. United States*, 711 F. Supp. 2d 479 (D. Md. 2010) ("*Higgs III*"). Specifically, addressing Higgs's claim that Gloria was spared a murder charge in Baltimore in exchange for his cooperation in the federal trial, the Court held:

> Again, pure speculation about supposed benefits cannot substitute for hard facts. See *Roane*, 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions.
>
> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict.

*Higgs III*, 711 F. Supp. 2d at 508.

The Court denied Higgs's motion for a certificate of appealability and his motion for reconsideration. ECF Nos. 560, 561. Higgs sought leave to appeal from the Fourth Circuit, which granted the certificate of appealability but only as to one issue unrelated to Higgs's present motion. On November 23, 2011, the Fourth Circuit denied Higgs's appeal. *United States v.*

*Higgs*, 663 F.3d 726 (4th Cir. 2011). On December 10, 2012, the U.S. Supreme Court denied

Higgs's petition for a writ of certiorari. *Higgs v. United States*, 663 F.3d 726, 133 S. Ct. 787, 184

L.Ed.2d 583 (2012).

**The Creighton Murder Investigation**

Meanwhile, Higgs's defense counsel continued to investigate Gloria's potential

involvement in the Creighton murder and sought access to the investigation file of the Baltimore

Police Department (BPD). Pet's Mot. Relief R. 60(d) "R.60(d) Mot." at 19, ECF No. 579. After

some back and forth, Higgs obtained the complete file in the spring of 2012. *Id.*

Because Higgs and the Government differ sharply as to the interpretation of the facts

contained in the police file, what follows is a summary of the facts upon which they appear to

agree or which appear on the face of the exhibits.

On July 18, 1998, over two years after the *Higgs/Haynes* murders and two-and-a-half

months before Gloria was arrested in connection with that case, a man named Martrelle

Creighton was killed in the Inner Harbor area of Baltimore by a single stab wound to the neck.

R.60(d) Mot., Ex. 2 at 1, ECF No. 579-1.

Baltimore Police soon learned that Creighton had died during an argument between two

groups of young men over a group of young women. *Id.* at 3. One of the groups of men consisted

of Creighton and his friends Clarence White and David Bishop. *Id.* The other group comprised

Kevin Miller, twin brothers Kevin and Keith Scott, and Victor Gloria. Witnesses described all

four men in Miller's group as African-American, or multi-racial – in Gloria's case, half African-

American half Puerto Rican. *See* R.60(d) Mot., Ex. 8 at 7, ECF No. 579-1.Various witnesses

described Gloria as well as the Scott twins as "light skinned", and Miller as "brown skinned" or

"dark skinned." R.60(d) Mot., Ex. 6 at 3, Ex. 8 at 7-8, 10, ECF No. 579-1. Miller was described as around six-feet tall; Gloria was described variously as between 5'7" and six feet. R.60(d) Mot., Ex. 2 at 4, Ex. 10 at 12, Ex. 11 at 8, ECF No. 579-1.

The trouble in the Inner Harbor began when Creighton's group attempted to strike up conversation with a group of three young women, which consisted of sisters Barbara and Charnetta Bailey, and their friend Erica Jones. R.60(d) Mot., Ex. 9 at 1, Ex. 10 at 2, ECF No. 579-1. The women, who knew nobody in Creighton's group, were not interested. *Id.* Shortly thereafter, the women began talking with Gloria's group, whom they also had not known previously. *Id.* Creighton apparently became angry that the young women were talking to members of Gloria's group given that they had no interest in talking to Creighton's group. *Id.* As a result, Creighton began yelling at the women and Gloria's group. *See* R.60(d) Mot., Ex. 6 at 2, ECF No. 579-1.

An altercation ensued. Someone in Gloria's group punched Creighton in the neck, apparently with a knife or sharp object of some kind, striking Creighton's carotid artery. More punches may or may not have been thrown; other people may have fought one another; members of Gloria's group ran away shortly thereafter and Creighton soon died of his wound.

The Baltimore Police Department ("BPD") began to investigate, interviewing White and Bishop (the victim's friends) on the night of the shooting. Handwritten notes in the police file indicate that White described how, once the altercation began, a man with "light skin" swung at Creighton, at which point Creighton "grabbed his neck and was bleeding bad." R.60(d) Mot., Ex. 5 at 2, ECF No. 579-1. In contrast, Bishop, in a taped interview hours after the killing, told how a 5'11" man with "dark skin" punched Creighton in the neck, and a man with "light skin" punched him in the head. R.60(d) Mot., Ex. 7 at 1-2, ECF No. 579-1.

About a week later, on July 29, BPD Detective Robert Patton interviewed Barbara Bailey. From her conversations with the two groups of men, Bailey knew their first names. R.60(d) Mot, Ex. 8 at 2, ECF No. 579-1. Bailey said that before the altercation took place, Gloria in fact ran away. *Id*. at 3. She said she was walking away from the group but turned around when the men began fighting and saw Miller, whom she described as dark skinned, punch the victim. *Id*. at 3-4. She did not realize that the victim had been stabbed, but said she did see blood all over his shirt. *Id*. at 4.

On August 12, Detective Patton interviewed Charnetta Bailey. She also said that before the victim was stabbed, Gloria had run off. R.60(d) Mot., Ex. 9 at 3, ECF No. 579-1. She indicated that she saw Miller and the victim circling each other as if they were going to fight but turned around before any punches were thrown. *Id*. She said she turned back and saw blood, and described how Miller then boasted of having beaten Creighton. *Id*. She, too, did not realize the victim had been stabbed. *Id*. at 5.

In mid-November, the BPD showed a photographic line-up to Bishop and the Bailey sisters, all of whom identified the Scott twins as part of Gloria's group. Govt.'s Resp. R. 60(d) Mot. ("Govt.'s Resp."), Ex. 5 at 1, Ex. 6 at 1, ECF Nos. 585-5, 585-6. The BPD arrested the Scott twins on February 2, 1999. R.60(d) Mot., Ex. 3 at 2, ECF No. 579-1.

The Scott twins both stated that it was Gloria who stabbed Creighton, although they, too, did not initially realize that Creighton had been stabbed. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. The Scott twins both said that Creighton approached Miller as though he was going to throw a punch, at which point Gloria punched Creighton in the neck and then ran away. R.60(d) Mot., Ex. 10 at 7-10, Ex. 11 at 4-7, 11, ECF No. 579-1. Both said neither they nor Miller exchanged blows with Creighton. *Id.* The Scott twins also indicated that they knew

-9-

from the news that he knew Gloria at that time had been incarcerated in connection with the murder of three women in Prince George's County. R.60(d) Mot., Ex. 10 at 11, Ex. 11 at 11, ECF No. 579-1. Keith Scott further indicated that Gloria had been arrested with Willis Haynes, whom Keith knew. R.60(d) Mot., Ex. 10 at 11-12, ECF No. 579-1.

At some point in their investigation, the BPD began discussing the case with federal authorities involved in the *Higgs/Haynes* Murder investigation and trial. The BPD file contains a handwritten note dated February, 2, 1999 – the same day the Scott twins identified Gloria as Creighton's killer. That note listed the names of Detectives Rydi Abt and Joseph Green of the United States Park Police, along with Detective Green's office and pager numbers. R.60(d) Mot., Ex. 14, ECF No. 579-1. It also lists the number for the Park Police Criminal Investigations Bureau. *Id.* Immediately under the names and telephone numbers was the following notation: "Jan '96 – 3/B/F victims shot to death on BW Pkwy." *Id.* Under that notation is the notation "Dec '98 – 3 arrest made," followed by the names of Haynes, Higgs and Gloria, along with other identifying information. *Id.*

On that date, February 2, 1999, Detective Green retrieved a photographic line-up previously created by the Park Police, which included pictures of Gloria, and provided it to the Baltimore Police. R.60(d) Mot., Ex. 15, ECF No. 579-1. The police file also contained a complaint dated September 9, 1996 in which the complainant alleged that Gloria had thrown a rock at his face and pulled a knife on him outside an Applebee's restaurant in College Park, MD. R.60(d) Mot., Ex. 14, ECF No. 579-1.

The police file also contained a handwritten note dated February 10, 1999, which included the notation: "Case Agent for Victor Gloria S/A Brad Shaefe FBI Calverton Office." R.60(d) Mot., Ex. 16, ECF No. 579-1. Several additional, undated, handwritten notes contained

-10-

the names of Detectives Green and Abt, along with telephone numbers and information relating to the *Higgs/Haynes* Murders. *Id.*; R.60(d) Mot., Ex. 17, Ex. 18, ECF No. 579-1. One such note contained directions to the U.S. Park Police Headquarters. R.60(d) Mot., Ex. 20, ECF No. 579-1.

On March 19, 1999, Detective Patton showed Barbara and Charnetta Bailey photographic line-ups of Gloria and Miller. Barbara Bailey could not identify either man. Govt.'s Resp., Ex. 12 at 1, ECF No. 585-12. Charnetta Bailey identified Miller but not Gloria. Govt.'s Resp., Ex. 13 at 1. As for Miller, Charnetta Bailey identified him as one of four suspects involved in the homicide.[3] *Id.*

On April 7, 1999, the BPD arrested Miller. R. 60(d) Mot., Ex. 12 at 1, ECF No. 579-1. Although some details of his testimony differed from that of the Scott twins, Miller also said that Gloria punched Creighton and then ran away. *Id.* at 5-6. Miller said that he himself then threw a punch at one of Creighton's friends, but never hit Creighton. *Id.* Miller denied stabbing Creighton and said he did not realize when he began fighting that Creighton had been stabbed, and that it was only when the Scott twins called him after their arrest and "told him everything" that he learned about the stabbing. *Id* at 6. Miller told Detective Patton that he had talked with the Scotts at least three times since they were arrested because they wanted him to "be their witness" and give them some "lawyer money." *Id.* at 15. Miller also said he received a letter from the Scotts while they were in jail, and talked to their girlfriends. *Id.* at 16. He said he talked with the Scotts about the case over the phone, and described how "their girlfriends told me everything about their statements and stuff." *Id.*

---

[3] In its brief, the Government quotes Charnetta Bailey as saying, presumably at the photographic line-up interview, in reference to Miller: "[H]e looks like the guy who may have had the knife." Govt.'s Resp. at 14-15, ECF No. 585. However, the exhibit to which the Government cites (Govt. Ex. 13) contains no such quote. Nor can the Court find it in any other exhibit parties have provided.

The BPD file also contained a handwritten note dated one week later, August 14, 1999, the author of which was Mark Cohen, then chief homicide prosecutor in the Baltimore City State's Attorney's Office[4]. The note read as follows:

Bobby,

　　　　Re Victor Gloria

1 I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilty to AAF in triple murder case + that his plea agreement is sealed. The two Co-[Defendants] Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt. Co-[Defendant].

2 AUSA Johnston states that it is possible that Co-[Defendants] – Scott, Scott + Miller are blaming Gloria because they are friends of [Defendants] in her case especially Haynes. She suggested we talk to

　　　　(1) Joe Green Park Police B - [phone number]

　　　　(2) Brad Sheafe - FBI B - [phone number]

　　　　- They could give us background on case

3 After we talk to these officers, we will decide on next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case.

4 Please call me

Mark Cohen

R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1.

Further, the BPD file contained a progress report dated April 21, 1999 prepared by Detectives Patton and Kirk Hastings, addressed to the commanding officer of the Homicide Unit. Like the Cohen note, it indicated contact between state and federal authorities regarding the Creighton murder investigation. The report read as follows:

---

[4] It is unclear exactly from the record to whom this note was addressed. But given that it was found in the BPD's investigative file and was addressed to "Bobby," quite probably it was meant for Robert Patton, the lead BPD detective on the Creighton case.

-12-

**A-452**

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder. Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.l.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted [sic] to testify against his co-defendants, Willis Haymes [sic] and Dustin Higgs who are reportedly are [sic] close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory [sic] punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.

This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria In the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed [sic] to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria,

Your Investigators along A.S.A Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

-13-

**A-453**

> In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.
>
> In addition A.S.A Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.
>
> On the 21st of April 1999 your Investigator In concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview. Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and staled that their attorney's [sic] told them not to talk to the Police and to stand by their original statements.
>
> Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.
>
> Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

R.60(d) Mot., Ex. 22 at 1-2, ECF No. 579-1.

On June 8, 1999, over a month after Detective Patton wrote his report, the BPD showed Bishop (Creighton's friend who was with him the night of the murder) photographic line-ups. Bishop identified Miller as the person who stabbed the victim. Govt.'s Resp., Ex. 17 at 1, ECF No. 585-17. He did not identify Gloria. Govt.'s Resp., Ex. 18, ECF No. 585-18.

Then, on June 11, 1999, the BPD showed White (who also was Creighton's friend and with him the night of the murder) photographic line-ups of Miller, Gloria and the Scott twins.

-14-

Govt.'s Resp., Ex. 19 at 1, ECF No. 585-19. White also identified Miller, who he said "looks like the person who stabbed" the victim. R.60(d) Mot., Ex. 6 at 5, ECF No. 579-1. White did not identify Gloria. Govt.'s Resp., Ex. 21 at 1, ECF No. 585-21. White also identified Kevin and Keith Scott as having been present when the murder occurred. Govt.'s Resp., Ex. 20 at 1-2, ECF No. 585-20. When the BPD interviewed White on the night of the murder (about a year before this line-up), he had described the man who had swung at Creighton as having "light skin." But in an interview apparently simultaneous with the line-up, White – at that point 16 years old – described the assailant as having dark skin. R.60(d) Mot., Ex. 6 at 1-3, ECF No. 579-1.

Five days later, the BPD re-interviewed the Scott twins and administered a polygraph examination, which both twins "failed." The BPD file contains a report written by Detective Patton that same day addressed to the commanding officer. It read in part:

> On the 16th of June 1999 at 0900 hours and in furtherance of the captioned investigation. Your Investigators obtained the appropriate legal documents and transported Keith and Kevin Scott from the Baltimore City Detention Center to the Homicide office. Your Investigators planed [sic] to initiate a marathon interrogation initiative and administer polygraph examination on both suspects.
>
> Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.
>
> Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements they made no reference to Victor Gloria. Prior to the polygraph examination your investigators interviewed the Scott brothers in an effort to determine if there was any changes in their original statements.
>
> Your Investigators ultimately found that both suspects continue to maintain that Victor Gloria was the stabber and was the only person who engaged the victim in altercation. At this point we initiated the polygraph examination starting with Keith Scott. Keith Scott was then moved to the polygraph examination room where Detective J.T. Brown initiated the polygraph examination.

Your Investigators will note that while Keith was taking the polygraph examination your Investigators continued the interrogation of Kevin Scott. After an extensive examination Det. Brown reported that Keith Scott was given the examination a total of three times and ultimately failed all three examinations. At this point, Kevin Scott was then taken to the polygraph examination room and Keith Scott was moved back to the Homicide office.

In reference to Kevin Scott he was ultimately given the same number of examinations and also failed each examination. Your Investigators will note that while Kevin Scott was in the polygraph room your Investigators continued the interrogation of Keith Scott and were ultimately unable to rehabilitate him. Kevin Scott was ultimately moved back to the Homicide office where your investigators continued the interrogation that ultimately yielded the same results. Your investigators will note that the entire process encompassed several hours of comprehensive interrogation and interview, which ultimately had negative results. At conclusion the Scott brothers were transported back to B.C.D.C. with their conspiracy intact.

A month or so later, on July 18, 1999, the Scott twins and Miller were indicted on charges of first-degree murder. R.60(d) Mot., Ex. 23 at 1, Ex. 24 at 1, ECF No. 579-1. On August 30, 1999, the Scott twins pleaded guilty to second-degree assault, and were sentenced to time served (about seven months). R.60(d) Mot., Ex. 25 at 1, Ex. 26 at 1, ECF No. 579-1.

Miller pleaded guilty in state court to second-degree murder on October 18, 1999, and received a sentence of twenty years with all but five years suspended. R.60(d) Mot., Ex. 27 at 1, ECF No. 579-1. This five-year sentence was made concurrent to any other sentence, with credit for time served. R.60(d) Mot., Ex. 28 at 1, ECF No. 579-1. Miller was also given three years of probation upon release. *Id.* The judge who sentenced Miller, Judge William Quarles (then a judge for the Circuit Court for Baltimore City and later of the U.S. District Court for the District of Maryland) explained his departure from the state guideline range in the following terms: "[M]uddled factual statement leaves few things clear: someone died and the Def. was involved." *Id*. Miller did not serve his full five-year term; he was released from prison in July 2002, three years and three months after he was first arrested. R.60(d) Mot., Ex. 30 at 1, ECF No. 579.

Nothing in the BPD file indicates that Gloria was ever charged in connection with Creighton's murder, or that BPD investigators spoke with Gloria at any point during their investigation, or that the investigators made any sort of arrangement with the AUSA not to charge Gloria as part of an overall deal to get Gloria to testify against Higgs in the present case.

## II.

### The Pending 60(d) Motion

Based on this allegedly newly discovered evidence, Higgs has filed a Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and Federal Rule of Civil Procedure 60(d), asking the Court to set aside its decision denying his Motion to Vacate pursuant to § 2255 because of alleged "fraud on the court."[5] R.60(d) Mot., ECF No. 579. He also filed a Renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery. Pet.'s Mot. Disc., ECF No. 580.

Higgs argues that the Government, through AUSA Johnston, made fraudulent assertions to the Court in its Response in Opposition to his Motion to Vacate regarding the extent of the connection between the federal murder investigation involving Gloria and the BPD's murder investigation. Specifically, Higgs alleges the Government committed fraud on the court by

---

[5] Higgs argues, and the Government does not dispute, that his motion is not barred by the prohibition on "second or successive" § 2255 petitions absent appellate court permission. *See* 28 U.S.C. § 2255(h).  In support, he cites the Supreme Court's decision in *Gonzalez v. Crosby*, 545 U.S. 524 (2005), which held that if a Rule 60(b) motion "attacks . . . the integrity of the federal habeas proceedings," rather than the outcome of those proceedings, it is not a habeas corpus application and does not require pre-filing authorization. *See id.* at 532 ."[F]raud on the federal habeas court," the Supreme Court suggested, would be an example of a defect in the integrity of proceedings. *Gonzalez*, 545 U.S. at 532 n.5; *see also United States v. Williams*, 790 F.3d 1059, 1088 n.11 (10th Cir. 2015) (suggesting ADEPA does not limit court's power to correct fraud on initial habeas court because, in such a case, "the petitioner may not have had a fair opportunity to challenge the merits of his conviction in the first habeas proceeding"). *Gonzalez* specifically limited its discussion to § 2254 cases, and not § 2255 cases such as the one before the court. However, the Fourth Circuit has applied *Gonzalez* to Rule 60 petitions seeking to reopen § 2255 proceedings. *See United States v. McRae*, 793 F.3d 392, 397 (4th Cir. 2015). Given that *Gonzalez* applies to § 2255 in this Circuit, and that Higgs's Motion ostensibly attacks the integrity of the § 2255 proceedings (because he alleges misrepresentation by an officer of the court) the Court agrees with Higgs that his Motion is not barred by the "second or successive" rule.

-17-

denying that federal officials knew about or had any influence with respect to benefits supposedly conferred on Gloria by the local authorities in Baltimore. R.60(d) Mot. at 2. In other words, Higgs claims, the Government knew his allegation that Gloria avoided murder charges in exchange for his testimony was supported by hard facts, but "made false representations to this Court during the § 2255 litigation in order to prevail." *Id*. at 2-3, 24. Higgs argues the Government's alleged misrepresentations "induced the Court to rule that Higgs's constitutional claim failed," and that it is "difficult to envision the Court making such rulings had it been presented with the arguments and evidence contained in this motion during the pendency of the § 2255." *Id.* at 24.

The Government responds that Higgs has failed to show fraud on the court, Govt.'s Resp. R.60(d) Mot. ("Govt.'s Resp.") at 20-24, ECF No. 585, arguing as follows: The evidence contained in the BPD's investigation file most likely shows the BPD did not charge Gloria because the BPD did not believe he was guilty; consequently Higgs has failed to prove Gloria was not charged for the Creighton murder in consideration of his testimony in the *Higgs/Haynes* murder trial. If Higgs cannot prove there was consideration to Gloria, Higgs also fails to prove that the Government's denial of that consideration during the § 2255 proceedings was in any way false or misleading. And if there is no misrepresentation to the Court by the Government, the Government argues, there was no fraud on the court as Higgs alleges. *See id*. The Government also attacks Higgs for allegedly failing to prove by clear and convincing evidence that the Government employed a "deliberately planned and carefully executed scheme" to defraud the Court. *Id*. at 24-25. Moreover, the Government argues, even if Higgs has proved a deliberate plot to mislead the Court – which the Government vigorously denies – he has not shown that the alleged deception was material to the Court's ruling on his § 2255 Motion. *Id*. at 26.

## III.

## Rule 60(d)

The bar Higgs has set himself in bringing a motion under Federal Rule of Civil Procedure 60(d) is a high one. *See Fox v. Elk Run Coal Co.*, 739 F.3d 131, 136-37 (4th Cir. 2014). Ordinarily when a party believes its opponent has obtained a court ruling by fraud or misrepresentation, it may move for relief under Federal Rule of Civil Procedure 60(b)(3) within one year of the judgment. *See* Fed R. Civ. P. 60(b)(3), (c). This one year limit "balances the competing interests of relieving an aggrieved party from the hardships of an unjustly procured decision against the deep 'respect for the finality of judgments . . . engrained in our legal system.'" *Fox*, 739 F.3d at 135 (alteration in original) (quoting *Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters*, 675 F.2d 1349, 1354-55 (4th Cir. 1982)). But "as often happens with a rule, there is an exception," *Fox*, 739 F.3d at 135. Accordingly, under Rule 60(d̲), a court is empowered to "set aside a judgment for fraud on the court" after more than one year has passed. Fed. R. Civ. P. 60(d)(3). However, because fraud on the court is a "nebulous concept" it "should be construed very narrowly" lest it swallow Rule 60(b̲)(3) entirely. *Fox*, 739 F.3d at 136 (citing *Great Coastal*, 675 F.2d at 1356).

Fraud on the court is therefore "not your garden-variety fraud." *Fox*, 739 F.3d at 135 (internal quotation marks and citations omitted). It is confined to "the most egregious cases," such as "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal*, 675 F.2d at 1536; *see also Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 986 (4th Cir. 1987) (indicating that fraud on the court involves "corruption of the judicial process itself" (quoting *In re Whitney-Forbes*, 770 F.2d 692, 698 (7th Cir. 1985))). Fraud on the

court requires an "intentional plot to deceive the judiciary," and must "touch on the public

interest in a way that fraud between individual parties generally does not." *Fox*, 739 F.3d at 136.

The Fourth Circuit has held that a petitioner must also establish that the fraud was

material to the disposition of the proceedings he or she wants reopen in order to be entitled to

relief. *United States v. MacDonald*, No. 97-7297, 1998 WL 637184, at *2 (4th Cir. Sept. 8,

1998) ("Our decision in *Great Coastal Express* requires that MacDonald at least establish that

the fraud was material and deliberate."); *accord United States v. Estate of Stonehill*, 660 F.3d

415, 454 (9th Cir. 2011) (holding no fraud on the court because "[a]ny misrepresentations or

false statements made by government witnesses or attorneys were on largely tangential issues

and did not substantially undermine the judicial process by preventing the district court or this

court from analyzing the case"); *Apotex Corp. v. Merck & Co.*, 507 F.3d 1357, 1360 (Fed. Cir.

2007) (holding fraud on the court requires "material subversion of the legal process").[6]

Lastly, to prevail on a Rule 60(d) motion, the petitioner must prove fraud on the court by

"clear and convincing evidence." *See United States v. MacDonald*, No. 97-7297, 1998 WL

637184, at *2 (4th Cir. Sept. 8, 1998) (citing *Square Const. Co. v. Wash. Metro. Area Transit*

---

[6] That said, at least two Fourth Circuit panels prior to *MacDonald* held that a party seeking relief under Rule 60(b)(3) for fraud, misrepresentation, or misconduct need not show that newly obtained evidence would have altered the outcome of the final judgment. *Shultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994) (holding new evidence need not be "result altering" to entitle the petitioner to relief under Rule 60(b)(3) because the rule "focuses not on erroneous judgments as such, but on judgments which were unfairly procured." (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988))); *Square Const. Co. v. Wash. Metro. Area Transit Auth.*, 657 F.2d 68, 72 (4th Cir. 1981) ("Setting aside a judgment under FRCP 60(b)(3) does not require that the material withheld be sufficient to alter the district court's judgment."). In contrast to both these cases, the defendant's motion in *MacDonald* was brought under a previous "savings clause" of Rule 60(b), which contained substantively identical language regarding fraud-on-the-court claims and was incorporated into Rule 60(d) in 2007. *See* Fed. R. Civ. P. 60(b) (1987) (amended 2007) (providing that "[t]his rule does not limit the power of the court . . . to set aside a judgment for fraud on the court"). Given that *MacDonald* came later in time and decided a motion, like this one, alleging fraud on the court, the Court follows *MacDonald* in holding that the petitioner must show materiality. This also seems more consistent with the strong policy in favor of finality of judgments, and the high bar defendants accordingly must meet to disturb a years-old final judgment under Rule 60(d). *See, e.g., United States v. Beggerly*, 524 U.S. 38, 47 (1998) (cautioning that independent actions under Rule 60 should be available "only to prevent a grave miscarriage of justice"); *Great Coastal*, 675 F.2d at 1355 ("Respect for the finality of judgments is deeply engrained in our legal system."); *Fox*, 739 F.3d at 136-37 (noting that proving fraud on the court presents a very high bar for any litigant).

-20-

*Auth.*, 657 F.2d 68, 71 (4th Cir. 1981) ("A party seeking relief under [Rule 60(b)(3)] must also prove the misconduct complained of by clear and convincing evidence.")); *Herring v. United States*, 424 F.3d 384, 386-87 (3d Cir. 2005) (requiring fraud on the court to be proven by "clear, unequivocal and convincing evidence" (internal quotation marks and citation omitted)); *see also Booker v. Dugger*, 825 F.2d 281, 284 n.4 (11th Cir. 1987) ("It is clear that the policy of finality of judgments requires the same, if not more stringent, standards [than the Rule 60(b)(3) clear and convincing evidence standard] be applied to independent actions alleging fraud on the court which are brought after the one year limit has run.")).

## IV.

In the case at bar, the Court finds that Higgs has failed to prove by clear and convincing evidence, first, that the Government in any sense committed fraud on the court by denying that Gloria received consideration from Baltimore city prosecutors in the Creighton murder case; and second, that the Government engaged in an intentional plot to deceive the Court during § 2255 proceedings; and third, even assuming the factual accuracy of Higgs's allegations, he has failed to establish that evidence of benefits to Gloria beyond those already disclosed to the defense would have made a material difference to the outcome of § 2255 proceedings.

### A. The Government's Alleged Fraud

Higgs grounds his claim of fraud on the court in certain assertions the Government made during the § 2255 proceedings. Specifically, he argues, the Government denied the existence of any consideration flowing to Gloria in the Creighton murder investigation in exchange for Gloria's cooperation in the Higgs and Haynes trials, despite knowing that in fact such consideration existed.

-21-

To support his claim, Higgs relies primarily on two documents in the BPD's investigative file that supposedly demonstrate direct, two-way communication between Baltimore authorities and AUSA Johnston regarding the Creighton murder. Thus, he points to a phone-message note dated April 12, 1999 from Baltimore City ASA Cohen and likely to Detective Robert Patton, in which Cohen explains that he spoke to Johnston about Gloria, and that she suggested the Scott twins might be falsely implicating Gloria. According to the message note, Johnston then suggested that Baltimore authorities should talk to the Park Police and FBI because they "could give us background on the case." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1. Cohen then wrote that "[a]fter we talk to these officers, we will decide on the next course of action, that is, either writ Gloria + charge him or talk to his lawyer about the case." *Id.* Higgs submits that it is hard to imagine what "background" the Government could have provided to state authorities that would have aided them in their deliberations, and that the "only logical conclusion" is that the "background" must have consisted of the Government informing state authorities that Gloria was a vital witness in the Higgs prosecution and that, on that basis, this information influenced state authorities. Pet.'s Repl. Br. at 2.

Higgs argues that Detective Patton's April 21, 1999 investigation report shows that the BPD embraced AUSA Johnson's version of events, further proving that federal intervention had a direct impact on Gloria not being charged. Patton wrote that:

> The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott Brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during [the] course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes [sic] and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and plan[n]ed to testify against Hymes [sic] and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1, and added that "[y]our Investigators along with A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption." *Id.* Higgs also notes that, according to Patton's report, AUSA Johnston told Baltimore authorities that Gloria was due to testify against Higgs and Haynes, despite Johnston apparently telling Cohen nine days earlier that she could not reveal whether Gloria would testify, as his guilty plea was under seal.

Higgs suggests that considering this evidence in light of other facts – namely the Scott twins' and Miller's testimony that Gloria fought with Creighton; the testimony of Clarence White, Creighton's friend, from the night of the murder that a "light skinned" man swung at Creighton, causing him to grab his neck and leaving him badly bleeding; Gloria's previous involvement in violent criminal activity; and the various notes indicating police contact with Park Police and FBI and interest in the *Higgs/Haynes* murders – the "only plausible explanation" for the BPD's apparent failure to charge or even interview Gloria in connection with the Creighton murder was that the BPD "did not want to disrupt their federal colleague's prosecution of a capital triple homicide." Pet.'s Repl. Br. at 4. Since the evidence shows Gloria received lenient treatment in the Creighton case because of his cooperation in the Higgs case, Higgs argues, the Government's denial of that lenient treatment during § 2255 proceedings constituted fraud on the court.

The Government responds that Higgs has failed to establish any false statements by AUSA Johnston during § 2255 proceedings. Govt.'s Resp. at 25. In the Government's view, the BPD files show that local authorities conducted a thorough, independent investigation of the Creighton homicide, and decided not to charge Gloria not in response to a federal request, but based on their own independent review of the evidence. *Id.* at 20. Since the files fail to show Gloria was spared murder charges because of his cooperation, the Government's denial of lenient treatment during § 2255 proceedings was not a false statement. *Id.* at 24.

As noted, to prevail on his 60(d) Motion, Higgs must prove by clear and convincing evidence that the Government's § 2255 response to this Court fraudulently denied the fact that Baltimore authorities decided not to charge Gloria at the behest of the federal prosecutors. He has not done so. On the contrary, it is far more likely, as the Government has it, that throughout its investigation the BPD suspected Miller, not Gloria, was Creighton's killer, and that the Baltimore City State's Attorney's Office ultimately chose not to prosecute Gloria because of the lack of evidence that he was involved, especially in the face of strong evidence pointing to Miller. *See United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014) (holding that "clear and convincing" evidence must render factual determination "highly probable" and produce a "firm belief or conviction" as to the truth of the allegations being sought to be established).

Again, before Baltimore authorities discussed the case with AUSA Johnston, three eyewitnesses with no obvious motive to lie to police independently identified Miller as the likely murderer (two doing so by name), and all three suggested Gloria was not even involved in the altercation. On July 19, 1998, one day after the murder, Creighton's friend Bishop told police that three men[7] were involved in the fracas, a "dark skinned man" (a description consistent with Miller and inconsistent with Gloria) and two men who "looked like brothers." R.60(d) Mot., Ex. 7 at 3, ECF No. 579-1. Bishop also described how the dark-skinned man struck Creighton and "cut him with something in his neck." *Id.* at 2. Just over a month later, Barbara Bailey claimed Gloria had run off before the fight, and described how she then saw Miller punch Creighton leaving him with blood all over his shirt. Less than a month after that, Charnetta Bailey gave a

---

[7] It is also worth noting that the first officer report on the homicide, dated July 18, 1998, reported that the victim "had been engaged in a[n] argument and altercation with *three* unidentified black males." R.60(d) Mot., Ex. 2, ECF No. 579-1. Later testimony indicating Gloria fled before the fight is consistent with this initial report; quite possibly, then, this would have made the BPD more inclined to believe the fight involved Miller, the Scott twins, and Creighton (the Baileys', Bishop's and White's version) and not Gloria, Miller, the Scott twins, and Creighton (the Scotts' and Miller's story).

similar account: Gloria ran off before the fight; Miller struck Creighton; and Creighton had blood on his neck.[8] Then, in March 1999, the police showed Charnetta Bailey photographs of Gloria and Miller, and she reportedly "without hesitation" identified Miller as being involved in the homicide, and failed to identify Gloria at all. Govt.'s Resp., Ex. 13 at 1, ECF No. 585-13. All these interviews took place before April 12, 1999 – the first recorded date of any contact between Baltimore authorities and AUSA Johnston. In marked contrast, the only eyewitness, besides the Scott twins and Miller, whose testimony pointed to Gloria being the murderer was Clarence White, a fifteen-year-old who later gave a conflicting account of the evening. The weight of evidence implicating Miller and exonerating Gloria to this point unquestionably supports the Government's position that the reason Gloria was not charged was because police concluded he was not involved.

Beyond this, it is clear that BPD had reason to doubt the reliability of the suspects' stories independent of the AUSA's input. Miller told Patton during his April 7, 1999 interview that the Scott twins had asked him for money and to be a witness for them, that he discussed the Creighton murder with both Scotts over the phone, that he knew what they had told police through the Scotts' girlfriends, and that he had received a letter from them while they were incarcerated about events the night of the Creighton murder.[9] Knowing this, the BPD had

---

[8] Higgs casts doubt on the Baileys' version of events, noting that they both told police they were walking away when the fight started. According to Higgs, the most straightforward interpretation of the Bailey sisters' statements is that they had their backs turned when Gloria stabbed Creighton, and only turned around in time to see Gloria run away. Pet's Repl. Br. at 9. That may be so, but it is beside the point. The Court's inquiry is not to determine Gloria's actual guilt or innocence, but instead whether the evidence tends to show that the BPD came to their own independent conclusion not to charge Gloria at the time. Both sisters told police that Gloria ran off before the fight, and that Miller struck Creighton. Whether what they said is actually true does not change the fact that police had independent testimony that Gloria had absented himself and Miller struck Creighton and made him bleed. That supports the Government's argument that the BPD's decision not to charge Gloria was based on their own review of the evidence.

[9] Admittedly, Miller equivocated on some of these facts, sometimes in the same breath. *See* R.60(d) Mot., Ex. 12 at 15-17, ECF No. 579-1.

independent reason to doubt the accuracy and reliability of these statements[10] in comparison to the independent statements implicating Miller, again making it more likely that the decision not to charge Gloria was based not on federal intervention, but on the Baltimore authorities' own assessment of strength of the evidence in their case.

The reasonable inference from all the foregoing is that AUSA Johnston's suggestion of collusion among the Scott twins and Miller with regard to their statements merely helped solidify the BPD in their own theory of the case, rather than amounting to federal pressure that changed the course of the Creighton murder probe. Patton's own words in his April 1999 Report say it all: professing his belief that Johnston was "on track with [her] assumption" about the Creighton suspects, Patton told his superiors that his conclusion was supported by "information that Victor Gloria ran from the scene prior to the stabbing" and eyewitnesses who "identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation."[11] R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1. In short, the BPD appears to have had a strong intimation that Miller was the murderer, that Gloria was not involved, and that the Scott twins and Miller were lying.[12]

---

[10] Indeed, in his April 12, 1999 Report, Detective Patton notes that his "assumption" that the suspects' statements were rehearsed was "supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with murder." R.60(d) Mot., Ex. 22 at 1, ECF No. 579-1.

[11] It is not entirely clear to the Court whom exactly Detective Patton is referring to when he speaks of "eyewitnesses" who identified Miller as the stabber from a photo line-up. As far as the record shows, at that point only one person (Charnetta Bailey) had identified Miller from a photo as involved in the homicide. This does not diminish the point, however, that at the time AUSA Johnston discussed the case with the Baltimore authorities, detectives already appeared to have a strong inclination that Miller, and not Gloria, was the murderer.

[12] It seems highly doubtful that AUSA Johnston would have known through the course of the *Higgs/Haynes* investigation that Haynes and Higgs knew the Scott twins and Miller and therefore was able to deduce the Scotts and Miller were conspiring against Gloria on behalf of Haynes/Higgs. There is no indication the Scott twins or Miller were in any way connected to the *Higgs/Haynes* murders, and if Haynes or Higgs were behind that scheme they probably would not say so. As Higgs suggests, then, it seems plausible the AUSA's knowledge of the friendship and theory of the conspiracy came from her questioning Gloria himself about the Creighton murder. But just because the information may have come from Gloria, does not by itself suggest – let alone prove – that the AUSA's divulging it

But there is more. Higgs's claim that the Baltimore authorities failed to charge Gloria so as not to upset the federal murder trial is further undermined by evidence that emerged subsequent to the Baltimore authorities' conversations with AUSA Johnston that strongly links Miller with the murder and casts further doubt on Gloria's involvement. On June 8, 1999, the police conducted a photographic line-up with Bishop, Creighton's friend, who had previously told police the day after the murder that Creighton was cut on the neck by a dark-skinned man. Bishop picked out Miller's photo from the six-man array and identified him as the person who stabbed Creighton, but failed to pick out Gloria from a separate array. Three days later, on June 11, Clarence White told detective Patton that three men were involved in the altercation with Creighton, and that the "brown skinned guy" stabbed him. R.60(d) Mot., Ex. 6 at 2-3, ECF No. 579-1. White also identified Miller from a photo line-up as looking like the person who stabbed Creighton, identified the Scott twins as both being present when the stabbing occurred, and failed to pick out Gloria from a line-up. Moreover, the fact that the Scott twins were later interviewed and both "failed" polygraph tests while maintaining their story implicating Gloria supports the Government's assertions that BPD independently chose to discount their version of events.

Higgs's claims of a quid pro quo between the Baltimore and federal authorities is further undermined by evidence that the BPD continued to treat Gloria as a suspect in the Creighton murder even after discussing the case with AUSA Johnston and even after learning he was to testify in the *Higgs/Haynes* trial. As the Government points out, ASA Cohen was still contemplating charging Gloria at that point, noting in his phone message that "[a]fter we talk to these officers, we will decide on next course of action, *that is, either writ Gloria + charge him or talk to his lawyer about the case*." R.60(d) Mot., Ex. 21 at 1, ECF No. 579-1 (emphasis added).

to state authorities was in some way an attempt to pressure them into dropping charges against Gloria, much less that it had such effect.

-27-

Then, too, in his April 21, 1999 investigation report, Detective Patton tells his superiors what efforts he planned to take to "finally discern who of the *four* listed suspects actually stabbed the victim," R.60(d) Mot., Ex. 22 at 2, ECF No. 579-1 (emphasis added). These statements suggest that the BPD still intended to treat Gloria as a suspect after speaking to the federal prosecutors, and that Baltimore authorities would make their own decision on the matter. What happened subsequently bears this out. In the months after Patton's April 1999 report, the BPD exposed both Bishop and White to photo line-ups containing Gloria's photo. It seems quite improbable that the BPD would go to that effort if it had by that point discarded Gloria as a suspect because of his acknowledged role in the federal case as Higgs claims. Higgs offers no explanation for this. In Detective Patton's follow-up report after re-interviewing the Scott twins, dated June 16, 1999, he continued to list Gloria as a suspect in the murder. Patton Rep. 2, Govt.'s Resp., Ex. 22 at 1, ECF No. 585-22.

Patton's June 16, 1999 Report reflects well the BPD's assessment of the case vis-à-vis Gloria weeks before the Scott twins and Miller were indicted for first-degree murder. Patton wrote that:

> Your Investigators will note that the Scott brothers in concert with Kevin Anthony Miller have conspired together and have given statement[s] implicating Victor Gloria. Your Investigators will note that three independent eyewitnesses have since positively identified Kevin Anthony Miller as the individual who stabbed the above victim.
>
> Those same witnesses are shown photographic arrays, which contained photographs of Victor Gloria and are unable to make an identification and in their statements that make no reference to Victor Gloria.

*Id.* at 2. Once more, the report shows Patton discounting Gloria as a suspect because of the lack of evidence linking him to the murder, in sharp contrast to the relatively strong eyewitness evidence implicating Miller. Patton appeared unwilling to believe the Scotts' and Miller's story

-28-

**A-468**

implicating Gloria, finding it self-serving and inherently suspicious, and in conflict with eyewitness testimony, all of which pointed to Miller striking Creighton and none of which unambiguously put Gloria at the scene during the fight. Patton had a particular reason to disbelieve their testimony because they had just "failed" a lie-detector test.

Higgs's argument suffers from other deficiencies as well. He does not sufficiently explain why state officials would have agreed to allow a murderer, which Higgs implies Gloria was, to escape prosecution and return to the streets just so the federal government could prosecute another set of defendants in an apparently unrelated case that did not take place in Baltimore. Higgs's response that the difficulty of the Creighton investigation somehow explains the BPD's willingness to help federal counterparts cuts no ice. Further, there is no evidence in the record showing federal authorities requested, urged, or even knew of the alleged lenient treatment of Gloria by Baltimore authorities. Higgs simply asks the Court to infer this from an alleged follow-up phone call in which state authorities purportedly sought "background" on the federal case at AUSA Johnston's suggestion.[13] This is clearly insufficient to sustain the high burden of proof required to grant a Rule 60(d) motion. *See, e.g.*, *Apotex*, 507 F.3d at 1360-61 ("[Fraud-on-the-court] requires rigorous proof, as do other challenges to final judgment, lest the finality established by Rule 60(b) be overwhelmed by continuing attacks on the judgment.").

The Court has no trouble concluding that Higgs has failed to meet his "very high bar" of showing by clear and convincing evidence that Gloria received leniency in the Creighton case in exchange for his testimony in the federal trial. *See Fox*, 739 F.3d at 136-37; *see also Herring*,

---

[13] Recall that ASA Cohen's note contained names and phone numbers for the FBI and U.S. Park Police, along with instructions that its recipient call them for "background on the case" before deciding whether to charge Gloria. There is no direct evidence in the record, however, that anyone made these calls.

424 F.3d at 390 (employing a "demanding standard" for independent actions alleging fraud on the court). There was no fraud on the Court during § 2255 proceedings.[14]

It is therefore unnecessary to discuss at length the issue of materiality of the Government's supposed fraud. If there was no fraud, as the Court finds here, materiality is a moot point. Suffice it to here reiterate what the Court said when ruling on Higgs's § 2255 Motion:

> Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. ***In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict***.

*Higgs III*, 711 F. Supp. 2d at 508 (emphasis added).

## V.

### Higgs's Discovery Motion

In company with his Rule 60(d) Motion, Higgs asks the Court to order the Government to turn over all evidence in its possession relating to the Baltimore authorities' investigation of Creighton's murder, and grant a discovery request the Court previously denied. *See* Pet.'s Mot. Disc. at 2-4, ECF. No. 580. Although he does not clearly articulate whether he seeks discovery to

---

[14] Furthermore, to the extent Higgs claims the Government intentionally deceived the court, his claims necessarily fail because, as the Court finds, he has failed to establish that any statement by the Government in connection with § 2255 proceedings was deceitful or fraudulent. See *Great Coastal*, 675 F.2d at 1356 (holding that petitioner must prove "deliberately planned and carefully executed scheme to defraud" the court (quoting *Hazel-Atlas Glass*, 322 U.S. at 245-46)); *see also Fox* 739 F.3d at 136 (holding fraud on the court requires "an intentional plot to deceive the judiciary").

supplement the record in relation to his Rule 60(d) Motion, or proceeds under the assumption that the Court will revisit his § 2255 claim, either way, the Court declines to grant the request.

Rule 60(d) has no discovery provision, and Higgs offers no cases, and the Court has found none from this circuit, to support his request for such discovery. The First Circuit in *Pearson v. First NH Mortg. Corp.* has held that courts may consider such a request in the Rule 60(d) context and exercise its discretion to permit discovery "once the record evidence demonstrates a 'colorable' claim of fraud [on the court]." *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 (1st Cir. 1999). And a "colorable" claim has been defined as one "appearing to be true, valid, or right." *Bowie v. Maddox*, 677 F.Supp.2d 276, 285 (D.D.C. 2010) (applying *Pearson* to reject discovery request in context of fraud-on-the-court motion because plaintiff presented only "bare allegations and evidence that points to the mere possibility of fraud on the court" and nothing that "makes his claim appear to be true").

The Sixth Circuit in *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.* has held that a litigant seeking discovery to prove fraud-on-the-court claims must first "present some proof to establish" its charges. 536 F.2d 1115, 1122 (6th Cir. 1976); *see also Jones v. Ill. Central R.R. Co.* 617 F.3d 843, 853 (6th Cir. 2010) (holding, with minimal analysis, that under *H.K. Porter* a district court entertaining a discovery request under Rule 60(d) may "require the moving party to make some evidentiary showing of fraud before granting post-trial discovery or an evidentiary hearing"). The court stressed that "a request for discovery for the purpose of attacking a final judgment involves considerations not present in pursuing discovery in a pending action prior to a judgment," chief among them "the public interest of the judiciary in protecting the finality of judgments." *H.K. Porter Co.*, 536 F.2d at 1118. District courts applying *H.K. Porter* have required a prima facie showing of likely success on the merits of the fraud-on-the-court claim

-31-

before permitting post-judgment discovery. *See Signtech USA, Ltd. v. Vutek, Inc.*, No. CIVASA-95-CA-0226NN, 1999 WL 33290625, at *2-3 (W.D. Tex. Aug. 9, 1999); *accord Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 646 (N.D. Cal. 1978) ("The question then is whether [the] evidence demonstrates fraud on the court.") *aff'd*, 645 F.2d 699 (9th Cir. 1981)).[15]

But the Court need not adopt one standard or the other for the purposes of Higgs's motion. Under either *Pearson*'s "colorable claim" standard or *H.K. Porter*'s prima facie standard, Higgs has failed to proffer sufficient evidence to support his discovery request.

Alternatively, assuming as the Government does, that Higgs seeks discovery on the condition that his § 2255 Motion is reopened and the Court's judgment set aside, his request would be denied. Since the Court has found no basis to reopen § 2255 proceedings, there is no occasion for discovery.

---

[15] The only case the Court could find in which a district court has permitted discovery in connection with fraud-on-the-court allegations is *Whitmore v. Symons Intern. Grp., Inc.*, No. 1:09–cv–0391, 2011 WL 806624 (S.D. Ind. March 1, 2011). There, a creditor had obtained a $34 million judgment against its debtor, but prior to execution, a third party sued the same debtor for allegedly defaulting on $316 million worth of notes. *Id.* at *1. The debtor consented to a judgment on the entire $316 million before the original $34 million order became executable, and the second creditor thereby took priority over the first. *Id.* The original creditor intervened alleging fraud on the court in the form of collusion between the debtor and the third party. *Id.* Finding the debtor's failure to contest "highly unusual" in light of the high amount of the award and the debtor's historical litigiousness, and noting circumstantial evidence that the parties may not be adverse, the court (albeit with little discussion) found the evidence demonstrated a colorable claim of fraud sufficient to warrant post-judgment discovery. *Id.* at *2. Higgs's case differs from *Whitmore* not only because Higgs has, unlike the petitioner in that case, already obtained considerable evidence to support his motion, but also because the evidence he does present does not (for all the reasons explained above) rise to the same level of suspicion as the defendant's failure to contest did in *Whitmore*.

## VI.

### Conclusion

For the reasons stated above, Higgs's Motion for Relief from Final Judgment Pursuant to

*Hazel-Atlas Glass Co.* and Federal Rule of Civil Procedure 60(d) is **DENIED**. Higgs's Motion

for Production of Exculpatory Evidence and Renewed Motion for Discovery is also **DENIED**.

A separate Order will **ISSUE.**


_____/s/_____

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**June 29, 2016**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | Crim. No. **PJM-98-0520** |
| | * | Civ. No. **PJM-05-3180** |
| | * | |
| **DUSTIN JOHN HIGGS,** | * | |
| | * | |
| Petitioner | * | |
| | * | |

## ORDER

Having considered Petitioner Dustin Higgs's Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co.* and Federal Rule of Civil Procedure 60(d), ECF No. 579, and his Renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery, ECF No. 580, and the Government's opposition to these Motions, it is, for the reasons set forth in the accompanying Memorandum Opinion, this 29th day of June, 2016

       **ORDERED**

1. Defendant's Motion for Relief from Final Judgment Pursuant to *Hazel-Atlas Glass Co.* and Federal Rule of Civil Procedure 60(d), ECF No. 579, is **DENIED**; and

2. Defendant's Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery, ECF No. 580, is **DENIED**.

 

                                    **/s/**
                        **PETER J. MESSITTE**
            **UNITED STATES DISTRICT JUDGE**

**A-474**

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

_____
                                                  :
UNITED STATES OF AMERICA,          :        Criminal No. PJM-98-0520
                                                  :
                    Respondent,            :        Civil No. PJM-05-3180
                                                  :
            v.                                   :        Peter J. Messitte, U.S.D.J.
                                                  :
DUSTIN JOHN HIGGS,                    :        Greenbelt Division
                                                  :
                    Petitioner.              :
_____:

**NOTICE OF APPEAL**

     Petitioner Dustin Higgs, by counsel, hereby appeals from this Court's Order, entered June

29, 2016, denying Higgs's motion for relief pursuant to *Hazel-Atlas Glass Co.* and Fed. R. Civ.

P. 60(d), and from each and every subsidiary adverse ruling and finding incorporated therein.

Respectfully Submitted,

/s/ Matthew C. Lawry                   /s/ Stephen H. Sachs
Matthew C. Lawry                       Stephen H. Sachs
Federal Community Defender Office        WilmerHale LLP
    for the Eastern District of Pennsylvania   Five Roland Mews
Curtis Center, Suite 545-West             Baltimore, MD 21210
601 Walnut Street                       (410) 532-8405
Philadelphia, PA 19106              Steve.Sachs@wilmerhale.com
215-928-0520
Matthew_Lawry@fd.org

Dated: August 26, 2016

1

**CERTIFICATE OF SERVICE**

I, Stephen H. Sachs, hereby certify that on this 26th day of August, 2016, I electronically

filed the foregoing notice using the Court's CM/ECF system.  Electronic notice will be provided

to the following individuals:

> James A. Crowell IV
> Sujit Raman
> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Stephen H. Sachs
> Stephen H. Sachs

2

**A-476**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | Crim. No. **PJM-98-0520** |
| | * | Civ. No. **PJM-05-3180** |
| | * | |
| DUSTIN JOHN HIGGS, | * | |
| | * | |
| Petitioner | * | |
| | * | |

## MEMORANDUM OPINION

Following Dustin John Higgs's conviction for the kidnapping and murder of Tanji Jackson, Tamika Black, and Mischann Chinn, a jury concluded that he should receive the death penalty.  His conviction and sentence were affirmed on appeal.  *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) *cert. denied*, 543 U.S. 999, 125 S. Ct. 627, 160 L.Ed.2d 456 (2004). The Court denied Higgs' Motion to Vacate Pursuant to 28 U.S.C. § 2255, *see United States v. Higgs*, 711 F. Supp. 2d 479 (D. Md. 2010). Two years later, Higgs filed a Motion for Relief pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) and Federal Rule of Civil Procedure 60(d). The Court denied the Motion, concluding that Higgs failed to establish even colorable fraud on the Court.  *See United States v. Higgs*, 2016 WL 3541387 (D. Md. June 29, 2016). Higgs then filed his pending Motion for Certificate of Appealability. Because jurists of reason could not find it debatable whether the Court was correct in its procedural denial of Higgs' Rule 60(d) Motion, his Motion for Certificate of Appealability is **DENIED**.

-1-

**A-477**

Rule 11(a) of the Rules Governing § 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Slack v. McDaniel*, 529 U.S. 473, 474 (2000); *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003).

Here, the parties disagree about whether the Court's denial of Higgs' Motion under Rule 60(d) was procedural or on the merits. Accordingly, the parties disagree on the appropriate standard that the Court should apply in considering the Motion for Certificate of Appealability.[1]

For the purposes of § 2255 appeals, the distinction between procedural rulings and rulings on the merits turns on whether the court "reach[ed] the petitioner's underlying constitutional claim." *Slack*, 529 U.S. at 484. In Higgs' Rule 60(d) Motion, Higgs asserted that the Government denied him due process by withholding potentially exculpatory evidence. The Court made no holding on this question. Rather, the Court held that Higgs had not made a sufficient showing of a fraud on the Court to warrant relief under Rule 60(d). *Higgs*, at *1 (D. Md. June 29, 2016) ("Because the Court agrees with the Government that Higgs has failed to establish even a colorable fraud on the Court, his Motion is **DENIED**."). Accordingly, the Court's decision was procedural,[2] and in order for a Certificate of Appealability to be granted, Higgs must show (1) "that jurists of reason would find it debatable whether the petition states a

---

[1] If the denial was on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. If, on the other hand, the denial was procedural, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.
[2] Indeed, arguably the Court had no jurisdiction to "reach the petitioner's underlying constitutional claim," without first granting Higgs' Rule 60(d) Motion because of the bar on "second or successive" habeas petitions absent appellate permission. *See Gonzalez v. Crosby*, 545 U.S. 524 (2005) (Rule 60(b) motion challenging outcome of habeas proceedings requires pre-filing authorization).[2] Thus, the ruling on the Rule 60(d) Motion was necessarily procedural.

-2-

valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

The Court has considered the entire record in the case and finds that Higgs has not made the requisite showing here. Higgs falters on the second prong because he fails to demonstrate that jurists of reason would find it debatable whether the Court was correct in its procedural ruling. To prevail on his Rule 60(d) motion, Higgs would have had to prove fraud on the Court by "clear and convincing evidence." *Higgs*, at *11 (D. Md. June 29, 2016). *See United States v. Antone*, 742 F.3d 151, 159 (4th Cir. 2014) (holding that "clear and convincing" evidence must render a factual determination "highly probable" and produce a "firm belief or conviction" as to the truth of the allegations being sought to be established). But the Court concluded that Higgs failed to demonstrate that the Government committed fraud on the Court in any sense, much less did he offer any suggestion of clear and convincing evidence of fraud. Higgs also failed to indicate, even colorably, that the Government engaged in an intentional plot to deceive the Court during the § 2255 proceedings. Finally, even assuming the factual accuracy of Higgs' allegations, he was unable to establish that the allegedly undisclosed evidence would have made a material difference to the outcome of § 2255 proceedings. As such, no jurist could have found that Higgs proved fraud on the Court by clear and convincing evidence.

Because Higgs cannot satisfy the second prong of the *Slack* test for issuing a Certificate of Appealability for a procedural ruling, the Court need not consider whether jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.[3]

---

[3] In *Slack* the Supreme Court recognized that the "court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Slack* at 485.

The Certificate of Appealability is **DENIED.**

A separate Order will **ISSUE.**


                                                          _____/s/_____

                                                          **PETER J. MESSITTE**
                                                          **UNITED STATES DISTRICT JUDGE**

**November 22, 2016**

**A-480**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| Respondent, | * | |
| | * | |
| v. | * | Crim. No. **PJM-98-0520** |
| | * | Civ. No. **PJM-05-3180** |
| | * | |
| **DUSTIN JOHN HIGGS,** | * | |
| | * | |
| Petitioner | * | |
| | * | |

### ORDER

Having considered Petitioner Dustin Higgs' Motion for Certificate of Appealability, ECF

No. 602, and the Government's opposition thereto, it is, for the reasons set forth in the

accompanying Memorandum Opinion, this 22nd day of November, 2016

**ORDERED**

1. A Certificate of Appealability is **DENIED**; and

2. The Clerk of Court is **DIRECTED** to mail a copy of this Order and the

   accompanying Memorandum Opinion to Petitioner Higgs.

_____
/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**A-481**